## UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE:  THE HONORABLE JANE A. RESTANI, JUDGE

NINGXIA GUANGHUA CHERISHMET
ACTIVATED CARBON CO., LTD. AND JILIN
BRIGHT FUTURE CHEMICALS CO., LTD.,

                  Plaintiffs,

    and

CARBON ACTIVATED TIANJIN CO., LTD. AND
CARBON ACTIVATED CORPORATION,

                  Consolidated Plaintiffs,

    and

BENGBU MODERN ENVIRONMENTAL CO.,      Consol. Court No. 24-00262
LTD., ET AL.,

                  Plaintiff-Intervenors,

      v.

UNITED STATES,

                  Defendant,

    and

CALGON CARBON CORPORATION AND NORIT
AMERICAS, INC.,

                  Defendant-Intervenors.

### RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD OF CARBON ACTIVATED TIANJIN CO., LTD. & CARBON ACTIVATED CORPORATION

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Consolidated Plaintiffs Carbon Activated Tianjin Co., Ltd. and Carbon Activated Corporation (collectively, "Carbon Activated") respectfully move for judgment on the administrative record on the issues raised in their Complaint challenging the U.S. Department of Commerce's ("Commerce") final results of the sixteenth administrative review of the antidumping duty order on certain activated carbon from the People's Republic of China.  *See Certain Activated Carbon From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2022-2023*, 89 Fed. Reg. 92,893 (Dep't Commerce Nov. 25, 2024), and accompanying Issues and Decision Memorandum; *Certain Activated Carbon From the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review; 2022-2023*, 89 Fed. Reg. 104,978 (Dep't Commerce Dec. 26, 2024), and accompanying Ministerial Error Memorandum.

For the reasons set forth in the accompanying memorandum, Commerce's determination is unreasonable, not supported by substantial evidence on the record, and otherwise not in accordance with law.  Accordingly, Carbon Activated respectfully requests that the Court remand to Commerce with instructions to correct the errors identified by the Court and grant such other or further relief that the Court deems just and proper.

Respectfully submitted,

*/s/ David J. Ross*
David J. Ross
Stephanie E. Hartmann
Elizabeth A. Argenti
Wilmer Cutler Pickering Hale and Dorr
    LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6300
Facsimile: (202) 663-6363
Email: david.ross@wilmerhale.com

*Counsel for Carbon Activated Tianjin Co.,*
*Ltd. and Carbon Activated Corporation*

Dated: August 14, 2025

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  THE HONORABLE JANE A. RESTANI, JUDGE**

| | |
|---|---|
| **NINGXIA GUANGHUA CHERISHMET ACTIVATED CARBON CO., LTD. AND JILIN BRIGHT FUTURE CHEMICALS CO., LTD.,** | |
| **Plaintiffs,** | |
| **and** | |
| **CARBON ACTIVATED TIANJIN CO., LTD. AND CARBON ACTIVATED CORPORATION,** | |
| **Consolidated Plaintiffs,** | |
| **and** | |
| **BENGBU MODERN ENVIRONMENTAL CO., LTD., ET AL.,** | **Consol. Court No. 24-00262** |
| **Plaintiff-Intervenors,** | |
| **v.** | |
| **UNITED STATES,** | |
| **Defendant,** | |
| **and** | |
| **CALGON CARBON CORPORATION AND NORIT AMERICAS, INC.,** | |
| **Defendant-Intervenors.** | |

**<u>ORDER</u>**

Upon consideration of Consolidated Plaintiffs Carbon Activated Tianjin Co., Ltd. and

Carbon Activated Corporation's Rule 56.2 Motion for Judgment on the Agency Record, and the

Memorandum in Support of Carbon Activated Tianjin Co., Ltd. and Carbon Activated Corporation's Rule 56.2 Motion for Judgment on the Agency Record, and all other papers and proceedings herein, it is hereby

**ORDERED** that Carbon Activated's motion is granted; it is further

**ORDERED** that the determination of the U.S. Department of Commerce ("Commerce") in *Certain Activated Carbon From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2022-2023*, 89 Fed. Reg. 92,893 (Dep't Commerce Nov. 25, 2024), as amended by *Certain Activated Carbon From the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review; 2022-2023*, 89 Fed. Reg. 104,978 (Dep't Commerce Dec. 26, 2024), is unreasonable, not supported by substantial evidence, and otherwise not in accordance with law; and it is further

**ORDERED** that the matter is remanded to Commerce for further consideration consistent with this opinion.

**SO ORDERED.**

_____
Jane A. Restani, Judge

Dated: _____
       New York, New York

# UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

NINGXIA GUANGHUA CHERISHMET
ACTIVATED CARBON CO., LTD. AND JILIN
BRIGHT FUTURE CHEMICALS CO., LTD.,

                **Plaintiffs,**

    **and**

CARBON ACTIVATED TIANJIN CO., LTD. AND
CARBON ACTIVATED CORPORATION,

                **Consolidated Plaintiffs,**

    **and**

BENGBU MODERN ENVIRONMENTAL CO.,
LTD., ET AL.,

                **Plaintiff-Intervenors,**

        **v.**

UNITED STATES,

                **Defendant,**

    **and**

CALGON CARBON CORPORATION AND NORIT
AMERICAS, INC.,

                **Defendant-Intervenors.**

Consol. Court No. 24-00262

<u>NON-CONFIDENTIAL VERSION</u>

**Business Proprietary
Information Removed from
Pages 2, 4, 7-9, 26-27**

---

<u>MEMORANDUM IN SUPPORT OF CONSOLIDATED PLAINTIFFS CARBON
ACTIVATED TIANJIN CO., LTD. AND CARBON ACTIVATED CORPORATION'S
RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD</u>

David J. Ross
Stephanie E. Hartmann
Elizabeth A. Argenti
Wilmer Cutler Pickering Hale and Dorr
   LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037

*Counsel for Carbon Activated Tianjin Co.,
Ltd. and Carbon Activated Corporation*

Dated: August 14, 2025

<u>**Table of Contents**</u>

I.      **INTRODUCTION**................................................................................................1

II.     **RULE 56.2 STATEMENT** ...............................................................................1

    A.    **Administrative Decision Under Review** ............................................1

    B.    **Issues Presented and Summary of Arguments** .................................1

III.   **STATEMENT OF FACTS** .............................................................................3

    A.    **The Preliminary Phase of Commerce's Administrative Review** ...........3

    B.    **Commerce's Preliminary Results** .......................................................5

    C.    **Commerce's Final Results** .................................................................6

    D.    **Ministerial Error Allegations and Commerce's Amended Final Results**................9

IV.   **STANDARD OF REVIEW** .........................................................................10

V.    **ARGUMENT** ...............................................................................................11

    A.    **Commerce's Determination that Malaysian Import Data are Not Aberrational was Unreasonable, Not Supported by Substantial Evidence, and Otherwise Not in Accordance with Law, and this Determination Resulted in Several Surrogate Values Being Not Supported by Substantial Evidence** ...............................................11

        1.    **Commerce improperly disregarded comparisons to global average prices and largely ignored comparisons to country-specific average unit values**................................................12

        2.    **Commerce improperly disregarded evidence showing Malaysian surrogate values represented relatively small volumes of imports** ...................17

        3.    **Commerce failed to provide a rational connection between the facts on the record and its determinations that the Malaysian import data for several factors of production were not aberrational** ...............22

    B.    **Commerce's Inclusion in GHC's Margin Calculation of a Supplier's Costs That were Not Associated with the Production of Subject Merchandise Was Unreasonable, Not Supported by Substantial Evidence, and Not in Accordance with Law** ...............25

    C.    **Commerce's Failure to Correct a Ministerial Error in Jilin Bright's Surrogate Value Calculation was Arbitrary and Otherwise Not in Accordance with Law** ...............29

        1.    **The statute provides for correction of ministerial errors to ensure Commerce calculates accurate dumping margins** ...............30

        2.    **Commerce's final margin calculation for Jilin Bright is not supported by substantial evidence and otherwise not in accordance with law** ...................30

VI.   **CONCLUSION** ...........................................................................................32

i

# Table of Authorities

Page(s)

**Statutes and Regulations**

19 U.S.C. § 1516a(b)(1)(B)(i)...........................................................................................10

19 U.S.C. § 1673d(e) .......................................................................................................30

19 U.S.C. § 1677b.............................................................................................................27

19 U.S.C. § 1677b(c) ..................................................................................................14, 25

19 U.S.C. § 1677f(i)(3)(A) ..............................................................................................11

19 C.F.R. § 351.224(c)........................................................................................................9

**Cases**

*Acciai Speciali Terni, S.p.A. v. United States*,
    26 C.I.T. 892, 217 F. Supp. 2d 1345 (2002)....................................................10

*Alloy Piping Products, Inc. v. Kanzen Tetsu Sdn. Bhd.*,
    334 F.3d 1284 (Fed. Cir. 2003)........................................................................31

*Anshan Iron & Steel Co. v. United States*,
    28 C.I.T. 1728, 358 F. Supp. 2d 1236 (2004) ..................................................29

*Arch Chemicals, Inc. v. United States*,
    Slip Op. 11-41 (CIT 2011).................................................................................28

