THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JANE A. RESTANI, SENIOR JUDGE

| | |
|---|---|
| NINGXIA GUANGHUA CHERISHMET ACTIVATED CARBON CO., LTD. AND JILIN BRIGHT FUTURE CHEMICALS CO., LTD., <br><br> Plaintiffs, <br><br> CARBON ACTIVATED TIANJIN CO., LTD. AND CARBON ACTIVATED CORPORATION, <br><br> Consolidated Plaintiffs, <br> and <br><br> BENGBU MODERN ENVIRONMENTAL CO., LTD., ET AL., <br><br> Plaintiff-Intervenors, <br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> CALGON CARBON CORPORATION AND NORIT AMERICAS, INC., <br><br> Defendant-Intervenors. | Consol. Court No. 24-00262 <br><br> PUBLIC VERSION <br><br> (BPI removed from brackets on pp.44-45) |

**RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD OF PLAINTIFFS, CONSOLIDATED PLAINTIFFS, AND PLAINTIFF-INTERVENORS**

Irene H. Chen
VCL Law, LLP
1945 Old Gallows Rd., Ste. 260
Vienna, VA 22031
(301) 760-7393

Mark B. Lehnardt
Davis & Leiman, PLLC
1012 Connecticut Ave., N.W., Ste. 1012
Washington, D.C. 20036
(202) 642-4850

*Attorneys for Plaintiffs, Consolidated Plaintiffs, and Plaintiff-Intervenors*

## TABLE OF CONTENTS

TABLE OF CONTENTS................................................................................................ii

TABLE OF AUTHORITIES ........................................................................................ iv

INTRODUCTION ......................................................................................................... 1

STATEMENT PURSUANT TO USCIT R.56.2(c)(1) ................................................. 2

    I.    Administrative Determination To Be Reviewed.................................................. 2

    II.    Issues Presented ................................................................................................ 3

JURISDICTION .......................................................................................................... 5

STATEMENT OF FACTS .......................................................................................... 6

    I.    Procedural Background...................................................................................... 6

    II.    Legal Background ............................................................................................. 8

    III.    Factual Background .......................................................................................... 9

STANDARD OF REVIEW ........................................................................................ 14

SUMMARY OF THE ARGUMENT ......................................................................... 16

ARGUMENT .............................................................................................................. 17

    I.    Commerce's Selection of Malaysia as the Primary Surrogate Country Is Unsupported by Substantial Evidence and Is Arbitrary and Capricious Because It Overlooked Romania's Status as a Significant Producer and the Superior Quality of Romanian Data .................................... 17

        A.    Commerce's Determination That Romania Is Not a Significant Producer Is Not Supported by Substantial Evidence ...................................................................... 18

        B.    Commerce's Selection of Malaysia as the Primary Surrogate Country is Unsupported by Substantial Evidence Because Commerce Did Not Evaluate Whether Malaysia's Data Constituted the Best Available Information Compared to Romania's as Required by 19 U.S.C. § 1677b(c)(1)(B) .............................................................................. 20

    II.    To the Extent Commerce's Selection of Malaysia as the Primary Surrogate Country Was Lawful, Its Selection Of an Aberrational Surrogate Value for Coal Tar Is Unsupported by Substantial Evidence and Inconsistent With Its Obligation To Use the Best Available Information .......................................................................................................... 27

    III.    To the Extent Commerce's Selection of Malaysia as the Primary Surrogate Country Was Lawful, Its Selection of an Aberrational Surrogate Value for Sub-Bituminous Coal Is Unsupported by Substantial Evidence and Inconsistent With Its Obligation To Use the Best Available Information ....................................................................................... 32

IV.     To the Extent Commerce's Selection of Malaysia as the Primary Surrogate Country Was Lawful, Its Selection Of an Aberrational Surrogate Value for Hydrochloric Acid Is Unsupported by Substantial Evidence and Inconsistent With Its Obligation To Use the Best Available Information ................................................................................................ 33

V.     To the Extent Commerce's Selection of Malaysia as the Primary Surrogate Country Was Lawful, Its Selection Of an Aberrational Surrogate Value for Sodium Hydroxide and Potassium Hydroxide is Unsupported by Substantial Evidence and Inconsistent With Its Obligation To Use The Best Available Information ................................................................ 39

VI.     If Commerce's Selection of Malaysia as the Primary Surrogate Country was Lawful, Commerce's Decision to Exclude Financial Statements from Producers of Identical Merchandise In its Financial Ratio Calculation Is Not Supported by Substantial Evidence. ... 41

VII.     Commerce's Decision To Deny Jilin's Ministerial Error Allegations By Adding "Fair Value Loss on Equity Investments" And "Loss on Disposal of Equity Instruments" To The Profit Category In The Financial Ratio Calculation Was Not Supported By Substantial Evidence ........................................................................................................................... 43

VIII.     Commerce Should Adopt The Formula Jilin Proposed In Its Section C Questionnaire Response To Correct A Double Multiplication Error In The Per Unit VAT Tax (I.E., RVATTAXU = (TOTAMO / 1.13 * 0.13) / QTYU) TO DERIVE "RVATTAXU" ................ 44

CONCLUSION ............................................................................................................ 45

# TABLE OF AUTHORITIES

**Cases**

*Ad Hoc Shrimp Trade Action Comm. v. United States*, 882 F. Supp. 2d 1366 (Ct. Int'l Trade 2012) .......26

*Ancientree Cabinet Co. v. United States*, 532 F. Supp. 3d 1241 (Ct. Int'l Trade 2021)..........................15

*Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367 (Fed. Cir. 2012)...............15

*Consol. Bearings Co. v. United States*, 348 F.3d 997 (Fed. Cir. 2003) .................................................16

*Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197 (1938) .......................................................................14

*CP Kelco U.S., Inc. v. United States*, 949 F.3d 1348 (Ct. Int'l Trade 2020) ........................................42

*CS Wind Viet. Co. v. United States*, 832 F.3d 1367 (Fed. Cir. 2016)....................................................15

*Delverde, SrL v. United States*, 202 F.3d 1360 (Fed. Cir. 2000)..........................................................21

*Dorbest Ltd. v. United States*, 604 F.3d 1363 (Fed. Cir. 2010).......................................................9, 41

*Fuwei Films (Shandong) Co. v. United States*, 837 F. Supp. 2d 1347 (Ct. Int'l Trade 2012)................22

*Guangdong Chems. Imp. & Exp. Corp. v. United States*, 460 F. Supp. 2d 1365 (Ct. Int'l Trade 2006)....43

*Heze Huayi Chem. Co. v. United States*, 532 F. Supp. 3d 1301 (Ct. Int'l Trade 2021) .........................22

*Jiaxing Bro. Fastener Co., Ltd. v. United States*, 822 F.3d 1289 (Fed. Cir. 2016) ..............................39

*Jinan Yipin Corp. v. United States*, 637 F.Supp.2d 1183 (Ct. Int'l Trade 2009) ..................................39

*Linyi Chengen Imp. and Exp. Co. v. United States*, 391 F. Supp. 3d 1283 (2019)................................15

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024)............................................................16, 21

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ..............15

*NTSF Seafoods Joint Stock Co. v. United States*, 487 F. Supp. 3d 1310 (Ct. Int'l Trade 2020)..............41

*Parkdale Int'l v. United States*, 475 F.3d 1375 (Fed. Cir. 2007) ........................................................39

*Sandifer v. U.S. Steel Corp.*, 571 U.S. 220,  134 S. Ct. 870, 187 L. Ed. 2d 729 (2014).........................16

*SKF USA Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001).........................................................15

*SKF USA, Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001)......................................................... 9

*Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996)..............................................15

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ...................................................................15

*Yama Ribbons & Bows Co. v. United States*, 865 F. Supp. 2d 1294 (2012) .........................................15

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013).......................15

**Statutes**

19 U.S.C. § 1516(a)(2)(B)(iii) ......................................................................................................... 5

19 U.S.C. § 1516a(a)(2)(A)(i)(II) ................................................................................................... 5

19 U.S.C. § 1516a(a)(2)(B)(iii) .....................................................................................................14

19 U.S.C. § 1516a(b)(1)(B)(i) .......................................................................................................14

19 U.S.C. § 1675 ......................................................................................................................... 5

19 U.S.C. § 1677b(c)(1) ....................................................................................................... passim

19 U.S.C. § 1677b(c)(1)(B) .................................................................................................. passim

19 U.S.C. § 1677b(c)(4) ....................................................................................................... passim

28 U.S.C. § 1581(c) ..................................................................................................................6, 14

**Other Authorities**

*Enforcement and Compliance's Policy Bulletin No. 04.1, regarding, "Non-Market Economy Surrogate*
    *Country Selection Process"* (March 1, 2004)............................................................19, 20, 26, 27

**Rules**

USCIT R. 3(a)-(b) ................................................................................................................ 6

**Regulations**

19 CFR § 351.224(f) ...........................................................................................................43

**Administrative Determinations**

*1,1,1,2-Tetrafluroethane from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 79 Fed. Reg. 62597 (Dep't of Commerce Oct. 20, 2014)...............................................34

*Carbazole Violet Pigment 23 from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 75 Fed. Reg. 36630 (Dep't of Commerce June 28, 2010)............................34

*Certain Activated Carbon From the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review; 2022–2023*, 89 Fed. Reg. 10,4978 (Dep't of Commerce Dec. 26, 2024) . 1

*Certain Activated Carbon From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2022–2023*, 89 Fed. Reg. 92,893 (Dep't of Commerce Nov. 25, 2024) .......... 1

*Certain Activated Carbon From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2022–2023*, 89 Fed. Reg. 35797 (Dep't of Commerce May 2, 2024)...... 7

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review and New Shipper Reviews; 2010-2011*, 78 Fed. Reg. 17350 (Dep't of Commerce March 21, 2013) ...................................................................................................... 9

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, and Affirmative Final Determination of Critical Circumstances, in Part,* 77 Fed. Reg. 63791 (Dep't of Commerce Oct.ober 17, 2012) ......................................................................................................................35

*Freshwater Crawfish Tail Meat from the People's Republic of China; Notice of Final Results of Antidumping Duty Administrative Review, and Final Partial Rescission of Antidumping Duty Administrative Review*, 67 Fed. Reg. 19546 (Dep't of Commerce April 22, 2002)..........................40

*Initiation of Antidumping & Countervailing Duty Administrative Review*, 88 Fed. Reg. 38021 (Dep't of Commerce June 12, 2023)........................................................................................... 6

*Multilayered Wood Flooring from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 79 Fed. Reg. 26712 (Dep't of Commerce May 9, 2014) .............................30

*Multilayered Wood Flooring from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011–2012*, 79 Fed. Reg. 26712 (Dep't of Commerce May 9, 2014) ...........35

*Polyethylene Terephthalate Film, Sheet, and Strip from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 73 Fed. Reg. 55039 (Dep't of Commerce Sept. 24, 2008)..........................................................................................................................40

*Saccharin from the People's Republic of China: Final Results of the 2005-2006 Antidumping Duty Administrative Review*, 72 Fed. Reg. 51800, (Dep't of Commerce Dec 4, 2007) .............................32

Plaintiffs Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd. ("GHC") and Jilin Bright Future Chemicals Co., Ltd. ("Jilin"), Consolidated Plaintiffs, Carbon Activated Tianjin Co., Ltd., and Carbon Activated Corporation (collectively, "Plaintiffs"), and Plaintiff-Intervenors Bengbu Modern Environmental Co., Ltd., Datong Hongdi Carbon Co., Ltd., Datong Juqiang Activated Carbon Co., Ltd., Datong Municipal Yunguang Activated Carbon Co., Ltd. Ningxia Huahui Environmental Technology Co., Ltd., and Shanxi Industry Technology Trading Co., Ltd. (collectively, "Plaintiff-Intervenors"), respectfully submit this Rule 56.2 Motion for Judgment on the Agency Record with respect to the final results issued by the U.S. Department of Commerce ("Commerce") in the administrative review of the antidumping duty order published in the Federal Register as *Certain Activated Carbon From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2022–2023*, 89 Fed. Reg. 92,893 (Dep't of Commerce Nov. 25, 2024) ("*Final Results*") and accompanying Final Issues and Decision Memorandum ("*Final IDM*"), as amended by *Certain Activated Carbon From the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review; 2022–2023*, 89 Fed. Reg. 10,4978 (Dep't of Commerce Dec. 26, 2024) ("*Amended Final Results*") and accompanying Issues and Decision Memorandum ("*Amended IDM*").

