# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JANE A. RESTANI, SENIOR JUDGE

| | |
|---|---|
| NINGXIA GUANGHUA CHERISHMET ACTIVATED CARBON CO., LTD. AND JILIN BRIGHT FUTURE CHEMICALS CO., LTD., | ) ) ) ) |
| Plaintiffs, | ) ) |
| and | ) ) |
| CARBON ACTIVATED TIANJIN CO., LTD. AND CARBON ACTIVATED CORPORATION, | ) ) ) |
| Consolidated Plaintiffs, | ) ) |
| and | ) ) |
| BENGBU MODERN ENVIRONEMTNAL CO., LTD., ET AL., | ) ) |
| Plaintiff-Intervenors, | ) ) |
| v. | ) ) Consol. Court No. 24-00262 |
| UNITED STATES, | ) ) |
| Defendant, | ) ) |
| and | ) ) |
| CALGON CARBON COROLATION AND NORIT AMERICAS, INC., | ) ) |
| Petitioners. | ) ) |

## **ORDER**

Upon consideration of the motions for judgment upon the agency record filed by

plaintiffs, consolidated plaintiffs, and plaintiff-intervenors, all responses thereto, the

administrative record, and other pertinent papers, it is hereby

ORDERED that the motions are DENIED; and it is further

ORDERED that the Department of Commerce's final results in this matter are sustained; and it is further

ORDERED that judgment is entered in favor of the United States.


Dated: _____, 2026                    _____
       New York, NY                                JUDGE

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE JANE A. RESTANI, SENIOR JUDGE

| | |
|---|---|
| NINGXIA GUANGHUA CHERISHMET ACTIVATED CARBON CO., LTD. AND JILIN BRIGHT FUTURE CHEMICALS CO., LTD., | ) ) ) ) |
| Plaintiffs, | ) ) |
| and | ) ) |
| CARBON ACTIVATED TIANJIN CO., LTD. AND CARBON ACTIVATED CORPORATION, | ) ) ) ) |
| Consolidated Plaintiffs, | ) ) |
| and | ) ) |
| BENGBU MODERN ENVIRONEMTNAL CO., LTD., ET AL., | ) ) ) |
| Plaintiff-Intervenors, | ) ) |
| v. | ) ) |
| UNITED STATES, | ) ) ) |
| Defendant, | ) ) |
| and | ) ) |
| CALGON CARBON COROROATION AND NORIT AMERICAS, INC., | ) ) ) ) |
| Petitioners. | ) |

Court No. 24-00262
PUBLIC VERSION
CONTAINS REDACTED BPI ON
PAGES 49-51

**DEFENDANT'S RESPONSE TO PLAINTIFFS', CONSOLIDATED PLAINTIFFS', AND
PLAINTIFF-INTERVENORS'
MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Deputy Director

OF COUNSEL:

RUSLAN KLAFEHN
Attorney
Office of the Chief Counsel
for Trade Enforcement & Compliance

BLAKE W. COWMAN
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
U.S. Department of Commerce
Washington, D.C. 20044
Telephone: (202) 353-2494
Email: Blake.W.Cowman@usdoj.gov

February 2, 2026

*Attorneys for Defendant United States*

## TABLE OF CONTENTS

RULE 56.2 STATEMENT ................................................................................................ 3

    I.    The Administrative Determination Under Review ................................................ 3

    II.   Issues Presented for Review ................................................................................ 3

STATEMENT OF FACTS ............................................................................................... 5

    I.    Commerce Initiates The Sixteenth Administrative Review Of The Antidumping Duty
Order On Activated Carbon From China ................................................................ 5

    II.   Cherishmet Reports Its FOP Database and Parties Submit Surrogate Country Comments
and Surrogate Value Information to Commerce .......................................................... 6

        A.   Surrogate Country Comments ....................................................................... 6

        B.   Surrogate Value Information ......................................................................... 7

        C.   Cherishmet Reports Its FOP Database ........................................................... 8

    III.   Commerce Publishes the Preliminary Results, Selecting Malaysia as the Primary
Surrogate Country and Using Malaysian Data for All Surrogate Values Except Labor, and
Parties Submit Case Briefs ....................................................................................... 9

    IV.   Commerce Publishes the *Final Results* ............................................................. 10

    V.   Commerce Amends the *Final Results* in Response to Ministerial Error Allegations ....... 11

SUMMARY OF THE ARGUMENT ............................................................................. 11

ARGUMENT .................................................................................................................. 14

    I.    Standard Of Review ......................................................................................... 14

    II.   Commerce's Selection of Malaysia as the Primary Surrogate Country is Supported by
Substantial Evidence and Otherwise in Accordance with Law ................................... 14

        A.   Commerce Reasonably Rejected Romania from Consideration as a Surrogate Country
Because Record Evidence Demonstrated That Romania Did Not Have Significant
Production of Activated Carbon .......................................................................... 16

        B.   Commerce Was Not Required to Evaluate Whether Romania Provided The "Best
Available Information" to Select a Surrogate Country ........................................... 20

    III.   Commerce Reasonably Selected the Best Available Information on the Record for
Determining Surrogate Values for All Input Factors of Production ............................ 26

        A.   Malaysian Surrogate Values Are the Best Available Information on the Record ........ 27

        B.   Plaintiffs Have Not Identified Error in the Selection of the Coal Tar Surrogate Value 35

        C.   Plaintiffs Have Not Identified Error in the Selection of the Sub-Bituminous Coal
Surrogate Value .................................................................................................. 41

        D.   Plaintiffs Have Not Identified Error in the Selection of the Hydrochloric Acid
Surrogate Value .................................................................................................. 43

E.    Plaintiffs Have Not Identified Error in the Selection of the Sodium Hydroxide and Potassium Hydroxide Surrogate Values ................................................................................ 45

F.    Plaintiffs Have Not Identified Error in the Selection of the Surrogate Financial Ratios 46

IV.    Commerce Appropriately Corrected the Consolidated FOP Database Provided by Cherishmet ........................................................................................................................... 48

V.    Commerce Reasonably Declined to Adopt Jilin Bright's Proposed VAT Tax Calculation Formula ................................................................................................................................ 52

VI.    Commerce's *Amended Final Results* Are Supported by Substantial Evidence and Otherwise in Accordance with Law ..................................................................................... 53

A.    Commerce Reasonably Removed the Fair Value Loss on Equity Investments and Loss on Disposal of Equity Investments From SG&A ................................................................ 55

B.    Commerce's *Amended Final Results* with Respect to the Valuation of Bituminous Coal Consumption are Supported by Substantial Evidence and Otherwise in Accordance with Law 56

CONCLUSION ........................................................................................................................... 61

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*ABB Inc. v. United States*,
   355 F. Supp. 3d 1206 (Ct. Int'l Trade 2018) .......................................... 50

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
   882 F. Supp. 2d 1366 (Ct. Int'l Trade 2012) .................................. 21, 24

*Al Ghurair Iron & Steel LLC v. United States*,
   65 F.4th 1351 (Fed. Cir. 2023) .......................................................... 43

*Alloy Piping Prods., Inc. v. United States*,
   201 F. Supp. 2d 1267 (Ct. Int'l Trade 2002) ..................................... 54

*Alloy Piping Products, Inc. v. Kanzen Tetsu Sdn. Bhd.*,
   334 F.3d 1284 (Fed. Cir. 2003)........................................................... 60

*Baoding Mantong Fine Chemistry Co. v. United States*,
   222 F. Supp. 3d 1231 (Ct. Int'l Trade 2017) ..................................... 30

*Best Mattresses Int'l Co. v. United States*,
   622 F. Supp. 3d 1347 (Ct. Int'l Trade 2023) .................................. 33, 44

*Bio-Lab, Inc. v. United States*,
   776 F. Supp. 3d 1315 (Ct. Int'l Trade 2025) ................................. passim

*Blue Field (Sichuan) Food Industrial Co. v. United States*,
   949 F. Supp. 2d 1311 (2013) ............................................................. 30

*Boomerang Tube LLC v. United States*,
   856 F.3d 908 (Fed. Cir. 2017)........................................................ 59, 60

*Calgon Carbon Corp. v. United States*,
   443 F. Supp. 3d 1344 (Ct. Int'l Trade 2020) ..................................... 39

*Carbon Activated Tianjin Co. v. United States*,
   650 F. Supp. 3d 1354 (Ct. Int'l Trade 2023) ..................................... 19

*Carbon Activated Tianjin Co. v. United States*,
   No. 2023-2413, 2025 WL 1354994 (Fed. Cir. May 9, 2025)........................... passim

*Charles G. Williams Constr., Inc. v. White*,
   326 F.3d 1376 (Fed. Cir. 2003)........................................................... 34

*Cleo Inc. v. United States*,
   501 F.3d 1291 (Fed. Cir. 2007)........................................................... 14

*Coalition of Am. Flange Producers v. United States*,
   448 F. Supp. 3d 1340 (Ct. Int'l Trade 2020) ....................................... 34

*Consol. Edison Co. v. NLRB*,
   305 U.S. 197 (1938) ....................................................................... 14

*Consolo v. Fed. Mar. Com.*,
   383 U.S. 607 (1966) ....................................................................... 14

*Corus Staal BV v. United States*,
   502 F.3d 1370 (Fed. Cir. 2007) ....................................................... 59

*Daewoo Elecs. Co. v. Int'l Union of Elec., Elec., Tech., Salaried & Mach. Workers*,
   6 F.3d 1511 (Fed. Cir. 1993) ............................................... 18, 50, 53

*Dorbest Ltd. v. United States*,
   604 F.3d 1363 (Fed. Cir. 2010) ................................................ passim

*Downhole Pipe & Equip., L.P. v. United States*,
   776 F.3d 1369 (Fed. Cir. 2015) ......................................................... 5

*Encino Motorcars, LLC v. Navarro*,
   584 U.S. 79 (2018) ....................................................................... 20

*Goldlink Indus. Co., Ltd. v. United States*,
   431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) ........................... 29, 30, 36

*Goodluck India Ltd. v. United States*,
   11 F.4th 1335 (Fed. Cir. 2021) ....................................................... 53

*Guangdong Chemicals v.United States*,
   460 F. Supp. 2d 1365 (Ct. Int'l Trade 2006) ................................ 55, 56

*Home Meridian Int'l, Inc. v. United States*,
   772 F.3d 1289 (Fed. Cir. 2014) ....................................................... 27

*Hyundai Electronics Industries Co. v. United States*,
   395 F. Supp. 2d 1231 (Ct. Int'l Trade 2005) ..................................... 60

*Jacobi Carbons AB v. United States*,
   313 F. Supp. 3d 1344 (Ct. Int'l Trade 2018) ..................................... 39

*JBF RAK LLC v. United States*,
   790 F.3d 1358 (Fed. Cir. 2015) ....................................................... 23

*JBF RAK LLC v. United States*,
   961 F. Supp. 2d 1274 (Ct. Int'l Trade 2014) ..................................... 52

*Jiaxing Bro. Fastener Co. v. United States,*
(*Jiaxing II*), 822 F.3d 1289 (Fed. Cir. 2016) ................................................. passim

*Jiaxing Bro. Fastener Co. v. United States,*
11 F. Supp. 3d 1326 .......................................................................................... 27

*Jiaxing Bro. Fastener Co., Ltd. v. United States,*
961 F. Supp. 2d 1323 (Ct. Int'l Trade 2014) .................................................. 24

*Lifestyle Enterprise, Inc. v. United States,*
751 F.3d 1371 (Fed. Cir. 2014) ....................................................................... 31

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024) .................................................................................... 21, 22

*Matsushita Elec. Indus. Co. v. United States,*
750 F.2d 927 (Fed. Cir. 1984) .................................................................... 18, 19

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) ...................................................................................... 35, 36

*Nagase & Co. v. United States,*
719 F. Supp. 3d 1343 (Ct. Int'l Trade 2024) .................................................. 61

*Nagese & Co. v. United States,*
628 F. Supp. 3d 1326 (Ct. Int'l Trade 2023) .................................................. 58

*Nation Ford Chem. Co. v. United States,*
166 F.3d 1373 (Fed. Cir. 1999) .................................................................. 26, 27

*Ningbo Dafa Chem. Fiber Co. v. United States,*
580 F.3d 1247 (Fed. Cir. 2009) ....................................................................... 14

*NMB Singapore Ltd. v. United States,*
557 F.3d 1316 (Fed. Cir. 2009) .................................................................. passim

*OTR Wheel Eng'g, Inc. v. United States,*
901 F. Supp. 2d 1375 (Ct. Int'l Trade 2013) ............................................ 26, 44

*Pirelli Tyre Co. v. United States,*
128 F.4th 1265 (Fed. Cir. 2025) ................................................................. 34, 47

*QVD Food Co., Ltd. v. United States,*
658 F.3d 1318 (Fed. Cir. 2011) .......................................................... 32, 50, 58

*United States v. Eurodif S.A.,*
555 U.S. 305 (2009) .......................................................................................... 14

*Wheatland Tube v. United States,*
   755 F. Supp. 3d 1304 (Ct. Int'l Trade 2025) .................................................. 50

*Writing Instrument Mfrs. Ass'n, Pencil Section v. United States,*
   984 F. Supp. 629 (Ct. Int'l Trade 1997) ..................................................... 38

*Zhaoqing Tifo New Fibre Co., Ltd. v. United States,*
   60 F. Supp. 3d 1328 (Ct. Int'l Trade 2015) ................................................. 59

*Zhejiang DunAn Hetian Metal Co. v. United States,*
   652 F.3d 1333 (Fed. Cir. 2011)......................................................... 26, 30

*Zhejiang Native Produce & Animal By-Prods. Imp. & Exp. Grp. Corp. v. United States,*
   32 C.I.T. 673 (2008) ................................................................... 37

## Statutes

19 U.S.C. § 1675(h) ............................................................ 53, 54, 56

19 U.S.C. § 1677b(c) .................................................................. 29

19 U.S.C. § 1677b(c)(1)(B) ......................................................... 23, 26

19 U.S.C. § 1677b(c)(3) ............................................................... 27

19 U.S.C. § 1677b(c)(4).......................................................... passim

19 U.S.C. § 1677b(c)(5) ............................................................... 29

28 U.S.C. § 2637(d) .................................................................. 59

## Regulations

19 C.F.R. § 351.224 .................................................................. 54

19 C.F.R. § 351.224(b)-(c).............................................................. 54

19 C.F.R. § 351.224(e)................................................................. 54

19 C.F.R. § 351.224(f) ............................................................. 54, 57

19 C.F.R. § 351.408(c)(2)............................................................. 26

## Other Authorities

*Activated Carbon from China: Notice of Preliminary Results of the Antidumping Duty
   Administrative Review and Extension of Time Limits for the Final Results,* 87 Fed. Reg.
   21,317, 21321 (Dep't of Commerce May 7, 2009)................................... 49

*Carbazole Violet Pigment 23 from China: Final Results of Antidumping Duty Administrative Review*, 75 Fed. Reg. 36,630 (Dep't of Commerce, June 28, 2010)......................................... 29

*Certain Activated Carbon from China: Final Results of Antidumping Duty Administrative Review; 2013-2014 (CAC from China, 2013-2014)*, 80 Fed. Reg. 61,172 (Dep't of Commerce, Oct. 9, 2015) ...................................................................................................................... 38, 39

*Certain Activated Carbon from China: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 83 Fed. Reg. 53,214 (Dep't of Commerce, Oct. 22, 2018) .................... 39

*Certain Activated Carbon From the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review; 2022–2023*, 89 Fed. Reg. 104,978 (Dep't of Commerce Dec. 26, 2024) ....................................................................................................... 3

*Certain Activated Carbon From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2022–2023*, 89 Fed. Reg. 92,893 (Dep't of Commerce Nov. 25, 2024) ........................................................................................................................................ 3

*Certain Activated Carbon From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2022–2023*, 89 Fed. Reg. 35,797, 35,798 (Dep't of Commerce May 2, 2024) ..................................................................................................... 3

*Certain Corrosion-Resistant Steel Products From the Socialist Republic of Vietnam: Amended Preliminary Affirmative Determination of Sales at Less Than Fair Value*, 90 Fed. Reg. 22,690 (Dep't of Commerce May 29, 2025).......................................................................................... 57