*Baoding Mantong Fine Chemistry Co. v. United States*,
    222 F. Supp. 3d 1231 (Ct. Int'l Trade 2017) .......................................14, 15, 19

*Blue Field (Sichuan) Food Industrial Co. v. United States*,
    37 C.I.T. 1619, 949 F. Supp. 2d 1311 (2013).............................................15

*Budd Co. Ry. Div. v. United States*,
    1 C.I.T. 67, 507 F. Supp. 997 (1980) ................................................................29

*Calgon Carbon Corp. v. United States*, 190 F. Supp. 3d 1224
    (Ct. Int'l Trade 2016).........................................................................................19

*Camau Frozen Seafood Processing Import Export Corp. v. United States*,
    37 C.I.T. 1116, 929 F. Supp. 2d 1352 (2013)...........................................18, 19

*Changzhou Wujin Fine Chemical Factory Co. v. United States*,
    701 F.3d 1367 (Fed. Cir. 2012)...................................................................11

*CS Wind Vietnam Co. v. United States*,
    832 F.3d 1367 (Fed. Cir. 2016)................................................................10, 27

*Hyundai Electronics Industries Co. v. United States,*
  29 C.I.T. 981, 395 F. Supp. 2d 1231 (2005) ........................................30, 31

*Indus. Fasteners Group v. United States,*
  2 C.I.T. 181, 525 F. Supp. 885 (1981) ................................................29

*Jiaxing Brother Fastener Co. v. United States,*
  380 F. Supp. 3d 1343 (Ct. Int'l Trade 2019) ......................................11

*Koyo Seiko Co. v. United States,*
  14 C.I.T. 680, 746 F. Supp. 1108 (1990) ......................................28, 30

*Mittal Steel Galatai S.A. v. United States,*
  31 C.I.T. 1121, 502 F. Supp. 2d 1295 (2007) ....................................20

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm*
  *Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983) ....................10, 11, 23

*Nagase & Co. v. United States,*
  628 F. Supp. 3d 1326 (Ct. Int'l Trade 2023) ......................................27

*NMB Singapore Ltd. v. United States,*
  557 F.3d 1316 (Fed. Cir. 2009) ........................................................11

*NSK Ltd. v. United States,*
  29 C.I.T. 1, 358 F. Supp. 2d 1276 (2005) ..........................................28

*RHP Bearings Ltd. v. United States,*
  288 F.3d 1334 (Fed. Cir. 2002) ........................................................11

*SeAH Steel VINA Corp. v. United States,*
  950 F.3d 833 (Fed. Cir. 2020) ..........................................................20

*Shanghai Foreign Trade Enterprises v. United States,*
  28 C.I.T. 480, 318 F. Supp. 2d 1339 (2004) ......................................20

*SolarWorld Americas, Inc. v. United States,*
  273 F. Supp. 3d 1254 (Ct. Int'l Trade 2017) ..........................16, 18, 19

*SolarWorld Americas, Inc. v. United States,*
  962 F.3d 1351 (Fed. Cir. 2020) ..................................................20, 21

*Trust Chem Co. v. United States,*
  35 C.I.T. 1012, 791 F. Supp. 2d 1257 (2011) ..............................19, 21

*Universal Camera Corp. v. NLRB,*
  340 U.S. 474 (1951) ..............................................................10, 17, 18

*Yangzhou Bestpak Gifts & Crafts Co. v. United States,*
  716 F.3d 1370 (Fed. Cir. 2013) ........................................................30

*Zhejiang DunAn Hetian Metal Co. v. United States,*
  34 C.I.T. 408, 707 F. Supp. 2d 1355 (2010),
  *vacated on other grounds*, 652 F.3d 1333 (Fed. Cir. 2011) ..............11, 20

**Administrative Determinations**

*Common Alloy Aluminum Sheet from India: Final Results of Antidumping Duty Administrative Review; 2020-2022*, 88 Fed. Reg. 76,724 (Dep't Commerce Nov. 7, 2023), and accompanying Issues and Decision Memorandum...............................28

*Stainless Steel Flanges from India: Final Results of Antidumping Duty Administrative Review; 2021-2022*, 89 Fed. Reg. 17,410 (Dep't Commerce Mar. 11, 2024), and accompanying Issues and Decision Memorandum..............................28

I.      **INTRODUCTION**

On behalf of Consolidated Plaintiffs Carbon Activated Tianjin Co., Ltd. and Carbon

Activated Corporation (collectively, "Carbon Activated"), we submit this brief in support of

Carbon Activated's Rule 56.2 motion for judgment on the agency record.

II.     **RULE 56.2 STATEMENT**

A.      **Administrative Decision Under Review**

Carbon Activated challenges certain aspects of the final determination by the U.S.

Department of Commerce ("Commerce") in the administrative review of the antidumping duty

("AD") order on certain activated carbon from the People's Republic of China ("China") for the

period April 1, 2022 through March 31, 2023.  The final results were published in the Federal

Register on November 25, 2024.  *Certain Activated Carbon From the People's Republic of*

*China: Final Results of Antidumping Duty Administrative Review; 2022-2023*, 89 Fed. Reg.

92,893 (Dep't Commerce Nov. 25, 2024), P.R. 267, ECF No. 40-4 ("*Final Results*"), and

accompanying Issues and Decision Memorandum, P.R. 251, ECF No. 40-5 ("IDM").  Commerce

published amended final results in the Federal Register on December 26, 2024.  *Certain*

*Activated Carbon From the People's Republic of China: Amended Final Results of Antidumping*

*Duty Administrative Review; 2022-2023*, 89 Fed. Reg. 104,978 (Dep't Commerce Dec. 26,

2024), P.R. 277, ECF No. 40-6 ("*Amended Final Results*"), and accompanying Ministerial Error

Memorandum, P.R. 271, ECF No. 40-7 ("Ministerial Error Memo").

B.      **Issues Presented and Summary of Arguments**

1.      **Whether Commerce's determination that Malaysian import data are
        not aberrational was unreasonable, not supported by substantial
        evidence, and otherwise not in accordance with law, rendering its use
        of Malaysian data as surrogate values for several factors of
        production not supported by substantial evidence and not in
        accordance with law.**

**BUSINESS PROPRIETARY
INFORMATION DELETED**

Consol. Court No. 24-00262                    NON-CONFIDENTIAL VERSION

Yes. Commerce's determination that Malaysia's data are not aberrational was unreasonable, not supported by substantial evidence, and otherwise not in accordance with law. Commerce unlawfully ignored or dismissed two key arguments by Respondents concerning aberrations in Malaysia's import data. Commerce has an obligation to address evidence of aberrations and must account for conflicting evidence on the record in order to satisfy the substantial evidence standard. By failing to do so here, its use of Malaysian data for several factors of production also was not supported by substantial evidence and not in accordance with law.

2.      **Whether Commerce's determination to include a supplier's costs for certain inputs in GHC's production database, despite evidence showing that such inputs were not associated with the production of subject merchandise, was unreasonable, not supported by substantial evidence, and not in accordance with law**.

Yes. Commerce's determination to include costs related to a supplier's **[**

**]** in GHC's factors of production database, despite evidence showing that the supplier did not use the inputs in its production of subject merchandise, inflated GHC's normal value calculation and frustrated the overarching goal imbedded in the antidumping statute of determining fair and accurate dumping margins. Accordingly, Commerce's determination was unreasonable, not supported by substantial evidence, and not in accordance with law.

3.      **Whether Commerce abused its discretion by failing to correct an error in Jilin Bright's antidumping duty rate calculation.**

Yes. Commerce abused its discretion when it corrected an error in GHC's margin calculation methodology but failed to address the same error in Jilin Bright's calculation methodology. Commerce is obligated to calculate antidumping duty margins as accurately as possible and has discretion to correct ministerial errors. Given that Commerce took the same approach to calculating the dumping margins for both respondents, Commerce should have

corrected the known error for both respondents.  Commerce's failure to correct the error for Jilin

Bright resulted in an inaccurate dumping margin.

## III.    STATEMENT OF FACTS

### A.    The Preliminary Phase of Commerce's Administrative Review

On April 4, 2023, Commerce published a notice of opportunity to request an

administrative review of the antidumping duty order on imports of certain activated carbon from

China.  *Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation;*

*Opportunity to Request Administrative Review and Join Annual Inquiry Service List*, 88 Fed.

Reg. 19,916 (Dep't Commerce Apr. 4, 2023).  After receiving timely requests for an

administrative review of the order from several interested parties, including a request from

Carbon Activated Tianjin Co., Ltd., Commerce initiated a review for the period of April 1, 2022

through March 31, 2023.  *Initiation of Antidumping and Countervailing Duty Administrative*

*Reviews*, 88 Fed. Reg. 38,021, 38,025 (Dep't Commerce June 12, 2023), P.R. 29.  Commerce

chose Jilin Bright Future Chemicals Co., Ltd. ("Jilin Bright") and Ningxia Guanghua

Cherishment Activated Carbon Co., Ltd. ("GHC") (collectively, "Respondents") as mandatory

respondents in the administrative review.  *Certain Activated Carbon From the People's Republic*

*of China: Preliminary Results of Antidumping Duty Administrative Review; 2022-2023*, 89 Fed.