For the reasons explained below, this Court should hold that the contested portions of the *Final Results* and *Amended Final Results* are not supported by substantial evidence or otherwise in accordance with law and remand this matter to Commerce for a redetermination consistent with the opinion of this Court.

## INTRODUCTION

Activated carbon is a product used in purification and filtration processes, such as water treatment, air purification, and industrial chemical processing. This appeal presents issues

related to surrogate country selection and surrogate values ("SV") that examine what happened to make antidumping duty ("AD") rates in the period of review covering April 1, 2022, to March 31, 2023, ("POR") increase significantly from the directly preceding review:

| Respondent | AR15 (2021-2022) | AR16 (2022-2023) | Percentage Increase |
|---|---|---|---|
| Jilin | 0.23 USD/kg | 1.95 USD/kg | 848% |
| GHC (All Others Rate) | 0.23 USD/kg | 1.21 USD/kg | 526% |
| All Others | 0.23 USD/kg | 1.44 USD/kg | 626% |

There were no material changes in the market for activated carbon between the two reviews. The key difference is two aberrational SVs for key inputs that distorted the AD margin calculation for both Jilin and GHC, and consequently for Plaintiff-Intervenors, the separate rate companies that all received the average of Jilin and GHC's rates. The aberrational SVs would have been avoided had Commerce not rejected Romania as a surrogate country, or at a minimum, not dismissed Romanian SVs when confronted with aberrational SVs from Malaysia. Instead, Commerce unlawfully refused to consider Romania as a surrogate country or use any potential SVs from Romania, resulting in aberrational AD margins. Using Romanian SVs would be in line with Commerce's mandates to use the best available information and to calculate AD margins as accurately as possible.

### STATEMENT PURSUANT TO USCIT R.56.2(c)(1)

### I.  Administrative Determination To Be Reviewed

Respondent Parties contest aspects of Commerce's final determination in the 2022-2023 antidumping duty administrative review of activated carbon from China, published as *Final Results*, 89 Fed. Reg. 92,893 and accompanying *Final IDM*, as amended by *Amended Final*, 89 Fed. Reg. 104,978 and accompanying *Amended Final IDM*.

## II.    Issues Presented

**Issue 1:** 19 U.S.C. § 1677b(c)(4) requires Commerce, in an antidumping proceeding concerning a non-market economy" – to select surrogate countries that are – "to the extent possible – at a "comparable" level of economic development and are also "significant producers" of subject merchandise. Commerce rejected Romania because it was not a net exporter during the POR.  But Romania produced significant activated carbon during the POR but was not a net exporter. Commerce excluded Romania, as not a significant producer, relying on its policy equating net exports with significant production. Is Commerce's exclusion of Romania as a potential surrogate country unlawful?

**Short Answer:** Yes, Commerce's exclusion of Romania is unlawful because it gave dispositive weight to its policy that a significant producer includes a net exporter, rather than fully evaluating Romania's production in light of the statutory requirement under 19 U.S.C. § 1677b(c)(4).

**Issue 2:** 19 U.S.C. § 1677b(c)(1)(B) requires Commerce to use the "best available information" to value factors of production, an obligation the Court has recognized as equally critical in determining surrogate country eligibility. Commerce excluded Romania from surrogate country consideration based solely on its policy that a net exporter satisfies the significant producer requirement, without evaluating whether Romania's data were more reliable than Malaysia's, despite record evidence of aberrational Malaysian surrogate values. Is Commerce's exclusion of Romania from surrogate country consideration without a meaningful comparison of its data to Malaysia's to determine the "best available information" unlawful?

**Short Answer:**  Yes, Commerce's exclusion of Romania is unlawful because it failed to conduct a reasoned comparison of data quality and ignored record evidence showing Malaysia's surrogate values were aberrational.

**Issue 3:** GHC used 1,986.18 kg of hydrochloric acid in the production of activated carbon during the POR. Commerce selected the 3.13 USD/kg average unit value ("AUV") as the surrogate value based on 878,994 kg of hydrochloric acid imports into Malaysia. This value represents a drastic increase, approximately 130% higher than the AR15 AUV and 79% higher than the AR 14 AUV. It is also more than 500% higher than the

next highest AUV reported among potential surrogate countries and 2,275% of the global average. Did Commerce err in selecting this surrogate value despite clear evidence that it was aberrational, contrary to its obligation to use the best available information under 19 U.S.C. § 1677b(c)(1)(B)?

**Short Answer**: Yes, Commerce relied on an aberrational surrogate value for hydrochloric acid that, given its drastic increases over historical and contemporaneous benchmarks, did not reflect the best available information and was therefore contrary to its legal obligation.

**Issue 4:** GHC used 33,904.36 kg of coal tar in the production of activated carbon during the POR. Commerce selected the 1.67 USD/kg AUV as the surrogate value based on 73,198 kg of coal tar imports into Malaysia, a figure that sharply deviated from both historical Malaysian AUVs and contemporaneous values from other potential surrogate countries. Did Commerce err in selecting this surrogate value despite clear evidence that it was aberrational, contrary to its obligation to use the best available information under 19 U.S.C. § 1677b(c)(1)(B)?

**Short Answer:**  Yes, Commerce selected an aberrational surrogate value for coal tar that, given its drastic increases over historical and contemporaneous benchmarks, did not reflect the best available information and was therefore contrary to its legal obligation.

**Issue 5:** GHC used sub-bituminous coal in the production of activated carbon during the POR. Commerce selected the 0.39 USD/kg AUV as the surrogate value based on 4,707,477,525 kg of sub-bituminous coal imports into Malaysia, representing a stark increase compared to historical values and more than 200% higher than the AUV reported in AR15. Moreover, Commerce relied on a country not considered as a potential surrogate country in its benchmarking analysis. Did Commerce err in selecting this aberrational surrogate value?

**Short Answer**: Yes, Commerce selected an aberrational surrogate value for sub-bituminous coal that, given its drastic increases over historical benchmarks, did not reflect the best available information and was therefore contrary to its legal obligation.

**Issue 6:** GHC used sodium hydroxide and potassium hydroxide during the POR. Commerce selected the 1.03 USD/kg AUV for the surrogate value for sodium hydroxide based on 3,097,288 kg of imports into Malaysia, and the 7.91 MYR/kg AUV for the

surrogate value for potassium hydroxide, despite both values significantly deviating from world AUVs that were on the record. Did Commerce err in selecting these aberrational surrogate values?

**Short Answer**: Yes, Commerce selected aberrational surrogate values for sodium hydroxide and potassium hydroxide that, given their drastic increases over global averages, do not reflect the best available information and were therefore contrary to its legal obligation.

**Issue 7:** Commerce must abide by its obligation under 19 U.S.C. § 1677b(c)(1)(B) to use the "best available information" when selecting financial statements to include in financial ratio calculations. It is Commerce's own best practice to include as many usable financial statements in these calculations to mitigate the distortive impact of outliers and provide the most representative data. GHC and Jilin offered three financial statements from Malaysian producers of activated carbon that were not incorporated in these calculations. Did Commerce use an unlawful financial ratio calculation?

**Short Answer:** Yes, Commerce's calculation of the financial ratio was unsupported by substantial evidence and thus unlawful.

**Issue 8:** Jilin alleged Commerce made a ministerial error under 19 CFR 351.224(f). Commerce removed "Fair Value Loss on Equity Investments" and "Loss on Disposal of Equity Instruments" from selling, general, and administration expenses but added these value decreases as profit in Century's financial statement. Did Commerce commit a ministerial error by adding these losses as positive values in Century's financial statement?

**Short Answer:** Yes. According to Commerce's established practice and general accounting principles, the "Fair Value Loss on Equity Investments" and "Loss on Disposal of Equity Instruments" categories were wrongfully added to profit after being subtracted from selling, general, and administration expenses. Commerce's error resulted in an unlawfully inflated AD margin.


## JURISDICTION

This action contests a final decision by Commerce under 19 U.S.C. § 1675 and thus is

brought under 19 U.S.C. §§ 1516a(a)(2)(A)(i)(II) and 1516(a)(2)(B)(iii). Jilin and GHC timely

filed a combined summons within 30 days of publication of the *Final Results* and timely filed the complaint within 30 days of the filing of the summons. See USCIT R. 3(a)-(b); ECF1, Summons; ECF7, Complaint. Thus, this Court has jurisdiction pursuant to 28 U.S.C. § 1581(c).

## STATEMENT OF FACTS

### I.    Procedural Background

On June 12, 2023, Commerce initiated an administrative review of the Order covering the period of review ("POR") of April 1, 2022, through March 31, 2023, based on timely requests from interested parties, including Plaintiffs and Calgon Carbon Corporation and Norit Americas, Inc. (collectively, the "Petitioners" or "Petrs"). *See* PR29, *Initiation of Antidumping & Countervailing Duty Administrative Review*, 88 Fed. Reg. 38021 (Dep't of Commerce June 12, 2023); PR7, *Petrs Request for Review*; PR11, *Jilin Request for Review*; PR13, *GHC Request for Review*. Commerce subsequently issued a respondent selection memorandum on July 27, 2023, selecting Plaintiffs as mandatory respondents. *See* PR76/CR35, *Respondent Selection Memo*, at 5.

On November 7, 2023, Commerce placed on the record a list of potential surrogate countries based on economic comparability to China, namely Romania, Panama, Costa Rica, Malaysia, Bulgaria, and Türkiye ("OP List"), and invited interested parties to comment on the selection of the primary surrogate country ("SC") and provide surrogate information to value the FOPs ("Surrogate Value" or "SV"). *See* PR131, *SC/SV Request Letter*, at Attachment Surrogate Countries Memorandum. Plaintiffs and Petitioners submitted comments on surrogate country selection on November 21, 2023. *See* PR132, *Jilin SC Cmts*; PR137, *GHC SC Cmts*; PR134–136, *Petrs SC Cmts.*

The parties submitted information to value SVs on December 20, 2023. *See* PR144–145, *Jilin SV Cmts*; PR146–149, *GHC SV Cmts*; PR150–151, *Petrs SV Cmts*. The parties submitted rebuttal comments on information to value SVs on January 10, 2024. *See* PR155–156, *GHC Rebuttal SV Cmts*; PR157–160, *Jilin Rebuttal SV Cmts*; PR161–165, *Petrs Rebuttal SV Cmts*. The parties submitted additional information to value SVs on March 27, 2024. *See* PR194–196/CR144–146, *Jilin Final SV Cmts*; PR188–191, *GHC Final SV Cmts*; PR192–193, *Petrs Final SV Cmts*. Jilin and Petitioners submitted rebuttal comments on additional information to value SVs on April 8, 2024. See PR204–205, *Jilin Final Rebuttal SV Cmts*; PR206, *Petrs Final Rebuttal SV Cmts*; PR208–211, *Petrs Final Rebuttal SV Submission*.