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, and Affirmative Final Determination of Critical Circumstances, in Part*, 77 Fed. Reg. ................ 43

*Final Determination of Sales at Less Than Fair Value: Prestressed Concrete Steel Rail Tie Wire from the People's Republic of China*, 79 Fed. Reg. 25,572 (Dep't of Commerce May 5, 2014) .................................................................................................................................................. 38

H.R. Conf. Rep. No. 100-576 .................................................................................................... 15

*Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review of the Order on Bars and Wedges*, 68 Fed. Reg. 53,347 (Dep't of Commerce Sept. 10, 2003) ....................... 33

*HeavyForged Hand Tools, Finished or Unfinished, With or Without Handles, From thePeople's Republic of China; Final Results of Antidumping Duty AdministrativeReviews*,63 Fed. Reg. 16,758, 16,761(Dep't of Commerce April 6, 1998) .............................................................. 32

*Honey from the People's Republic of China*, 71 Fed. Reg. 34,893 (Dep't of Commerce June 16, 2006) ...................................................................................................................................... 37

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 Fed. Reg. 38,021, 38,025-26 (Dep't of Commerce June 12, 2023) ........................................................................ 5

*LWRPT from China*, 88 FR 15671 (March 14, 2023) .................................................................... 32

*Notice of Antidumping Duty Order: Certain Activated Carbon From the People's Republic of China*, 72 Fed. Reg. 20,988 (Dep't of Commerce April 27, 2007) ............................................ 5

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE JANE A. RESTANI, SENIOR JUDGE

| | |
|---|---|
| NINGXIA GUANGHUA CHERISHMET ACTIVATED CARBON CO., LTD. AND JILIN BRIGHT FUTURE CHEMICALS CO., LTD., | ) ) ) ) |
| Plaintiffs, and | ) ) ) ) |
| CARBON ACTIVATED TIANJIN CO., LTD. AND CARBON ACTIVATED CORPORATION, | ) ) ) ) |
| Consolidated Plaintiffs, and | ) ) ) ) ) |
| BENGBU MODERN ENVIRONEMTNAL CO., LTD., ET AL., | ) ) ) |
| Plaintiff-Intervenors, | ) ) |
| v. | ) ) |
| UNITED STATES, | ) ) |
| Defendant, and | ) ) ) ) |
| CALGON CARBON CORORATION AND NORIT AMERICAS, INC., | ) ) ) |
| Petitioners. | ) ) |

Court No. 24-00262
CONFIDENTIAL VERSION
BPI ON PAGES XX

**DEFENDANT'S RESPONSE TO PLAINTIFFS', CONSOLIDATED PLAINTIFFS', AND PLAINTIFF-INTERVENORS' MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade,

defendant, the United States, respectfully responds to the motions for judgment on the agency

record filed by plaintiffs, Ningxia Guanghua Cherishmet Acitvated Carbon Co., Ltd.

1

(Cherishmet) and Jilin Bright Future Chemicals Co., Ltd. (Jilin Bright),[1] consolidated plaintiffs Carbon Activated Tianjin Co., Ltd. and Carbon Activated Corporation (collectively, Carbon Activated), and Calgon Carbon Corporation and Norit Americas, Inc. (collectively, the petitioners), and plaintiff-intervenors, Ningxia Mineral & Chemical Limited, Tianjin Channel Filters Co., Ltd., and Shanxi Sincere Industrial Co., Ltd.[2]

Plaintiffs, consolidated plaintiffs, plaintiff-intervenors, and the petitioners challenge certain aspects of the United States Department of Commerce's *Final Results* and *Amended Final Results* in the sixteenth administrative review of the antidumping duty order on certain activated carbon (activated carbon) from the People's Republic of China (China). Specifically, concerning *Final Results*, the parties challenge Commerce's selection of Malaysia as the primary surrogate country, Commerce's use of Malaysian average unit values (AUVs) to value certain factors of production (FOPs), Commerce's calculation of surrogate financial ratios, Commerce's corrections to Cherishmet's FOP database. Concerning the *Amended Final Results*, parties challenge Commerce's removal of two expenditures from selling, general and administrative (SG&A) expenses and addition of those expenditures to profit, and Commerce's correction of Cherishmet's but not Jilin Bright's bituminous coal consumption value. As explained below, the

---

[1] Shanxi Industry Technology Trading Co., Ltd., Ningxia Huahui Environmental Technology Co., Ltd., Datong Municipal Yunguang Activated Carbon Co., Ltd., Datong Juqiang Activated Carbon Co., Ltd., Datong Hongdi Carbon Co., Ltd., and Bengbu Modern Environmental Co., Ltd. join in Plaintiffs' opening brief. *See* Pls. Br., ECF Nos. 60, 61 (Aug. 14, 2025).

[2] In their motion for judgment on the agency record, plaintiff-intervenors "incorporate by reference the arguments raised by Consolidated Plaintiff Carbon Activated and other Plaintiffs and Plaintiff-Intervenors." Pls.-Intervenor Br., ECF No. 57 (Aug. 14, 2025). Accordingly, this response addresses the arguments made in Plaintiffs' and consolidated plaintiffs' briefs. *See* Pls. Br., ECF Nos. 60, 61 (May 25, 2023); Consol. Pls. Br., ECF Nos. 58, 59.

motions should be denied because Commerce's final results and amended final results are supported by substantial evidence and are otherwise in accordance with law.

## RULE 56.2 STATEMENT

### I.    The Administrative Determination Under Review

This consolidated action challenges Commerce's final results of the sixteenth administrative review of the antidumping duty order on certain activated carbon from China.  *See Certain Activated Carbon From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2022–2023*, 89 Fed. Reg. 92,893 (Dep't of Commerce Nov. 25, 2024) (*Final Results*) (P.R. 267), and accompanying Issues and Decision Memorandum (IDM) (P.R. 251), as amended by *Certain Activated Carbon From the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review; 2022–2023*, 89 Fed. Reg. 104,978 (Dep't of Commerce Dec. 26, 2024) (*Amended Final Results*) (P.R. 277), and accompanying Amended IDM (P.R. 271).  The period of review is April 1, 2022, through March 31, 2023.  IDM at 1.  The review covers twenty producers and/or exporter of subject merchandise, including the two mandatory respondents Jilin Bright and Cherishmet.  *See Certain Activated Carbon From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2022–2023*, 89 Fed. Reg. 35,797, 35,798 (Dep't of Commerce May 2, 2024) (*Preliminary Results*) (P.R. 223), and accompanying Preliminary Decision Memorandum (PDM) (P.R. 221).

### II.    Issues Presented for Review

1.  Whether Commerce's selection of Malaysia as the primary surrogate country is supported by substantial evidence and otherwise in accordance with law.

2.  Whether Commerce reasonably rejected Romania from consideration as the primary surrogate country.

3.  Whether Commerce selected the best available information for determining the surrogate value of coal tar.

4.  Whether Commerce selected the best available information for determining the surrogate value of coal.

5.  Whether Commerce selected the best available information for determining the surrogate value of hydrochloric acid.

6.  Whether Commerce selected the best available information for determining the surrogate value of sodium hydroxide.

7.  Whether Commerce selected the best available information for determining the surrogate value of potassium hydroxide.

8.  Whether Commerce selected the best available information for determining the surrogate financial ratios.

9.  Whether Commerce reasonably corrected Cherishmet's Consolidated FOP database.

10. Whether Commerce reasonably declined to adopt Jilin Bright's value-added-tax calculation.

11. Whether Commerce reasonably removed "fair value loss on equity investments" and "loss on disposal of equity investments" from SG&A but added the same to profit in calculating surrogate financial ratios

12. Whether Commerce reasonably corrected Cherishmet's bituminous coal consumption value but not Jilin Bright's.

## STATEMENT OF FACTS

I.    **Commerce Initiates The Sixteenth Administrative Review Of The Antidumping Duty Order On Activated Carbon From China**

In April 2007, Commerce published the antidumping duty (AD) order on certain activated carbon from the People's Republic of China. *See Notice of Antidumping Duty Order: Certain Activated Carbon From the People's Republic of China*, 72 Fed. Reg. 20,988 (Dep't of Commerce April 27, 2007). On June 12, 2023, having received timely requests for review, Commerce initiated the sixteenth administrative review of the *Order* for the period of review from April 1, 2022, through March 31, 2023. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 Fed. Reg. 38,021, 38,025-26 (Dep't of Commerce June 12, 2023) (P.R. 29). Following initiation, Commerce selected Jilin Bright and Cherishmet as mandatory respondents in this administrative review, and issued the initial questionnaire to both. *See Preliminary Results* PDM at 3.

In AD proceedings involving nonmarket economy countries (NMEs), such as China, the Tariff Act requires Commerce to "determine{} normal value by valuing the 'factors of production' used in producing the merchandise in a comparable market economy." *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1374–75 (Fed. Cir. 2015) (quoting 19 U.S.C. § 1677b(c)(1)(B)). In selecting the appropriate surrogate country, Commerce, to the extent possible, chooses from a list of potential countries assembled by the Office of Policy that are at a level of economic development comparable to that of the NME and that are significant producers of comparable merchandise (OP List or listed country). *See* 19 U.S.C. § 1677b(c)(4); *see also* Import Admin., U.S. Dep't of Commerce, Non-Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (2004), https://enforcement.trade.gov/policy/bull04-1.html (Policy Bulletin 04.1). Accordingly, Commerce compiled and placed the OP List on the

record of the administrative review, identifying countries that are at a level of economic

development comparable to China, and invited interested parties to submit surrogate value data.

*See* Commerce's Letter, "Request for Economic Development, Surrogate Country and Surrogate

Value Comments and Information," dated Nov. 7, 2023 (Surrogate Country Mem.), at

Attachment 1.  The country list identified Bulgaria, Costa Rica, Malaysia, Panama, Romania,

and Türkiye as economically comparable based on per capita gross national income (GNI) data

available from the World Bank's 2021 World Development Report.  *See id.*

## II.    Cherishmet Reports Its FOP Database and Parties Submit Surrogate Country Comments and Surrogate Value Information to Commerce

### A.    Surrogate Country Comments

In the Surrogate Country Memorandum, Commerce instructed parties to submit

information pertaining to whether a country was a "significant producer of merchandise

comparable to the merchandise subject to this review," "information regarding data availability

and the quality of the data," "and information regarding data availability and quality of financial

statements."  *See* Surrogate Country Mem. at 1-2.  Commerce also instructed parties to submit

information "to value the factors of production."  *Id.* at 2.

All parties agreed that the six countries identified were economically comparable to

China.  *See* PDM at 6.  Cherishmet and Jilin Bright submitted comments arguing that Commerce

should select Romania as the primary surrogate country because Malaysian data was

aberrational.  Cherishmet's Letter, "GHC's Pre-Preliminary Comments," dated April 8, 2024

(Cherishmet's Pre-Preliminary Comments) (P.R. 207, C.R. 197); Jilin Bright's Letter, "Jilin

Bright's Comment Regarding Preliminary Determination," dated April 12, 2024 (Jilin Bright's

Pre-Preliminary Comments) (P.R. 213, C.R. 204).

The petitioners submitted comments arguing that Commerce should use Malaysia as the primary surrogate country.  *See* Petitioners' Letter, "Petitioners' Comments on Surrogate Country Selection," dated November 21, 2023, at 4 (Petitioners' Surrogate Country Comments). Specifically, the petitioners argued that Commerce has found Romania not to be a significant producer in prior reviews, while continuing to find Malaysia to be a significant producer.  *See id.* at 3-4 (internal citations omitted).  With respect to Türkiye, the petitioner contended that only two Turkish companies exported subject merchandise, one of which was a distributor.  *Id.* at 5-6. The petitioners also argued that there was "no evidence of producers of activated carbon in Costa Rica, Chile, Panama, or Bulgaria."  *Id.* at 6.  Therefore, the petitioners argued that Malaysia should be selected as the primary surrogate country.

### B.    Surrogate Value Information

The parties provided surrogate value data from three countries: Romania, Malaysia, and Türkiye.  PDM at 7.  Cherishmet and Jilin Bright provided publicly available export data for Romania published by Trade Data Monitor and consolidated financial statements from one Romanian and four Malaysian companies that produce comparable merchandise.  *See* Jilin Bright's Letter, "Surrogate Value Information," dated December 20, 2023 (P.R. 144-45); Cherishmet's Letter, "Comments on the Department's Selection of a Surrogate Country," dated December 20, 2023 (Cherishmet's First Surrogate Value Submission) (P.R. 146-49); Jilin Bright's Letter, "Surrogate Value Information," dated March 27, 2024 (P.R. 194-96); and Cherishmet's Letter, "Final Surrogate Submission," dated March 27, 2024 (P.R. 188-191) (Cherishmet's Final Surrogate Value Submission).  The petitioners also submitted Trade Data Monitor data for exports from Malaysia and labor FOPs from the International Labor Organization for Türkiye and Malaysia, as well as consolidated financial statements from one Malaysian company that produces comparable merchandise.  *See* Petitioners' Letter "First

Affirmative Surrogate Value Comments, dated December 20, 2023 (P.R. 150-51); Petitioners'

Letter, "Petitioner's Final Affirmative Surrogate Value Comments," dated March 27, 2024 (P.R.

192-93).

Cherishmet and Jilin Bright provided rebuttal surrogate value information from the

publicly available United Nations Comtrade database arguing that Malaysian values were

aberrational in comparison to world average prices, not exclusive of prices from NMEs and

countries with general export subsidies.  *See e.g.*, Cherishmet's Final Surrogate Value

Submission at Exhibits 2a, 2b, 3.  Petitioners provided rebuttal surrogate value information

demonstrating that Malaysian values were not aberrational when analyzed consistent with

Commerce's practice.  Petitioners' Letter, "Petitioners' Rebuttal of Respondents' First Surrogate

Value Submission," dated January 10, 2024 (Petitioners' Rebuttal Surrogate Value Submission)

(P.R. 160-170, C.R. 82).

### C.    Cherishmet Reports Its FOP Database

Cherishmet submitted cost of production information for itself, its toller,[3] and its

unaffiliated supplier.  Cherishmet's Letter, "Section D Questionnaire Response," dated

September 28, 2023 (P.R. 123, C.R. 64-78).  Following concerns raised by the petitioners,

Commerce asked Cherishmet about its supplier's raw materials and whether inputs were self-

produced or not.  Petitioners' Letter "Request to Issue Supplemental Questionnaire Addressing

Unresolved Critical Deficiencies in GHC's DQR," dated March 22, 2024 (P.R. 184, C.R. 142);

Commerce's Letter, "Second Supplemental Section A, C, and D Questionnaire," dated March

25, 2024 (P.R. 185, C.R. 143).  Cherishmet replied that its supplier's inputs were self-produced

based on an agreement reached with the supplier, but did not provide evidence of the agreement.

---

[3] A toller is a third-party company that further processes inputs into finished
merchandise.

Cherishmet's Letter, "Second Supplemental Section A, C, and D Questionnaire Response," dated April 5, 2024 (Cherishmet's 2nd Supp QR") at 3, Exhibit 2SD-1 (P.R. 202, C.R. 152).

### III.    Commerce Publishes the Preliminary Results, Selecting Malaysia as the Primary Surrogate Country and Using Malaysian Data for All Surrogate Values Except Labor, and Parties Submit Case Briefs

On May 2, 2024, Commerce published the *Preliminary Results* and preliminarily determined that activated carbon from China was sold at prices below normal value. *Preliminary Results*, 89 Fed. Reg. at 35,797.  In the *Preliminary Results*, Commerce preliminarily selected Malaysia as the primary surrogate country because, of the listed countries, Malaysia was the only net exporter of comparable merchandise and, thus, the only significant producer.  PDM at 7-8.