Reg. 35,797 (Dep't Commerce May 2, 2024), P.R. 223 ("*Preliminary Results*"), and

accompanying Preliminary Decision Memorandum at 1, P.R. 221 ("PDM").

GHC submitted cost of production information for itself, its toll producer, and its

unaffiliated supplier in its questionnaire responses, and submitted a consolidated factor of

production ("FOP") database that incorporated this information.  GHC Section D Questionnaire

Response, September 28, 2023 ("GHC Sec D QR"), P.R. 123, C.R. 64-78; GHC Second

Supplemental Section A, C, and D Questionnaire Response, April 5, 2024 ("GHC 2nd Supp

**BUSINESS PROPRIETARY**
**INFORMATION DELETED**

Consol. Court No. 24-00262                    NON-CONFIDENTIAL VERSION

QR") at 3, Exhibit 2SD-1, P.R. 202, C.R. 152.  After petitioners raised concerns that GHC's

Section D questionnaire response was deficient, Commerce issued supplemental questions

asking for clarification and further information regarding, *inter alia*, GHC's supplier and its

production process.  Petitioners Request to Issue Supplemental Questionnaire Addressing

Unresolved Critical Deficiencies in GHC's DQR, March 22, 2024, P.R. 184, C.R. 142; Second

Supplemental Section A, C, and D Questionnaire to GHC, March 25, 2024 ("2nd Supp

Questionnaire"), P.R. 185, C.R. 143.

In its supplemental questionnaire, Commerce asked about GHC's supplier's raw

materials and use of [              ] inputs.  In response, GHC repeatedly explained that its

supplier had agreed to only use self-produced products to produce the carbon activated material

that GHC exports to the U.S. market, and that it would not use [                              ]

for this purpose.  2nd Supp Questionnaire, Attachment 1 at 4-6, P.R. 185, C.R. 143; GHC 2nd

Supp QR at 20, 23, 27, P.R. 202, C.R. 152.  In order to be responsive to Commerce's request,

however, the supplier provided – under duress – unit consumption ratios for [

          ].  In providing this information, the supplier stated explicitly that

the use of such data would not result in accurate factors of production.  GHC 2nd Supp QR at 27,

P.R. 202, C.R. 152.

Petitioners (Calgon Carbon Corporation and Norit Americas Inc.) and Respondents

submitted surrogate country comments, surrogate value comments, and pre-preliminary

comments.  In their submissions, Respondents advocated for Romania to be the primary

surrogate country and argued that the Malaysian import data with respect to multiple factors of

production were aberrational, unreliable, and not the best information available.  *See, e.g.*, Jilin

Bright's Comment Regarding Preliminary Determination, April 12, 2024, P.R. 213, C.R. 204;

GHC's Pre-Preliminary Comments, April 8, 2024, P.R. 207, C.R. 197.  Respondents argued,

*inter alia*, that Malaysia's import prices deviated substantially from global average prices as well

as historical averages and that Malaysia's imports were not representative of a broad market

average because they accounted for a small share of total import volumes.  Jilin Bright's

Comment Regarding Preliminary Determination, April 12, 2024, at 6-11, P.R. 213, C.R. 204;

GHC's Pre-Preliminary Comments, April 8, 2024, at 2-4, P.R. 207, C.R. 197.

### B.    Commerce's Preliminary Results

Commerce published the *Preliminary Results* on May 2, 2024, and preliminarily found

that certain activated carbon from China was sold in the United States during the review period

at prices below the normal value.  *Preliminary Results*, 89 Fed. Reg. at 35,797, P.R. 223.

Commerce explained that when dealing with a non-market economy ("NME"), such as China, its

methodology involves choosing a surrogate market economy country that is used to value the

NME producers' factors of production.  PDM at 5, P.R. 221.  In determining the appropriate

surrogate country, the statute instructs Commerce to utilize "to the extent possible, the prices or

costs of FOPs in one or more {market economy} countries that are: (1) at a level of economic

development comparable to that of the NME country; and (2) significant producers of

comparable merchandise."  *Id.* at 5-6 (quoting section 773(c)(4) of the Tariff Act of 1930, as

amended).

Commerce initially identified Romania, Panama, Bulgaria, Costa Rica, Malaysia, and

Türkiye ("OP List countries") as countries that were at the same level of economic development

as China during the period of review ("POR"), and the record contained surrogate value data and

additional information for Romania, Malaysia, and Türkiye.  PDM at 6-7, P.R. 221.  However,

Commerce found that Malaysia was the only net exporter of comparable merchandise during the

POR, and therefore preliminarily determined that Malaysia was the only country among the OP

List countries that was a significant producer of comparable merchandise. *Id.* at 7 (citing Import Administration Policy Bulletin No. 04.1, regarding "Non-Market Economy Surrogate Country Selection Process," March 1, 2004 ("Policy Bulletin No. 04.1")). Commerce also found that the only financial statement on the record for a Romanian producer did not show it was a significant producer of the subject merchandise. PDM at 8-9, P.R. 221. Therefore, Commerce found the information for Malaysia to be more complete and preliminarily chose Malaysia as the primary surrogate country. *Id.* at 9.

Commerce used data from Malaysia for all surrogate values except for labor, for which it used Turkish data. *Id.* Commerce did not address Respondents' arguments regarding the aberrational nature of the Malaysian data in the *Preliminary Results* or accompanying PDM.

### C.    Commerce's Final Results

Following the issuance of the *Preliminary Results*, Petitioners and Respondents submitted case briefs. In their briefs, Respondents continued to advocate for Romania to be the primary surrogate country and continued to argue that the data for Malaysia were aberrational in several respects. *See* Case Brief of Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd., June 12, 2024 ("GHC Case Brief"), P.R. 231, C.R. 223; Case Brief of Jilin Bright Future Chemicals Co., Ltd., June 12, 2024 ("Jilin Bright Case Brief"), P.R. 229, C.R. 221. In particular, GHC argued that Malaysia's import data for various factors of production exhibited substantial fluctuations both within the period of review and as compared to prior periods of review; that Malaysia's import unit prices for various factors were substantially higher than world average unit prices and also as compared to average prices in countries with comparable import volumes as Malaysia; and that Malaysia's import volumes for certain factors accounted for a small share of total imports among the OP List countries and had substantially higher unit values than the

**BUSINESS PROPRIETARY**
**INFORMATION DELETED**

**Consol. Court No. 24-00262**                    **NON-CONFIDENTIAL VERSION**

large-volume OP List countries, which demonstrated that Malaysia's imports did not reflect broad market averages.  GHC Case Brief at 16-21, P.R. 231, C.R. 223.

Jilin Bright similarly argued that Malaysia's small volume of imports of coal tar were likely not reflective of broad market averages and therefore were aberrational.  Jilin Bright Case Brief at 10, P.R. 229, C.R. 221.  It further argued that Malaysia's data were aberrational with respect to coal tar because Malaysia exported drastically higher volumes than it imported, and the much smaller volume of imports had a substantially higher unit value than the exports.  This suggested that the import values were not reflective of a broad market average and likely were not reflective of the prices that Malaysian producers of activated carbon were paying for coal tar. *Id.* at 8-9.  Jilin also asserted an aberration based on the historical trend of sub-bituminous coal being less expensive than bituminous coal.  Jilin noted that Malaysia's data exhibited this trend in prior review periods, but it switched in the current review period – such that sub-bituminous coal was more expensive than bituminous coal – unlike in other OP List countries, where the historical trend continued.  *Id.* at 12.  Jilin Bright argued that this anomaly with respect to Malaysia's data made it unreliable, and thus that Malaysia's data was not the best available information for valuing sub-bituminous coal.  *Id.* at 12-13.

In their case brief, petitioners alleged that GHC's consolidated FOP database that Commerce relied on in the *Preliminary Results* was incomplete.  Case Brief of Petitioners Concerning GHC, June 12, 2024 ("Petitioners Case Brief for GHC"), at 23-34, P.R. 233, C.R. 225.  Specifically, Petitioners argued that GHC's supplier had improperly calculated the consumption ratios for its [

                                        ] and took issue with the fact that GHC did not incorporate these ratios into its consolidated FOP database.  Petitioners Case Brief for GHC, at 26, 29, 33-34,

**BUSINESS PROPRIETARY**
**INFORMATION DELETED**

Consol. Court No. 24-00262                    **NON-CONFIDENTIAL VERSION**

P.R. 233, C.R. 225.  GHC countered that Commerce had correctly relied on the FOP database

and asserted that no revisions were necessary because GHC's supplier had agreed not to use [

            ] in its production of activated carbon material that GHC exports to the United

States.  Rebuttal Brief of Ningxia Guanghua Cherishment Activated Carbon Co., Ltd., July 2,

2024 ("GHC Rebuttal Brief"), at 6-8, P.R. 238, C.R. 227.

Commerce published the *Final Results* on November 25, 2024, and published *Amended*

*Final Results* on December 26, 2024.  *Final Results*, 89 Fed. Reg. 92,893, P.R. 267; *Amended*

*Final Results*, 89 Fed. Reg. 104,978, P.R. 277.  In its determinations, Commerce continued to

find that Malaysia was the only country among the OP List countries that satisfied the statutory

criteria of being both economically comparable to China and a significant producer of

comparable merchandise, and therefore Commerce continued to use Malaysia as the primary

surrogate country.  Commerce generally noted Respondents' arguments contending that there

were anomalies in Malaysia's import data with respect to several factors of production, but it

concluded that the data were not aberrational.