GHC submitted pre-preliminary comments on April 8, 2024. See PR207/CR197, *GHC Pre-Prelim Cmts*. Commerce issued its preliminary determination on May 2, 2024, selecting Malaysia as the primary surrogate country, including data from Turkiye for labor SV. *See* PR220, *Certain Activated Carbon From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2022–2023*, 89 Fed. Reg. 35797 (Dep't of Commerce May 2, 2024) ("*Preliminary Results*" or "*Prelim. Results*"); PR221, *Decision Memorandum for the Preliminary Results of the 2022-2023 Administrative Review of the Antidumping Duty Order on Certain Activated Carbon from the People's Republic of China* ("*PDM*"); PR216, *Surrogate Value Memorandum for the Preliminary Determination*.

The parties submitted case briefs on June 12, 2024, *see* PR229–230/CR221–222, *Jilin Case Br.*; PR231/CR223, *GHC Case Br.*; PR232/CR224, *Petrs Case Br. re Jilin*; PR233/CR225–226, *Petrs Case Br. re GHC*, and rebuttal briefs on July 2, 2024. *See* PR238/CR227, *GHC Rebuttal Br.*; PR239/CR228, *Jilin Rebuttal Br.*; PR240/CR229, *Petrs Rebuttal Br.*

On November 5, 2024, Commerce issued the Final Results and the accompanying Decision Memorandum. See PR250, *Final Results*, and PR251, *Final IDM*. On November 20, 2024, GHC and Jilin both submitted comments on ministerial errors. *See* PR266, *Jilin Ministerial Error Allegation*. On December 18, 2024, Commerce issued amended final results. *See* PR270, *Amended Final Results*, and PR271, *Amended Final IDM*.

## II.    Legal Background

This appeal presents arguments related to surrogate country selection, surrogate value selection, and financial ratio calculation.

*Surrogate Country.*  Under 19 U.S.C. § 1677b(c)(4), when Commerce investigates subject merchandise exported from a non-market economy ("NME") country, it must obtain factors of production ("FOPs") and corresponding SVs to value each FOP. Commerce must, to the extent possible, use SVs from one or more surrogate countries that are at a comparable level of economic development to the NME under investigation and are significant producers of comparable merchandise.  Commerce's overarching obligation is that "the valuation of the factors of production shall be based on the best available information."  19 U.S.C. § 1677b(c)(1)(B).

Further, Congress expects that the best available information may not be concentrated in a single surrogate country, stating in the statute that the values should be taken from "a market economy *country or countries*."  *Id.* (emphasis added).  The "best available" directive controls selection, without limitation to a preference to select SV from a single country.

*Surrogate Values.*  Under the "best available information" directive, Commerce has a practice of selecting SVs which are publicly available, product specific, representative of a broad market average, tax exclusive and contemporaneous with the POR.  *See, e.g., Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results of Antidumping Duty*

8

*Administrative Review and New Shipper Reviews; 2010-2011*, 78 Fed. Reg. 17350 (Dep't of Commerce March 21, 2013), and accompanying IDM at Comment I (C).

      *Financial Ratio Calculation.*  When calculating financial ratios, Commerce's longstanding practice is to average as many usable financial statements as possible to account for outliers and provide the most representative data. *See Dorbest Ltd. v. United States*, 604 F.3d 1363, 1368 (Fed. Cir. 2010). Commerce must provide a reasonable explanation if it chooses to depart from this practice. *See SKF USA, Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("An agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently." (internal citation omitted)).

### III.    Factual Background

      Regarding surrogate-country selection, Plaintiffs argued that all potential countries on the list except Panama demonstrate commercial-level exports of activated carbon based on the 2022 United Nations International Trade Statistics Database ("UN Comtrade") data and therefore qualify as significant producers of comparable merchandise. *See* PR132, *Jilin SC Cmts*, at 3; PR137, *GHC SC Cmts*, at 3–4. Petitioners submitted Trade Data Monitor ("TDM") data, contending that Malaysia is the only country likely to provide high-quality SV information, based upon the existence of several known producers of activated carbon and Malaysia's status as both the largest exporter of activated carbon and the only net exporter. *See* PR134, *Petrs SC Cmts*, at 6–7.

      For SV, Jilin submitted Romanian TDM import data for raw material inputs covering the POR and a financial ratio calculation worksheet based on financial statements from S.C. Romcarbon S.A. ("Romcarbon"), a Romanian producer of activated carbon. *See* PR144–145, *Jilin SV Cmts*. GHC submitted Romanian TDM import data for raw materials as well as

Malaysian TDM import data for certain packing materials and natural gas for energy. *See* PR146–149, *GHC SV Cmts*. Petitioners submitted Malaysian TDM import data for the FOP and proposed a labor rate from Türkiye, sourced from the International Labor Organization (ILO), in lieu of that for Malaysia due to concerns about forced labor in the Malaysian manufacturing sector. *See* PR150–151, *Petrs SV Cmts*.

GHC argued that Malaysian TDM import data is not reliable for some raw materials submitted by Petitioners because of significant year-over-year price increases compared to the data from the immediately preceding period of review, POR 15.[1] *See* PR155, *GHC Rebuttal Cmts* at 2–3. Petitioners argued that Romania was not a significant producer of identical or comparable merchandise because Commerce had found as much in previous administrative reviews and because TDM data indicate Malaysia is the only net exporter during the POR. *See* PR161, *Petrs Rebuttal Cmts* at 4–7. Petitioners argued that financial statements of Malaysian activated carbon producers indicate that Malaysia is a significant producer by gross revenue and output figures. *See id.* at 9–10. Petitioners contend that, in contrast, the financial statements of Romania producer of activated carbon, Romcarbon, showed less production of activated carbon, accounting for a small percentage of the Romcarbons's overall revenue. *See id.* at 8–9.

For surrogate financial ratios, Jilin submitted data from the audited 2022 financial statements for New Chang Hua Sdn. Bhd.), Mesjaya Abadi Sdn. Bhd., and Greenlink Biotech Sdn. Bhd., all producers of activated carbon from Malaysia. *See* PR194–196, *Jilin Final SV Cmts.* Jilin also submitted POR import data covering HTS 2701.12 Bituminous Coal for Malaysia from TDM; HTS 2706.00 coal tar, HTS 2701.12 Bituminous Coal, and 2701.19 sub-bituminous Coal for Romania and Turkiye from UN Comtrade and TDM. *See id.*

---

[1] The HTS codes most relevant to the parties' SV disputes include: HTS 2706.00 coal tar, 2801.19 sub-bituminous coal, 2806.10 hydrochloric acid, 2815.11 sodium hydroxide, and 2815.20 potassium hydroxide

GHC submitted the financial ratios calculation worksheet, the 2022 financial statement, and company brochure from Nikom Carbon Technology Sdn. Bhd. ("Nikom"), a producer of activated carbon from Malaysia, and calculations of unit values and worldwide average unit values ("AUVs"), calculated as the global average of all countries' reported imported unit values for a given HTS code during the POR, for the raw material inputs using UN Comtrade data. *See* PR188–191, *GHC Final SV Cmts*. Petitioners submitted updated SV information covering raw materials, by-products, energy, labor, and financial ratios, and 2022 financial statements for Century Chemical Works Sdn. Bhd. ("Century"), a producer of activated carbon from Malaysia, for overhead, selling, general, and administration expenses ("SG&A"), and profit ratios. *See* PR192–193, *Petrs Final SV Cmts*.

GHC submitted its pre-preliminary comments, urging Commerce to select Romania as the primary surrogate country on the grounds that Malaysia's data is aberrational. *See* PR207/CR197, *GHC Pre-Prelim Cmts*. GHC reiterated the concerns regarding the reliability of Malaysian SVs, highlighting dramatic one-year increases in certain Malaysian SVs corresponding to key inputs. *See id.* at 3.

GHC also highlighted that UN Comtrade data show significant deviations between Malaysia's SVs and corresponding world AUVs for several inputs: Malaysia's AUV for coal tar was $1.65/kg compared to the world AUV of 0.48 USD/kg; for hydrochloric acid, $3.64/kg compared to $0.16; for sodium hydroxide, $2.60/kg compared to $1.02/kg; and for potassium hydroxide, $2.31/kg compared to $1.20/kg. *See id.* at 3–4. Malaysia's SVs were multiples of global averages, while Romanian SVs for these inputs are much closer to the world AUVs. *See id.* GHC argued that aberrations in Malaysian data should have led Commerce to select Romania as the primary surrogate country. *See id.* at 4.

11

Further, for surrogate financial values, were Commerce select Malaysia, Commerce should rely on Nikom's financial statements rather than Century's, as Nickom's are more contemporaneous with the POR and more complete for purposes of calculating surrogate financial ratios. *See id*. GHC noted that Nikom's financial statements cover the period from June 1, 2022 to May 31, 2023, overlapping with ten of the twelve months of the POR, compared to just 9 months for Century, which does not show production of comparable merchandise. *See id.* at 6. Nikom's financial statements are complete, contain no indication of countervailable subsidies, and provide sufficient detail for calculating overhead and SG&A. *See id.* at 5. *See id.* Century's profit margin (35.83%) is significantly higher than those of other producers on the record, including Nikom (13.64%), New Chang Hua (2.99%), Mesjaya (3.44%), and Greenlink (6.40%). *See id.* at 5–6.

Commerce preliminarily determined that Malaysia was the only country among those under consideration that qualified as a significant producer of comparable merchandise and that Malaysian data constituted the best available SV data for all SV except labor. *See* PR221, *PDM* at 7–8. Commerce acknowledged that both Romania and Malaysia meet the criteria for surrogate country selection, but relied on financial statements from Romcarbon to conclude that Romania did not demonstrate significant production of the subject merchandise when compared to the Malaysian financial statements on the record. *See id.* at 8–9.

Commerce relied on Malaysian import data for direct materials and packing materials from TDM and Turkish labor data from the ILO because of Malaysian labor data concerns. *See id.* at 18–22. Commerce averaged the financial statements of Century and New Chang Hua to calculate financial ratios, excluding Mesjaya, Greenlink, and Nikom, the other Malaysian companies on the record. *See id.* Commerce preliminarily determined weighted-average dumping

margins of $2.01/kg for Jilin; and $1.17kg for GHC; with $1.43/kg for non-selected companies. *See* PR220, *Prelim. Results* at 35,798.

Plaintiffs case briefs reiterated arguments raised earlier supporting Romania as the primary surrogate. *See* PR229, *Jilin Case Br.* at 4–7; *GHC Case Br.* at 11–16.