Commerce then considered data on the record and determined that "Romania and Malaysia is generally publicly available, comprised of contemporaneous data that represent a broad market average{}, tax and duty exclusive, and specific to inputs used by Jilin Bright and GHC to produce subject merchandise during the POR."  PDM at 8.  With the exception of labor,[4] Commerce valued all FOPs using Malaysian data because "more complete {surrogate value} information is available from Malaysia{}" and, therefore, "Malaysian data {was} the best available {surrogate value} data." *Id.* at 9.  Specifically, for direct materials and packing materials, Commerce used Malaysian Trade Data Monitor (TDM) data.  PDM at 19-20.  For

---

[4] Commerce has previously determined that forced labor is prevalent in the Malaysian manufacturing sector and, therefore, Malaysian data is not the best available information to value the labor FOP.  *See* PDM at 9; IDM at 15.  Accordingly, Commerce determined that Türkiye is also a significant producer and thus eligible as a surrogate country and determined that Turkish data is the best available information to value labor.  *See* PDM at 9, 20-21; IDM at 15.  No party challenges this determination, nor argues that Turkish data is the best available information with respect to FOPs other than labor.

financial ratios, Commerce averaged the financial statements of two Malaysian companies: Century Chemical Works Sdn. Bhd. and New Chang Hua Sdn. Bhd. *Id.* at 21-22.

Plaintiffs and petitioners submitted case briefs, while consolidated plaintiffs did not. Plaintiffs reiterated arguments raised earlier, contending that Romania was the appropriate surrogate country, and that Romanian data provided superior data. Cherishmet argued that Commerce should continue to rely on its FOP database as presented at the preliminary results. Jilin Bright argued that it had erroneously reported its value-added tax (VAT) incurred and that Commerce should correct the value using a formula Jilin Bright proposed.

Petitioners reiterated arguments raised earlier that Malaysia was the appropriate surrogate country and that Malaysian data provided the best available information and was not aberrational. Petitioners also reiterated that Commerce reasonably rejected Romania as a surrogate country because it was not a significant producer of comparable merchandise. Petitioners also responded to plaintiffs' arguments concerning the Cherishmet's FOP database, which petitioners argued should be corrected, and Commerce's rejection of Jilin Bright's proposed formula to correct VAT calculations, which petitioners argued should not be accepted because Jilin Bright failed to alert Commerce to the issue before it submitted its case brief. IDM at 26.

## IV.    Commerce Publishes the *Final Results*

In the *Final Results*, Commerce continued to find that Malaysia was the appropriate primary surrogate country and that Malaysian data was the best available information to value all FOPs except for labor. 89 Fed. Reg. at 92,894. Commerce rejected Romania as a surrogate country because the record did not support that Romania was a significant producer of comparable merchandise. IDM at 11. Commerce also relied on the Century Chemical and New

Chang Hua financial statements to calculate surrogate financial ratios, removing two expenditures from Century Chemical's SG&A and added them to profit.  IDM at 24-26.

## V.    Commerce Amends the *Final Results* in Response to Ministerial Error Allegations

Following the *Final Results*, the petitioners, Cherishmet, and Jilin Bright filed ministerial error comments on Commerce's decision to remove two expenditures from Century Chemical's SG&A and add them to profit.  Cherishmet and the petitioners alerted Commerce that Commerce had not removed the two expenditures from SG&A, and had only added the expenditures to profit.  Jilin Bright argued that Commerce should not have added the expenditures to profit because the expenditures were offsets to SG&A and, thus Commerce should have removed them from profit and from SG&A.  Commerce deemed this error to be ministerial and corrected the values as suggested by both Cherishmet and the petitioners.  Amended IDM at 4-5.  Commerce disagreed with Jilin Bright's claim that Commerce made a ministerial error by improperly treating certain expenditures as additions to profit given Commerce's explicit statement in the *Final Results* that it would add these expenditures to profit.  Amended IDM at 5.

Cherishmet and the petitioners also filed comments on correcting Cherishmet's bituminous coal consumption value, where Commerce inadvertently used the surrogate value for another product in the final results, and Cherishmet failed to raise the issue in its case brief.  Commerce used its discretionary authority to correct the error in Cherishmet's bituminous coal consumption value, which while untimely, was ministerial.  Amended IDM at 5-6.

## SUMMARY OF THE ARGUMENT

Plaintiffs and consolidated plaintiffs' primary arguments are, at bottom, mere disagreement with Commerce's choice to use Malaysian surrogate values instead of Romanian surrogate values.  However, Commerce properly selected Malaysia as the primary surrogate country.

1.     The record demonstrates that Malaysia was the only net exporter by quantity and value and therefore the only listed country that was both economically comparable to China and a significant producer of comparable merchandise.  Commerce rejected Romania from consideration as the primary surrogate country because it was not a significant producer of comparable merchandise to activated carbon.  The record demonstrates that Romania imports significantly more activated carbon than it exports, and that activated carbon production is not even a principal activity of the one company for which information is on the record.  Therefore, Romania is not a significant producer.  Accordingly, Commerce also properly declined to compare the merits of the Romanian and Malaysian data.

2.     Plaintiffs' disagreement with Commerce's choice of Malaysian data for specific FOP's fares no better.  The record demonstrates that Malaysian data was the best available information to value all FOPs relevant to this litigation because it satisfied Commerce's data considerations and because it was not aberrational when compared to the values derived from other listed countries and historical Malaysian values.  The record also does not demonstrate that Malaysian import volumes were so small as to not be reliable.  For the coal tar and coal FOPs, the record also explains sharp increases in the coal tar and coal FOPs, as coal consumption and prices were at a record high during the period of review.

3.     Commerce properly averaged the financial ratios of Century Chemical Work and New Chang Hua because the record reflected that only these two companies' financial statements were contemporaneous, publicly available, and reflected producers of comparable merchandise.  Financial statements proffered by Plaintiffs were inadequate because they reflected companies that either produced non-comparable merchandise or did not produce

merchandise at all.  Therefore, the record supports that Century Chemical Work and New Chang Hua were the best available information to value surrogate financial ratios.

4.      Commerce properly corrected Cherishmet's FOP database because the record demonstrates that Cherishmet's supplier did not self-produce merchandise it sold to Cherishmet which, in turn, sold that merchandise to the United States.  The purchased inputs also related to the production of subject merchandise and, thus, Commerce properly accounted for the inputs in correcting Cherishmet's FOP database.

5.      Commerce also declined to adopt Jilin Bright's proposed VAT calculation formula because Jilin Bright had only notified Commerce of its own alleged reporting error *after* the factual record was closed, preliminary results were published, and interested parties commented on the preliminary results.  Accordingly, Commerce properly rejected the proposed recalculation of the reported vat tax expense.

6.      Commerce properly removed two expenditures from SG&A and added them to profit because these expenditures were found to non-operational.  Therefore, prior to Commerce's adjustments, SG&A was overstated and profit was understated.  Commerce's calculation correctly balances the overstatement of SG&A and understatement of profit by removing the expenditures from SG&A and adjusting profit for the same.

7.      Finally, Commerce reasonably exercised its discretionary authority to correct Cherishmet's bituminous coal consumption value because it was a ministerial error and it was properly raised to Commerce, as part of ministerial error allegations submission.  Commerce also did not revise Jilin Bright's bituminous coal consumption value because Jilin Bright did not even raise the issue to Commerce, and thus the issue was not exhausted at the administrative level.  In such a case, Commerce is not required to correct an error, even if it is ministerial.

## ARGUMENT

### I.    Standard Of Review

The Court upholds Commerce determinations that are supported "by substantial evidence on the record" and otherwise "in accordance with law{.}"  19 U.S.C. § 1516a(b)(1)(B)(i). Commerce's factual findings "are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 & n.6 (2009) (citation omitted).  "Substantial evidence" connotes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Ningbo Dafa Chem. Fiber Co. v. United States*, 580 F.3d 1247, 1253 (Fed. Cir. 2009).  Even if the Court may draw two inconsistent conclusions from the evidence contained in the record, doing so "does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Com.*, 383 U.S. 607, 620 (1966) (citation omitted).  An agency decision may not be overturned "simply because the reviewing court would have reached a different conclusion based on the same record."  *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007) (citations omitted).

### II.    Commerce's Selection of Malaysia as the Primary Surrogate Country is Supported by Substantial Evidence and Otherwise in Accordance with Law

Commerce properly selected Malaysia as the primary surrogate country, consistent with the Tariff Act and Commerce's regulations.  While the record supported that all listed countries were economically comparable to China, the record demonstrated that only Malaysia satisfied the "significant producer of comparable" merchandise requirement.  Commerce then evaluated the Malaysian data and determined that it was the best available information on the record.

Because China is an NME, the Tariff Act requires Commerce to calculate normal value by selecting surrogate values for each factor of production, to the extent possible, in a surrogate

country that is (1) economically comparable to China, and (2) significant producer of subject

merchandise. 19 U.S.C. § 1677b(c)(4). Because terms in that statute, including "comparable

level of economic development," "comparable merchandise," and "significant producer" are not

defined, Commerce issued Policy Bulletin 04.1 to provide "guidance regarding {Commerce's}

selection of surrogate" countries:

> (1) the Office of Policy ("OP") assembles a list of potential surrogate countries that are at
> a comparable level of economic development to the {NME} country;
> (2) Commerce identifies countries from the list with producers of comparable
> merchandise;
> (3) Commerce determines whether any of the countries which produce comparable
> merchandise are significant producers of that comparable merchandise; and
> (4) if more than one country satisfies steps (1)–(3), Commerce will select the country
> with the best factors data.

See Jiaxing Bro. Fastener Co. v. United States (Jiaxing II), 822 F.3d 1289, 1293 (Fed. Cir.

2016). Moreover, both the legislative history of the Tariff Act and Policy Bulletin 04.1 state that

"significant producer" could mean "a country that is a net exporter, even though the selected

surrogate country may not be one of the world's top producers." Policy Bulletin 04.1; see

Conference Report to the 1988 Omnibus Trade & Competitiveness Act, H.R. Conf. Rep. No.

100-576, 590, reprinted at 1988 U.S.C.C.A.N. 1547, 1623 (1988).

Applying that guidance here, Commerce first found that Malaysia was economically

comparable to China. PDM at 7. Second, Commerce found that financial statements on the

record from multiple Malaysian companies demonstrated that Malaysia produces comparable

merchandise. See PDM at 7-8; Petitioners' Surrogate County Comments at 7 and Attachment 3

(Malaysian financial statements indicating activated carbon production). Third, Commerce

examined that TDM data demonstrated that Malaysia exported significantly more activated

carbon than it imported by both quantity and value and, therefore, was a significant producer of

comparable merchandise. See PDM at 7-8; Petitioners' Surrogate Country Comments at 7 and

Attachment 4.  Fourth, Commerce concluded that the only country that satisfied the first three

steps was Malaysia.  IDM at 12.  Commerce therefore reasonably selected Malaysia as the

primary surrogate country, determining that the surrogate value data on the record from Malaysia

were publicly available, contemporaneous, represented a broad market average, were tax and

duty exclusive, and specific to inputs used by Cherishmet and Jilin Bright to produce activated

carbon.  *See* PDM at 8-9.

Plaintiffs' argument that substantial evidence does not support Commerce's selection of

Malaysia as the primary surrogate country is two-fold.  First, plaintiffs argue that Romania

should not have been rejected as a potential surrogate country because record evidence indicated

Romania exported some activated carbon and, therefore, was a significant producer of

comparable merchandise.  Pls. Br. at 18-20.  Second, plaintiffs argue that Commerce was

required to engage in a comparative analysis of Romanian and Malaysian surrogate value data to

determine which constituted the best available information to value factors of production.  Pls.

Br. at 20-27.  Both arguments are meritless.

### A.    Commerce Reasonably Rejected Romania from Consideration as a Surrogate Country Because Record Evidence Demonstrated That Romania Did Not Have Significant Production of Activated Carbon

There is no dispute that Romania is not a net exporter of activated carbon under Policy

Bulletin 04.1.  Instead, citing to Romcarbon's financial statements and 2022 annual report,

plaintiffs assert that, because Romania has *some* production of activated carbon, it qualifies as a

significant producer.  Pls. Br. at 19-20.   However, the Federal Circuit rejected a nearly identical

argument in *Carbon Activated Tianjin Co. v. United States*, No. 2023-2413, 2025 WL 1354994,

at *3 (Fed. Cir. May 9, 2025) ("We see no error in Commerce's reliance on the net exporter

criterion of the Policy Bulletin.").[5]  There, as here, by analyzing the legislative history of the

Tariff Act, import and export data, and financial statements on the record, Commerce reasonably

determined that Romania was not a significant producer of comparable merchandise, and thus

was ineligible as a surrogate country because (i) it is not a net exporter and (ii) the Romanian

company financial statements on the record did not indicate any significant production.  *See id.*;

IDM at 7-12.

> **i.    Malaysia Was the Only Net Exporter**

The record of this review contains period of review import and export quantity value data

for all listed countries:

| Trade in Activated Carbon, HTS 3802.10 | | | |
|---|---|---|---|
| April 2022 - March 2023 (16th POR) | | | |
| Country | Exports (Kg) | Imports (Kg) | Net Exports (Kg) |
| Malaysia | 19,795,328 | 16,829,591 | 2,965,738 |
| Türkiye STS | 460,926 | 16,892,010 | -16,431,084 |
| Türkiye | 586,881 | 16,803,559 | -16,216,678 |
| Romania | 35,319 | 1,243,143 | -1,207,824 |
| Bulgaria | 12,599 | 385,112 | -372,513 |
| Costa Rica | 1,869 | 1,489,468 | -1,487,599 |
| Chile | 13,635 | 1,271,020 | -1,257,385 |
| Panama | 0 | 106,457 | -106,457 |

Petitioners' Surrogate Country Comments at 7.  This data indicates that, of the list of potential

surrogate countries, Malaysia was the *only* net exporter of activated carbon; *i.e.*, only Malaysia

---

[5] Plaintiffs in this case substitute surrogate values for surrogate financial ratios, but the premise is the same, as surrogate financial ratios are one aspect of surrogate values that approximate an NME respondent's selling, general and administrative expenses.  *See* 19 U.S.C. § 1677b(c)(4).

exported more activated carbon than it imported.  Indeed, Malaysia exported significantly more activated carbon than all other potential surrogate countries.  *Id.*

By contrast, Commerce found that Romania imported significantly more activated carbon than it exported, indicating that Romania is not a significant producer.[6]  IDM at 9 (citing Petitioners' Rebuttal Surrogate Value Submission at Exhibit SVR-1).  Examining the Trade Data Monitor data, Romania exported only 35,314 kilograms (kg) of activated carbon (i.e., approximately 35 tons) and *imported* 1,245,233 kgs of activated carbon.  Thus, Romania's trade in activated carbon is almost entirely import-based and is not eligible to be considered a significant producer on the basis of being a net exporter.

### ii.   The Romcarbon Financial Statements Do Not Demonstrate Significant Production

In addition to lack of significant exports from Romania, the record supports Commerce's conclusion that Romcarbon—the Romanian company on which plaintiffs rely—is not a significant producer of activated carbon.

Analyzing Romcarbon's 2022 annual report, Commerce found that Romcarbon's principal activities relate to non-subject merchandise.  IDM at 8-9 (citing Cherishmet's First Surrogate Value Submission at Exhibit 6) (*e.g.* waste wholesaling, plastic products and motor vehicle parts and accessories manufacturing).  Further, Romcarbon's financial statements group sales of activated carbon with sales of respiratory protective equipment represented only 2.04 percent of Romcarbon's total revenue between these two activities.  *Id.* at 9 (citing same).  As

---

[6] The logical inference from such a disparity in imports and export is that Romania does not produce enough activated carbon to even meet its own consumption needs and, therefore, is not a significant producer.  *See Daewoo Elecs. Co. v. Int'l Union of Elec., Elec., Tech., Salaried & Mach. Workers,* 6 F.3d 1511, 1520 (Fed. Cir. 1993) (quoting Mats*ushita Elec. Indus. Co. v. United States, 7*50 F.2d 927, 933 (Fed. Cir. 1984) ("The specific determination we make is 'whether the evidence and reasonable inferences from the record support the {Commerce} finding.") (emphasis added)).

Commerce explained in this review, and prior reviews, it can reasonably infer that, because sales

of activated carbon are grouped with sales of respiratory equipment, activated carbon represents

an even smaller portion of Romcarbon's revenue than the 2.04 percent.  *See id.* (citing *Carbon*

*Activated Tianjin Co. v. United States*, 650 F. Supp. 3d 1354, 1363-65 (Ct. Int'l Trade 2023)).