In the *Final Results*, Commerce agreed with petitioners that GHC's consolidated FOP

database was incomplete, and, therefore, modified the database to reflect GHC's supplier's

purported consumption of [                                    ] in its production of activated carbon.

IDM at 38-39, P.R. 251; Commerce Proprietary Memorandum for Ningxia Guanghua

Cherishment Activated Carbon Co., Ltd., November 5, 2024 ("Proprietary GHC Memo"), P.R.

252, C.R. 230.  Commerce valued this consumption using Malaysian import data for activated

carbon.  *Id.* at 39, P.R. 251; Proprietary GHC Memo at 4, P.R. 252, C.R. 230.  In doing so,

Commerce ignored repeated statements in GHC's certified questionnaire responses, and in a

subsequent certified submission from GHC, that the supplier did not use [

BUSINESS PROPRIETARY
INFORMATION DELETED

Consol. Court No. 24-00262                                    NON-CONFIDENTIAL VERSION

**]** to produce the carbon activated material that GHC exports to the United States.  GHC 2nd Supp QR at 20-27, P.R. 202, C.R. 152; GHC Rebuttal Brief at 6-8, P.R. 238, C.R. 227.

### D.    Ministerial Error Allegations and Commerce's Amended Final Results

Following the issuance of Commerce's *Final Results*, GHC and Jilin Bright submitted ministerial error allegations pursuant to 19 C.F.R. § 351.224(c).  *See* GHC Ministerial Error Allegations, November 20, 2024, P.R. 265; Jilin Bright Ministerial Error Allegations, November 20, 2024, P.R. 266, C.R. 242.  In its submission, GHC alleged that Commerce had incorrectly used the surrogate value for lump coal rather than the surrogate value for bituminous coal when it calculated GHC's margin in the *Final Results*.  GHC Ministerial Error Allegations, November 20, 2024, at 2, P.R. 265.  GHC asserted that Commerce had determined the surrogate value for bituminous coal to be 1,552.65 MYR and the surrogate value for lump coal to be 1,720.22 MYR, but when calculating GHC's margin, Commerce used 1,720.22 MYR as the surrogate value for bituminous coal.  *Id.* at 2-3.

Jilin Bright also submitted ministerial error allegations, but it did not include an allegation regarding the incorrect surrogate value used for bituminous coal.  Jilin Bright Ministerial Error Allegations, November 20, 2024, P.R. 266, C.R. 242.  Similar to Commerce's final analysis memorandum for GHC, the final analysis memorandum for Jilin Bright shows that Commerce used the incorrect surrogate value for bituminous coal when determining Jilin Bright's final antidumping duty margin.  Final Analysis Memorandum for Jilin Bright Future Chemicals Co., Ltd., November 5, 2024, at 3, P.R. 254, C.R. 237; Final Analysis Memorandum for Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd., November 5, 2024, at 3, P.R. 253, C.R. 231.

On December 26, 2024, Commerce published the *Amended Final Results* and noted, *inter alia*, that it agreed with GHC's allegation regarding the incorrect surrogate value being applied

to a factor of production, and it corrected the error in GHC's margin calculation. *Amended Final Results*, 89 Fed. Reg. 104,978, P.R. 277, and accompanying Ministerial Error Memo at 6-7, P.R. 271 (identifying the relevant factor of production as bituminous coal). In response to objections by the petitioners that GHC should have raised this issue in its case brief following the *Preliminary Results*, Commerce specifically noted it had "determined that the error is ministerial in nature, within the meaning of 19 CFR 351.22 as it was an inadvertent clerical error," and therefore exercised its discretionary authority to correct the ministerial error in GHC's margin calculation. Ministerial Error Memo at 6-7, P.R. 271. Commerce did not make a similar correction to the same error in Jilin Bright's margin calculation, however.

## IV.    STANDARD OF REVIEW

In reviewing Commerce's AD determinations, the Court will hold unlawful any determination, finding, or conclusion found "to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Acciai Speciali Terni, S.p.A. v. United States*, 26 C.I.T. 892, 893, 217 F. Supp. 2d 1345, 1346-47 (2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)), taking into account "whatever in the record fairly detracts" from the weight of supportive evidence. *CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016). The substantial evidence standard also requires the agency to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

The Court of Appeals for the Federal Circuit has explained that this standard of review encompasses the "arbitrary and capricious" standard established under the Administrative Procedure Act. *See Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367, 1377 (Fed. Cir. 2012) (citing *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 284 (1974)). "{A}n agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." *RHP Bearings Ltd. v. United States*, 288 F.3d 1334, 1347 (Fed. Cir. 2002) (quoting *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996)). Thus, Commerce must treat like situations similarly and may not depart from a prior practice, unless "it provides a reasoned explanation for its change." *Jiaxing Brother Fastener Co. v. United States*, 380 F. Supp. 3d 1343, 1365 (Ct. Int'l Trade 2019) (citing *Rust v. Sullivan*, 500 U.S. 173, 187 (1991); *State Farm*, 463 U.S. at 42). Failure to consider "an important aspect of the problem" similarly renders a determination by an agency arbitrary. *State Farm*, 463 U.S. at 43. Agency determinations that ignore relevant statutory or regulatory language, or interpret that language contrary to its plain meaning, are also not in accordance with law. *See Zhejiang DunAn Hetian Metal Co. v. United States*, 34 C.I.T. 408, 437-38, 707 F. Supp. 2d 1355, 1381-82 (2010), *vacated on other grounds*, 652 F.3d 1333 (Fed. Cir. 2011).

Finally, Commerce is required by law to provide in the final determination "an explanation of the basis for its determination that addresses relevant arguments{} made by interested parties." 19 U.S.C. § 1677f(i)(3)(A). Failure to do so renders an AD determination unlawful. *See NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1320 (Fed. Cir. 2009).

## V.  <u>ARGUMENT</u>

### A.  **Commerce's Determination that Malaysian Import Data are Not Aberrational was Unreasonable, Not Supported by Substantial Evidence, and Otherwise Not in Accordance with Law, and this Determination Resulted in Several Surrogate Values Being Not Supported by Substantial Evidence**

Throughout the administrative review, Respondents presented arguments and evidence showing that Malaysian import data were not the best available information on the record to determine surrogate values for several key factors of production because the Malaysian data were aberrational.  Specifically, Respondents presented arguments and evidence about the aberrational nature of the Malaysian data for coal tar, hydrochloric acid, solid sodium hydroxide, and potassium hydroxide.  Respondents pointed to various benchmarks to demonstrate the aberrational nature of the data, including comparisons to global average prices, historical data from prior reviews, and individual countries' average prices.  Respondents also argued that Malayia's import volumes were small while its average prices were high, thus indicating that Malaysia's data were distortive and not a reflection of broad market averages.  In the *Final Results*, Commerce summarily dismissed the comparisons to global average prices, did not address Respondents' arguments regarding the low volume of Malaysia's imports, and provided insufficient reasoning to explain its determination that Malaysian data were not aberrational.  Because Commerce failed to adequately address the evidence of aberration raised by Respondents, Commerce's determination was unreasonable, not supported by substantial evidence, and otherwise not in accordance with law.  Consequently, Commerce's use of Malaysian import data as surrogate values for coal tar, hydrochloric acid, solid sodium hydroxide, and potassium hydroxide also was not supported by substantial evidence.

### 1.    Commerce improperly disregarded comparisons to global average prices and largely ignored comparisons to country-specific average unit values

GHC argued that the average unit values ("AUVs") of the surrogate values for Malaysia's imports of coal tar, hydrochloric acid, solid sodium hydroxide, and potassium hydroxide were aberrational because they "deviated drastically" from the world AUVs, and also were higher than the AUVs of countries that had comparable levels of imports.  GHC Case Brief

at 18-20, P.R. 231, C.R. 223. For example, Malaysia's AUV for coal tar was $1.65 per kilogram, which was significantly higher than both the global AUV of $0.48 per kilogram and Finland's AUV ($0.78 per kilogram). Similarly, Malaysia's AUV for hydrochloric acid was $3.64 per kilogram, which was several multiples higher than the global AUV of $.016 per kilogram, as well as the AUVs for Benin ($0.35 per kilogram), Costa Rica ($0.47 per kilogram), and Trinidad and Tobago ($0.62 per kilogram). *Id.* at 18-19.

Commerce rejected GHC's argument concerning the world average unit price for coal tar on the grounds, *inter alia*, that the price contains data for imports "into countries that are not at the same level of economic development as China . . . ." IDM at 16, P.R. 251.[1] Additionally, Commerce did not address GHC's country-specific AUV comparisons but it generally dismissed the data GHC provided in its arguments regarding Malaysia's import AUVs being aberrational by referring to its rationale for rejecting the global averages. *Id.* at 19-20. In other words, Commerce took the position that it will only consider data from countries that are at the same level of economic development as China (*i.e.*, the other OP List countries) to determine whether proposed surrogate values are aberrational. However, the statute does not require Commerce to confine its analysis in this manner, and courts have specifically rejected this approach.