Plaintiffs argued that Malaysian import data from TDM for coal tar and hydrochloric acid, were unreliable because of substantial discrepancies between Malaysian import and export volumes and prices, low import quantities, and significant deviations from world average unit values, and thus were unrepresentative of a broad market average, *see* PR229/CR221, *Jilin Case Br.*; PR231/CR223, GHC *Case Br.*, while Romanian trade data for these inputs reflected higher volumes and closer alignment with global averages. *See* PR231/CR223, *GHC Case Br.* at 12–15. Plaintiffs also argued that all financial statements on record should be included in the surrogate financial ratio calculation. *Id.*

In the *Final Results*, Commerce maintained Malaysia as the primary surrogate country for valuing all the respondents' FOPs except labor (using Turkish labor data), rejected Romania as the surrogate country for any purpose, and relied only on financial statements of Century and New Chang Hua for calculating surrogate financial ratios. *See* PR251, *Final IDM* at 7. Commerce reclassified Century's "Fair Value Loss on Equity Investments" and "Loss on Disposal of Equity Instruments" from SG&A to profit. Commerce determined final weighted-average dumping margins of $1.95/kg for Jilin and $1.21/kg for GHC, while non-selected companies received the average, 1.44 USD/kg. *See* PR250, *Final Results,* at 92894.

Jilin submitted ministerial error allegation, arguing that Commerce incorrectly removed "Fair Value Loss on Equity Investments" and "Loss on Disposal of Equity Instruments" from Century's SG&A while continuing to treat these two values as additions to profit rather than

deductions in the calculation of Century's surrogate financial ratios. *See* PR266, *Jilin Ministerial Error Allegation*. This treatment inflated the profit ratio and affected the resulting dumping margin for Jilin. *See id.* at 2. GHC alleged Commerce incorrectly used the SV for lump coal instead of for bituminous coal in calculating GHC's dumping margin. *See* PR265, *GHC Ministerial Error Allegations*.

Commerce issued an amended final results, correcting the inadvertent ministerial error alleged by GHC of using the SV for lump coal instead of bituminous coal when valuing bituminous coal in calculating the respondents' final margins, and revised Jilin's final dumping margin to 1.90 USD per kilogram and GHC's final dumping margin to 1.10 dollars per kilogram. *See* PR270, *Amended Final Results* at 3, and PR271, *Amended IDM* at 1. Commerce rejected Jilin's ministerial error allegation, stating that although the items were not related to operating costs, they nonetheless contributed to profitability, and thus declined to revise its surrogate financial ratio calculations. *See* PR271, *Amended IDM* at 4–5.

## STANDARD OF REVIEW

This Court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c). When reviewing the final results of countervailing and antidumping duty reviews, this Court shall hold unlawful and remand any administrative determination by Commerce that is "not supported by substantial evidence or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938). "The substantiality of evidence must take into account

whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).

For Commerce to "fulfill [its] obligation" under the substantial evidence and in accordance with law standard, it must "examine the record and articulate a satisfactory explanation for its action." *CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1376 (Fed. Cir. 2016) (quoting *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013)). Commerce's explanation must explain that its decision is "authorized by the statute, and consistent with the agency's regulations." *Yama Ribbons & Bows Co. v. United States*, 865 F. Supp. 2d 1294, 1297 (2012).

In addition, the court will hold unlawful any determination that is "arbitrary and capricious." *Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367, 1377 (Fed. Cir. 2012); *Ancientree Cabinet Co. v. United States*, 532 F. Supp. 3d 1241, 1251-52 (Ct. Int'l Trade 2021). An agency acted in an arbitrary and capricious manner if it "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Linyi Chengen Imp. and Exp. Co. v. United States*, 391 F. Supp. 3d 1283, 1292 (2019) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

Moreover, "it is well-established that 'an agency action is arbitrary when the agency offer[s] insufficient reasons for treating similar situations differently." *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (alteration in original) (quoting *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996)). To demonstrate that Commerce's actions were arbitrary and capricious, a plaintiff "must show that Commerce consistently followed a

contrary practice in similar circumstances and provided no reasonable explanation for the change in practice." *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003).

The plain language of a statute has always controlled over any preferred interpretation by an agency, *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227, 134 S. Ct. 870, 187 L. Ed. 2d 729 (2014) ("It is a fundamental cannon of statutory construction that . . . words will be interpreted as taking their ordinary, contemporary, common meaning." (internal quotation marks and citation omitted)), and this Court interprets ambiguous statutory without deferring to any interpretation by the agency. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024). In doing so, this Court must "exercise {its} independent judgment in deciding whether an agency has acted within its statutory authority." *Id.*, 603 U.S. at 412. To the extent ambiguity may be found in the law, "agencies have no special competence in resolving statutory ambiguities." *Id.* at 400–01. Instead, "courts use every tool at their disposal to determine the best reading of the statute and resolve the ambiguity." *Id.* at 400.

## SUMMARY OF THE ARGUMENT

Commerce's determinations in the final results of the 2022–2023 administrative review of the antidumping duty order on activated carbon from China are unsupported by substantial evidence and not in accordance with law.

First, Commerce unlawfully excluded Romania from consideration as the primary surrogate country by giving dispositive weight to its policy that a "significant producer" includes a net exporter, rather than evaluating the totality of the circumstances as required. As a result of this exclusion, Commerce failed to compare the quality of Romanian data against Malaysian data on the record, despite clear evidence that Malaysian surrogate values were aberrational and that Romanian surrogate values were more reliable and consistent.

Second, Commerce selected Malaysian surrogate values for key inputs, namely hydrochloric acid, coal tar, sub-bituminous coal, sodium hydroxide, and potassium hydroxide, that are aberrational under its benchmarking practices. Historical Malaysian data, contemporaneous values from other OP List countries during the POR, and corresponding world averages demonstrate that these values are severely inflated. Rather than adjust for or replace these distortions with more reliable Romanian data, Commerce ignored or downplayed the discrepancies.

Third, Commerce departed from its longstanding practice of including as many usable financial statements as possible when calculating surrogate financial ratios, instead excluding financial statements of multiple Malaysian producers without a reasonable explanation. This narrowed dataset amplified distortions and further inflated the resulting margins.

Fourth, Commerce's refusal to correct Jilin's ministerial error allegation was unsupported by substantial evidence and inconsistent with both standard accounting principles and its own established practice. In calculating Century's profit ratio, Commerce subtracted "Fair Value Loss on Equity Investments" and "Loss On Disposal of Equity Instruments" from SG&A but added these losses to profit, inflating the surrogate financial ratio and increasing Jilin's dumping margin. Under C.F.R. § 351.224(f), this constitutes a ministerial error in arithmetic or similar unintentional error. Commerce offered no reasonable explanation for departing from the principles that such losses reduce, rather than increase, profit.

## ARGUMENT

I.   **Commerce's Selection of Malaysia as the Primary Surrogate Country Is Unsupported by Substantial Evidence and Is Arbitrary and Capricious Because It Overlooked Romania's Status as a Significant Producer and the Superior Quality of Romanian Data**

Commerce's decision to select Malaysia as the primary surrogate country is not supported by substantial evidence on the record and, thus is not in accordance with the law. Commerce relied on an incorrect interpretation of the statutory requirements for selecting surrogate countries and subsequently failed to apply the correct legal standard and to provide sufficient evidence of its surrogate country selection based on the data availability and reliability criteria. Thus, this Court should remand the *Final Results* for Commerce to reevaluate its surrogate country selection and final rate decision.

**A.  <u>Commerce's Determination That Romania Is Not a Significant Producer Is Not Supported by Substantial Evidence</u>**

In its final results, Commerce concluded that Romania was not a significant producer of activated carbon and therefore not eligible for selection as the primary surrogate country. *See* PR251, *Final IDM* at 8–10. Commerce should not have disqualified Romania as a potential surrogate country simply because it was not a net exporter of activated carbon and its production was not as high as Malaysia.  Congress set the qualifications for surrogate countries as simply "significant producers of comparable merchandise."  19 U.S.C. § 1677b(c)(4).  Romania produced significant activated carbon during the POR, but was disqualified Romania because it does not export more activated carbon than it imports.  Commerce did not dispute that Romcarbon produces activated carbon. *See* PR161, *Petrs Rebuttal SV Cmts* at 7. The additional qualification are not required by Congress.  Because Romania produced a significant volume of activated carbon, Commerce's decision to disqualify Romania from consideration was contrary to law and unsupported by substantial evidence.

The primary statutory directive is to base the FOP values on the "best available information."  *See* 19 U.S.C. § 1677b(c)(1)(B).  The statute sets forth two criteria for choosing a primary surrogate country: they must be market economy countries that are: (1) "at a level of

economic development comparable to that of the nonmarket economy country," and (2) a "significant producer[] of comparable merchandise." 19 U.S.C. § 1677b(c)(4).

Commerce generally defines "significant producer" as a 'significant net exporter.'" *See* PR251, *Final IDM* at 7. But even Commerce acknowledges elsewhere that the statute does not require "the *most* significant producer of comparable merchandise" as a surrogate country. *Enforcement and Compliance's Policy Bulletin No. 04.1, regarding, "Non-Market Economy Surrogate Country Selection Process"* (March 1, 2004) ("Policy Bulletin 04.1"); *see also Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1308, 1327 (Ct. Int'l Trade 2018) ("This guidance, however, does not suggest that positive net exports *per se* satisfy the significant producer criterion").

Although Commerce referenced other considerations, including the availability of financial statements, its determination in selecting Malaysia as the primary surrogate country placed predominant weight on net exporter status, rather than fully evaluating the totality of the circumstances. *See* PR251, *Final IDM* at 8. Commerce stated, "Malaysia was the only *net exporter* of activated carbon, *i.e.*, only Malaysia exported more activated carbon than it imported. On this basis, Commerce asserts that record evidence demonstrates that only Malaysia satisfied the second prong for selection as the {surrogate country}." *Id.* Although Commerce considered export data, it based its conclusion that Romania is not a significant producer of comparable merchandise on its review of Romcarbon's financial statements. *See* PR251, *IDM* at 8–10. The financial statements establish that Romcarbon produces significant enough volumes of activated carbon to support an entire production line that saw significant increases in sales. *See* PR161, *Petrs Rebuttal SV Cmts* at 7. And Romcarbon's 2022 annual report describe it as a "long-standing producer of activated carbon." *See* PR144, *Jilin SV Cmts*, Exhibit 8C at 5.

Commerce did not dispute Romcarbon's production of activated carbon, dismissing on the basis of what Commerce claims is insufficient production based on the fact that 2.04% of Romcarbon's revenue derived from finished goods sales of activated carbon and respiratory protective equipment. *See id.*, Exhibit 8C at 9–10. Commerce did not identify a standard by which to determine that production is significant or representative, opining simply that Romcarbon didn't produce enough. Commerce failed to explain why.

Given this evidence, Commerce should not have excluded Romania as one of available surrogate countries from which it could obtain SV.

**B. Commerce's Selection of Malaysia as the Primary Surrogate Country is Unsupported by Substantial Evidence Because Commerce Did Not Evaluate Whether Malaysia's Data Constituted the Best Available Information Compared to Romania's as Required by 19 U.S.C. § 1677b(c)(1)(B)**

Commerce selected Malaysia as the primary surrogate country without evaluating whether the Malaysian data on the record better satisfied the best available information standard for surrogate value selection, thus failing to adequately address the aberrational nature of the Malaysian data as part of that analysis.

Commerce is required to choose SV on the "best available information regarding the values of such factors in a market economy country." 19 U.S.C. § 1677b(c)(1)(B). SV should reflect the most accurate and reliable data available, regardless of whether it comes from a single surrogate country or multiple surrogate countries. Commerce acknowledged in the IDM, "{a} country that perfectly meets the requirements of economic comparability and significant producer is not of much use as a primary surrogate *if crucial factor price data from that country are inadequate or unavailable*" (emphasis added). PR251, *Final IDM* at 15, citing Policy Bulletin 04.1. For this reason, the statutory language Congress choose requires that Commerce select the best available information from among adequate surrogate countries.