In contrast, Commerce also analyzed Malaysian financial statements and found that "100

percent of the Malaysian producers' revenues are earned through the production and sale of

activated carbon, similar to the operations and sales of the mandatory respondents."  IDM at 9.

Commerce also observed that the Malaysian producers' production experience is similar to

Cherishment's.  IDM at 10.  Thus, contrary to plaintiffs' suggestion, Commerce did not

disqualify Romania simply because "its production was not as high as Malaysia."  Pls. Br. at 18.

Instead, Commerce found that plaintiffs' proffered support did not demonstrate that activated

carbon production was principal activity, let alone evince significant production.  IDM at 9.

Plaintiffs nevertheless argue that Romcarbon's financial statements demonstrate that

Romcarbon "produces significant enough volumes of activated carbon to support an entire

production line that saw significant increases in sales" and thus Romania must be a significant

producer.  Pls. Br. at 19.  However, when contextualized with the small percentage of revenue

that activated carbon production represents for Romcarbon, this argument is meritless.  IDM at

8-9 (citing Cherishmet's First Surrogate Value Submission at Exhibit 6).  Plaintiffs do not

explain why the mere fact that a production line saw an increase in sales indicates production is

significant, particularly where those sales accounted for less than 2.04 percent of Romcarbon's

total revenue to begin with.  Plaintiffs cannot even quantify the level of production.  There is no

dispute that Romcarbon has *some* activated carbon production.  Commerce disagrees, however,

that Romcarbon's production is significant enough to make *it* a significant producer, let alone

Romania.  IDM at 9.  Accordingly, Commerce reasonably determined that Romcarbon's financial documents did not demonstrate that Romcarbon was a significant producer of activated carbon.

### B.    Commerce Was Not Required to Evaluate Whether Romania Provided The "Best Available Information" to Select a Surrogate Country

Because Romania is not a significant producer of comparable merchandise, as required by 19 U.S.C. § 1677b(c)(4), Commerce reasonably declined to evaluate whether the Romania data is the best available information on the record.  "Congress delegated to Commerce the duty to value the factors of production." *Bio-Lab, Inc. v. United States*, 776 F. Supp. 3d 1315, 1328 (Ct. Int'l Trade 2025).  Under the Tariff Act, Commerce is only required to "utilize, to the extent possible, the prices or costs of factors of production in one *or* more market economy countries" that are economically comparable and significant producers of comparable merchandise. 19 U.S.C. § 1677b(c)(4) (emphasis added).[7]

This "governing statute requires Commerce to use, to the extent possible, data from countries that are 'significant producers of comparable merchandise.'" *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1372 (Fed. Cir. 2010) (invalidating Commerce's regulation that allowed Commerce to use labor data from countries that were not significant producers of comparable merchandise as inconsistent with 19 U.S.C. § 1677b(c)(4)).  Plaintiffs do not contend that there

---

[7] Plaintiffs argue that "Commerce's administrative preference for valuing all factors of production from a single surrogate country is not in harmony with the statutory language" and, therefore, Commerce's "categorical rejection" of Romania is in error.  Pls. Br. at 21 (referencing 19 U.S.C. § 1677b(c)(4)).  However, plaintiffs' interpretation is belied by the plain language of the statute.  The use of the disjunctive "or" in the statute demonstrates that Commerce does not commit legal error by using only one surrogate country.  *See Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 87 (2018) ("'{O}r' is 'almost always disjunctive'"); *cf. Bio-Lab, Inc.*, 776 F. Supp. 3d at 1330 (reasoning the conjunctive "and" in 19 U.S.C. § 1677b(c)(4)(A) requires that a potential surrogate country be both economically comparable *and* a significant producer of comparable merchandise).

is no data from a country that is a significant producer of comparable merchandise on the record, such as it would be impossible to use such data. Accordingly, Commerce did not need to further analyze Romanian data that failed to satisfy the threshold statutory requirements, when Malaysian data did.

As discussed above, Commerce's surrogate country selection process is a four-step sequence. *See* Policy Bulletin 04.1; *accord Carbon Activated Tianjin*, 2025 WL 1354994, at *3 ("We have recognized Commerce's reliance on the Policy Bulletin{.}") (citing *Jiaxing II*, 822 F.3d at 1294, n. 3). Assessing data quality is the final step in Commerce's four-step sequence for selecting a surrogate country. *See* Policy Bulletin 04.1 ("Fourth, if more than one country has survived the selection process to this point, the country with the best factors data is selected as the primary surrogate country."); *accord Jiaxing II*, 822 F.3d at 1294 n.3. Commerce, however, reasonably determined that Romania was not a significant producer. *See supra* Sec. II(A). Therefore, regardless of whether the Romania data "meet all of Commerce's established criteria for the best available information for valuing FOPs," Pls. Br. at 22, Commerce properly declined to evaluate whether Romania data was the best available information in selecting a surrogate country because it determined Romania was not a significant producer.

Plaintiffs contend that "Commerce must select the country whose data best satisfy" the best available information standard "when choosing among *eligible* countries." Pls. Br. at 21-22 (emphasis added) (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024). According to Plaintiffs, "the plain language of the statue does not economic comparability or significant production {sic} if they contravene the directive to use the 'best available information,'" nor does Policy Bulletin 04.1 assign "preeminen{ce}" to any of the surrogate country eligibility criteria. Pls. Br. at 26 (citing *Ad Hoc Shrimp Trade Action Comm. v. United States*, 882 F. Supp.

2d 1366, 1374 (Ct. Int'l Trade 2012)).  Plaintiffs conclude that because the Romania data met "all of Commerce's established criteria for the best available information for valuing FOPs," Pls. Br. at 22, Commerce was required to "evaluate the comparative quality of the Romanian and Malaysian data."  *Id.* at 22, 26.  Plaintiffs' arguments fail for several reasons.

*First*, plaintiffs' position is belied by the Federal Circuit's decision in *Dorbest*, which held that 19 U.S.C. § 1677b(c)(4) "requires Commerce to use, to the extent possible, data from countries that are 'significant producers of comparable merchandise.'"  *Dorbest*, 604 F.3d at 1372.  The existence of alternative data from a country that, like Romania here, is not a significant producer of comparable merchandise, does not authorize Commerce to ignore the clear language of the statute.  Commerce may not use data from countries that are not significant producers of comparable merchandise, unless Commerce finds that data from countries that are significant producers "was unavailable or otherwise unusable."  *Id.*  Accordingly, Commerce's decision to use data from Malaysia, which is an economically comparable country that is a significant producer of comparable merchandise, is consistent with the statute and controlling Federal Circuit precedent, and with *Loper Bright*.  *See Loper Bright*, 603 U.S. at 412 ("{W}e do not call into question prior cases that relied on the *Chevron* framework.  The holdings of those cases that specific agency actions are lawful . . . are still subject to statutory *stare decisis* despite our change in interpretive methodology).[8]

---

[8] In any event, Commerce's rejection of Romania does not implicate *Loper Bright* because Commerce was expressly delegated with the authority to select a surrogate country using reasonable methods.  *See Bio-Lab, Inc.*, 776 F. Supp. 3d at 1328.  And to the extent that there are any issues of statutory interpretation involved, they have already been addressed and resolved by the Federal Circuit in *Dorbest*.  *See also Carbon Activated Tianjin*, 2025 WL 1354994, at *3 ("We see no error in Commerce's reliance on the net exporter criterion of the Policy Bulletin.").

*Second*, Plaintiffs' argument fails because it presupposes Romania's eligibility as a surrogate country, an argument which the Federal Circuit has already dismissed on substantially identical facts. *See Carbon Activated Tianjin*, 2025 WL 1354994, at *3. Indeed, in *Carbon Activated Tianjin*, the Federal Circuit assessed whether "Commerce 'shielded itself from having to consider the on-record (and superior) financial statements of Romania producer Romcarbon,'" 2025 WL 1354994, at *3 (quoting Appellants Brief), by finding that Malaysia was the only significant producer and thus the Malaysian statements were the best available information. *Id.*; *cf. Pls.* Br. at 21 ("By excluding Romania, Commerce improperly defaulted to Malaysian data without fulfilling its statutory obligation to rely on the best available information under 19 U.S.C. § 1677b(c)(1)(B)."). Appellants had argued that "Commerce thus ran afoul of the requirement of both the Policy Bulletin and 19 U.S.C. § 1677b(c)(1)(B) that the selection of a surrogate country be based upon the "best available information." *Carbon Activated Tianjin*, 2025 WL 1354994, at *3.

In dismissing the plaintiff's arguments, the Federal Circuit affirmed Commerce's surrogate country selection process and reliance on the net exporter criterion. *See id.* (citing *Jiaxing II*, 822 F.3d at 1294, n. 3.).[9] Based on nearly identical facts, Commerce, in this case, again reasonably concluded that Romania was not a significant producer and thus that it was not required to evaluate whether Romanian data was the "best available information." IDM at 14-15.

---

[9] In *Jiaxing II*, Commerce had observed that both Thailand and the Philippines were economically comparable to China and significant producers of comparable merchandise. *Jiaxing II*, 822 F.3d at 1296-97 ("As between Thailand and the Philippines, observing that both countries were significant producers of comparable merchandise . . .). Thus, economic comparability and significant production are preconditions to questions regarding data reliability. *See id.* at 1298 ("Commerce may perform its duties in the way it believes most suitable.") (quoting *JBF RAK LLC v. United States*, 790 F.3d 1358, 1364 (Fed. Cir. 2015)).

*Third*, Commerce is only required to evaluate the "relative strengths and weaknesses among potential surrogates" *if* a potential surrogate has *otherwise qualified* as a surrogate country.[10]  Pls. Br. at 26 (quoting *Ad Hoc Shrimp Trade Action Comm. v. United States*, 882 F. Supp. 2d 1366, 1374-75 (Ct. Int'l Tr. 2012)).  Plaintiffs correctly state the holding in *Ad Hoc Shrimp*, that Policy Bulletin 04.1 does not assign "preeminen{ce}" to any of the surrogate country eligibility criteria.  Pls. Br. at 26.  Plaintiffs, however, miss the context of that holding. The *Ad Hoc Shrimp* court remanded Commerce's surrogate country selection determination because of "{a}n unexplained and conclusory blanket policy of simply ignoring relative GNI comparability . . . where more than one potential surrogate within the GNI range *is a substantial producer of comparable merchandise for which adequate data is publicly available*."  *Ad Hoc Shrimp*, 882 F. Supp. 2d at 1375 (emphasis added).[11]  As the court explained, "in such situations, Commerce must explain why its chosen surrogate's superiority in one of the three eligibility criteria outweighs another potential surrogate's superiority in one or more of the remaining criteria."  *Id.*  Thus, the *Ad Hoc Shrimp* court only required Commerce to engage in collective analysis of the surrogate country criteria because there was more than one country that qualified as a surrogate country.  The instant record, however, supports a determination that Romania was ineligible as a surrogate country because it was not a significant producer of comparable

---

[10] This is subject to very limited exceptions, none of which Plaintiffs allege.  *See* Policy Bulletin 04.1 (Exceptions to the Sequencing Procedure).

[11] Federal Circuit precedent is clear on this issue.  In *Jiaxing II*, the Federal Circuit assessed whether Commerce's selection of Thailand over India was reasonable in light of the fact that India had served as the surrogate country in several prior reviews.  In affirming Commerce's determination to select Thailand, the Federal Circuit held that Commerce's rejection of India "was consistent with the antidumping statute and supported by substantial evidence" because *India did not satisfy the economic comparability criterion*.  *See Jiaxing II*, 822 F.3d at 1300 (quoting *Jiaxing Bro. Fastener Co., Ltd. v. United States*, 961 F. Supp. 2d 1323, 1330-32 (Ct. Int'l Trade 2014)).

merchandise.  *See* Cherishmet's First SV Submission at Exhibit 6 (Romcarbon Financial

Statement); Petitioners' Surrogate Country Comments at 7 (Romanian Import/Export Volumes);

*see also* Petitioners' Rebuttal SV Submission at SVR-1 (same)  Accordingly, it was unnecessary

for Commerce to evaluate whether Romanian data was the "best available information" in a

situation where Romania failed to satisfy the basic threshold requirement under 19 U.S.C. §

1677b(c)(4) of being a significant producer of comparable merchandise.

   *Finally*, Commerce has already disclaimed the weighing of selection criteria in the

manner contemplated by plaintiffs.  In Policy Bulletin 04.1, Commerce explained that it had

"considered, but rejected as administratively unfeasible," an approach that would "grade{}"

economic comparability and significant production with "grading of factors data quality and

completeness."  Policy Bulletin 04.1 at n. 7; *cf.* Pls. Br. at 21 ("Commerce's categorical rejection

of Romanian data, without a comparative evaluation against the aberrational Malaysian data, was

unlawful.").  That Romania may provide alternative quality information[12] is irrelevant under the

Tariff Act because Romania does not meet the significant producer criterion.  *See Dorbest*, 604

F.3d at 1372.  Indeed, as the Federal Circuit held in *Carbon Activated Tianjin*, "The test 'is not

whether the information Commerce used was the best available, but rather whether a reasonable

mind could conclude that Commerce chose the best available information.'"  *Carbon Activated

Tianjin*, 2025 WL 1354994, at *4.  Because Plaintiffs' argument is veiled disagreement with

---

   [12] Even plaintiffs' comparative analysis lacks merit.  For example, plaintiffs allege that
Malaysian import average unit values (AUV) for sub-bituminous coal and hydrochloric acid
"increased by 138% and 145%, respectively, which cannot be reconciled with Malaysia's modest
annual inflation rate in 2022 of just 3.38%."  Pls. Br. at 23.  Plaintiffs' do not explain, however,
why Malaysia's annual inflation would be relevant.  Any other number of reasons could equally
explain why there was an increase to import AUVs, such as the record information showing
historically high coal consumption with respect to the sub-bituminous coal surrogate value.  *See*
IDM at 18.

Commerce's weighing of evidence in determining that Romania is not a significant producer of

comparable merchandise, it is not a sufficient basis for this Court to remand Commerce's

determination.  *See OTR Wheel Eng'g, Inc. v. United States*, 901 F. Supp. 2d 1375, 1380 (Ct.

Int'l Trade 2013) ("the {C}ourt will not re-weigh the evidence presented to Commerce, and will

uphold Commerce's determination provided it chooses from among the range of possible

reasonable conclusions based on the record.").

### III.    Commerce Reasonably Selected the Best Available Information on the Record for Determining Surrogate Values for All Input Factors of Production

Commerce reasonably determined that Malaysian import data was the best available

information to calculate surrogate values for coal tar, sub-bituminous coal, hydrochloric acid,

sodium hydroxide, and potassium hydroxide.

By statute, Commerce must select the "best available information" on the record to value

the factors of production.  19 U.S.C. § 1677b(c)(1)(B); *see also Jiaxing II*, 822 F.3d at 1293.

However, because the statute is silent regarding what constitutes the "best available

information," Commerce possesses "broad discretion" in deciding what record evidence meets

the criteria.  *See Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed.

Cir. 2011); *Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999).

Commerce's practice is to select, to the extent practicable, surrogate values that are product-

specific, representative of a broad-market average, publicly available, contemporaneous with the

period of review, and tax- and duty-exclusive.  *See generally* Policy Bulletin 04.1; *see also*

*Jiaxing II*, 822 F.3d at 1293.

Commerce also has a regulatory preference to use as much data as possible from a single

primary surrogate country.  *See* 19 C.F.R. § 351.408(c)(2); *Jiaxing II*, 822 F.3d at 1294, n.3

(citing Policy Bulletin 04.1).  This Court has explained that Commerce will "*only* resort to a

secondary surrogate country if data from the primary surrogate country are *unavailable or unreliable*." *See Jiaxing Bro. Fastener Co. v. United States*, 11 F. Supp. 3d 1326, 132–33 (Ct. Int'l Trade 2014) (citations omitted) (emphasis added), *aff'd*, *Jiaxing II*, 822 F.3d 1289.