Specifically, the statute instructs Commerce to utilize "to the extent possible, the prices or costs of factors of production in one or more market economy countries that are: (A) at a level of economic development comparable to that of the {NME} country; and (B) significant producers of comparable merchandise," and it requires Commerce to use the best available

---

[1] Commerce also argued that the price contained data for imports from countries "that are excluded from Commerce's analysis as NMEs (including China itself) or economies with widely available export subsidies (e.g., India)." IDM at 16-17, P.R. 251. Commerce then referred to this reasoning in rejecting Respondents' arguments regarding the aberrational nature of the Malaysia data for other surrogate values, including hydrochloric acid, solid sodium hydroxide, and potassium hydroxide. *Id.* at 18-19

information to determine those FOPs.  19 U.S.C. § 1677b(c).  The statute does not further detail

the information Commerce should use in its analysis of potential surrogate values.  *See id.*  Thus,

the statute does not require Commerce to narrowly limit its analysis of whether surrogate value

data are aberrational to information from OP List countries.  As a matter of practice, in

determining what is the "best available information" for valuing factors of production,

Commerce has stated it seeks surrogate values which are, *inter alia*, "representative of a broad

market average."  *See, e.g.*, PDM at 18, P.R. 221.  Global average prices are relevant to

Commerce's assessment of whether potential surrogate value data are representative of a "broad

market average."  It was unreasonable for Commerce to summarily reject Respondents'

arguments based on global average prices.

　　　Moreover, the Court has stated explicitly that Commerce is not restricted to using

comparison data from OP List countries as benchmarks for assessing whether proposed surrogate

values are aberrational and has suggested that confining Commerce's analysis to those countries

may create an unhelpful and unnecessarily small sample.  For example, in *Baoding Mantong*, the

plaintiff argued that the Indonesian data Commerce used as surrogate values were aberrational

when compared to the AUVs for the other countries on the surrogate country list (*i.e.,* the

countries Commerce considered to be economically comparable to the NME country).  In finding

that Commerce had not erred in using the data, the Court noted that the plaintiff had not provided

Commerce with enough comparative data to substantiate its argument, leaving Commerce with a

"limited record" on which to base its decision.  *Baoding Mantong Fine Chemistry Co. v. United

States*, 222 F. Supp. 3d 1231, 1247-48 (Ct. Int'l Trade 2017).  The Court noted that "a wider set

of data could have shown the Indonesian surrogate value to be aberrationally high," and added

that "data used for these comparison purposes need not have been confined to the {countries on Commerce's surrogate country list}." *Id.*

Similarly, in *Blue Field (Sichuan) Food Industrial Co.*, the plaintiff argued that the Colombian data Commerce used as surrogate values were aberrational as compared to several data points, including data from India, which was not on the possible surrogate country list. *Blue Field (Sichuan) Food Industrial Co. v. United States*, 37 C.I.T. 1619, 1637-38 , 949 F. Supp. 2d 1311, 1330 (2013). The Court found that Commerce had not adequately explained why it rejected the data from India, and stated that Commerce's assertion that it could not use data from India because it was not on the approved surrogate country list was inconsistent with Commerce's own reference to the surrogate country list being "non-exhaustive" and its statement that Commerce could consider data from other countries if there was enough information to evaluate them. *Id.* The Court further noted that the statute permits Commerce to use surrogate values from countries that are not economically comparable to the subject country when data from economically comparable countries are not probative of the relevant input prices. *Id.* The Court ultimately remanded this issue to Commerce, and stated that "Commerce should not have ignored useful data from countries not found in the agency's surrogate country list." *Id.* The Court also noted that when Commerce is presented with a "colorable claim" that data it is considering is aberrational, it is "obligated, at a minimum, to discuss competing evidence and decide whether to credit or reject it." *Blue Field*, 37 C.I.T. at 1634, 949 F. Supp. 2d at 1327.

In the present case, GHC did precisely what the Court suggested in *Baoding Mantong* and provided Commerce with different points of comparison, including global average prices and comparisons to countries beyond the OP List. Specifically, GHC supported its argument that the Malaysian import data were aberrational by comparing the Malaysian data to the world

15

average as well as to individual country averages for countries that reported similar import

volumes as Malaysia for the relevant products (*e.g.,* Finland for coal tar; Benin, Costa Rica, and

Trinidad and Tobago for hydrochloric acid; Kuwait, Namibia, and Uruguay for solid sodium

hydroxide; and Oman and Peru for potassium hydroxide).  GHC Case Brief at 18-20, P.R. 231,

C.R. 223.  Whether compared to the global averages or to the individual country averages for

countries with comparable import volumes, Malaysia's AUVs were much higher.  *Id.*  It was not

reasonable for Commerce to summarily dismiss Respondents' arguments and evidence based on

its stated rationale that the global averages included data from countries that may not qualify as

surrogate countries.

 Importantly, GHC never advocated for Commerce to use the global average prices as the

surrogate values; rather, it used the global average prices as reference points to demonstrate the

aberrational nature of the Malaysian surrogate values for key factors of production.  GHC Case

Brief at 20, P.R. 231, C.R. 223.  Moreover, in addition to pointing out discrepancies as compared

to the global average prices, GHC also presented arguments and evidence based on individual

country comparisons.  *Id.* at 14-15.  GHC argued that the aberrations it highlighted with respect

to several factors of production suggested that Malaysia's data were distortive and unreliable as

surrogate values.  *See id.*  GHC argued that Commerce should select Romania as the primary

surrogate country instead of Malaysia, *id.* at 14-15, or, in the alternative, use alternative

surrogate values that were more in line with the world average prices for the factors for which

the Malaysian data were aberrational.  *Id.* at 20.

 The Court has stated that "{w}here there is a claim that data is aberrational, Commerce

must address evidence of aberration in order to demonstrate that the data is nonetheless the best

information available." *SolarWorld Americas, Inc. v. United States*, 273 F. Supp. 3d 1254, 1271-

72 (Ct. Int'l Trade 2017) (citing *Universal Camera Corp.*, 340 U.S. at 488). In the present case, Commerce failed to address Respondents' arguments and evidence that the Malaysian surrogate values for coal tar, hydrochloric acid, solid sodium hydroxide, and potassium hydroxide were aberrational, and therefore it failed to demonstrate that the Malaysian data was the best information available. Consequently, Commerce's use of Malaysian import data as the surrogate value for coal tar, hydrochloric acid, sodium hydroxide, and potassium hydroxide is unreasonable, not supported by substantial evidence, and otherwise not in accordance with law.

### 2. Commerce improperly disregarded evidence showing Malaysian surrogate values represented relatively small volumes of imports

In considering the surrogate values for coal tar, hydrochloric acid, solid sodium hydroxide, and potassium hydroxide, Respondents also argued that the volume of Malaysia's imports accounted for a small share of the total imports among the OP List countries and that these relatively small volumes of imports often had higher AUVs than imports in the other, larger-volume OP List countries. GHC Case Brief at 20-21, P.R. 231, C.R. 223; Jilin Bright Case Brief at 10, P.R. 229, C.R. 221.

For example, GHC presented evidence that the Malaysian surrogate value for hydrochloric acid only represented 1.38 million kilograms, which equated to 1.56 percent of total imports in the potential surrogate countries, and Malaysia's imports had an AUV of $3.64 per kilogram, while imports in Bulgaria, Romania, and Türkiye accounted for 96.35 percent of the imports and had AUVs of $0.25, $0.20, and $0.18 per kilogram, respectively. GHC Case Brief at 21, P.R. 231, C.R. 223; GHC Final Surrogate Value Submission, March 27, 2024 ("GHC Final SV Subm."), Exhibit 2b, P.R. 188. Similarly, GHC's evidence showed that Malaysia's imports of sodium hydroxide were 1.23 million kilograms, which equated to 0.98 percent of total imports in the potential surrogate countries, and had a unit value of $2.60 per kilogram, while imports

from Türkiye, Bulgaria, Costa Rica, and Romania accounted for 98.79 percent of imports and

had AUVs of $0.68, $1.00, $1.16, and $1.19 per kilogram, respectively. GHC Case Brief at 21,

P.R. 231, C.R. 223; GHC Final SV Subm., Exhibit 2b, P.R. 188.

Respondents contended that these small volumes of imports made the data aberrational

because they did not represent broad market averages. GHC Case Brief at 3, P.R. 231, C.R. 223;

Jilin Bright Case Brief at 10, P.R. 229, C.R. 221. GHC also argued that Commerce has a

practice of disregarding data based on a small volume of imports when their per-unit value

differs substantially from the unit values of countries that had larger import quantities. GHC

Case Brief at 3, 20, P.R. 231, C.R. 223.

In the *Final Results*, Commerce faulted GHC for not presenting a comparison of

historical Malaysian surrogate values over multiple years. IDM at 19-20, P.R. 251. However

Commerce wholly ignored GHC's comparison of the Malaysia import volumes and AUVs to

those of other potential surrogate countries, which showed the Malaysian imports represented a

tiny percentage of import volumes and were aberrationally high in value. *See* GHC Case Brief at

21, P.R. 231, C.R. 223; GHC Final SV Subm., Exhibit 2b, P.R. 188.