Here, Commerce improperly dismissed Romania despite Romania being a significant producer, then failed to evaluate Romanian SV in light of serious aberrations in Malaysian SV. Thus, Commerce failed to adequately examine whether Romania's data constituted the best available information to value certain factors of production. By excluding Romania, Commerce improperly defaulted to Malaysian data without fulfilling its statutory obligation to rely on the best available information under 19 U.S.C. § 1677b(c)(1)(B).

Commerce is bound by the plain language of the statute and the Court's statutory construction. Courts must "exercise their independent judgment in deciding whether an agency has acted within its statutory authority," using "every tool at their disposal to determine the best reading of the statute." *Loper Bright*, 603 U.S. at 412, 373. Courts may not defer to Commerce's interpretation of statutory terms, but must instead apply traditional tools of statutory construction, examining the "statute's text, structure, legislative history, and apply the relevant canons of interpretation" to determine the correct meaning. *Delverde, SrL v. United States*, 202 F.3d 1360, 1363 (Fed. Cir. 2000).

Commerce's discretion is constrained where its interpretation conflicts with statutory mandates. Here, Commerce's policy equating "significant producer" with "net exporter," and a flawed examination of Romcarbon's financial statement fails under 19 U.S.C. § 1677b(c)(1)(B). Moreover, 19 U.S.C. § 1677b(c)(4) directs Commerce to utilize "one or more market economy countries" in its search for the best available information. 19 U.S.C. § 1677b(c)(4). Commerce's administrative preference for valuing all factors of production from a single surrogate country is not in harmony with the statutory language. In this case, Commerce's categorical rejection of Romanian data, without a comparative evaluation against the aberrational Malaysian data, was unlawful.

Under its longstanding practice, when selecting SVs for valuing FOPs, Commerce's practice is to rely on data that, to the extent practicable, are publicly available, contemporaneous with the POR, representative of a broad market average, tax- and duty-exclusive, and specific to the inputs being valued, without applying these criteria in a rigid hierarchy. *See* PR251, *IDM* at 22 (citing *Fuwei Films (Shandong) Co. v. United States*, 837 F. Supp. 2d 1347, 1350-51 (Ct. Int'l Trade 2012)); *see also Heze Huayi Chem. Co. v. United States*, 532 F. Supp. 3d 1301, 1312 (Ct. Int'l Trade 2021). Accordingly, when choosing among eligible countries, Commerce must select the country whose data best satisfy these criteria.

In this case, the Romanian data submitted by Plaintiffs meet all of Commerce's established criteria for the best available information for valuing FOPs. See PR144–145, *Jilin SV Cmts*; PR146–149, *GHC SV Cmts*. The Romanian data are publicly available, contemporaneous with the POR, representative of a broad market average, exclusive of taxes and duties, and specific to the valued inputs, thus meeting all of Commerce's established criteria.

In contrast, the Malaysian import data are aberrational and unreliable, exhibiting extreme deviations that render them unsuitable for FOP valuation. As discussed in greater detail below, the Malaysian surrogate values for key inputs such as HTS 2706.00 coal tar, HTS 2701.19 sub-bituminous coal, and HTS 2806.10 hydrochloric acid deviate significantly from Malaysian AUVs in prior administrative reviews and diverge sharply from corresponding world AUVs. *See* discussion *infra* Section I.B.1.; *see also* discussion *infra* Sections II, III, IV, V.

Despite these clear distinctions, Commerce failed to evaluate the comparative quality of Romanian and Malaysian data. By excluding Romania from surrogate country consideration at the threshold based solely on significant producer status, Commerce effectively bypassed its obligation to determine whether Romanian data constituted the best available information.

Commerce's failure to conduct this analysis renders its selection of Malaysia as the primary surrogate country contrary to its obligation under 19 U.S.C. § 1677b(c)(1)(B) to rely on the best available information.

The Malaysian data on the record exhibit significant aberrations, which Commerce failed to meaningfully consider in its selection of surrogate values to value factors of production. *See* PR221, *Final IDM* at 8–9. A comparison of Malaysia's import AUVs during the POR with those from the immediately preceding review (AR15) shows that nearly all SVs rose sharply, by an average of 49%, without any plausible explanation. See PR155, *GHC Rebuttal SV Cmts* at 2 (citing PR150, *Petrs SV Cmts, Summary Worksheet*). Notably, the import AUVs for HTS 2701.19 sub-bituminous Coal and HTS 2806.10 hydrochloric acid increased by 138% and 145%, respectively, which cannot be reconciled with Malaysia's modest annual inflation rate in 2022 of just 3.38%. See PR231/CR223, *GHC Case Brief* at 13–14.

**The Department Cannot Use the Malaysian Import SVs**
**Petitioner Submitted Because they Are Aberrational**

| Category | Factor Input Name | HTS Number | POR 15 Value (Ringgit/Kg) | POR 16 Value (Ringgit/Kg) | Increase POR 15 to POR 16 |
|---|---|---|---|---|---|
| **Raw Materials** | Anthracite Coal | 2701.11 | 0.99 | 1.26 | 27% |
| | Bituminous Coal | 2701.12 | 1.01 | 1.52 | 50% |
| | Sub-Bituminous Coal | 2701.19 | 0.71 | 1.69 | 138% |
| | Coal Tar, Coal Tar Pitch, Partially Refined | 2706.00 | 5.01 | 7.41 | 48% |
| | Pitch, Fully Refined | 2708.10 | 4.03 | 6.88 | 71% |
| | Hydrochloric Acid | 2806.10 | 5.68 | 13.92 | 145% |
| | Magnesium Oxide | 2519.90 | 1.52 | 1.81 | 19% |
| | Potassium Hydroxide (KOH) | 2815.20 | 4.53 | 7.91 | 75% |
| | Solid Sodium Hydroxide | 2815.11 | 4.01 | 4.59 | 14% |
| | Liquid Sodium Hydroxide (caustic soda) | 2815.12 | 1.31 | 1.62 | 24% |
| | Asphalt | 2714.90 | 2.32 | 2.61 | 13% |
| | Copper Oxide | 2825.50 | 38.14 | 42.37 | 11% |
| | Alkali | 2805.19 | 16.6 | 18.68 | 13% |
| | Salt | 2501.00 | 0.35 | 0.41 | 17% |
| | Sulfuric Acid; Oleum | 2807.00 | 0.57 | 0.98 | 72% |

*Source:* POR 15 (**Exhibit 1**), POR 16 (Petitioner's December 20, SV Submission, Summary Worksheet).

(Source: PR155, *GHC Rebuttal SV Cmts* at 2)

Moreover, Malaysia's import AUVs deviate substantially from corresponding world AUVs, further undermining their reliability as surrogate values and, by extension, calling into question the suitability of Malaysia as the primary surrogate country. *See* PR207/CR197, *GHC Pre-Prelim Cmts* at 3; *see also* discussion *infra* Sections II, III, VI, V. Notably, UN Comtrade data on the record show that the Malaysian AUV for HTS 2806.10 hydrochloric acid is 2,275% of the world average, while the AUVs for HTS 2706.00 coal tar and HTS 2815.11 sodium hydroxide are 344% and 255% of their respective world averages—figures that reflect gross inflation well beyond what could be attributed to ordinary price variation. *See* PR190, *GHC Final SV Cmts*, Exhibit 2B. In stark contrast, Romania's AUVs for the same inputs better reflect world averages, deviating no more than 30% from the corresponding world AUVs. *See id.*

24

Further, record evidence demonstrates that Malaysian import data for raw material inputs lacks broad market representativeness and therefore does not constitute the best available information to value FOPs under 19 U.S.C. § 1677b(c)(1). Malaysian import data for HTS 2706.00 coal tar is unreliable because they are based on limited volumes and reflects a distorted market dynamic. During the POR, Malaysia exported 65,471% more HTS 2706.00 coal tar than it imported, and the import AUV was 325% higher than the export AUV, which strongly suggests the import data do not reflect normal commercial values or a broad market average. *See* PR229/CR221, *Jilin Case Br.* at 8–9.

Romania's trade data reflect a more commercially typical and representative import market: UN Comtrade data establish that Romania exported a small amount of coal tar of 80kg, but imported a substantial 1,261,200 kilograms, demonstrating trade activity that supports the reliability of its import prices. *See id.* Record evidence also establishes that Romania imported over 1,000,000kg more coal tar and over 10,000,000kg more hydrochloric acid than Malaysia during the POR. See PR231/CR223, *GHC Case Br.* at 12. These significant differences in trade volume and pricing behavior indicate that Malaysian import data do not reflect normal commercial conditions and are not representative of a broad market average, whereas Romanian data offer a more reliable basis for surrogate value selection. *See* PR188, *GHC Final SV Cmts*; PR231/CR223, *GHC Case Brief* at 12–14. Commerce did not address this record evidence, thus failed in its statutory requirement to use the "best available information" in valuing factors of production, which necessarily informs the selection of the surrogate country.

Section 1677b(c)(4) directs Commerce to consider economic comparability and significant production in selecting a surrogate country, but only "to the extent possible."

19 U.S.C. § 1677b(c)(4). The plain language of the statute does not economic comparability or significant production if they contravene the directive to use the "best available information."

"Commerce's own policy suggests that none of the three surrogate country eligibility criteria—economic comparability, significant production of comparable merchandise, and quality data—is preeminent." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 882 F. Supp. 2d 1366, 1374 (Ct. Int'l Trade 2012) ("*Ad Hoc Shrimp*") (*citing* Policy Bulletin 04.1).  Instead, when selecting a surrogate country and SVs, Commerce must evaluate economic comparability, significant production, and data quality collectively, and weigh the "relative strengths and weaknesses among potential surrogates" together in light of its overarching obligation to rely on the "best available information." *Ad Hoc Shrimp*, 882 F. Supp. 2d 1366, 1374–75.

Commerce failed to meaningfully compare the contemporaneity of the Malaysian data with the Romanian data and failed to address a critical inconsistency in its reliance on Century's financial statements, which is that Century's financial statement covers only a one-year period ending December 31, 2022, whereas the POR extends through March 31, 2023. *See* PR192, *Petrs Final SV Cmts*, Attachment FSV-5A (Century's financial statements covers "the period ending 12/31/2022"); *see also* discussion *infra* Section VII.

Century's financial statements are not fully contemporaneous with the POR. The statements cover only the twelve-month period ending December 31, 2022, leaving the final three months of the POR (i.e., January 1 through March 31, 2023) entirely unaccounted for. Despite relying on these statements to support its surrogate country selection, Commerce failed to acknowledge or evaluate this temporal gap. Commerce's silence on this material deficiency undermines the credibility of its claim that it conducted a holistic and reasoned analysis of the

record, particularly where contemporaneity is a key criterion in identifying the best available

information for surrogate country selection under 19 U.S.C. § 1677b(c).

**II.    To the Extent Commerce's Selection of Malaysia as the Primary Surrogate Country Was Lawful, Its Selection Of an Aberrational Surrogate Value for Coal Tar Is Unsupported by Substantial Evidence and Inconsistent With Its Obligation To Use the Best Available Information**

Commerce's selected surrogate value for coal tar is not supported by substantial evidence

on the record and is unlawfully aberrational.  Commerce ignored record evidence establishing

that the Malaysian SV does not reflect a broad market average.  Further, the Malaysian SV

selected by Commerce substantially departs from recent pricing trends and significantly exceeds

the world AUV.  Commerce should have adjusted for this aberrational data by using the

Romanian AUV, which is consistent with global market averages.