Further, Commerce may rely on "imperfect" data. *Jiaxing II*, 822 F.3d at 1301 (citing *Home Meridian Int'l, Inc. v. United States*, 772 F.3d 1289, 1296 (Fed. Cir. 2014)). Commerce is not required to duplicate the precise experience of the NME manufacturer. *Nation Ford*, 166 F.3d at 1377. Instead, Commerce seeks to identify and to rely on the record data that "most accurately represents the fair market value" of the relevant factor of production. *Id.* Accordingly, given Commerce's discretion to determine the "best available information," and the fact-specific nature of this deferential case-by-case inquiry, a review of Commerce's determination should question "not whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." *Carbon Activated Tianjin*, 2025 WL 1354994, at *4 (quoting *Jiaxing*, 822 F.3d at 1300-01).

A.    **Malaysian Surrogate Values Are the Best Available Information on the Record**

Under 19 U.S.C. § 1677b(c)(3), factors of production include, but are not limited to hours of labor required, quantities of raw materials used, amounts of energy and other utilities consumed, representative capital costs, and transportation costs. *See also* PDM at 18. The administrative review record contained factors of production information submitted by parties for three countries: Malaysia, Romania, and Türkiye. PDM at 7. Commerce determined that only Malaysia and Türkiye were economically comparable and significant producers within the meaning of 19 U.S.C. § 1677b(c)(4). *See* PDM at 7-8, 20; IDM at 14-15; *supra* Sec. II. Therefore, consistent with Policy Bulletin 04.1, Commerce considered the surrogate value data

on the record from Malaysia and Türkiye to determine which represented the best available information to value factors of production. *See* PDM at 7-8, 20; IDM at 14-15. Except for labor, Commerce found that the Malaysian data was the best available information to value factors of production because, consistent with Commerce's practice in assessing data and data sources, Malaysian data was publicly available, contemporaneous with the POR, representative of a broad market average, tax- and duty-exclusive, and specific to the inputs in question *i.e.* "complete {surrogate value} information is available from Malaysia" and "Malaysian financial statements provide stronger evidence of production of subject merchandise." PDM at 9; IDM at 12, 15 (citing Policy Bulletin 04.1).

Plaintiffs and consolidated plaintiffs challenge Commerce's determination that Malaysian data was the best available information. Plaintiffs and consolidated plaintiffs' argument is tripartite. First, they argue that Commerce improperly disregarded comparisons to global average prices and to country-specific AUVs. *See e.g.*, Pls. Br. at 27 ("{T}he Malaysian {surrogate value} selected . . . departs from recent pricing trends and significantly exceeds the world AUV."); Consol. Pls. Br. at 12-17. Second, they argue that Commerce improperly disregarded evidence showing that Malaysian import volumes accounted for a "small share" of the total imports among Listed countries. *See e.g.*, Pls. Br. at 28 ("limited import volume"); Consol. Pls. Br. at 17-22. Last, they argue that Commerce failed to explain why Malaysian data was not aberrational. Consol. Pls. Br. at 22-25. Each argument fails

### i. Commerce Reasonably Explained That Comparison to Global Average Prices and Countries Not Economically Comparable to China are Inappropriate

Commerce reasonably explained that comparisons to global average prices and countries not economically comparable to China are inappropriate where Commerce has reason to believe or suspect that such prices are distorted or irrelevant. Commerce determines the surrogate value

of an input by determining its import price into a potential surrogate country.  *See* IDM at 15-16

(citing *Carbazole Violet Pigment 23 from China: Final Results of Antidumping Duty*

*Administrative Review*, 75 Fed. Reg. 36,630 (Dep't of Commerce, June 28, 2010) (*Violet*

*Pigment from China*), and accompanying IDM at Comment 4).  In determining which price data

to examine, the statute permits Commerce to disregard price or cost values that may be distorted.

*See* 19 U.S.C. § 1677b(c)(5) (permitting Commerce to disregard price or cost values without

further investigation if it has determined that certain subsidies existed with respect to those

values).  Similarly, given that the purpose of the surrogate value methodology is to approximate

prices in market economy countries economically comparable to China, Commerce also

disregards price data from NMEs and countries not at a similar level of economic development

as China.  *See Goldlink Indus. Co., Ltd. v. United States*, 431 F. Supp. 2d 1323, 1334 (Ct. Int'l

Trade 2006) ("Logically . . . Commerce cannot use a surrogate value if it is also distorted,

otherwise defeating the purpose of using a surrogate value."); *see generally* 19 U.S.C.

§ 1677b(c).

  As explained in the *Final Results*, Commerce determined that the global average prices

and individual country prices referenced by Plaintiffs and consolidated plaintiffs "contain{ed}

data for imports: (1) into countries that are not at the same level of economic development as

China; and (2) from countries that are excluded from Commerce's analysis as NMEs (including

China itself) or economies with widely available export subsidies."  IDM at 16-17 (citing

Cherishmet's Final SV Submission at Exhibit 1-3).  Thus, Commerce reasonably determined to

disregard those prices consistent with the statute and the purpose of calculating surrogate values.

  Still, consolidated plaintiffs argue that the statute does not require Commerce to

"narrowly limit its analysis of whether surrogate value data are aberrational to information from

OP List countries."  Consol. Pls. Br. at 14-15 (discussing *Baoding Mantong Fine Chemistry Co.*
*v. United States*, 222 F. Supp. 3d 1231, 1247-48 (Ct. Int'l Trade 2017); *Blue Field (Sichuan)*
*Food Industrial Co. v. United States*, 949 F. Supp. 2d 1311, 1330 (2013)).  But that is not what
Commerce did here.  Indeed, Commerce acknowledged that its practice is to "is to assess all
relevant price information on the record, including any appropriate benchmark data."  IDM at
15-16 (citing, *e.g.*, *Violet Pigment from China*, IDM at Comment 4).  Applying this practice,
Commerce evaluated individual country data from non-Listed countries such as Chile, where it
was possible to determine that the Chilean AUV was not distortive.  *See* IDM at 18.  The world
price averages that plaintiffs and consolidated plaintiffs ask Commerce to evaluate, however, are
distorted because the averages are based in part on prices from an NME or a country with
general export subsidies.  IDM at 16-17 (citing Cherishmet's Final SV Submission at Exhibit 1-
3).  Commerce is permitted to disregard such distorted data.  *See Goldlink*, 431 F. Supp. 2d. at
1334 ("the presumption is that NME data is distorted.")

Nor does it matter that Cherishmet never advocated for the global average prices to be
used as surrogate values, but rather only advocated for their use as reference points to allegedly
show aberrationality.  *See* Consol. Pls. Br. at 16.  It would be illogical to use *distortive* references
points to demonstrate that the Malaysian AUV was *aberrational*, when the purpose of the
surrogate value methodology is to account for price distortion assumed in NMEs.  *See Goldlink*,
431 F. Supp. 2d at 1334.

Importantly, in reviewing Commerce's surrogate value selections, the Court must not
"evaluate whether the information Commerce used was the best available, but rather whether a
reasonable mind could conclude that Commerce chose the best available information."  *Zhejiang*
*Dunan Hetian Metal Co.*, 652 F.3d at 1341.  That principle applies particularly "{w}hen all the

available information is flawed in some way," leaving Commerce to "make a judgment call as to

what constitutes the 'best' information." *Lifestyle Enterprise, Inc. v. United States*, 751 F.3d

1371, 1378 (Fed. Cir. 2014).  To the extent plaintiffs and consolidated plaintiffs have identified

the Malaysian data as flawed because of its higher AUVs, the other available options on the

record were also "flawed in some way." *Lifestyle Enterprise*, 751 F.3d at 1378.  Indeed,

plaintiffs and consolidated plaintiffs' preference for Romanian data is flawed because Romania

is not a significant producer of comparable merchandise and Commerce cannot use surrogate

value data from Romania.  IDM at 8-9; *see Dorbest*, 604 F.3d at 1372.  Similarly, plaintiffs and

consolidated plaintiffs' global average data contains improper benchmark data by including

import price data from non-economically comparable countries and countries that are excluded

from Commerce's analysis.  IDM at 16-17.  In such cases, Commerce has the discretion to

"make a judgment call as to what constitutes the 'best' information." *Lifestyle Enterprise*, 751

F.3d at 1378.  Here, Commerce has made that call, by analyzing the TDM data that does exclude

price values from NME and countries with general export subsidies.  IDM at 16-17.

> ### ii.    Commerce Adequately Responded to Arguments About Malaysia's "Small" Import Volumes

Plaintiffs and consolidated plaintiffs argue that Commerce failed to adequately respond to

the arguments that the "small volumes of imports made the data aberrational because they did

not represent broad market averages," and that Commerce's practice is to disregard values

"based on a small volume of imports when their per-unit value differs substantially from the unit

values of countries that had larger import quantities."[13]  Consol. Pls. Br. at 18; *see* Pls. Br. at 29.

In the *Final Results*, Commerce responded to both arguments.  As an initial matter, Commerce

---

[13] Unlike consolidated plaintiffs, who did not even submit administrative briefing,
plaintiffs have abandoned the latter half of the argument on appeal.

found that the Malaysian AUVs did represent broad market averages.  IDM at 15.  Neither

Plaintiffs nor consolidated plaintiffs argued before Commerce that the Malaysian import volume

was commercially insignificant, only that it was small when compared to other listed countries,

which is not sufficient, by itself, to show aberrationality.  *See* IDM at 19-20 (citing *Light-Walled*

*Rectangular Pipe and Tube from the People's Republic of China: Final Results of the*

*Antidumping Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 15,671 (Dep't of Commerce

March 14, 2023) (*LWRPT from China*), and accompanying IDM at 9-10)).  It is, however,

plaintiffs and consolidated plaintiffs' burden to build an adequate record to demonstrate that

Malaysian import volumes are so small as to be aberrational.  *See QVD Food Co., Ltd. v. United*

*States,* 658 F.3d 1318, 1324 (Fed. Cir. 2011) (holding that parties, not Commerce, have the

burden of building the record).  Simply comparing import volumes does not satisfy their burden,

where Commerce's practice requires specific evidence to demonstrate aberrationality such as

historical values or other listed country values.  *See* IDM at 19-20 (citing *LWRPT from China*, 88

FR 15671 (March 14, 2023), and accompanying IDM at 9-10).

　　　　Further, Commerce did not "wholly ignore{} {Cherishmet}'s comparison of the

Malaysia import volumes and AUVs to those of other potential surrogate countries."  Consol.

Pls. Br. at 18 (citing Cherishmet's Case Brief at 21).  Cherishmet's argument was based on

Commerce's practice as iterated in *Hand Tools from China*.  *See* Cherishmet's Case Brief at 21,

n. 86 (citing *Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, From*

*the People's Republic of China; Final Results of Antidumping Duty Administrative Reviews*, 63

Fed. Reg. 16,758, 16,761 (Dep't of Commerce April 6, 1998)).  Commerce responded to

Cherishmet's argument, citing *Light-Walled Rectangular Pipe and Tube from China*, that

Commerce's current practice has changed since 1998, when *Hand Tools from China* was

published.  *See* IDM at 19 (citing *LWRPT from China*, 88 Fed. Reg. 15,671 (Dep't of Commerce

March 14, 2023), and accompanying IDM at 9-10)).  In *Light-Walled Rectangular Pipe and*

*Tube from China*, Commerce addressed this exact argument in the context of a later *Hand Tools*

*from China* case, explaining that its practice has since changed, and its current practice requires

parties to point to specific evidence that a value is aberrational:

> In support of its argument Ailong cites an administrative review of *Hand Tools*
> *from China*, in which Commerce excluded imports of steel billet into India from
> France because the data were aberrationally high in relation to other Indian import
> data for the same FOP. We note, however, that Commerce's practice as to whether
> certain import data are aberrationally high has evolved since the issuance of *Hand*
> *Tools from China* in 2003. Specifically, since *Hand Tools from China*, when
> determining whether prices are aberrational, Commerce has found that the
> existence of higher prices alone does not necessarily indicate that the prices are
> distorted or misrepresentative, and thus, is not a sufficient basis upon which to
> exclude a particular {surrogate value}. Rather, under Commerce's current practice
> interested parties must provide specific evidence indicating that the value is
> aberrational.

*LWRPT from China*, IDM at 9 (citing *Heavy Forged Hand Tools, Finished or Unfinished, With*

*or Without Handles, from the People's Republic of China: Final Results of Antidumping Duty*

*Administrative Review of the Order on Bars and Wedges*, 68 Fed. Reg. 53,347 (Dep't of

Commerce Sept. 10, 2003).  As in *Light-Walled Rectangular Pipe and Tupe from China*,

Commerce looked to specific evidence on the record, *i.e.* historical values and a comparison of

values from the listed countries to determine aberrationality.  *See e.g.*, IDM at 19-20.  Thus,

Commerce did "address information that detracts from its determination{}" by applying its

current practice to the information submitted by interested parties.  *See* Consol. Pls. Br. at 18.

In any event, this Court has excluded "'aberrational values' that were nearly 30 times

higher than other values, . . . and 30 and 79 times higher than the average unit value."  *Best*

*Mattresses Int'l Co. v. United States*, 622 F. Supp. 3d 1347, 1379 (Ct. Int'l Trade 2023).  None

of the Malaysian AUVs reach that level and thus it was reasonable for Commerce to find such

AUVs not to be aberrational.[14]  *See Bio-Lab, Inc.*, 776 F. Supp. 3d at 1333 ("Considering the relevance of the Court's prior decisions on {aberrationality}, the Romanian AUV is not aberrational.").  Thus, Commerce addressed plaintiffs and consolidated plaintiffs' arguments, and the Malaysian AUVs are not aberrational based on this Court's prior decisions on aberrationality.  Accordingly, the *Final Results* should be sustained.

### iii.    Commerce Adequately Explained Why Malaysian Data Was Not Aberrational

Consolidated plaintiffs also argue that in limiting its aberrationality analysis "to only two data points: (a) historical Malaysia values used in prior reviews; and (b) current data from OP List countries," Commerce failed to provide a reasoned explanation for finding that Malaysian data was the best available information.  Consol. Pls. Br. at 22.  Consolidated plaintiffs claim that "Commerce provided no citations and no analysis of the data . . . to support its conclusory assertion."  *Id.*

"The substantial-evidence standard requires Commerce to consider all evidence on the record, but such consideration does not necessitate explicit mention and discussion of each piece of evidence."  *Pirelli Tyre Co. v. United States*, 128 F.4th 1265, 1271 (Fed. Cir. 2025) (citing *Charles G. Williams Constr., Inc. v. White*, 326 F.3d 1376, 1380 (Fed. Cir. 2003)); *see also Coalition of Am. Flange Producers v. United States*, 448 F. Supp. 3d 1340, 1351 (Ct. Int'l Trade 2020) ("Moreover, the agency is not required to address every piece of evidence submitted by the parties{.}").  Indeed, with respect to the coal tar surrogate value, Commerce, consistent with its practice, determined that the Malaysian AUV was not aberrational because it had "been used

---

[14] As discussed further below in Commerce's responses regarding specific surrogate values, the highest difference between plaintiffs and consolidated plaintiffs' preferred surrogate value and the one that Commerce ultimately chose was for hydrochloric acid, in which the Malaysian AUV was ~16 times as high, far below 30.  *See* Petitioners' Rebuttal SV Submission at Exhibit SVR-3 (Romania = 0.20 USD/kg; Malaysia 3.13 USD/kg).

on several occasions as well as past reviews generally using Malaysian factor values."  IDM at 16 (citing Petitioners' Rebuttal SV Submission at Exhibit SVR-2A).  Thus, far from consolidated plaintiffs' assertion that Commerce did not explain or cite underlying source data for its determination, "the path of Commerce's decision {is} reasonably discernable to a reviewing court."  *NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  Accordingly, the *Final Results* should be sustained.

### B.      Plaintiffs Have Not Identified Error in the Selection of the Coal Tar Surrogate Value

Commerce reasonably determined that Malaysian import data is the best available information for determining the coal tar surrogate value.  Plaintiffs argue that the Malaysian data is not the best available information to value coal tar because it is aberrational and does not reflect a broad market average.  Pls. Br. At 27.  Plaintiffs' and consolidated plaintiffs' arguments are unpersuasive.  First, the Malaysian AUV does represent a broad market average and represents imports from more countries than the Romanian AUV.  Second, the Malaysian AUV is not aberrational when compared to coal tar values from other listed countries and when compared to historical Malaysian AUVs.