It is well established that Commerce must address information that detracts from its

determinations. *See, e.g.*, *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) ("The

substantiality of evidence must take into account whatever in the record fairly detracts from its

weight."); *SolarWorld Americas*, 273 F. Supp. 3d at 1268 (noting that Commerce must

"adequately explain how its decision is reasonable in light of the record as whole, including the

evidence that reasonably detracts from its conclusion"); *Camau Frozen Seafood Processing*

*Import Export Corp. v. United States*, 37 C.I.T. 1116, 1121, 929 F. Supp. 2d 1352, 1356 (2013)

("Not addressing the conflicting evidence on the record…fails the substantial evidence test

because it does not take into account record evidence contrary to Commerce's determination.");

*Trust Chem Co. v. United States*, 35 C.I.T. 1012, 1024, 791 F. Supp. 2d 1257, 1268 (2011)

("Commerce's job is to compare the data on the record and provide an explanation that considers

the important aspects of the problem presented."). Here, Commerce wholly disregarded

Respondents' arguments that Malaysia's relatively small volume of imports of coal tar,

hydrochloric acid, solid sodium hydroxide, and potassium hydroxide and their associated high

average unit values as compared to other countries' available data suggested Malaysia's data

were not fair representations of broad market averages and therefore were unreliable surrogate

values. *See* IDM at 16-20, P.R. 251. Thus, Commerce failed to satisfy the substantial evidence

standard by not considering record evidence that detracted from its conclusion. *See Camau*

*Frozen Seafood Processing*, 37 C.I.T. at 1121, 929 F. Supp. 2d at 1356; *see also SolarWorld*

*Americas*, 273 F. Supp. 3d at 1271-72 (stating that when there is a claim that data are

aberrational, "Commerce must address evidence of aberration in order to demonstrate that the

data is nonetheless the best information available" (citing *Universal Camera Corp.*, 340 U.S. at

488)).

It is also well established that small-quantity import volumes may be distortive and not

reflective of broad market averages, thereby affecting the reliability of the data. *See Baoding*

*Mantong Fine Chemistry*, 222 F. Supp. 3d at 1253 (questioning whether the surrogate country

data, which was the lowest quantity among the available countries, was the best information

available, and noting that the volume discrepancies among the countries must be considered "in

light of the Department's stated preference for using data that represent a broad market

average"); *Calgon Carbon Corp. v. United States*, 190 F. Supp. 3d 1224, 1239-40 (Ct. Int'l

Trade 2016) (highlighting several determinations where Commerce relied on larger volume data

because it found the larger volume was more representative of a broad market average for the

input, and concluding that "Commerce's own decisions have explained that it uses import

volumes, which speak to the issue of broader market averages and, therefore,

representativeness."); *Shanghai Foreign Trade Enterprises v. United States*, 28 C.I.T. 480, 318

F. Supp. 2d 1339, 1350 (2004) ("Commerce has a preference for using import statistics to value

material inputs…{h}owever, if the import statistics are based on a small quantity of imports for

the period of investigation, the Commerce practice is to determine if the price for those imports

is aberrational."); *Mittal Steel Galatai S.A. v. United States*, 31 C.I.T. 1121, 1135, 502 F. Supp.

2d 1295, 1307-08 (2007) (remanding to Commerce to further explain decision to use selected

limestone value when data on the record showed it was higher value than limestone imported in

other countries and applied to only a small volume of imports).

The reliability of the data is crucial to the overall goal of Commerce determining

surrogate values that most closely resemble the actual experience of the NME producers. *See,

e.g.*, *SolarWorld Americas, Inc. v. United States*, 962 F.3d 1351, 1356 (Fed. Cir. 2020); *SeAH

Steel VINA Corp. v. United States*, 950 F.3d 833, 845 (Fed. Cir. 2020). Courts have emphasized

that "the critical question is whether the methodology used by Commerce is based on the best

available information and establishes the antidumping margins as accurately as possible."

*SolarWorld Americas,* 962 F.3d at 1356 (quoting *Zhejiang DunAn Hetian Metal Co. v. United

States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011)). In *SolarWorld Americas*, the Court found that

Commerce had not sufficiently justified its conclusion that certain data were the best available

information to use as a surrogate value, and noted that Commerce's reliance on the data, which

accounted for about 0.40 percent of total imports in the potential surrogate countries, was

inconsistent with Commerce's "usual practice" of "'disregard{ing} small-quantity import data

{from the primary surrogate country} when the per-unit value is substantially different from the

per-unit values of the larger quantity imports of that product from other {potential surrogate}

countries.'" *SolarWorld Americas*, 962 F.3d at 1358 (quoting *Shakeproof Assembly Components*

*Div. of Illinois Tool Works, Inc. v. United States*, 59 F. Supp. 2d 1354 (Ct. Int'l Trade 1999)).

    Thus, the Court has repeatedly found that evidence of whether potential surrogate values

represent comparatively small volumes of imports with high average unit values is relevant to

Commerce's evaluation of whether specific surrogate value data are the best available

information.  By ignoring Respondents' argument that Malaysian surrogate values represent low

volumes of imports, Commerce unlawfully failed to address arguments and evidence that

detracted from its determination and failed to provide an "explanation that considers the

important aspects of the problem presented." *Trust Chem*, 35 C.I.T. at 1024, 791 F. Supp. 2d at

1268; s*ee also Universal Camera*, 340 U.S. at 488.  Commerce itself considered the relative

volume of Malaysia's imports of sub-bituminous coal in evaluating whether the Malaysia

surrogate value was aberrational *in this administrative review*.  When explaining its finding that

the data for sub-bituminous coal were not aberrational, Commerce relied on the fact that imports

of this product from Malaysia "make up almost all of the market imports among the countries on

the OP List of countries which leads us to conclude that the Malaysian imports are representative

of prices during the POR among the OP List countries."  IDM at 18, P.R. 251.  It was

unreasonable for Commerce to consider evidence of relative import volumes when it supports

Commerce's determination and wholly disregard the same analysis in other instances.

    In sum, Commerce's refusal to address Respondents' arguments and evidence showing

the Malaysian surrogate values for coal tar, hydrochloric acid, solid sodium hydroxide, and

potassium hydroxide represent small volumes was unreasonable, unsupported by substantial

evidence, and otherwise not in accordance with law, and renders Commerce's use of the

Malaysian surrogate values for coal tar, hydrochloric acid, solid sodium hydroxide, and

potassium hydroxide unreasonable, unsupported by substantial evidence, and otherwise not in

accordance with law.

> 3.     **Commerce failed to provide a rational connection between the facts on the record and its determinations that the Malaysian import data for several factors of production were not aberrational**

As explained above, Commerce unlawfully disregarded two key arguments by

Respondents contending that Malaysia's import data were aberrational with respect to several

factors of production. Instead, Commerce limited its analysis of whether Malaysian surrogate

values were aberrational to only two data points: (a) historical Malaysia values used in prior

reviews; and (b) current data from other OP List countries. *See, e.g.*, IDM at 16, P.R. 251. As

explained below, Commerce failed to provide a reasoned explanation supported by substantial

evidence for selecting the Malaysia surrogate values.

With respect to coal tar, Commerce compared the Malaysian import value to the available

data from other OP List countries – which varied widely (*i.e.*, data for the four available

countries ranged between $0.33 USD/kg and $21.48 USD/kg) – and simply stated, "an analysis

of the Malaysian import AUV in past reviews demonstrates that the import AUV in this current

review is not aberrational. Therefore, based on the record of this review and prior Malaysian

import AUVs, we find that the Malaysian import AUV used is not aberrational." IDM at 16,

P.R. 251. However, Commerce provided no citations and no analysis of the data from the prior

reviews to support its conclusory assertion.

Similarly, with respect to hydrochloric acid, Commerce acknowledged that the Malaysia

value was higher than the average prices of other OP List countries, but it asserted that the price

was not aberrational as compared to Malaysian values in prior reviews.  *See* IDM at 18-19, P.R. 251.  Commerce noted "that while the Malaysian import value for this review is 130 percent greater than the Malaysian import AUV in AR15, it is only 79 percent greater than the Malaysian value in AR14," and added that a value at the high or low end of a range is not necessarily an aberration.  *Id.* at 19.  Finally, it suggested that there were substantial differences in the AUVs among the OP List countries, but it did not elaborate or cite to any record evidence.  *Id.*

The substantial evidence standard requires Commerce to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines*, 371 U.S. at 168).  Putting aside the detailed arguments Commerce had dismissed or ignored that already undermined its findings, citing an expansive range of price averages and vaguely referring to analysis in prior reviews does not provide a "rational connection" between the facts on the record and Commerce's determination that Malaysia's data were not aberrational.[2]

With respect to hydrochloric acid, the AUVs of the other OP list countries ranged from $0.18 per kilogram to $0.47 per kilogram.  Malaysia's AUV was at least 674 percent higher at $3.64 per kilogram.  GHC Case Brief at 21, P.R. 231, C.R. 223; GHC Final SV Subm., Exhibit

---

[2] With respect to coal tar, Jilin Bright also argued, *inter alia*, that Malaysia's import data were not representative of a broad market average due to a substantial discrepancy between the import and export volumes and their corresponding average prices.  Jilin Bright Case Brief at 8-9, P.R. 229, C.R. 221. Pointing to the fact that Malaysia historically reported substantially larger volumes of exports than imports, and the exports had significantly lower average prices than the imports, Jilin Bright argued that the imports were likely specialized types of coal.  *Id*. at 9.  Jilin Bright further contended that it would be unreasonable to assume that activated carbon producers in Malaysia were relying on the much more expensive imported coal tar in their production despite the fact that the export data proved there was robust domestic production, and this further supported the conclusion that Malaysia's import data were not representative of a broad market average.  *Id.*  Again, Commerce largely ignores this argument. Commerce noted in its analysis of the arguments concerning coal tar that it "prefers to have historical data on the record with which to evaluate whether a value is aberrational."  IDM at 15, P.R. 251.  Commerce's "preference" for specific data does not absolve it of its obligation to adequately address the arguments and information presented by parties and ensure that its determinations are supported by substantial evidence.