First, Commerce ignored record evidence establishing that the Malaysian SV does not

reflect a broad market average.  The Malaysian import AUV under HTS 2706.00, which

Commerce selected as the SV, is unreliable and does not provide the best available information

for valuing coal tar due to its lack of representation of a broad market average.  In the selection

of SVs to value inputs, Commerce emphasizes the use of SVs that are representative of a broad

market average.  *See* Policy Bulletin 04.1.

As shown in Jilin's First SV Rebuttal Submission, Malaysia has historically been a

significant net exporter of coal tar, with exports vastly exceeding imports.  PR157-159, *Jilin's SV*

*Rebuttal Submission*, Ex.4A. For instance, in 2020, Malaysia's coal tar exports were 597.61

times greater than imports, and similar trends persisted in subsequent years.  *Id.*  During the

POR, Malaysia continued to export a substantial amount of coal tar (i.e., 48,120,951 KG) while

importing only a negligible quantity (i.e., 73,198 KG).  *Id.* The imported quantity during the

POR represents only 0.15 percent of Malaysia's total exports of coal tar. This suggests that

Malaysia's imports may be limited to specialized types of coal tar. In Exhibit 4A, *id.*, Jilin

summarized the export and import of coal tar from and to Malaysia as follows:

**Summary**

|  | Export | | | Import | | | Export Qty/ Import Qty |
|---|---|---|---|---|---|---|---|
|  | Qty (KG) | Value (USD) | AUV | Qty (KG) | Value (USD) | AUV |  |
| **2020** | 57,412,861 | 10,549,099 | $ 0.18 | 96,070 | 115,073 | $ 1.20 | 59761% |
| **2021** | 48,209,900 | 17,904,533 | $ 0.37 | 125,342 | 123,052 | $ 0.98 | 38463% |
| **2022** | 45,411,925 | 22,919,679 | $ 0.51 | 126,411 | 203,760 | $ 1.61 | 35924% |
| **01/2023-10/2023** | 74,146,901 | 32,858,098 | $ 0.44 | 11,423 | 27,368 | $ 2.40 | 649102% |
| **POR (04/2022-03/2023)** | 48,120,951 | 24,823,493 | $ 0.52 | 73,198 | 122,713 | $ 1.68 | 65741% |

It is unreasonable to conclude that imports here represent a broad market average of the

price for coal tar in Malaysia when (1) Malaysia exported **65,000,000%** more coal tar than it

imported during the POR and (2) the import price is **325%** higher than the export price for coal

tar during the POR. It is simply unreasonable to assume that producers in Malaysia of identical

or comparable merchandise would rely on imports that are drastically more expensive when

Malaysia has robust domestic production of coal tar. The imports of coal tar into Malaysia

simply are not a broad market average of the value for coal tar in Malaysia. It also seems to be

the case that the coal tar imported into Malaysia is not specific to the coal tar used in the

production of activated carbon.

Additionally, the limited import volume (i.e., 73,198 KG) only accounts for 5 percent of

the total import quantity (i.e., 1,415,473 KG) from all six OP List countries for the POR.  Id.

(suggesting that during the POR, Malaysia imports only 73,198 KG of coal tar).  PR194-

195/CR144-145, *Jilin's Final SV Submission*, Ex.5-6 (indicating that during the POR, Türkiye

imports 81,075 KG of coal tar under HTS 2706.00, and Romania imports 1,261,200 KG of coal tar; no import record of HTS 2706.00 was found for Costa Rica, Bulgaria, Panama, in UN Comtrade Database; thus, 73,198 + 81,075 + 1,261,200 = 1,415,473). Moreover, the Malaysian import AUV under HTS 2706.00 is based on small quantities of imports from only three countries, with one country representing more than 98 percent of imports, further diminishing its representativeness of a broad market average. *Id.*

In contrast, Romania offers a more reliable import AUV under HTS 2706.00, superior to the Malaysian data. During the POR, Romania exported a nominal amount of coal tar (i.e., 80 KG) while importing a significantly larger quantity (i.e., 1,261,200 KG), demonstrating a closer alignment with a broad market average. PR195/CR145, *Jilin's Final SV Submission*, Ex.6.

Additionally, in Jilin's Mar. 27, 2024, Final SV Submission, PR194-195/CR144-145, an affidavit from a Malaysian importer of coal tar was submitted, *id.*, Ex.4, revealing a significant discrepancy between the unit price of coal tar provided in the affidavit (0.2 USD per KG), *id.* (20,450 / 102,250 = 0.2), and the Malaysian import AUV during the POR (1.68 USD/KG). PR204, *Jilin's SV Rebuttal Submission*, Ex.4A. This further underscores the unreliability of the Malaysian import data for coal tar as they are neither a broad market average or specific to the coal tar used for production of activated carbon. These facts weigh in favor of using Romania rather than Malaysia as the surrogate country. Commerce cannot continue to rely on this erroneous data with substantial evidence detracting from its reliability. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951), (stating, "{t}he substantiality of evidence must take into account whatever in the record fairly detracts from its weight"). In the Final Determination, Commerce should find the Malaysian import AUV under HTS 2706.00 unreliable and anomalous, as it is not reflective of a broad market average. This fact weighs in favor of

selecting Romania as the surrogate country. Alternatively, Commerce could simply use price provided by Jilin in the affidavit.  PR195/CR145, *Jilin Final SV Submission*, Ex.4.  While the affidavit price is less characteristic of a broad market average, it is far better than the import AUV in terms of specificity and is, thus, the best available information in Malaysia for this surrogate value.

Second, applying Commerce's previously described benchmarking practice, Commerce compared Malaysia's AUV for HTS 2706.00 coal tar during the POR with those of other OP List countries. *See* PR251, *Final IDM* at 16. Commerce noted its similarity to Turkey's (1.67 USD/kg vs. 1.48 USD/kg), and the large gap between Malaysia's and Costa Rica's AUVs (1.67 USD/kg vs. 21.48 USD/kg). *See id.* Commerce acknowledged that Malaysia's AUV was only approximately 7% of Costa Rica's and thus identified the latter as a possible outlier.

Commerce further asserted that "the same could be argued for the Romanian import AUV." *Id.* However, this reasoning is deficient and flawed. Costa Rica's AUV is a clear and extreme outlier, while Romania's value (0.33 USD/kg), although it is the lowest of the SVs of the OP List Countries, is much closer to other countries' AUVs. Record evidence also show that Romania's coal tar import volume (1,261,200 kg) was far greater than Malaysia's (73,198 kg) — just 6% of the Romanian import volume. See PR162, *Petrs Rebuttal SV Cmts*, at Exhibit SVR-3.

By suggesting that Romanian AUV could be an outlier solely because Malaysia's might be, Commerce contradicts its own stated practice, which holds that being at the high or low end of a range does not, by itself, render a value aberrational. *See, e.g.*, *Multilayered Wood Flooring from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 79 Fed. Reg. 26712 (Dep't of Commerce May 9, 2014), and accompanying *IDM* at Comment 6 ("Merely being at the low end, or the high end of a range, for that matter, does not render a data

point as an outlier."). Commerce's unsupported dismissal of the Romanian AUV lacks analytical basis and falls short of the reasoned decision-making required under its established practice.

In line with the historical-comparison component of its benchmarking practice, Commerce asserts that "an analysis of the Malaysian import AUV {of coal tar} in past reviews demonstrates that the import AUV in this current review is not aberrational." PR251, *Final IDM* at 16. However, Commerce did not provide any explanation of this analysis or cite the underlying source data on the record. Contrary to Commerce's assertion, a review of Malaysia's coal tar AUVs in the two most recent prior administrative reviews shows a substantial increase during the POR. Specifically, the Malaysian AUV rose from 1.22 USD/kg in the 14th Administrative Review (covering 2020-2021) and 1.20 USD/kg in the 15th Administrative Review (covering 2021-2022) to 1.68 USD/kg in the POR at issue in this appeal, representing an increase of approximately 38% and 40%, respectively. *See* PR164, *Petr Rebuttal SV Cmts*, Exhibit SVR-5.

Moreover, UN Comtrade data submitted by GHC show that the Malaysian AUV for coal tar is 344% percent of the corresponding world average. *See* PR231/CR223, *GHC Case Brief* at 14 (citing PR188, *GHC Final SV Cmts*, Exhibit 2B). In contrast, Romania's AUV is much more closely aligned, at just 71% of the world average. *See id.* Such extreme deviations in the Malaysian AUV from the world AUV are inconsistent with Commerce's obligation to rely on the best available information and to avoid distorted or unrepresentative data.

As stated previously, Commerce has previously found a value to be aberrational where it is extremely different from the benchmark value. *See Crystalline Silicon Photovoltaic Cells*, and accompanying IDM at 43. Given the steep increase in Malaysia's AUV relative to prior years, Commerce's decision is unsupported by substantial evidence. Instead, Commerce should have

considered the POR value aberrational under its established practice and instead used Romania's

AUV, which is supported by greater alignment with global averages.

III.    **To the Extent Commerce's Selection of Malaysia as the Primary Surrogate Country Was Lawful, Its Selection of an Aberrational Surrogate Value for Sub-Bituminous Coal Is Unsupported by Substantial Evidence and Inconsistent With Its Obligation To Use the Best Available Information**

Commerce's selection of Malaysia's AUV for sub-bituminous Coal as the surrogate

value is inconsistent with its established benchmarking practice, as the value sharply diverges

from historical Malaysian AUVs. Moreover, Commerce's benchmarking analysis was flawed, as

it inexplicably included data from Chile, which was not listed in the OP List, while failing to

meaningfully assess the reliability of Malaysia's AUV in light of the historical trends.

For its analysis on the challenged sub-bituminous coal surrogate value, Commerce

attempts to fulfill its benchmark analysis by comparing the Malaysian import AUV of HTS

2701.19 sub-bituminous coal to its counterpart in the other OP List countries. *See* PR251, *Final*

*IDM* at 18. However, Commerce's efforts to justify Malaysia's aberrationally high sub-

bituminous coal import values through benchmark analysis are fundamentally flawed.

First, Commerce oddly uses a country completely absent from the OP List with the "next

highest import values" (Chile) as a benchmark. *See* PR251, *Final IDM* at 18; *see also* PR131, *SC*

*List* (establishing the six potential primary surrogate countries as Panama, Türkiye, Romania,

Bulgaria, Malaysia, and Costa Rica). Arbitrarily selecting a country not on the OP List not only

contradicts Commerce's established practice, but also risks selecting benchmark data from a

market not economically comparable to the Plaintiff's home market. *See Saccharin from the*

*People's Republic of China: Final Results of the 2005-2006 Antidumping Duty Administrative*

*Review,* 72 Fed. Reg. 51800, (Dep't of Commerce Dec 4, 2007) ("*Saccharin*") and

accompanying IDM at comment 2. If Commerce defends Malaysia's high AUV of sub-

bituminous coal by claiming it is merely on the high end of a range of values, the range of values must be set by economically comparable OP List countries according to Commerce's practice. *See id.*; *see also* PR251, *Final IDM* at 18.

Applying Commerce's historical AUV benchmark test for aberrational data, Malaysia's AUV for HTS 2701.19 sub-bituminous coal for the POR shows a drastic increase when compared with Malaysia's previous administrative review AUV's. More specifically, Malaysia's sub-bituminous coal AUV rose sharply to 0.39 USD/kg during the POR, rising approximately 129% from 0.17 USD/kg in AR15 and 457% from 0.07 USD/kg in the AR14.