### i.      The Malaysian AUV For Coal Tar Represents a Broad Market Average, Unlike the Romanian AUV

Commerce reasonably concluded that the Malaysian AUV for coal tar represents a broad market average unlike the Romanian AUV.  IDM at 16-17.  Still, plaintiffs and consolidated plaintiffs contend that the Malaysian AUV does not represent a broad market average because it represents imports from only three countries and because Malaysia *exports* significantly more coal tar than it imports.  Pls. Br. at 27-29.

Record evidence demonstrates that, excluding prices of imports from NMEs and countries with general export subsidies, the Malaysian coal tar AUV represents import price data from Spain, Australia, and Taiwan.  *See* Petitioners' Rebuttal SV Submission at Exhibit SVR-3. Thus, prices from multiple countries comprise the Malaysian AUV.  By contrast, the Romanian coal tar AUV, however, represents import price data from a *single country*, Ukraine.  *See id.*  It is difficult to ascertain how Romania can provide "superior" data to Malaysia in terms of a broad market average when the underlying data is entirely from one country.

Indeed, plaintiffs and consolidated plaintiffs do not address this fact and instead conclude only that the "Romanian AUV . . . is consistent with global market averages" and, therefore, should be used.  Pls. Br. at 27.  However, as explained earlier, "global market averages" are not the appropriate benchmark for determining surrogate values because the global market averages do not remove prices of imports from NME and countries with general export subsidies.  *See* IDM at 16-17.  There is therefore no occasion for Commerce to use the Romanian AUV as a surrogate value simply because it is consistent with global averages, which themselves are potentially distorted, when the Malaysian data does not suffer from the same deficiency.  *See Goldlink*, 431 F. Supp. 2d at 1334.  Accordingly, Commerce reasonably determined that the Malaysian AUV represents a broad market average where it contains data from multiple market economy countries that do not have general export subsidies.

Plaintiffs and consolidated plaintiffs also misplace reliance on Malaysian export values to impugn the Malaysian AUV.[15]  Pls. Br. at 27-28; Consol. Pls. Br. at 23, n. 2.  Commerce's

---

[15] Commerce did not "largely ignore{} this argument" as consolidated plaintiffs argue. Consol. Pls. Br. at 23, n.2.  It is implicit in Commerce's practice that it does not consider export data, as it has repeatedly explained in other proceedings.  Consolidated plaintiffs only reference plaintiffs' argument, which itself provided nothing more than speculative reasoning, contrary to

practice, however, is not to use export data because, as is the case here, export data may not accurately reflect the market value of the goods within the country of exportation. *See* IDM at 15-16 (citing *e.g.*, *Violet Pigment from China*, IDM at Comment 4); *Honey from the People's Republic of China*, 71 Fed. Reg. 34,893 (Dep't of Commerce June 16, 2006), and accompanying IDM at 12. Indeed, plaintiffs do not offer any evidence that coal tar export prices "move in tandem with {import} prices." *See Zhejiang Native Produce & Animal By-Prods. Imp. & Exp. Grp. Corp. v. United States*, 32 C.I.T. 673, 680–81 (2008). Instead, plaintiffs assert, without support, that "{i}t is simply unreasonable to assume that {Malaysian activated carbon producers} would rely on imports that are drastically more expensive when Malaysia has robust domestic production of coal tar" and that the imported coal tar "is not specific to coal tar used in activated carbon production." Pls. Br. at 28. These arguments, however, are mere speculation; they cite no record evidence in support. Plaintiffs have therefore failed to meet their evidentiary burden to show Commerce's chosen surrogate value is unreliable.

### ii. The Malaysian AUV For Coal Tar Is Not Aberrant

Commerce reasonably determined that the Malaysian AUV for coal tar is not aberrant because it is within the range of values for other listed countries and because historical Malaysian AUVs do not indicate distortion. IDM at 16. Plaintiffs and consolidated plaintiffs contend that the Malaysian AUV is aberrational when compared to global market averages and a price quote affidavit from one Malaysian importer and based on the value range for other listed countries and historical Malaysian values. Consolidated plaintiffs further contend that

---

the substantial evidence standard. Accordingly, there was nothing for Commerce to address beyond stating that its practice is not to consider export data. IDM at 15-16.

Commerce was required to look at AUVs from countries not on the list. Consol. Pls. Br. at 13-15.

As an initial matter, Commerce's practice is to use publicly available information to value factors of production. IDM at 14; Policy Bulletin 04.1 (Data Considerations). As Commerce explained in the *Final Results*, the preference for publicly available information is because, *inter alia*, "price quotes are generally proprietary in nature and, as such, Commerce does not know the conditions under which the information is obtained." IDM at 17 (quoting *Final Determination of Sales at Less Than Fair Value: Prestressed Concrete Steel Rail Tie Wire from the People's Republic of China*, 79 Fed. Reg. 25,572 (Dep't of Commerce May 5, 2014), and accompanying IDM at Comment 6). The affidavit referenced by plaintiffs was designated as business proprietary information in its entirety. *See* Jilin Bright's Final SV Submission at Exhibit 4A. Accordingly, and consistent with its practice, Commerce reasonably disregarded the importer affidavit where alternative publicly available data was on the record to determine the coal tar surrogate value. IDM at 17-18. Such an action has previously been affirmed by this Court. *See Writing Instrument Mfrs. Ass'n, Pencil Section v. United States*, 984 F. Supp. 629, 644 (Ct. Int'l Trade 1997) (finding reasonable, Commerce's reliance on prices from a public trade journal rather than an expert study prepared by plaintiffs).

Still, as Commerce explained in the final results, Commerce's practice when valuing an input "is to assess all relevant price information on the record, including any appropriate benchmark data." IDM at 15-16 (citing, *e.g.*, *Violet Pigment from China*, IDM at Comment 4). "Regarding benchmarking, Commerce 'examines historical import data for the potential surrogate countries for a given case, to the extent such import data are available.'" *Id.* at 16 (quoting *Certain Activated Carbon from China: Final Results of Antidumping Duty*

*Administrative Review; 2013-2014* (*CAC from China, 2013-2014*), 80 Fed. Reg. 61,172 (Dep't

of Commerce, Oct. 9, 2015), and accompanying IDM at 26).  Alternatively, Commerce

"examines data from the same {Harmonized Tariff System} category for the primary surrogate

country over multiple years to determine if the current data appear aberrational compared to

historical values." *Id.* (quoting *CAC from China, 2013-2014*, 80 Fed. Reg. 61,172).  "Merely

appearing on the low or high end of a range of values is not enough to make data aberrational."

*Id.* (quoting *CAC from China, 2013-2014*, 80 Fed. Reg. 61,172); *see also Calgon Carbon Corp.

v. United States*, 443 F. Supp. 3d 1344, 1350 (Ct. Int'l Trade 2020) (citing *Jacobi Carbons AB v.

United States*, 313 F. Supp. 3d 1344, 1365 (Ct. Int'l Trade 2018)).  In the past, Commerce has

also "compared the alleged aberrational value with values from countries" on the list.  *Id.* at 16

(citing, *e.g.*, *Certain Activated Carbon from China: Final Results of Antidumping Duty

Administrative Review; 2016-2017*, 83 Fed. Reg. 53,214 (Dep't of Commerce, Oct. 22, 2018),

and accompanying IDM at Comment 4).  Applying these standards, Commerce concluded that

"the Malaysian import AUV used is not aberrational."  IDM at 16.

The record supports Commerce's determination that the Malaysian import AUV is not

aberrational.  The record contained coal tar import AUVs for four listed countries: Malaysia

(1.67 USD/kg); Romania (0.33 USD/kg); Türkiye (1.48 USD/kg); and Costa Rica (21.48

USD/kg).  *See* Petitioners' Rebuttal SV Submission at Exhibit SVR-3.  Commerce observed that

"Malaysian import AUV under HS code 2706.00 (1.67 USD/kg) is nearly identical to the

Turkish import AUV (1.48 USD/kg), and much lower than the Costa Rican import AUV (21.48

USD/kg)."  IDM at 16.  Commerce also noted that the Costa Rican and Romanian AUVs

appeared on the high and low end of coal tar values, and thus could potentially be aberrational,

but ultimately decided neither were.  *See* IDM at 16.  Instead, Commerce reasonably determined

that Malaysian coal tar AUV was not aberrational given that the Malaysian AUV is nearly

identical to another listed country and much lower than the highest AUV on the record.  *See id.*

The record also contained historical import prices, which Commerce explained

"demonstrate{d} that the import AUV in this current review is not aberrational."  *Id.* at 16 (citing

Petitioners' Rebuttal SV Submission at Exhibit SVR-2A).  Thus, "the path of Commerce's

decision {is} reasonably discernable to a reviewing court."  *NMB Sing. Ltd v. United States*, 557

F.3d 1316, 1319 (Fed. Cir. 2009).  The record supports Commerce's determination.  The current

Malaysian AUV is nearly identical to the value used in the 2017-2018 administrative review of

this order, and only 38% higher than the average of the five most recent administrative reviews.

*See* Petitioners' Rebuttal SV Submission at SVR-5.  Plaintiffs contend that is a "steep increase

. . . relative to prior years", Pls. Br. at 31, but Commerce accounted for this, finding that the

value was not aberrational "based on prior reviews."  IDM at 16.  As Commerce found, the

record also demonstrates that there was "historically high coal . . . consumption" during the

review period.  IDM at 18 (citing Petitioners' Rebuttal SV Submission at SVR-4A – SVR-4C).

Considering coal tar is a by-product of coal, it is reasonable to conclude that increases in coal

prices would result in increases in coal tar prices *i.e.* an increase to the Malaysian AUV.

Plaintiffs argue that the Malaysian AUV is aberrational because Costa Rica is a "clear

and extreme outlier" and "although {Romania} is the lowest of the {surrogate value}s of the OP

List Countries, {it} is much closer to other countries' AUVs" and should not have been

dismissed.  Pls. Br. at 30.  Consolidated plaintiffs further contend that Commerce acted

unreasonably in dismissing the probity of plaintiffs' global averages argument on the basis that

"global averages included data from countries that may not qualify as surrogate countries."

Consol. Pls. Br. at 12-17.

Plaintiffs and consolidated plaintiffs misunderstand Commerce's final results.

Commerce did not dismiss the Romanian AUV, as the question before it was whether the

*Malaysian* AUV is aberrational. Instead, Commerce examined that the Romanian and Costa

Rican AUVs were on the high and low end of coal tar AUVs and anticipated that parties may

argue that the values are aberrational. *See* IDM at 16 ("To the extent that the Costa Rican import

AUV may be an outlier, the same *could be* argued for the Romanian import AUV.") (emphasis

added). Commerce then found that the Malaysian AUV was within the range of values for coal

tar among the listed countries. *See id.* As a result, Commerce concluded that the Malaysian

AUV provided the best available information to value coal tar because it was reliable and usable

*i.e.* not aberrational, and satisfied Commerce's preference to value all surrogate values in the

primary surrogate country, which was Malaysia. IDM at 16. Still, even eliminating Costa Rica,

the Malaysian AUV is nearly identical to the Turkish AUV, which neither plaintiffs nor

consolidated plaintiffs argue is aberrational. IDM at 16. Accordingly, irrespective of

Commerce's discussion of whether the Romanian and Costa Rican AUVs are hypothetically

aberrational, Commerce's determination that the Malaysian AUV is the best available

information to value coal tar is supported by substantial evidence.

### C.    Plaintiffs Have Not Identified Error in the Selection of the Sub-Bituminous Coal Surrogate Value

Commerce reasonably determined that Malaysian import data is the best available

information for determining the sub-bituminous coal surrogate value. Plaintiffs argue that the

Malaysian AUV "value sharply diverges from historical Malaysian AUVs", and that

Commerce's benchmarking analysis was flawed "as it inexplicably included data form Chile,

which was not listed in the OP List."  Pls. Br. at 32.  Plaintiffs' arguments are meritless. Commerce reasonably explained why the value of sub-bituminous coal sharply diverged from historical Malaysian AUVs, and Commerce is not precluded from looking at price data on the record from non-listed countries.

*First*, Commerce fully addressed the divergence from historical Malaysian AUVs.  While Plaintiffs argue that the "value sharply diverges" from historical data, Commerce reasonably explained that the reason was because there was "high coal and natural gas consumption."  IDM at 18 (citing Petitioners' Rebuttal SV Submission at Exhibits SVR 4A – 4C).  Indeed, the record indicates that coal prices surged as high as 440 USD/MT during the POR.  *See* Petitioners' Rebuttal SV Submission at Exhibit SVR 4B.  Commerce also examined that AUVs in *both* Malaysian and Romania exceeded 300 USD/MT.  IDM at 18.  Accordingly, Commerce reasonably concluded that Malaysian AUV for coal was not aberrational where the record evidence explained the sharp increase in value, and where the Malaysian AUV was similar to the Romanian AUV in that both exceeded 300 USD/MT.  *Id.* .

*Second*, Commerce's reference to the Chilean AUV was consistent with its practice.  As explained earlier, Commerce's practice when valuing an input "is to assess all relevant price information on the record, including any appropriate benchmark data."  IDM at 15-16.  Because that practice does not limit Commerce to reviewing any specific set of country data, Commerce's reference to the Chilean AUV was not erroneous but rather consistent with Commerce's practice. Indeed, plaintiffs and consolidated plaintiffs point to this practice to argue that Commerce could and should examine individual AUVs from non-listed countries, *e.g.*, the Finland coal tar AUV. *See Pls.* Br. at 31 (discussing comparison to the world average); Consol. Pls. Br. at 13 (discussing comparison to individual non-list countries).  And unlike plaintiffs' proposed

surrogate value data, the Chilean data excludes import prices from NMEs and countries with general export subsidies—data that Commerce cannot consider in surrogate value calculations. *See* Petitioners' Rebuttal SV Submission at Exhibit SVR-3. Thus, Commerce permissibly compared the Chilean AUV to determine that the Malaysian AUV for coal was not aberrational consistent with its practice. *See* IDM at 15-16. Commerce did not identify Chile as a surrogate country or use Chilean data for any other purpose. The only incorrect statement was the reference to Chile as a listed country, but that is not grounds for reversal or remand. *See Al Ghurair Iron & Steel LLC v. United States*, 65 F.4th 1351, 1363 (Fed. Cir. 2023). Commerce's analysis is not otherwise flawed, and the final results should be sustained.

### D. Plaintiffs Have Not Identified Error in the Selection of the Hydrochloric Acid Surrogate Value

Commerce reasonably determined that Malaysian AUVs are the best available information for determining the hydrochloric acid surrogate value. Consistent with its practice, Commerce evaluated historical Malaysian AUVs for hydrochloric acid. IDM at 18-19. It found that, "while the Malaysian {AUV} for this review is 130 percent greater than the Malaysian import AUV in AR15, it is only 79 percent greater than the Malaysian value in AR14." IDM at 19 (citing Petitioners' Rebuttal SV Submission at Exhibit SVR-5). Such a difference is far smaller than the "substantial differences for AUVs in one HS category between {listed} countries" found in *Solar Cells from China*. IDM at 19 (citing *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, and Affirmative Final Determination of Critical Circumstances, in Part*, 77 Fed. Reg. 63,791 (October 17, 2012)), and accompanying IDM at 43).

Plaintiffs contend that "Commerce attempted to downplay the deviation" and that Malaysia's AUV in the contest review "marks a significant departure" from historical trends. Pls. Br. at 35.[16]  Further, Plaintiffs contend that the citation to *Solar Cells from China* is inapposite because in that case "record evidence showed intracountry and inter-country AUV differences of up to 10,000% {were} driven by substantial quality and product-specific differences."  Pls. Br. at 37.  Plaintiffs, however, never actually argue why the deviations Commerce found reasonable are aberrational; they merely suggest they are aberrational in comparison to other values.  In other words, plaintiffs point to no case law or administrative decisions by Commerce that show that a 79 percent increase to an AUV between reviews makes that value aberrational.  Thus, plaintiffs' argument is mere disagreement with Commerce's weighing of the evidence, and not a basis for remand.  *See OTR Wheel*, 901 F.Supp.2d at 1380 ("the {C}ourt will not re-weigh the evidence presented to Commerce, and will uphold Commerce's determination provided it chooses from among the range of possible reasonable conclusions based on the record.").