2b, P.R. 188. Malaysia's AUV was also 130 percent higher than in the last review. IDM at 19,

P.R. 251. Nevertheless, Commerce found it was not aberrational because Malaysia's AUV was

"only 79 percent greater" than two review periods ago. *Id.* at 19. A "reasonable mind" would

not reach the same conclusion on these facts. *See Universal Camera*, 340 U.S. at 477. Again,

Commerce failed to provide a satisfactory explanation for its action and did not demonstrate a

rational connection between the facts on the record and its determination.

With respect to solid sodium hydroxide and potassium hydroxide, Malaysia's imports

accounted for a small fraction of the total imports in the potential surrogate countries and their

AUVs were substantially higher than the larger-volume countries. *See* GHC Case Brief at 21,

P.R. 231, C.R. 223; GHC Final SV Subm., Exhibit 2b, P.R. 188. Malaysia's AUV for solid

sodium hydroxide was $2.60 per kilogram, while the larger-volume countries had AUVs ranging

between $0.68 per kilogram and $1.19 per kilogram, and Malaysia's AUV for potassium

hydroxide was $2.31 per kilogram, while the larger-volume countries had AUVs ranging

between $1.47 per kilogram and $1.53 per kilogram. GHC Case Brief at 21, P.R. 231, C.R. 223;

GHC Final SV Subm., Exhibit 2b, P.R. 188. Malaysia's import AUVs for these products were

also substantially above the global average prices, with its AUV for solid sodium hydroxide 255

percent higher than the global average and its AUV for potassium hydroxide 193 percent higher

than the global average. IDM at 19, P.R. 251. Commerce generally ignored these data,

however, and noted that for solid sodium hydroxide, "with the exception of AR14, the Malaysian

import value has been relatively stable over the past six review periods, and in the instant review,

the value is only 30 percent higher than all five periods." *Id.* Similarly, with respect to

potassium hydroxide, Commerce noted that "the Malaysian import value for the current review is

only 54 percent higher than the five-year review average and about 11 percent higher than the

AUV Commerce used in AR11." *Id.*  Again, a "reasonable mind" would not conclude that a Malaysian price that is roughly 200 percent higher than global prices but only 54 percent higher than historical Malaysia prices is not aberrational.  As explained above, Commerce has a responsibility to address the aberrations that the Respondents alleged and to adequately explain its conclusions. *See State Farm*, 463 U.S. at 43; *SolarWorld Americas*, 273 F. Supp. 3d at 1271-72.  Commerce failed on both fronts in this review.  The Court should remand to Commerce to reconsider its selection of Malaysian surrogate values for coal tar, hydrochloric acid, solid sodium hydroxide, and potassium hydroxide.

      **B.**      **Commerce's Inclusion in GHC's Margin Calculation of a Supplier's Costs That were Not Associated with the Production of Subject Merchandise Was Unreasonable, Not Supported by Substantial Evidence, and Not in Accordance with Law**

When dealing with a NME country, Commerce uses a foreign producer's cost of production information in its calculation of the normal value, and Commerce uses the normal value to calculate the foreign producer's dumping margin. *See* 19 U.S.C. § 1677b(c).  The accuracy of the cost of production information is therefore crucial in determining accurate dumping margins.  GHC submitted cost of production information for itself, its toll producer, and its unaffiliated supplier in its questionnaire responses, and it submitted a consolidated FOP database that incorporated this information.  GHC Sec D QR, P.R. 123, C.R. 64-78; GHC 2nd Supp QR at 3, Exhibit 2SD-1, P.R. 202, C.R. 152.  The contested information concerning its supplier pertains to Commerce's Section D questionnaire, which "requests information about the factors of production of merchandise *sold in or to the United States*."  Commerce Request for Information, July 27, 2023 ("Commerce Questionnaire"), at G-2 (emphasis added), P.R. 77.  The questionnaire instructions further state that Commerce will use the information "to construct the

BUSINESS PROPRIETARY
INFORMATION DELETED

Consol. Court No. 24-00262                    NON-CONFIDENTIAL VERSION

normal value of the merchandise under consideration *sold by your company to the U.S. market*."
*Id.* at D-1 (emphasis added).

GHC repeatedly explained that its supplier had agreed to only use self-produced products
in its production that GHC exported to the United States, and therefore the supplier did not use [

] as an input in production of the subject merchandise that was
sold in the U.S. market.  2nd Supp Questionnaire, Attachment 1 at 4-6, P.R. 185, C.R. 143; GHC
2nd Supp QR at 20, 23, 27, P.R. 202, C.R. 152.  In order to be responsive to Commerce's
request, however, the supplier provided – under duress – unit consumption ratios for [

], and explicitly stated use of such data would not result
in accurate factors of production.  GHC 2nd Supp QR at 27, P.R. 202, C.R. 152.

Commerce erroneously found that "GHC failed to establish whether GHC's supplier used
certain FOPs in the production of subject merchandise that was not self-produced."[3]  IDM at 38,
P.R. 251.  Commerce's finding is unsupported by substantial evidence because Commerce
ignored the repeated statements in GHC's certified questionnaire responses that the supplier did
not use [                                            ] in its production of activated carbon for GHC that was
to be exported to the United States.  GHC 2nd Supp QR at 20-27, P.R. 202, C.R. 152; GHC
Rebuttal Brief, at 6-8, P.R. 238, C.R. 227.  Commerce cited no record evidence in support of its
decision to include the supplier's [                                    ] as an input in GHC's cost

---

[3] Commerce stated that GHC failed to provide evidence of an agreement between GHC and its supplier that
restricted the supplier's production of activated carbon for GHC to the use of self-produced inputs.  *See* IDM at 38,
P.R. 251; Petitioners Case Brief for GHC at 30-31, P.R. 233, C.R. 225.  However, GHC's second supplemental
questionnaire response states that GHC and the supplier agreed, prior to the supplier being chosen to supply GHC,
that the products GHC purchased from the supplier and exported to the United States had to be started with self-
produced products.  GHC 2nd Supp QR at 27, P.R. 202, C.R. 152.  As additional evidence of this agreement, GHC
referenced production records and explained that they included a statement noting that "the products must be
produced by the seller itself…shall not undergo any processing in other factory."  GHC Rebuttal Brief at 7, P.R.
238, C.R. 227.  Consequently, the record does contain evidence that GHC and its supplier agreed that the supplier's
production of activated carbon that GHC would sell in the United States would be produced using self-produced
inputs.  Commerce unlawfully disregarded this evidence.

BUSINESS PROPRIETARY
INFORMATION DELETED

Consol. Court No. 24-00262                                    NON-CONFIDENTIAL VERSION

database, and unlawfully ignored contradictory evidence that detracted from its conclusion. *See*

*CS Wind*, 832 F.3d at 1373. Given the explicit, certified statements that the supplier self-

produced the inputs it used in the relevant production for GHC (*i.e.*, activated carbon that was to

be exported to the United States), Commerce's decision to include valuations for the [

                    ] in GHC's FOP database is unreasonable and not supported by substantial

evidence.

Commerce's decision to include the [                                    ] in GHC's cost

database was also contrary to law. As explained above, Commerce's instructions in the Schedule

D questionnaire specifically limited responses to costs of production for merchandise that was

sold in the United States. Commerce Questionnaire at D-1, P.R. 77. This is consistent with

Commerce's obligation to determine the normal value of the "subject merchandise," meaning

merchandise sold in the United States, in order to calculate an accurate dumping margin. *See* 19

U.S.C. § 1677b. By requiring GHC to report its supplier's costs for [

      ] that were not used in production of GHC's activated carbon for export to the U.S.

market, Commerce unlawfully included costs *unrelated* to the production of subject merchandise

in GHC's FOP database and inflated GHC's normal value, resulting in an inaccurate dumping

margin calculation.