As previously stated, data that is extremely different from the benchmark values constitutes aberrational data in the eyes of Commerce. *See Crystalline Silicon*, and accompanying IDM at 43. Such a steep increase in Malaysia's sub-bituminous coal AUV surely calls for an explanation from Commerce. However, an analysis of this benchmark discrepancy was wholly absent from Commerce's decision memo. *See* PR251, *Final IDM* at 18.

Accordingly, the AUV for sub-bituminous coal at issue is plainly aberrational and should be excluded from surrogate valuation. Instead, Commerce should have selected the Romanian AUV, which avoids the distortive effect of Malaysia's inflated figure. Commerce's reliance on this aberrational figure is inconsistent with its statutory obligation under 19 U.S.C. § 1677b(c)(1)(B) to use the "best available information" to value factors of production, in furtherance of the broader purpose of calculating "as accurately as possible." *See Jinan Yipin Corp.*, 637 F.Supp.2d at 1187 (quoting *Parkdale Int'l,* 475 F.3d at 1380).

**IV.    To the Extent Commerce's Selection of Malaysia as the Primary Surrogate Country Was Lawful, Its Selection Of an Aberrational Surrogate Value for Hydrochloric Acid Is Unsupported by Substantial Evidence and Inconsistent With Its Obligation To Use the Best Available Information**

Commerce's selected Malaysian  surrogate value for hydrochloric acid is aberrational under its established practice, as it significantly deviates from historical Malaysian AUVs and contemporaneous AUVs from other OP List countries. This conclusion is further reinforced by comparison to the world AUV, which shows Malaysia's value as a stark outlier. Commerce should have adjusted for this aberrational data and instead used the Romanian AUV, which is more consistent with global averages.

When valuing factors of production in NME antidumping proceedings, Commerce is required to use the "best available information" on the record to determine the normal value of subject merchandise. 19 U.S.C. § 1677b(c)(1)(B). To fulfill this obligation, Commerce has developed a practice of evaluating whether surrogate values are aberrational by comparing them to appropriate benchmark data. Commerce compares the proposed value to benchmark data, which typically includes: (1) historical import data for the same HTS category in the primary surrogate country over multiple years, and (2) import AUVs for the same HTS category from other potential surrogate countries on the OP List during the POR. *See Carbazole Violet Pigment 23 from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 75 Fed. Reg. 36630 (Dep't of Commerce June 28, 2010) ("*Carbazole Violet*"), and accompanying *IDM* at Comment 6; *see also 1,1,1,2-Tetrafluroethane from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 79 Fed. Reg. 62597 (Dep't of Commerce Oct. 20, 2014) ("*Tetrafluroethane*") and accompanying *IDM* at Comment 10. In past reviews, Commerce has defined aberrational values as those that differ extremely from benchmark data. *See* PR251, *Final IDM* at 18 (citing *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, and Affirmative Final Determination of Critical*

*Circumstances, in Part,* 77 Fed. Reg. 63791 (Dep't of Commerce Oct.ober 17, 2012) ("*Crystalline Silicon*"), and accompanying *IDM* at 43).

An application of these benchmarks in this review reveals that the Malaysian import AUV for hydrochloric acid relied on by Commerce is aberrational and therefore unsuitable for use as a surrogate value. The AUV for HTS 2806.10 hydrochloric acid during the POR was 3.13 USD/kg, which is significantly higher than Malaysian AUVs reported in AR7 through AR16, which ranged from 0.31 USD/kg to 1.75 USD/kg, specifically: 1.06, 0.40, 0.92, 0.41, 0.31, 0.37, 0.46, 1.75, 1.36. *See* PR164, *Petr Rebuttal SV Cmts*, Exhibit SVR-5. None of the prior values exceed 1.75 USD/kg, and most are below 1.00 USD/kg. The 3.13 USD/kg AUV marks a significant departure from that trend. *See id.* It represents a 130% percent increase over the AR15 value and a 79% increase over the AR14 value—the next-highest on record. *See id.* More strikingly, it is 580% higher than the AR13 value and more than 600% greater than the AR12 value. *See id.*

Commerce attempted to downplay the deviation by stating that "while the Malaysian import value for this review is 130{ %}  greater than the Malaysian import AUV in AR15, it is *only* 79{ % } percent greater than {that} in AR14." (emphasis added) PR251, *Final IDM* at 19. Commerce then seeks to dismiss the magnitude of these increases by invoking its general principle that "a value at the low or high end of a range is not necessarily an aberration," citing *MLWF from China. See* PR251, *Final IDM* at 19 (citing *Multilayered Wood Flooring from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011–2012*, 79 Fed. Reg. 26712 (Dep't of Commerce May 9, 2014) ("*MLWF from China*"), and accompanying IDM at Comment 6). But this reasoning is neither consistent with the record evidence nor supported by substantial evidence.

35

As shown above, the 3.13 USD/kg AUV from the POR does not fall at the high end of the range of historical Malaysian AUVs—it far exceeds it. Commerce's attempt to downplay the 3.13 USD/kg AUV by stating it is "*only* 79{%} greater" than the AR14 value is misleading; a 79% increase represents a near doubling of the prior value and signals a significant, aberrational spike, not a routine fluctuation. *See* PR251, *Final IDM* at 19. Moreover, Commerce selectively limited its comparison to AR14 and AR15 values, ignoring even greater deviations from earlier years. *See id.* Such a sharp and unprecedented increase cannot reasonably be viewed as a mere high-end fluctuation. It is not simply on the high end of a distribution, but it is a clear statistical outlier when viewed against the long-term trend of Malaysian import values. Commerce's attempt to characterize the 3.13 USD/kg as merely being on the "high end" of a range is untenable and is inconsistent with Commerce's established benchmarking practice.

Furthermore, Commerce's reliance on *MLWF from China* is misplaced. In that case, Commerce upheld the use of Philippine import data for face veneer under HTS 4408.90.1000 despite it being the lowest on the record, because the benchmark data used for comparison were based on a broader HTS category (HTS 4408.90) and thus were not product-specific or reliable. See *MLWF from China*, and accompanying IDM at p.40–41. Unlike in *MLWF from China*, there is no question here as to product specificity with respect to the historical AUVs for hydrochloric acid. Additionally, in *MLWF from China*, Commerce emphasized that "courts have affirmed the use of an SV that is the lowest value on the record *where it is not an outlier*, but simply the low end of a range, as is the case here." (emphasis added). *See id.* at p.41. As explained  above, the circumstances here render that principle irrelevant. A comparison to historical Malaysian AUVs from past reviews demonstrates that the AUV from the POR is not merely at the high end of that range, but it is a dramatic statistical outlier when viewed against the long-term trend of

Malaysian import values.  Commerce's failure to evaluate the overall historical trend of Malaysian AUVs renders its decision unsupported by substantial evidence.

In addition to being aberrational when compared to historical Malaysian AUVs, the 3.13 USD/kg surrogate value also significantly exceeds contemporaneous AUVs from other OP List countries during the POR, which is another benchmark Commerce routinely considers. *See Carbazole Violet*, and accompanying IDM at Comment 6. Specifically, Panama reported an AUV of 0.51 USD/kg, Costa Rica 0.48 USD/kg, Bulgaria 0.30 USD/kg, and Türkiye 0.22 USD/kg. *See* PR162, *Petr Rebuttal SV Cmts*, Exhibit SVR-3.

As shown, while some variation exists among the other countries' AUVs, they remain within a relatively narrow range when contrasted with Malaysia's 3.13 USD/kg figure, which is more than 500% greater than the next highest value, Panama's 0.51 USD/kg AUV. *See id.* Yet Commerce provided no analysis of this disparity in the Final Results.

Instead, Commerce attempted to justify its selection by broadly asserting that in a prior, unrelated case, "there were substantial differences in value for AUVs in one HS category between OP List countries." *See* PR251, *Final IDM* at 19 (citing *Crystalline Silicon*, and accompanying IDM at 43). However, that case involved HTS 2804.61 polysilicon, a category encompassing inputs with vastly different purity levels, where record evidence showed intra-country and inter-country AUV differences of up to 10,000% driven by substantial quality and product-specific differences. *See Crystalline Silicon*, and accompanying IDM at 43. That context bears no resemblance to the present case, where Commerce made no finding that hydrochloric acid imports varied meaningfully in composition or grade, nor did it provide any explanation for why such substantial inter-country AUV differences would be expected here. Furthermore, record evidence shows that both historical Malaysian AUVs and contemporaneous OP List

Country AUVs do not deviate substantially from one another to the degree that the 3.13 USD/kg figure from the POR does, which stands in stark contrast to the rest of the data. Thus, Commerce's reliance on that prior case is inapposite.

In addition to being aberrational under Commerce's established benchmarking practice, Malaysia's import AUV for hydrochloric acid also diverges sharply from the corresponding world AUV, further calling into question its reliability as a surrogate value. See PR231/CR223, *GHC Case Brief* at 14 (citing PR188, *GHC Final SV Cmts*, Exhibit 2B). UN Comtrade data submitted by GHC show that Malaysia's AUV for HTS 2806.10 hydrochloric acid is 2,275% higher than the global average. *See id.* In contrast, Romania's import AUV is closely aligned with global pricing—only 13% higher than the world AUV—highlighting its greater reliability as a surrogate value. *See id.* This extreme deviation further underscores the distorted nature of the Malaysian value and is inconsistent with Commerce's obligation to rely on the best available information and to avoid unrepresentative data. While the world average includes data from NMEs and countries not economically comparable to China, such entries are few and far between and unlikely to distort the overall average. Given the large sample size, the global average provides a reliable and reasonable comparison for assessing whether a surrogate value is aberrational. Commerce improperly refused to consider these global values as a benchmark.

The record clearly demonstrates that the Malaysian import AUV for hydrochloric acid from the POR is not just the highest on record, it is exceptionally and historically elevated and is a statistical outlier that undermines its reliability for surrogate valuation. Under Commerce's own benchmarking practice, which identifies values as aberrational when they are extremely different from historical and comparative benchmarks, the AUV for hydrochloric acid at issue is plainly aberrational and should be excluded from surrogate valuation. Commerce's reliance on

this aberrational figure runs contrary to its statutory obligation under 19 U.S.C. § 1677b(c)(1)(B) to use the "best available information" to value factors of production, in furtherance of the broader purpose of calculating "as accurately as possible." *See Jinan Yipin Corp. v. United States*, 637 F.Supp.2d 1183, 1187 (Ct. Int'l Trade 2009) (quoting *Parkdale Int'l v. United States,* 475 F.3d 1375, 1380 (Fed. Cir. 2007)).

The Federal Circuit has made clear that the relevant test "is not whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." *Jiaxing Bro. Fastener Co., Ltd. v. United States*, 822 F.3d 1289, 1300–01 (Fed. Cir. 2016). Given the extreme deviation of the Malaysian AUV for hydrochloric acid from both historical and contemporaneous benchmarks, no reasonable mind could conclude that Commerce selected the best available information in this instance. Commerce should have adjusted for the aberrational Malaysian AUV and instead relied on Romania's, the other available data on the record, which is supported by the record to be more reliable and thus constitutes the best available information.