Moreover, the increases at issue here, of 130 and 79 percent, IDM at 19, fall far short of the levels at which this Court has reversed for being aberrational.  In *Best Mattresses*, the data showed "'aberrational values' that were nearly 30 times higher than other values, . . . and 30 and 79 times higher than the average unit value."  *Best Mattresses*, 622 F. Supp. 3d at 1379.  The Malaysian AUV for hydrochloric acid does not reach that level.[17]  *See Bio-Lab, Inc.*, 776 F.

---

[16] Plaintiffs' comparisons to global averages, Pls. Br. at 38, are inapposite for the reasons discussed earlier.  *See supra* Sec. II(A).

[17] The difference between Plaintiff and consolidated plaintiffs' preferred Romanian surrogate value and the one that Commerce ultimately chose for hydrochloric acid, was ~16 times as high, far below 30.  *See* Petitioners' Rebuttal SV Submission at Exhibit SVR-3 (Romania = 0.20 USD/kg; Malaysia 3.13 USD/kg).

Supp. 3d at 1333 ("Considering the relevance of the Court's prior decisions on {aberrationality}, the Romanian AUV is not aberrational.").  Thus, the Malaysian AUV is not aberrational based on this Court's prior decisions on aberrationality.  Accordingly, the *Final Results* should be sustained.

**E.    Plaintiffs Have Not Identified Error in the Selection of the Sodium Hydroxide and Potassium Hydroxide Surrogate Values**

Commerce reasonably determined that Malaysian AUVs were the best available information for determining the sodium hydroxide and potassium hydroxide surrogate value. Plaintiffs contend that "UN Comtrade data on the record show that Malaysia's import prices for these inputs are markedly higher than global averages, raising serious concerns about their representative and reliability."  Pls. Br. at 40.  As with other surrogate values, plaintiffs' UN Comtrade data does not exclude prices of imports from NMEs and countries with general export subsidies.  *See* Cherishmet's Final SV Submission 2a, 2b, and 3.  Thus, plaintiffs' calculation of Malaysian AUVs for sodium hydroxide and potassium hydroxide is not reliable.  *See id.; cf.* Prelim. SV Memo at Exhibit 1.2.  As explained earlier, those prices may be distorted and, therefore, Commerce does not account for them in determining import prices for inputs.  *See* IDM at 15-16.

By contrast, the TDM data on the record, which properly excludes prices of imports from NMEs and countries with general export subsides, demonstrates that Malaysian AUVs for sodium hydroxide and potassium hydroxide are not aberrational.  *See* IDM at 19.  For solid sodium hydroxide, when looking at TDM data, with the exception of AR14, the Malaysian AUV has been relatively stable over six review periods, and in this instant review, the value is only 30 percent higher than all five periods.  *See* Petitioners' Rebuttal SV Submission at Exhibit SVR-5. Additionally, when comparing the Malaysian AUV for sodium hydroxide with the other listed

45

countries, the Malaysian AUV is approximately 98 percent of the average among the listed countries, and lower than Romania, Plaintiffs' preferred value.  *See id.* at Exhibit SVR-3.

Similarly to sodium hydroxide, the TDM data also demonstrates that the Malaysian AUV is not aberrational when prices of imports from NMEs and countries with general export subsidies are excluded.  The TDM data demonstrates that the Malaysian AUV for potassium hydroxide is 1.68 USD/kg, and not 2.31 USD/kg as Plaintiffs contend.  *See* Preliminary SV Memo at Exhibit 1.2.  For potassium hydroxide, the Malaysian AUV for the current review is only 54 percent higher than the five-year average and about 11 percent higher than the AUV Commerce used in AR11.  *See* Petitioners' Rebuttal SV Submission at Exhibit SVR-2A.  Thus, the Malaysian AUV for potassium hydroxide is not aberrational compared to historical values. *See* IDM at 19-20.

Consistent with its practice, Commerce reasonably determined that the Malaysian AUVs for sodium hydroxide and potassium hydroxide are the best available information.

## F.    Plaintiffs Have Not Identified Error in the Selection of the Surrogate Financial Ratios

Commerce reasonably calculated surrogate financial ratios based on the average of the financial statements of Century Chemical Works Sendirian Berhad (Century Chemical) and New Chang Hua Sdn. Bhd. (New Chang Hua).

Plaintiffs contend that Commerce's exclusion of three Malaysian producers' financial statements is in error.  However, plaintiffs' brief provides reasoning for only two of the three producers, so we only address those two producers identified in the brief.  Pls. Br. at 41-42. Specifically, plaintiffs argue that Commerce "fail{ed} to even utter an explanation" for disregarding financial statements from Greenlink Biotech Sdn. Bhd. (Greenlink)", and Commerce "fail{ed} to sufficiently explain its departure from the norm in excluding Nikom

Carbon Technology Sdn. Bhd. (Nikom)."  Pls. Br. at 42.  With respect to Nikom, plaintiffs claim

that record evidence, *i.e.* a company brochure, demonstrates that Nikom produces activated

carbon, even if Nikom's financial statement lists "its principal activit{y} as trading activated

carbon."  Pls. Br. at 42.

 With respect to Greenlink, "{t}he substantial-evidence standard requires Commerce to

consider all evidence on the record, but such consideration does not necessitate explicit mention

and discussion of each piece of evidence."  *Pirelli Tyre Co., Ltd. v. United States*, 128 F.4th

1265, 1271 (Fed. Cir. 2025).  Commerce explained in the *Preliminary Results* that only the

financial statements of Century Chemical and New Chang Hua were contemporaneous with the

period of review, publicly available, and reflected producers of comparable merchandise.  PDM

at 21-22.

 In the *Final Results*, although Commerce did not cite Greenlink specifically, it still

explained that it "disagreed{ed} with {Cherishmet} and find that we should not use all financial

statements on the record, as several of the financial statements are inadequate, or not appropriate

as described in our preliminary analysis."  IDM at 22.  For example, Commerce disregarded the

financial statement of Mesjaya Abadi Sdn. Bhd. (Mesjaya) because the company's principal

activity was "trading of household and industrial charcoal."  IDM at 24.  Similarly, the record

shows that Greenlink's principal activity is "manufacturing of *charcoal* products," which are not

comparable merchandise to activated carbon.  Jilin Bright Final SV Submission at Exhibit 3A.

Thus, the record demonstrates that Greenlink's experience, like that of Mesjaya, is "dissimilar to

that of the respondents."  *See* IDM at 24.

 Taken together, "the path of Commerce's decision {is} reasonably discernable to a

reviewing court," because Commerce rejected plaintiffs' request for Commerce to average in

their preferred financial statements (including Greenlink) on the basis that those financial

statements were "inadequate{} or not appropriate."  IDM at 22; *see NMB Singapore*, 557 F.3d at

1319.

With respect to Nikom, Commerce explained that Nikom's 2023 Annual Report states it

"is principally engaged in the business of trading, general merchants, dealers, wholesalers in

activated carbon and related products and that there have been no significant changes in the

nature of these activities during the financial year."  IDM at 24 (citing Cherishmet's Final SV

Submission at Exhibit 1).  The 2023 Annual Report further stated that "Nikom's plant and

equipment was valued at *three Ringgit* and that no raw materials were used" for the fiscal year.

*Id.* (citing same) (emphasis added).  Thus, irrespective of Nikom's company brochure stating that

it is "capable of *producing* high quality activated carbon", Pls. Br. at 42 (citing Cherishmet's

Final SV Submission at Exhibit 1) (emphasis in original), the record demonstrates that Nikom

does not produce comparable merchandise, but merely trades in activated carbon.  IDM at 24.

Accordingly, Commerce reasonably concluded that "Nikom cannot be considered to accurately

reflect the production of activated carbon."  *Id.*

## IV.    Commerce Appropriately Corrected the Consolidated FOP Database Provided by Cherishmet

As Commerce explained in the *Final Results*, in the *first* administrative review of this

order,[18] Commerce instructed that "an exporter must report the consumption of all inputs

required for the production of subject merchandise unless: (1) a relatively small volume of

exporters{[19]sic} were produced using activated carbon from non-reporting manufacturers, (2) the

---

[18] Cherishmet was also a mandatory respondent in the first administrative review, and is an experienced respondent generally as it has been a respondent in multiple reviews of the order.

[19] This should read "exports."

exporter obtained Commerce's permission early in the proceeding to omit certain reporting, or (3) substitute factors of production are available from cooperating manufacturers with control numbers that are identical or extremely similar to the unreported factors." Proprietary Mem. at 3 (citing *Activated Carbon from China: Notice of Preliminary Results of the Antidumping Duty Administrative Review and Extension of Time Limits for the Final Results*, 87 Fed. Reg. 21,317, 21321 (Dep't of Commerce May 7, 2009) (*Activated Carbon First Administrative Review*). Examining the record, Commerce found that none of those situations was present. IDM at 38; Proprietary Mem. at 3. Specifically, Cherishmet had "failed to report that [                    ] was used as an input, failed to quantify that the input was minor,"[20] and failed *to obtain permission* from Commerce to report bituminous coal [                              ]. Proprietary Mem. at 3.

While plaintiffs have wholly abandoned this issue on appeal, consolidated plaintiffs, who did not submit administrative case briefing, argue that "Commerce erroneously found that GHC failed to establish whether GHC's supplier used certain FOPs in the production of subject merchandise that was not self-produced." Consol. Pls. Br. at 26 (internal quotations omitted). As consolidated plaintiffs point out, "the contested information concerning {Cherishmet's} supplier pertains to Commerce's Section D questionnaire, which 'requests information about the factors of production of merchandise *sold in or to the United States*." Consol. Pls. Br. at 25 (emphasis in original). Consolidated plaintiffs argue that "Commerce . . . ignored the repeated statements . . . that the supplier did not use [                    ] in its production of activated carbon for GHC that was to be exported to the United States" and itself "cited no

---

[20] "Of the products exported to the United States during the POR (totally [        ] MT), GHC purchased [      ] MT from [                    ], an unaffiliated producer." Cherishmet Section A Response.

record evidence in support of its decision to include the supplier's [

].["] Consol. Pls. Br. at 26.

It is irrelevant that "Commerce cited no record evidence," Consol. Pls. Br. at 26, because it was Cherishmet's burden to build an adequate record to demonstrate that its supplier did not use [                                                    ]. *See QVD Food,* 658 F.3d at 1324 (holding that parties, not Commerce, have the burden of building the record). The sole support Cherishmet offered at the administrative level was its own certifications, *see* Consol. Pls. Br. at 26, that it had an agreement with its supplier that the products Cherishmet purchased from its supplier had to be started with self-produced products. Cherishmet's 2nd Supp QR at 27 (P.R. 202, C.R. 152). As Commerce found, however, Cherishmet did not actually furnish the agreement. Proprietary Mem. at 3; IDM at 38. In other words, the document that would definitively answer this question was not provided to Commerce; the logical inference, therefore, is that there was not an actual agreement. *See Daewoo Elecs.*, 6 F.3d at 1520.

Indeed, far from providing the actual agreement, Cherishmet only furnished a purchase order that it claimed, in its *rebuttal brief*, referenced the agreement. *See* Cherishmet's 2nd Supp QR at Exhibit 2SD-B-4; Cherishmet's Rebuttal Br. at 7 (highlighting un-translated Chinese language); *see also* Consol. Pls. Br. at 26, n. 3. To the extent that an untranslated Chinese text may have referenced the agreement, Cherishmet was required to provide such translation because it was seeking an exemption from reporting. *See* Cherishmet's 2nd Supp QR at Exhibit 2SD-B-4; *see also Wheatland Tube v. United States*, 755 F. Supp. 3d 1304, 1313 (Ct. Int'l Trade 2025) (discussing a company's burden "to provide the requisite evidence" when requesting a favorable adjustment such as a constructed export price adjustment). Nor was Commerce obligated to issue a supplemental questionnaire to clarify. *See ABB Inc. v. United States*, 355 F.

Supp. 3d 1206, 1222 (Ct. Int'l Trade 2018) ("Commerce is not obligated to issue a supplemental

questionnaire to the effect of, 'Are you sure?'").  Likewise, Commerce evaluated the purchase

order Cherishmet proffered and found that Cherishmet "failed to establish whether or not

[                          ] used [                    ] in the production of subject merchandise that was

not self-produced."  Proprietary Mem. at 3.  Commerce needed not specifically address

statements in questionnaire responses, *see* Consol. Pl. Br. at 26-27, as Commerce's decision was

reasonably discernable.  Finding that the record did not support that [

                                                          ], Commerce

reasonably determined to correct Cherishmet's FOP database.

Moreover, consolidated plaintiffs allege, without support, that in requiring Cherishment

to "report its supplier's costs for [                        ] that were not used in production

{Cherishmet's} activated carbon for export to the U.S. Market," Commerce impermissibly

"*included* costs that were unrelated to the production of subject merchandise in its calculation of

a respondent's dumping margin" and thus inflated Cherishmet's margin.  Consol. Pls. Br. at 28

(emphasis in original).  The record demonstrates that [                  ] purchased [

        ] to produce activated carbon that it sold to Cherishmet, who then sold that finished

product to the U.S. market.  Proprietary Mem. at 3-4; IDM at 38-39.  And Cherishment identified

no basis on which it should be excluded from the calculations.  *See* Proprietary Mem. at 3.  As a

result, consolidated plaintiffs identify no evidence showing the costs [

        ] are "related to non-subject merchandise."  Consol. Pls. Br. at 28.  Accordingly,

Commerce reasonably determined to correct Cherishmet's FOP database, and this Court should

sustain Commerce's final results.

**V.    Commerce Reasonably Declined to Adopt Jilin Bright's Proposed VAT Tax Calculation Formula**

Plaintiffs argue that, because of "a clerical error in the VATTAXU calculation" for a particular U.S. sale, "Commerce should adopt Jilin's proposed formula: RVATTAXU = (TOTAMO/1.13*0.13)/QTYU." Pls. Br. at 45. Plaintiffs' argument is nearly verbatim what they argued at the administrative level in Jilin Bright's case brief. The only difference that the Government can identify is that plaintiffs changed "determination" to "results" to distinguish that the contested proceeding is an administrative review as opposed to an investigation. *Compare* Pls. Br. at 44-45, *with* Jilin Bright's Case Br. at 17-18. Indeed, plaintiffs fail to invoke the substantial evidence standard at all with respect to this issue, excluding it even from the "Issues Presented" section of their opening brief. *See* Pls. Br. at 3-5. In other words, plaintiffs fail to address whether Commerce's decision is unsupported by substantial evidence or otherwise not in accordance with law. *See* 19 U.S.C. § 1516a(b)(1)(B)(i); *see also JBF RAK LLC v. United States*, 961 F. Supp. 2d 1274, 1282-83 (Ct. Int'l Trade 2014) (waiving issue where respondent "simply recycled its argument from its administrative case brief" ("almost verbatim"), "never address{ing} Commerce's findings and conclusions in the Issues and Decision Memorandum… just repeat{ing} the same arguments made prior to the Final Results without any consideration of Commerce's response and rejection of those very same arguments in the Final Results"). Accordingly, this Court should deem plaintiffs' argument waived.

Even if the Court considers the argument, Commerce reasonably declined to adopt Jilin Bright's proposed formula for calculating VAT tax. As explained in the *Final Results*, Commerce explained that "Jilin Bright maintains that it reported the incorrect amount for VAT in its section C response." IDM at 27. However, "Jilin Bright {had} submitted a supplemental

section C questionnaire response."[21]  *Id.*  In that supplemental response, "Jilin Bright did not state that its reported VAT amount was incorrect, nor did it update the amount."  In fact, "Jilin Bright did not alert Commerce that the VAT amount was incorrect until its submission of the case brief."  *Id.*

Commerce "cannot reject corrective information at a *preliminary* determination stage."[22] *Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1343-44 (Fed. Cir. 2021) (emphasis in original).  Thus, given that Jilin Bright failed to alert Commerce to reporting errors *after* Commerce had already issued the *Preliminary Results*, Commerce did not adjust the VAT amount reported because "Commerce did not have the opportunity to ensure that the proposed change is appropriate, correct, or more accurate than the VAT amount originally reported."  IDM at 27 (citing *Goodluck India Ltd.*, 11 F.4th at 1335).  Commerce therefore reasonably chose not to adjust the VAT amount reported, and the Court should decline plaintiff's invitation to substitute the Court's judgment for that of Commerce.  *See Goodluck India Ltd.*, 11 F.4th at 1344 Accordingly, Commerce reasonably declined to adopt Jilin Bright's proposed formula.