Commerce has an obligation to determine dumping margins that are as accurate as

possible and that best reflect the foreign producer's actual production experience. *See, e.g.*,

*SolarWorld Americas,* 962 F.3d at 1356. Recognizing the need for accuracy and the focus on

production of subject merchandise, Commerce routinely excludes costs and expenses from its

dumping calculations when those costs and expenses are related to the production of non-subject

merchandise. *See, e.g.*, *Nagase & Co. v. United States*, 628 F. Supp. 3d 1326, 1332 (Ct. Int'l

Trade 2023) (discussing Commerce's usual practice of excluding expenses related to the production of non-subject merchandise from its calculation of general and administrative expenses); *NSK Ltd. v. United States*, 29 C.I.T. 1, 17, 358 F. Supp. 2d 1276, 1291 (2005) (discussing an allocation methodology involving removal of selling expenses that were unrelated to subject merchandise and noting the court has previously upheld such methodologies); *Stainless Steel Flanges from India: Final Results of Antidumping Duty Administrative Review; 2021-2022*, 89 Fed. Reg. 17,410 (Dep't Commerce Mar. 11, 2024), and accompanying Issues and Decision Memorandum at 6-7 (refusing to adjust respondent's cost of production to include certain tolling expenses because they were related to the production of non-subject merchandise); *Common Alloy Aluminum Sheet from India: Final Results of Antidumping Duty Administrative Review; 2020-2022*, 88 Fed. Reg. 76,724 (Dep't Commerce Nov. 7, 2023), and accompanying Issues and Decision Memorandum at 41 (stating it would be inappropriate to include certain costs in the cost database because they relate to non-subject merchandise); *see also Arch Chemicals, Inc. v. United States*, Slip Op. 11-41 (CIT 2011) (discussing whether a disputed credit was earned during the production of subject or non-subject merchandise).

In the present case, in contravention of the accuracy goals noted above, and contrary to its practice of excluding costs and expenses related to non-subject merchandise, Commerce specifically *included* costs that were unrelated to the production of subject merchandise in its calculation of a respondent's dumping margin. *See* IDM at 38-39, P.R. 251; Proprietary GHC Memo, P.R. 252, C.R. 230; GHC 2nd Supp QR at 20, 23, 27, P.R. 202, C.R. 152. By including production costs that were unrelated to the production of subject merchandise, Commerce arbitrarily inflated GHC's normal value calculation, contrary to the statutory mandate to calculate antidumping margins that are as accurate as possible. *See Koyo Seiko Co. v. United*

*States*, 14 C.I.T. 680, 683, 746 F. Supp. 1108, 1111 (1990); *see also Anshan Iron & Steel Co. v. United States*, 28 C.I.T. 1728, 358 F. Supp. 2d 1236, 1243 (2004) (stating that "{t}his Court has consistently held that deference is not due an agency determination which relies upon inadequate factual basis or is inconsistent with congressional intent" (citing *Rhone-Poulenc Inc. v. United States*, 927 F. Supp. 451 (1996))); *Budd Co. Ry. Div. v. United States*, 1 C.I.T. 67, 507 F. Supp. 997 (1980); *Indus. Fasteners Group v. United States*, 2 C.I.T. 181, 525 F. Supp. 885 (1981).  The Court should remand this issue to Commerce with instructions to reconsider inclusion of these costs in GHC's FOP database.

    **C.**    **Commerce's Failure to Correct a Ministerial Error in Jilin Bright's Surrogate Value Calculation was Arbitrary and Otherwise Not in Accordance with Law**

In GHC's ministerial error allegations, it alerted Commerce to the fact that Commerce had used an incorrect value for bituminous coal in GHC's margin calculation.  GHC Ministerial Error Allegations, November 20, 2024, at 2-3, P.R. 265; *see* Final Analysis Memorandum for Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd., November 5, 2024, at 3, P.R. 253, C.R. 231.  In the *Amended Final Results*, Commerce agreed that it had inadvertently used the wrong value for bituminous coal, it determined that this qualified as a ministerial error, and it corrected the error with respect to GHC.  *Amended Final Results*, 89 Fed. Reg. at 104,978, P.R. 277; Ministerial Error Memo at 6-7, P.R. 271.  However, although Commerce made this same error in Jilin Bright's margin calculation, it failed to correct the error with respect to Jilin Bright. *See* Final Analysis Memorandum for Jilin Bright Future Chemicals Co., Ltd., November 5, 2024, at 3, P.R. 254, C.R. 237; Ministerial Error Memo at 6-7, P.R. 271.  By failing to correct a known ministerial error, Commerce abused its discretion and calculated an inaccurate margin for Jilin Bright.

1.    **The statute provides for correction of ministerial errors to ensure Commerce calculates accurate dumping margins**

The statute specifically provides for the correction of ministerial errors in final determinations and explains that "the term 'ministerial error' includes errors in addition, subtraction, or other arithmetic function, clerical errors resulting from inaccurate copying, duplication, or the like, and any other type of unintentional error which the administering authority considers ministerial." 19 U.S.C. § 1673d(e).  In discussing the legislative intent behind this provision, Courts have emphasized that "fair and accurate determinations are fundamental to the proper administration of our dumping laws," and that Congress added this provision to the statute to further the goal of ensuring accurate determinations. *Koyo Seiko*, 14 C.I.T. at 682, 746 F. Supp. at 1110; *see also Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013) (stating "{a}n overriding purpose of Commerce's administration of antidumping laws is to calculate dumping margins as accurately as possible" (citing *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990))).  The Court in *Koyo Seiko* further stated that "affirming a final determination *known to be based on incorrect data* would not only perpetuate the error, but would also be contrary to legislative intent." *Koyo Seiko*, 14 C.I.T. at 683, 746 F. Supp. at 1111.  Other Courts have echoed this sentiment, acknowledging that the Court has its own "responsibility to 'exercise its discretion to prevent knowingly affirming a determination with errors.'" *Hyundai Electronics Industries Co. v. United States*, 29 C.I.T. 981, 993, 395 F. Supp. 2d 1231, 1243 (2005) (quoting *Torrington Co. v. United States*, 21 CIT 1079, 1082 (1997)).

2.    **Commerce's final margin calculation for Jilin Bright is not supported by substantial evidence and otherwise not in accordance with law**

In response to GHC's ministerial error comments, Commerce agreed that it had inadvertently used the wrong surrogate value for bituminous coal in calculating GHC's final

dumping margin.  Ministerial Error Memo at 6-7, P.R. 271.  Commerce corrected the error

despite an objection by the petitioners that GHC should have raised the argument in its case brief

following the issuance of the *Preliminary Results*.  *Id.* at 7.  Commerce rejected petitioners'

argument because the error was an inadvertent clerical error and therefore fell within the

meaning of a ministerial error.  *Id.*  Accordingly, Commerce amended the *Final Results* to use

the correct surrogate value for bituminous coal in GHC's margin calculation.  *Id*.

Although Jilin Bright did not raise this particular error in its ministerial error allegations,

Commerce has a responsibility to produce accurate dumping margins, as discussed above.

Moreover, the Court has also made clear that Commerce may correct ministerial errors in final

determinations "with or without a party's request."  *Hyundai Electronics*, 29 C.I.T. at 993, 395 F.

Supp. 2d at 1243 (citing *Shandong Huarong Gen. Corp. v. United States*, 25 CIT 834, 848, 159

F. Supp. 2d 714, 727 (2001) (quoting *Aramide Maatschappij V.o.F. v. United States*, 19 CIT

1094, 1103, 901 F. Supp. 353, 361 (1995)), *aff'd sub nom. Shandong Huarong Gen. Group

Corp. v. United States*, 60 Fed. Appx. 797 (Fed. Cir. Jan. 10, 2003)).  Additionally, in a case

discussing whether Commerce was required to correct an error made by a respondent, the Court

stated that "{t}he failure of Commerce to correct an error that was made by the respondent that

was apparent or should have been apparent to Commerce would be arbitrary and capricious."

*Alloy Piping Products, Inc. v. Kanzen Tetsu Sdn. Bhd.*, 334 F.3d 1284, 1292-93 (Fed. Cir. 2003).

Commerce's failure to correct a known error made by Commerce itself is an abuse of discretion.

Given that Commerce had used the same erroneous value for bituminous coal in the margin

calculations for both mandatory respondents, it should have been apparent to Commerce that the

error it addressed in GHC's margin calculation also existed in Jilin Bright's margin calculation.

Commerce's failure to remedy the error in both calculations was arbitrary and capricious and an

abuse of discretion, and resulted in an inaccurate dumping margin for Jilin Bright.  The Court

should remand to Commerce with instructions to correct the erroneous value for bituminous coal

in Jilin Bright's margin calculation.

## VI.    <u>CONCLUSION</u>

Carbon Activated respectfully requests that the Court find that Commerce's

determinations addressed above are unsupported by substantial evidence and otherwise not in

accordance with law and remand for redetermination consistent with the Court's opinion.

Respectfully submitted,

<u>/s/ David J. Ross</u>
David J. Ross
Stephanie E. Hartmann
Elizabeth A. Argenti
Wilmer Cutler Pickering Hale and Dorr
   LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6300
Facsimile: (202) 663-6363
Email: david.ross@wilmerhale.com

*Counsel for Carbon Activated Tianjin Co.,*
*Ltd. and Carbon Activated Corporation*

Dated: August 14, 2025

## CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this Memorandum in Support of Carbon Activated's Rule 65.2 Motion for Judgment on the Agency Record complies with the word limitation requirement.  The word count for this submission, as computed by Wilmer Hale LLP's word processing system, is 10,029 words.

*/s/ David J. Ross*
(Signature of Attorney)

David J. Ross
(Name of Attorney

Carbon Activated Tianjin Co., Ltd. and Carbon Activated Corporation
(Representative Of)

August 14, 2025
(Date)

}