**V.    To the Extent Commerce's Selection of Malaysia as the Primary Surrogate Country Was Lawful, Its Selection Of an Aberrational Surrogate Value for Sodium Hydroxide and Potassium Hydroxide is Unsupported by Substantial Evidence and Inconsistent With Its Obligation To Use The Best Available Information**

Commerce's selected surrogate values for sodium hydroxide and potassium hydroxide are unsupported by substantial evidence, as they significantly deviate from corresponding world AUVs.  In making surrogate value determinations, Commerce does not apply a strict hierarchy but instead "must weigh available information with respect to each input value and make a product-specific and case-specific decision as to what the 'best' {SV} is for each input." *See, e.g.*, *Polyethylene Terephthalate Film, Sheet, and Strip from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 73 Fed. Reg. 55039 (Dep't of Commerce

Sept. 24, 2008), and accompanying IDM at Comment 2; *see also Freshwater Crawfish Tail Meat from the People's Republic of China; Notice of Final Results of Antidumping Duty Administrative Review, and Final Partial Rescission of Antidumping Duty Administrative Review*, 67 Fed. Reg. 19546 (Dep't of Commerce April 22, 2002), and accompanying IDM at Comment 2.

Under these standards, the record supports a finding that Romania's data are more reliable and representative for valuing sodium hydroxide and potassium hydroxide. UN Comtrade data on the record show that Malaysia's import prices for these inputs are markedly higher than global averages, raising serious concerns about their representativeness and reliability. *See* PR190, *GHC Final SV Cmts*, Exhibit 2B. The Malaysian AUVs for HTS 2815.11 sodium hydroxide and HTS 2815.20 potassium hydroxide are approximately 155% and 93% higher than their respective world averages. *See id.*

Table 1 below presents Malaysia's and Romania's AUVs alongside the corresponding world AUVs and each country's AUV expressed as a percentage of the world AUV for the relevant production inputs during the POR.

| HTS Code | Malaysia AUV (USD/kg) | World AUV (USD/kg) | Malaysia as % of World AUV | Romania AUV (USD/kg) | Romania as % of World AUV |
|---|---|---|---|---|---|
| 2815.11 Sodium Hydroxide | 2.6 | 1.02 | 255% | 1.19 | 117% |
| 2815.20 Potassium Hydroxide | 2.31 | 1.2 | 193% | 1.47 | 123% |

(Source: PR190, GHC Final SV Cmts, Exhibit 2-B)

Such extreme deviations are inconsistent with Commerce's obligation to rely on the "best available information" and to avoid distorted or unrepresentative data. 19 U.S.C.

§ 1677b(c)(1)(B). The record shows that Malaysia's AUVs for sodium hydroxide and potassium hydroxide significantly exceed the contemporaneous world AUVs, while Romania's values fall much more closely in line with global averages. By disregarding Romania's more representative data in favor of Malaysia's inflated figures, Commerce failed to select the surrogate values most consistent with its statutory mandate.

**VI.**     **If Commerce's Selection of Malaysia as the Primary Surrogate Country was Lawful, Commerce's Decision to Exclude Financial Statements from Producers of Identical Merchandise In its Financial Ratio Calculation Is Not Supported by Substantial Evidence.**

Commerce's exclusion of the financial statements of three Malaysian identical producers in calculating the financial ratio deviates from Commerce's established practice without substantial evidence in support. Pursuant to the requirement under 19 U.S.C. § 1677b(c)(1)(B) to use the "best available information" when calculating factors of production, Commerce selects financial statements that are contemporaneous with the POR, publicly available, and from producers of comparable merchandise. *See* PR251*, Final IDM* at 25. Additionally, Commerce's longstanding preference has been to calculate the average of as many financial statements as possible in order to account for outliers and provide the most representative data. *See, e.g.*, *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1368 (Fed. Cir. 2010); *see also* PR251*, Final IDM* at 22–23 (citing to *Amended Final Results of Antidumping Duty Administrative Review and New Shipper Reviews: Wooden Bedroom Furniture from the People's Republic of China*, 72 Fed. Reg. 46957 (Dep't of Commerce Aug. 22, 2007), and accompanying IDM at Comment 17. This Court has frequently taken note of Commerce's inclination to average numerous financial statements in order to normalize potential distortions. *See, e.g.*, *NTSF Seafoods Joint Stock Co. v. United States*, 487 F. Supp. 3d 1310, 1318 (Ct. Int'l Trade 2020).

Commerce's decision to depart from the established practice lacks the backing of substantial evidence. First, Commerce fails to even utter an explanation for its decision to disregard the financial statements from Greenlink Biotech Sdn. Bhd. ("Greenlink") in its financial ratio calculations. Nowhere in the *Final Results* or the *Preliminary Results* does Commerce take issue with Greenlink's financial statement offered by Jilin. *See* PR251*, Final IDM; see also* PR221, *PDM*. Since Greenlink, a producer of comparable merchandise to Jilin and GHC, provides a contemporaneous and publicly available financial statement, Commerce is required to offer a reasoned  explanation for its decision not to incorporate Greenlink in its financial ratio calculation. *See CP Kelco U.S., Inc. v. United States*, 949 F.3d 1348, 1356 (Ct. Int'l Trade 2020) ("Commerce must provide an explanation that is adequate to enable the court to determine whether its choices are actually reasonable"). Without explanation, Commerce's actions seem completely contradictory to its practice of averaging numerous financial statements to provide the most accurate, representative data. *See NTSF Seafoods Joint Stock Co. v. United States*, 487 F. Supp. 3d 1310, 1318 (Ct. Int'l Trade 2020).

Moreover, Commerce further fails to sufficiently explain its departure from the norm in excluding Nikom Carbon Technology Sdn. Bhd. ("Nikom") financial ratios.  Commerce highlights Nikom's financial statement listing its principal activities as trading activated carbon, but neglects evidence indicating Nikom both trades and produces activated carbon. *See* PR251, *Final IDM* at 24; *see also* PR188, *GHC's Final SV Submission*, Exhibit 1. In Nikom's product brochure, the company states that it was incorporated "for the *production* and export of steamed activated carbon" (emphasis added) and is "capable of *producing* high quality activated carbon" (emphasis added). PR188, *GHC's Final SV Submission*, Exhibit 1. While Nikom's principal activity may be trading, this does preclude the company from also producing activated carbon as

evidence suggests. *See id.* With evidence like this brochure on the record, Commerce is at least required to consider its validity to determine what truly is the best available information. Commerce's refusal to acknowledge this evidence of production from Nikom fails to show that a sufficient effort was made to fulfill the 19 U.S.C. § 1677b(c)(1) best available information requirement.

**VII.    Commerce's Decision To Deny Jilin's Ministerial Error Allegations By Adding "Fair Value Loss on Equity Investments" And "Loss on Disposal of Equity Instruments" To The Profit Category In The Financial Ratio Calculation Was Not Supported By Substantial Evidence**

The decision to deny Jilins's ministerial error allegations by neglecting to abide by both common accounting principles and Commerce's own established practice was not supported by substantial evidence on the record. *See Guangdong Chems. Imp. & Exp. Corp. v. United States*, 460 F. Supp. 2d 1365, 1374 (Ct. Int'l Trade 2006) ("Because overhead, SG&A and profits are calculated based on manufacturing costs, a reduction in manufacturing costs reduces overhead, SG&A and profit amounts as well"). Commerce erred in subtracting "fair value loss on equity investments" and "loss on disposal of equity instruments" from SG&A but not from the total profit. This decision fits Commerce's definition of a ministerial error under 19 CFR § 351.224(f). *See* 19 CFR § 351.224(f) ("an error in addition, subtraction, or other arithmetic function, clerical error resulting from inaccurate copying, duplication, or the like, and any other similar type of unintentional error which the Secretary considers ministerial").

There is no clear reason provided by Commerce for a loss in capital value on equity investments and/or instruments to be added to the overall profit in terms of calculating the profit ratio. Commerce explains that these values are not related to the operating cost, but do contribute to profitability. *See* PR271, *Amended IDM* at 4. Since these values constitute losses for Century Chemical Works Sendirian Berhad ("Century") under standard accounting principles, the loss in

value should instead have been deducted from the profit, resulting in a decrease in the overall adjusted profit. As argued by Jilin, the values in L32 and L33 of Century's financial ratio calculations should have been changed to negative values to reflect the reduction in the profit and thereby making L34 a negative number. *See* PR266, *Jilin's Ministerial Error Allegation.* The adjusted profit ratio would thereby be 33.18% represented in L43. Here, Commerce failed to provide substantial evidence explaining its decision to depart from both its own practice and standard accounting principles, which in turn led to an inflated profit figure in the surrogate financial ratio, impacting the dumping margin calculated for Jilin. *See id.* at 4–5.

**VIII.    Commerce Should Adopt The Formula Jilin Proposed In Its Section C Questionnaire Response To Correct A Double Multiplication Error In The Per Unit VAT Tax (I.E., RVATTAXU = (TOTAMO / 1.13 * 0.13) / QTYU) TO DERIVE "RVATTAXU"**

In the Preliminary Results, Commerce introduced a revised per-unit VAT tax variable, RVATTAXU, calculated as RVATTAXU=VATTAXU/QTYU, to arrive at a unit VAT cost, replacing the previously used VATTAXU, which listed the total amount of VAT for each SEQU. *See* CR207/PR218, *Jilin Preliminary Calculation Memorandum* at 2. However, a clerical error in the VATTAXU calculation for SEQU [      ] has resulted in inaccuracies in the newly derived RVATTAXU for this SEQU.  In the Final Results, Commerce should use the formula Jilin stated in its Section C questionnaire response (i.e., RVATTAXU=(TOTAMO/1.13*0.13)/QTYU) to calculate the variable RVATTAXU.

The clerical error occurred in Jilin's U.S. sales database submitted on September 21, 2023, where the VATTAXU for SEQU [      ] was reported as [            ].  CR51/PR114, *Jilin Sec.C Response*, Exh. C-1.  This figure was inaccurately calculated using the formula VATTAXU=**QTYU**\*GRSUPRU\*QTYU/1.13\*0.13, incorrectly multiplying the QTYU

twice.[2] For all other SEQUs, the correct formula used

was VATTAXU=GRSUPRU*QTYU/1.13*0.13.

In Jilin's Section C questionnaire response, Jilin has provided the correct formula to

derive the per-unit VAT tax variable—RVATTAXU=(TOTAMO/1.13*0.13)/QTYU.

[ ] Specifically,

TOTAMO (Total Amount)=GRSUPRU*QTYU

VATTAXU=TOTAMO/1.13*0.13

RVATTAXU=VATTAXU/QTYU

By using the formula RVATTAXU=(TOTAMO/1.13*0.13)/QTYU, the clerical error in

the VATTAXU field for SEQU [    ] will be rectified.  Therefore, to ensure accuracy and

consistency in the per-unit VAT tax calculations in the Final Results, Commerce should adopt

Jilin's proposed formula: RVATTAXU=(TOTAMO/1.13*0.13)/QTYU.


## CONCLUSION

For these reasons, this Court should remand the final results of this administrative

decision for redetermination consistent with the statutory mandate.

---

[2] GRSUPRU is gross unit price. *Id.* at C-16.  The VAT tax rate is 13percent. *Id.* at C-32.

Respectfully Submitted,

*/s/ Irene H. Chen*
Irene H. Chen
VCL Law LLP
1945 Old Gallows Rd., Ste 260
Vienna, VA  22182
Tel: (301) 760-7393
Email: ichen@vcllegal.com

*/s/ Mark B. Lehnardt*
Davis & Leiman PLLC
1025 Connecticut Avenue, NW
Suite 1012
Washington, DC  20036
Tel: (202) 642-4850
Email: mlehnardt@dltrade.com