## VI. Commerce's *Amended Final Results* Are Supported by Substantial Evidence and Otherwise in Accordance with Law

Commerce's determination with respect to each of the ministerial errors alleged by various parties are supported by substantial evidence.  Commerce is required to "establish procedures for the correction of ministerial errors in final determinations within a reasonable time after the determinations are issued."  19 U.S.C. § 1675(h).  The statute and Commerce

---

[21] The inference is that Jilin Bright *could have* alerted Commerce to the reporting error at that point.  *See Daewoo Elecs.*, 6 F.3d at 1520.

[22] Notably, Plaintiffs do not raise the issue of when Commerce may be required to accept corrective information, though it is inapplicable here because the reporting errors were not raised to Commerce until after the *Preliminary Results*.

define ministerial errors as "errors in addition, subtraction, or other arithmetic function, clerical errors resulting from inaccurate copying, duplication, or the like, and any other type of unintentional error which the administering authority considers ministerial."  19 U.S.C. § 1675(h); 19 C.F.R. § 351.224(f).

Consistent with the statute, Commerce promulgated 19 C.F.R. § 351.224.  Therein, Commerce stipulates that it "will disclose its calculations to parties to the proceeding and that a party to the proceeding to whom Commerce has disclosed its calculations may submit comments concerning any ministerial errors in such calculations within five days after disclosure." Amended IDM at 2 (citing 19 C.F.R. § 351.224(b)-(c)).  Commerce requires comments to explain the alleged ministerial error and present the appropriate correction.  *Id.* (citing 19 C.F.R. § 351.224(d)).  Commerce will, if appropriate, correct any ministerial errors by amending the final results of review.  *Id.* (citing 19 C.F.R. § 351.224(e)).  Commerce will not, however, correct an allegation that relates to a methodological decision because such allegation inherently does not address a ministerial error.  *See, e.g.*, *Alloy Piping Prods., Inc. v. United States*, 201 F. Supp. 2d 1267, 1285 (Ct. Int'l Trade 2002) ("The error in question must be demonstrated to be a clerical error, not a methodological error, an error in judgment, or a substantive error{.}").  Still, Commerce retains discretionary authority to correct errors it deems ministerial.

Plaintiffs, consolidated plaintiffs, and petitioners raise arguments that Commerce's *Amended Final Results* are unsupported by substantial evidence.  First, plaintiffs argue that Commerce erred in "subtracting 'fair value loss on equity investments' and 'loss on disposal of quity instruments' from SG&A but not from the total profit.  Pls. Br. at 43.  Second, with respect to Commerce's valuation of bituminous coal consumption, consolidated plaintiffs argue that Commerce reasonably corrected Cherishmet's bituminous coal consumption value but erred in

not correcting the same for Jilin Bright.  Consol. Pls. Br. at 30-32.  Petitioners, however, argue

that Commerce erred in correcting the bituminous coal consumption value because Cherishmet's

allegation was methodological in nature and untimely raised.  Petitioners Br. at 9-18.  As

explained below, these arguments are unpersuasive.

### A.    Commerce Reasonably Removed the Fair Value Loss on Equity Investments and Loss on Disposal of Equity Investments From SG&A

Following ministerial error comments from Plaintiffs and Petitioners, in the *Amended*

*Final Results*, Commerce reasonably removed the "fair value loss on equity investments" and

"loss on disposal of equity investments" expenditures in calculating financial ratios.  As

Commerce explained in the *Final Results*, these expenditures are not part of a company's

administrative costs; therefore, they should not be included in the SG&A calculation.  IDM at 2-

3.  In the *Final Results*, Commerce added the value of these two expenditures to profit;

Commerce, however, neglected to remove these two expenditures from SG&A.  Plaintiffs argue

now that Commerce's addition of the expenditures to profit departs from "both common

accounting principles and Commerce's own established practice." [23]  Pls. Br. at 43 (citing

*Guangdong Chems. Imp. & Exp. Corp. v. United States*, 460 F. Supp. 2d 1365, 1374 (Ct. Int'l

Trade 2006).  Plaintiffs' argument fails, however, because it conflates an offset to SG&A with

removal of non-operational expenditures from SG&A.

Indeed, in *Guangdong*, cited by plaintiffs, this Court assessed whether Commerce

properly applied a by-product offset to manufacturing prior to the calculation of overhead,

SG&A and profits.  *Guangdong*, 460 F. Supp. 2d at 1373.  As the Court explained "Commerce

sometimes grants a respondent a 'credit' for a 'by-product . . . generated in the manufacturing

---

[23] Cherishmet appears to have reversed the position it took before Commerce as it had not
raised disagreement with Commerce's addition of the expenditures to profit in the contested
review.  *See* Cherishmet's Ministerial Error Allegations at 4.

process {that is} either reintroduced into production or sold for revenue."  Here, by contrast, the expenditures were *unrelated* to operating activities because they did not reflect the company's underlying administrative costs, and plaintiffs do not appear to contest Commerce's finding. IDM at 2-5.  Instead, plaintiffs argue that Commerce should treat these expenditures as it treats expenditures that are related to operating activities such as a by-product offset.  It may be the case that "under standard accounting principles, the loss in value should have been deducted from the profit," Pls. Br. at 43-44, but it is simply illogical that *removal of losses* would *decrease* a company's profitability, which plaintiffs appear to argue.  *See id.*  Instead, as Commerce found, the SG&A value was overstated, and the profit value was understated.  *See* IDM at 25 ("These expenses are non-operational as they do not reflect the company's underlying administrative costs so should not be included in the SG&A calculation.  However, they do contribute to the profitability of Century Chemical during their fiscal year.").  Accordingly, Commerce correctly removed these expenditures from the SG&A calculation and adjusted profit to account for the same.  As a result, this Court should sustain Commerce's final results.

### B.    Commerce's *Amended Final Results* with Respect to the Valuation of Bituminous Coal Consumption are Supported by Substantial Evidence and Otherwise in Accordance with Law

Following ministerial error comments from Cherishmet and Petitioners, in the *Amended Final Results*, Commerce reasonably corrected Cherishmet's bituminous coal consumption value.  As explained therein, "Commerce inadvertently used the {surrogate value} for lump coal (1,720.22 MYR) instead of bituminous coal (1,552.65 MYR) when valuing *bituminous coal*." Amended IDM at 6-7.  In other words, where Commerce intended to value bituminous coal consumption by using the bituminous coal surrogate value, Commerce instead inadvertently replaced the bituminous coal surrogate value with the lump coal surrogate value.  Such an error is a clerical error within the meaning of the statute and regulations.  *See* 19 U.S.C. § 1675(h);

19 C.F.R. § 351.224(f).  This error was also present in Jilin Bright's margin calculation; however, no party raised the issue with respect to Jilin Bright during the administrative review. Therefore, Commerce reasonably declined to correct Jilin Bright's bituminous coal consumption value.

> ### i.    Commerce Reasonably Determined to Correct the Valuation of Bituminous Coal Consumption for Cherishmet in the *Amended Final Results*

Petitioners assert that Commerce's correction to GHC's bituminous coal consumption valuation was in error for two reasons.  First, that the valuation was a methodological decision and, therefore, "not subject to change pursuant to {Commerce's} ministerial error regulation." Petitioners Br. at 6-7, 9-12.  Second, because "Commerce's regulations . . . require all arguments be raised in . . . administrative case briefs," GHC's claim was untimely when it raised the claim for the first time after the final results were published.  *Id.* at 12-18.

First, Petitioners mischaracterize the allegation as methodological.  Petitioners Br. at 11 (citing *Certain Corrosion-Resistant Steel Products From the Socialist Republic of Vietnam: Amended Preliminary Affirmative Determination of Sales at Less Than Fair Value*, 90 Fed. Reg. 22,690 (Dep't of Commerce May 29, 2025), and accompanying Amended PDM at 6 (Dep't of Commerce May 22, 2025)).  *CORE Vietnam* is distinguishable, however, because in that case, Commerce determined that its "analysis of record information and selection of an appropriate {surrogate value}" from that information "is a methodological issue."  *CORE Vietnam*, Amended PDM at 6.  The ministerial error here, however, had nothing to do with the substance of the surrogate value selection. Neither Commerce's analysis of the information for bituminous coal, nor its selection of the value was at issue.  Instead, Cherishmet alerted Commerce that where Commerce meant to value bituminous coal consumption, it inadvertently used a different surrogate value in the programming.  Thus, while petitioners are correct that "Commerce

considers the selection of surrogate information to value a factor of production to be a methodological decision," Petitioners Br. at 11, the error made does not implicate which information comprises bituminous coal, but rather whether the correct value was coded in programming language. The inadvertent inclusion of an incorrect value in programming language is a quintessential ministerial error, just like "an error in addition or subtraction, or some other type of clerical error." Pet. Br. at 10. Accordingly, this Court should sustain Commerce's final results.

Second, with respect to the timeliness argument, petitioners rely on an improper negative inference to argue that because Commerce is not *required* to correct untimely raised ministerial errors, Commerce commits legal error in *discretionarily* correcting an untimely ministerial that is nevertheless raised during the administrative stage. Petitioners Br. at 13-15 (citing *QVD Food*, 658 F.3d at 1328; *Dorbest*, 604 F.3d at 1376-77 (Fed. Cir. 2010)). The latter does not follow even if the former is true. Indeed, in *Dorbest*, cited to by Petitioners, the Federal Circuit explicitly recognized Commerce's "authority to act to correct ministerial errors in the course of judicial review of the final results of its determinations." *Dorbest*, 604 F.3d at 1376; *see* Amended IDM at 7 (citing *Nagese & Co. v. United States*, 628 F. Supp. 3d 1326, 1345 (Ct. Int'l Trade 2023) (quoting *Dorbest*, 604 F.3d at 1376). Accordingly, petitioners' timeliness argument is meritless.

### ii. Commerce Reasonably Declined to Correct the Valuation of Bituminous Coal Consumption for Jilin Bright in the *Amended Final Results*

Consolidated plaintiffs argue that Commerce is required to correct Jilin Bright's bituminous coal consumption value, despite no party raising this issue before Commerce, and consolidated plaintiffs' own lack of participation in the administrative review. *See* Consol. Pls. Br. at 30-32. Consolidated plaintiffs' argument fails because they have failed to exhaust their

administrative remedies, and because the Federal Circuit has already ruled on this issue and held that Commerce "has authority not to fix clerical errors" where they are untimely raised.

Consolidated plaintiffs have failed to exhaust their administrative remedies. This Court "shall, where appropriate, require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d). "{T}his statutory mandate 'indicates a congressional intent that, absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies.'" *Boomerang Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017) (quoting *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007)). By regulation, interested parties must raise in their case brief all arguments that remain "relevant" to Commerce's "final determination or final results." *Corus Staal BV*, 502 F.3d at 1378 (citing 19 U.S.C. § 351.309(c)(2)). Interested parties must exhaust administrative remedies with respect to all issues that they have notice may be decided by Commerce in its final determination or final results. *See also Boomerang Tube* LLC, 856 F.3d at 913 (requiring exhaustion of administrative remedies even when Commerce changes its reasoning from the preliminary determination, so long as parties knew or should have known that Commerce may consider the issue in the final determination).

Still, "one-recognized exception" to exhaustion "permits a party to litigate an issue that the party did not exhaust at the administrative level where that issue was raised before the agency by a different party." *Zhaoqing Tifo New Fibre Co., Ltd. v. United States*, 60 F. Supp. 3d 1328, 1351 (Ct. Int'l Trade 2015). Consolidated plaintiffs have used this exception liberally, arguing issues that even the actual participants have abandoned. *See supra* Argument Section V. No party, however, had raised the issue of Jilin Bright's bituminous coal consumption value in administrative briefing. In fact, not only did "Jilin Bright {} not raise this particular error in its

ministerial error allegations", Consol. Pls. Br. at 31, plaintiffs have even failed to raise this error

in briefing before this Court.  *See generally* Pls. Br.  As a result, where no other party had raised

this issue with respect to Jilin Bright and consolidated plaintiffs did not participate in case

briefing, consolidated plaintiffs, by definition, did not raise the issue they are now seeking to

litigate in court.  Accordingly, this Court should decline to entertain consolidated plaintiffs' new

argument.  *See Boomerang Tube*, 856 F.3d at 913.

Even if this Court finds that exhaustion is not implicated, consolidated plaintiffs'

argument still fails.  Consolidated plaintiffs argue that "the Court has also made clear that

Commerce *may* correct ministerial errors in final determinations.  Consol Pls. Br. at 31.  The

question, however, is whether Commerce *is required* to correct a ministerial error that is not

simply untimely but not raised at all.  Consolidated plaintiffs cite numerous cases decided by this

Court and by the Federal Circuit, *see* Consol. Pls. Br. at 31 (citing *e.g.*, *Hyundai Electronics*

*Industries Co. v. United States*, 395 F. Supp. 2d 1231, 1243 (Ct. Int'l Trade 2005), all of which

have been distinguished by *Dorbest*.  *See Dorbest*, 604 F.3d at 1376-77.  Indeed, as the *Dorbest*

Court concluded, consolidated plaintiffs

> {P}oint{} to no decision of either the CIT or this court that holds that Commerce's
> refusal to fix a clerical error in the calculation of an antidumping duty margin is an
> abuse of discretion when the clerical error was discoverable during the original
> proceedings but was not pointed out to Commerce during the time period specified
> in the regulations.

*Compare id.* at 1377 (discussing *Hyundai Electronics*; *Alloy Piping Products, Inc. v. Kanzen*

*Tetsu Sdn. Bhd.*, 334 F.3d 1284, 1293 (Fed. Cir. 2003)), *with* Consol. Pls. Br. at 31-32

(discussing same).  Put differently, "{a}lthough Commerce may have the power to offer {Jilin

Bright} an opportunity to revise its data as a matter of grace following publication of the Final

Results, it is not legally obligated to do so." *Nagase & Co. v. United States*, 719 F. Supp. 3d 1343, 1355 (Ct. Int'l Trade 2024).

And in any event, the final determination was not "known to be based on incorrect data." Consol. Pls. Br. at 30. Unlike the error in Cherishmet's calculations, which was raised during the administrative proceedings (albeit untimely), the error in Jilin Bright's calculations was *never* raised during the administrative proceedings. Commerce therefore had no reason to know that there was an error, and discretion not to correct an error that was never raised in any event. Accordingly, this Court should sustain Commerce's final results.

## CONCLUSION

For these reasons, we respectfully request that the Court deny plaintiffs', consolidated plaintiffs', plaintiff-intervenors', and petitioners' motions for judgment upon the agency record, sustain Commerce's final results in all respects, and enter judgment for the United States.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Deputy Director

OF COUNSEL:                              /s/ Blake W. Cowman
RUSLAN KLAFEHN                           BLAKE W. COWMAN
Attorney                                 Trial Attorney
Office of the Chief Counsel              U.S. Department of Justice
for Trade Enforcement & Compliance       Civil Division
                                         Commercial Litigation Branch
                                         P.O. Box 480, Ben Franklin Station
                                         Washington, D.C. 20044
                                         Telephone: (202) 353-2494
                                         Email: Blake.W.Cowman@usdoj.gov

February 2, 2026                         *Attorneys for Defendant United States*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing brief complies with the Rules of this Court, the Court's Standard Chamber Procedures, and the Court's order (ECF No. 71) in that it contains 17,989 words, including text, footnotes, and headings.

<u>/s/ Blake W. Cowman</u>

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on the second day of February, 2026, I have caused service of the

foregoing document to be made on all parties via the Justice Enterprise File Sharing System

(JEFS).

<u>/s/ Blake W. Cowman</u>