# UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

|  |  |
|---|---|
| NINGXIA GUANGHUA CHERISHMET ACTIVATED CARBON CO., LTD. AND JILIN BRIGHT FUTURE CHEMICALS CO., LTD., | |
| **Plaintiffs,** | |
| and | |
| CARBON ACTIVATED TIANJIN CO., LTD. AND CARBON ACTIVATED CORPORATION, | |
| **Consolidated Plaintiffs,** | |
| and | **Consol. Court No. 24-00262** |
| BENGBU MODERN ENVIRONMENTAL CO., LTD., ET AL., | <u>**NON-CONFIDENTIAL VERSION**</u> |
| **Plaintiff-Intervenors,** | **Business Proprietary Information Removed from Page 8** |
| v. | |
| UNITED STATES, | |
| **Defendant,** | |
| and | |
| CALGON CARBON CORPORATION AND NORIT AMERICAS, INC., | |
| **Defendant-Intervenors.** | |

<u>**CARBON ACTIVATED TIANJIN CO., LTD. & CARBON ACTIVATED CORPORATION'S REPLY IN SUPPORT OF ITS RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD**</u>

David J. Ross
Stephanie E. Hartmann
Elizabeth A. Argenti
Wilmer Cutler Pickering Hale and Dorr LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6300
Facsimile: (202) 663-6363
Email: david.ross@wilmerhale.com

*Counsel for Carbon Activated Tianjin Co.,
Ltd. and Carbon Activated Corporation*

Dated: April 24, 2026

**TABLE OF CONTENTS**

I.   INTRODUCTION ........................................................................................... 1

II.  ARGUMENT ................................................................................................. 2

   A.   Commerce's Determination that Malaysian Import Data for Several Factors of Production were Not Aberrational was Unreasonable, Not Supported by Substantial Evidence and Otherwise Not in Accordance with Law ........................................................ 2

   B.   Commerce's Determination to Include in GHC's Margin Calculation Certain Costs That were Not Associated with the Production of Subject Merchandise was Unreasonable, Not Supported by Substantial Evidence, and Not in Accordance with Law 8

   C.   Commerce's Failure to Correct a Ministerial Error in Jilin Bright's Surrogate Value Calculation was Arbitrary and Otherwise Not in Accordance with Law .............. 13

III. CONCLUSION ........................................................................................... 16

# TABLE OF AUTHORITIES

Page(s)

## ADMINISTRATIVE DETERMINATIONS

*2022-2023 Administrative Review of the Antidumping Duty Order on Certain Activated Carbon from the People's Republic of China: Request for Economic Development, Surrogate Country, and Surrogate Value Comments and Information* (Dep't of Commerce, Nov. 7, 2023) .....................................3

*Certain Activated Carbon From the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review; 2022-2023*, 89 Fed. Reg. 104,978 (Dep't Commerce Dec. 26, 2024), and accompanying Ministerial Error Memorandum ........................................................................1, 2, 13, 16

*Certain Activated Carbon From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2022-2023*, 89 Fed. Reg. 92,893 (Dep't Commerce Nov. 25, 2024), and accompanying Issues and Decision Memorandum ........................................................................1, 2, 13

*Certain Activated Carbon From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2022-2023*, 89 Fed. Reg. 35,797 (Dep't Commerce May 2, 2024), and accompanying Preliminary Decision Memorandum ........................................................................2

*Common Alloy Aluminum Sheet from India: Final Results of Antidumping Duty Administrative Review; 2020-2022*, 88 Fed. Reg. 76,724 (Dep't Commerce Nov. 7, 2023), and accompanying Issues and Decision Memorandum ...........................12

*Light-Walled Rectangular Pipe and Tube from the People's Republic of China: Final Results of the Antidumping Duty Administrative Review: 2020-2021*, 88 Fed. Reg. 15,671 (Dep't of Commerce Mar. 14, 2023).................................................6

*Stainless Steel Flanges from India: Final Results of Antidumping Duty Administrative Review; 2021-2022*, 89 Fed. Reg. 17,410 (Dep't Commerce Mar. 11, 2024), and accompanying Issues and Decision Memorandum ..........................11

## CASES

*Anshan Iron & Steel Co. v. United States*, 358 F. Supp. 2d 1236 (CIT 2004) .............................12

*Arch Chemicals, Inc. v. United States*, Slip Op. 11-41 (CIT 2011)...............................................12

*Budd Co. Ry. Division v. United States*, 507 F. Supp. 997 (CIT 1980).......................................12

*Camau Frozen Seafood Processing Import Export Corp. v. United States*, 929 F. Supp. 2d 1352 (CIT 2013), *as amended* (Aug. 1, 2013)..................................4, 5, 8

*Indus. Fasteners Group, American Import Ass'n v. United States*, 525 F. Supp. 885 (CIT 1981) .........................................................................................12

*Jiangsu Senmao Bamboo & Wood Industries Co. v. United States*, 769 F. Supp. 3d 1344 (CIT 2025) ..............................................................................11

*Koyo Seiko Co. v. United States*, 746 F. Supp. 1108 (CIT 1990) .....................12, 14, 15

*Nagase & Co. v. United States*, 628 F. Supp. 3d 1326 (CIT 2023) ................................11

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006)...............................3

*NSK Ltd. v. United States*, 358 F. Supp. 2d 1276, 1291 (CIT 2005), *aff'd*, F. App'x 982 (Fed. Cir. 2006)............................................................................11, 15

*Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185 (Fed. Cir. 1990).........................14

*Rhone-Poulenc Inc. v. United States*, 927 F. Supp. 451 (CIT 1996) ..............................12

*SolarWorld Americas, Inc. v. United States*, 273 F. Supp. 3d 1254 (CIT 2017)....................4, 5, 8

*SolarWorld Americas, Inc. v. United States*, 962 F.3d 1351 (Fed. Cir. 2020) ..........................5, 10

*Torrington Co. v. United States*, 21 CIT 1079, 1082 (1997)), *modified on reconsideration*, 30 C.I.T. 63 (2006) ...................................................................15

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ...................................3, 4, 5, 8

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013) ......................................................................................................14

*Zhaoqing Tifo New Fibre Co. v. United States*, 60 F. Supp. 3d 1328 (CIT 2015) ........................13

## STATUTES, RULES, AND REGULATIONS

19 U.S.C. § 1677b(c) ....................................................................................................8

## I.       INTRODUCTION

Consolidated Plaintiffs Carbon Activated Tianjin Co., Ltd. and Carbon Activated Corporation (collectively, "Carbon Activated") respectfully submit this reply brief in support of their Rule 56.2 motion for judgment on the agency record challenging certain aspects of the final determination by the U.S. Department of Commerce ("Commerce") in the administrative review of the antidumping duty order on certain activated carbon from the People's Republic of China ("China") for the period April 1, 2022, through March 31, 2023.  *Certain Activated Carbon From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2022-2023*, 89 Fed. Reg. 92,893 (Dep't Commerce Nov. 25, 2024), P.R. 267, ECF No. 40-4 ("*Final Results*"), and accompanying Issues and Decision Memorandum, P.R. 251, ECF No. 40-5 ("IDM"), as amended by *Certain Activated Carbon From the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review; 2022-2023*, 89 Fed. Reg. 104,978 (Dep't Commerce Dec. 26, 2024), P.R. 277, ECF No. 40-6 ("*Amended Final Results*"), and accompanying Ministerial Error Memorandum, P.R. 271, ECF No. 40-7 ("Ministerial Error Memo").

This reply brief addresses arguments that the Defendant, the United States, and Defendant-Intervenors, Calgon Carbon Corporation and Norit Americas, Inc., made in their response briefs.[1]  *See* Defendant's Response Brief to Plaintiffs', Consolidated Plaintiffs', and Plaintiff-Intervenors' Motions for Judgment on the Agency Record (Feb. 2, 2026), ECF No. 73 ("Defendant's Response Br."); Response Brief of Defendant-Intervenors Calgon Carbon Corporation and Norit Americas, Inc. (Mar. 4, 2026), ECF No. 74 ("Defendant-Intervenors'

---

[1] Defendant-Intervenors' brief incorporates by reference all arguments made in Defendant's response brief and is limited to one argument beyond that.  *See* Defendant-Intervenors' Response Br. at 2.  Consequently, most references throughout this reply brief are to Defendant's response brief.

Response Br.") (collectively, "Defendants"). As Carbon Activated demonstrates below, Defendants fail to rebut Carbon Activated's arguments that Commerce made several determinations in the *Final Results* and *Amended Final Results* that were unreasonable, not supported by substantial evidence, or otherwise not in accordance with law. Accordingly, Carbon Activated respectfully requests that the Court grant its motion for judgment on the agency record and remand to Commerce for redetermination consistent with the Court's opinion.

## II.     ARGUMENT

### A.     Commerce's Determination that Malaysian Import Data for Several Factors of Production were Not Aberrational was Unreasonable, Not Supported by Substantial Evidence and Otherwise Not in Accordance with Law

As Carbon Activated explained in its opening brief, Commerce provided superficial and conclusory reasoning for its selection of Malaysian import data to calculate surrogate values for the mandatory respondents, Jilin Bright Future Chemicals Co., Ltd. ("Jilin Bright") and Ningxia Guanghua Cherishment Activated Carbon Co., Ltd. ("GHC") (collectively, "Respondents"). *See* IDM at 4-20, P.R. 251; *Certain Activated Carbon From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2022-2023*, 89 Fed. Reg. 35,797 (Dep't Commerce May 2, 2024), P.R. 223 ("*Preliminary Results*"), and accompanying Preliminary Decision Memorandum at 5-9, P.R. 221 ("PDM"); Memorandum in Support of Consolidated Plaintiffs Carbon Activated Tianjin Co. and Carbon Activated Corporation's Rule 56.2 Motion for Judgment Upon the Agency Record (Aug. 14, 2025), ECF No. 58 ("Carbon Activated's 56.2 Br. ") at 12-25. Commerce failed to address Respondents' arguments regarding aberrations in the Malaysian import data for coal tar, hydrochloric acid, solid sodium hydroxide, and potassium hydroxide. *See id.*; IDM at 15-20, P.R. 251. Commerce also failed to address specific data showing imports from Malaysia accounted for a small share of total imports among

the potential surrogate countries and therefore were not representative of broad market averages, and it unlawfully disregarded benchmark data consisting of broad global averages and individual country comparisons. *Id.*

In its response brief, Defendant mischaracterizes Carbon Activated's arguments with respect to the Malaysian data, stating that, "at bottom," Carbon Activated simply disagrees with "Commerce's choice to use Malaysian surrogate values instead of Romanian surrogate values." *See* Defendant's Response Br. at 11. This is incorrect. Carbon Activated does not simply disagree with Commerce; rather, Carbon Activated contends that Commerce failed to fulfill its obligation to address evidence on the record that detracted from its conclusions. *See* Carbon Activated's 56.2 Br. at 11-25. This failure renders Commerce's determinations unsupported by substantial evidence and otherwise not in accordance with law. *See Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006) (*citing Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

In its opening brief, Carbon Activated argued that Commerce improperly restricted its analysis to the OP List countries (*i.e.*, the list of possible surrogate countries).[2] *See* Carbon Activated's 56.2 Br. at 13. Commerce stated that its practice regarding benchmarking was to consider only "historical import data for the potential surrogate countries for a given case" and/or "data from the same {HS} category for the primary surrogate country over multiple years." IDM at 16, P.R. 251. Similarly, with respect to evaluating aberrations, Commerce stated that it considers specific import data for the surrogate country over multiple years or specific data for

---

[2] Commerce identified Romania, Panama, Costa Rica, Malaysia, Bulgaria, and Turkey as countries that were at the same level of economic development as China and therefore were considered as possible surrogate countries in the underlying review. *See 2022-2023 Administrative Review of the Antidumping Duty Order on Certain Activated Carbon from the People's Republic of China: Request for Economic Development, Surrogate Country, and Surrogate Value Comments and Information* (Dep't of Commerce, Nov. 7, 2023), P.R. 131; PDM at 6. These countries are referred to as the OP List countries.

other potential surrogate countries for a given case.  IDM at 19-20, P.R. 251.  Commerce relied

on these alleged practices to dismiss the global averages and individual country comparisons that

respondents provided, by implying the data did not comply with Commerce practice.  *See* IDM

at 15-16, 19-20, P.R. 251.

However, as Carbon Activated explained in its opening brief, Courts have cautioned

Commerce against taking such a restrictive approach when evaluating potential aberrations.  *See*

Carbon Activated's 56.2 Br. at 14-16.  Moreover, Commerce has an obligation to address

information on the record that detracts from its determinations.  *See, e.g.*, *Universal Camera*

*Corp. v. NLRB*, 340 U.S. at 488 ("The substantiality of evidence must take into account whatever

in the record fairly detracts from its weight."); *SolarWorld Americas, Inc. v. United States*, 273 F.

Supp. 3d 1254, 1268 (CIT 2017) (noting that Commerce must "adequately explain how its

decision is reasonable in light of the record as a whole, including the evidence that reasonably

detracts from its conclusion"); *Camau Frozen Seafood Processing Imp. Exp. Corp. v. United*

*States*, 929 F. Supp. 2d 1352, 1356 (CIT 2013) ("Not addressing the conflicting evidence on the

record…fails the substantial evidence test because it does not take into account record evidence

contrary to Commerce's determination."), *as amended* (Aug. 1, 2013).

Although Commerce relied on its OP List practice to dismiss the respondents' data,

Defendant asserts that Commerce's practice does not limit it to "reviewing any specific set of

country data," and it argues that Commerce looked beyond the OP List countries by referencing

Chilean data in one instance.  Defendant's Response Br. at 42-43; IDM at 18, P.R. 251.  This

example is inapposite.  In referencing the Chilean data, Commerce stated "Of the five OP List

countries with imports of merchandise under HS code 2701.19, three countries, Malaysia,

Romania, and Chile, all had import values exceeding $300/MT."  IDM at 18, P.R. 251.  Thus,

Commerce intended to reference Chile as an OP List country (although Chile was not on the OP List in this case),[3] not to look beyond the OP List countries as Defendant contends. *See* Defendant's Response Br. at 42-43; IDM at 18, P.R. 251.

With respect to GHC's argument regarding the comparatively small volume of Malaysia's imports and corresponding high prices, Defendant asserts GHC relied on an outdated practice in *Hand Tools from China* from 1998. Defendant's Response Br. at 32-33. GHC's actual citation was to a 2020 Federal Circuit opinion discussing "Commerce's longstanding 'administrative practice with respect to aberrational data,'" in which Commerce disregarded small-quantity import data from the primary surrogate country when the average unit value was substantially different from the unit values of the larger-quantity import countries. *See* GHC Brief, "Activated Carbon from the People's Republic of China: Case Brief of Petitioners Concerning GHC," dated June 12, 2024 at 20; *SolarWorld Americas, Inc. v. United States*, 962 F.3d 1351, 1358 (Fed. Cir. 2020). This opinion, in turn, referenced the *Hand Tools* determination. *SolarWorld Americas*, 962 F.3d at 1358. Even if Commerce's practice has evolved since these determinations were issued, as Defendant contends, Commerce is still required to address the evidence on the record that detracts from its determination, so Commerce must explain why it deems the comparative volume and price data unpersuasive. *See, e.g.*, *Universal Camera*, 340 U.S. at 488; *SolarWorld Americas*, 273 F. Supp. 3d at 1268; *Camau Frozen Seafood*, 929 F. Supp. 2d at 1356.

In pointing to Commerce's practice under *Light-Walled Rectangular Pipe and Tube from the People's Republic of China*, Defendant contends that Respondents were required to provide "specific evidence" that the proposed surrogate values were aberrational and implies that

---

[3] The six OP List countries in this case were Romania, Panama, Costa Rica, Malaysia, Bulgaria, and Turkey. See Department Memorandum, "2022-2023 Administrative Review of the Antidumping Duty Order on Certain Activated Carbon from the People's Republic of China: Request for Economic Development, Surrogate Country, and Surrogate Value Comments and Information," dated Nov. 7, 2023 at 2, P.R. 131.

respondents failed to do so in the underlying review. *See* Defendant's Response Br. at 32-33; IDM at 19-20, P.R. 251 (citing *Light-Walled Rectangular Pipe and Tube from the People's Republic of China: Final Results of the Antidumping Duty Administrative Review: 2020-2021*, 88 Fed. Reg. 15,671 (Dep't of Commerce Mar. 14, 2023)). To the contrary, as Carbon Activated explained in its opening brief, this is precisely what Respondents did: they provided evidence showing that the Malaysian import volumes were comparatively small and had significantly higher average unit values in relation to specific other potential surrogate countries. Carbon Activated's 56.2 Br. at 17-18. The Respondents also provided evidence showing that the average unit values for Malaysian imports were much higher than specific other countries that had comparable import volumes. Carbon Activated's 56.2 Br. at 15-16. Thus, Respondents did not "{s}imply compare import volumes" or point to the mere "existence of higher prices alone" in its arguments regarding the Malaysian data. *See* Defendant's Response Br. at 32-33.

Additionally, Defendant fails to address Commerce's contradictory position with respect to the significance of comparative volumes and their relevance to evaluating aberrations. As Carbon Activated explained in its opening brief, Commerce pointed to the fact that Malaysia's imports of sub-bituminous coal "make up almost all of the market imports among the countries on the OP List" to support its conclusion that "the Malaysian imports are representative of prices during the POR among the OP List countries." *See* Carbon Activated's 56.2 Br. at 21; IDM at 18, P.R. 251. But the natural corollary of this conclusion is that if a surrogate country's imports account for a small fraction of the total imports among countries on the OP List, those imports may not be representative of prices among those countries and therefore may be aberrational.

The Respondents provided evidence that supported this corollary position – for example, Malaysia's imports of hydrochloric acid accounted for just 1.56 percent of the total imports

among the OP List countries and had an average unit value of $3.64 per kilogram, while imports

in Bulgaria, Romania, and Türkiye accounted for 96.35 percent of the total imports and had

average unit values of $0.25, $0.20, and $0.18 per kilogram, respectively. Carbon Activated's

56.2 Br. at 17. Thus, Respondents did not "simply compar{e} import volumes," as Defendant

asserts, but rather provided *specific* evidence showing that Malaysia's import volumes with

respect to certain factors of production accounted for a tiny fraction of the overall imports among

the OP List countries and had substantially higher values. *See* Defendant's Response Br. at 32.

Commerce relied on a similar analysis to determine that a different factor of production was *not*

aberrational, but Defendant suggests that Commerce was not required to address this same type

of information when it detracted from Commerce's finding because the analysis was allegedly

not consistent with Commerce's current practice. *See* Defendant's Response Br. at 32-33. This

logic fails. Commerce cannot rely on certain information when it supports Commerce's position

and disregard the same information when it does not.

In sum, Commerce unlawfully failed to address contrary evidence on the record that

detracted from its determinations that Malaysian import values for coal tar,[4] hydrochloric acid,

solid sodium hydroxide, and potassium hydroxide were the best surrogate value data available on

the record, and its determinations therefore were unreasonable, unsupported by substantial

---

[4] Defendant misunderstands the point with respect to Malaysian exports of coal tar. *See* Defendant's Response Br. at 36-37. When a country has a larger volume of exports as compared to imports, Commerce views this as support to conclude there is significant domestic production of the exported article. Indeed, this was a key rationale for finding that Malaysia was a significant producer of activated carbon as it was the only net exporter of comparable merchandise. *See* Defendant's Response Br. at 9; IDM at 8, P.R. 251. When those exports have a significantly lower average unit value than imports of the same merchandise, as the evidence from Jilin Bright showed with respect to Malaysian coal tar, it raises questions as to whether Malaysian producers of activated carbon would use the expensive imports as inputs in their production, rather than the abundant domestic production that was exported at lower prices, and thus whether the import prices were actually reflective of a broad market average and most accurately represented the relevant factor of production. *See* Carbon Activated's 56.2 Br. at 23 n.2. This was simply another piece of evidence that suggested the Malaysian import value was aberrational that Commerce failed to address. *See id.* Contrary to Defendant's assertion, Commerce did not address this evidence in the IDM, nor did it make any reference to exports on the cited pages. *See* Defendant's Response Br. at 36-37 (citing IDM at 15-16, P.R. 251).

7

BUSINESS PROPRIETARY
INFORMATION DELETED

Consol. Court No. 24-00262                                         NON-CONFIDENTIAL VERSION

evidence, and not in accordance with law. *See, e.g.*, *Universal Camera*, 340 U.S. at 488;

*SolarWorld Americas*, 273 F. Supp. 3d at 1268; *Camau Frozen Seafood*, 929 F. Supp. 2d at 1356.

**B.     Commerce's Determination to Include in GHC's Margin Calculation Certain Costs That were Not Associated with the Production of Subject Merchandise was Unreasonable, Not Supported by Substantial Evidence, and Not in Accordance with Law**

In its final margin calculations, Commerce included certain input costs in GHC's factors

of production ("FOP") database that were unrelated to the production of the subject merchandise

and that GHC's toll supplier only provided under protest. *See* Carbon Activated's 56.2 Br. at 25-

28. As Carbon Activated explained in its opening brief, Commerce uses a foreign producer's

cost of production information in its calculation of the normal value when dealing with a non-

market economy country, and Commerce uses the normal value to calculate the foreign

producer's dumping margin. *See* Carbon Activated's 56.2 Br. at 25; 19 U.S.C. § 1677b(c). The

accuracy of the cost of production information is therefore crucial in determining accurate

dumping margins.

In its initial questionnaire response, GHC followed Commerce's instructions to provide

information on the inputs it used in the production of its subject merchandise, *i.e.*, activated

carbon that was to be sold in the U.S. market. Carbon Activated's 56.2 Br. at 3; GHC Letter,

"Certain Activated Carbon from the People's Republic of China: Ningxia Guanghua Cherishmet

Activated Carbon Co., Ltd. Section D Questionnaire Response," dated Sept. 28, 2023 ("GHC

Sec D QR"), P.R. 123, C.R. 64-78. When Commerce issued a supplemental questionnaire to

GHC and inquired about its unaffiliated supplier's inputs, including [

], GHC explained in detail that the supplier did not use [

] (the "contested inputs") in its production of subject merchandise that GHC sold to the

U.S. market. Carbon Activated's 56.2 Br. at 4; GHC Letter, " Administrative Review of

8

Activated Carbon from the People's Republic of China: Second Supplemental Section A,C, and

D Questionnaire Response," dated Apr. 5, 2024 ("GHC 2nd Supp QR") at 20-27, Exhibit 2SD-1,

P.R. 202, C.R. 152, 171-174.  GHC explained that prior to selecting the supplier, "it had been

agreed" that the merchandise GHC purchased from the supplier that was to be exported to the

United States had to be started with self-produced products.  GHC 2nd Supp QR at 27, P.R. 202,

C.R. 152.  GHC stated definitively that there was "no chance" the contested inputs were used in

the products GHC purchased from the supplier and exported to the United States.  GHC 2nd

Supp QR at 27, P.R. 202, C.R. 152.  Hence, GHC had no reason to include the contested inputs

in its cost of production reporting, and there was no reason for it to request a reporting

exemption, because its supplier did not use the contested inputs in the production of subject

merchandise that was to be sold in the U.S. market.  *See* Defendant's Response Br. at 48, 50.

Nonetheless, in its second supplemental questionnaire response, GHC provided, "with

protest," alternative consumption ratios that included the contested inputs, noting specifically

that use of such data would not meet the goal of reporting the factors of production as accurately

as possible and could lead to distortions.  Carbon Activated's 56.2 Br. at 26; GHC 2nd Supp QR

at 27.  Later in the proceedings, as further evidence that GHC's supplier was complying with the

terms of their arrangement, GHC highlighted language in its purchase orders stating that all

products must be produced by the seller itself.  Carbon Activated's 56.2 Br. at 26 n.3.

Despite this record evidence, Defendant argues that GHC did not provide a hard copy of

an agreement stating that the supplier would not use the contested inputs for merchandise that it

sold to GHC that was destined for the U.S. market, and asserts that the only "logical inference" is

that no such agreement existed.  Defendant's Response Br. at 50.  However, this unsupported

assumption and *post hoc* rationalization cannot justify Commerce's summary dismissal of all the

other evidence on the record and reliance on the inaccurate consumption ratios GHC provided

under duress.  Commerce's decision is thus unsupported by substantial evidence and contrary to

its obligation to determine dumping margins that are as accurate as possible and that best reflect

the foreign producer's actual production experience.  *See, e.g.*, *SolarWorld Americas, Inc. v.*

*United States*, 962 F.3d at 1356.

In its discussion of this issue, Defendant asserts that GHC (referred to as Cherishmet in

Defendant's brief) is an "experienced respondent" that has participated in multiple reviews of the

antidumping duty order, suggesting that GHC is familiar with the administrative review process

and aware of what is required.  *See* Defendant's Response Br. at 48 n.18.  However, the record

shows that it was precisely because of its experience as a respondent that GHC required its

supplier not to use the contested inputs, took steps to ensure it would not do so, and certified the

accuracy of those facts.  GHC also made clear to Commerce that using the consumption ratios

with the contested data, which it only provided under duress, would lead to distortions and not

meet the goal of reporting the factors of production as accurately as possible.  Carbon

Activated's 56.2 Br. at 26; GHC 2nd Supp QR at 27.  Despite the clear warning from an

"experienced respondent" that inclusion of the contested data would not result in accurate factors

of production, as well as the additional record evidence definitively stating in certified

submissions that the contested inputs were not used in subject merchandise that GHC exported to

the United States, the Defendant asserts that GHC was required to provide even more evidence.

*See* Defendant's Response Br. at 50.  But Commerce cannot ignore the uncontroverted evidence

a respondent has provided simply by claiming it falls short of some preferred alternative.  Rather,

Commerce must adequately explain the reasons why the information on the record is insufficient

or impossible to verify. *See Jiangsu Senmao Bamboo & Wood Indus. Co. v. United States*, 769 F. Supp. 3d 1344, 1405 (CIT 2025). Commerce failed to do so here.

Defendant further asserts that Carbon Activated did not support its claim that Commerce impermissibly included costs in its calculation of GHC's dumping margin that were unrelated to the production of subject merchandise, thereby inflating GHC's antidumping duty margin. Defendant's Response Br. at 51. To the contrary, Carbon Activated explained in its opening brief that by including the contested downstream inputs in GHC's FOP database – inputs that GHC explained repeatedly were not used in the production of subject merchandise that was exported to the United States – Commerce included costs unrelated to the production of subject merchandise in GHC's margin calculation. Carbon Activated's 56.2 Br. at 27. By including these downstream (*i.e.*, more expensive), unrelated input costs, Commerce *ipso facto* inflated GHC's normal value calculation.

Moreover, as Carbon Activated explained in its opening brief, in order to achieve its goal of determining accurate dumping margins, Commerce routinely excludes costs and expenses from its dumping calculations when those costs and expenses are related to the production of non-subject merchandise (*i.e.*, unrelated to the production of subject merchandise). *See* Carbon Activated's 56.2 Br. at 27-28, citing *Nagase & Co. v. United States*, 628 F. Supp. 3d 1326, 1332 (CIT 2023) (discussing Commerce's usual practice of excluding expenses related to the production of non-subject merchandise from its calculation of general and administrative expenses); *NSK Ltd. v. United States*, 358 F. Supp. 2d 1276, 1291 (CIT 2005) (discussing an allocation methodology involving removal of selling expenses that were unrelated to subject merchandise and noting the court has previously upheld such methodologies), *aff'd*, F. App'x 982 (Fed. Cir. 2006); *Stainless Steel Flanges from India: Final Results of Antidumping Duty*

*Administrative Review; 2021-2022*, 89 Fed. Reg. 17,410 (Dep't Commerce Mar. 11, 2024), and accompanying Issues and Decision Memorandum at 6-7 (refusing to adjust respondent's cost of production to include certain tolling expenses because they were related to the production of non-subject merchandise); *Common Alloy Aluminum Sheet from India: Final Results of Antidumping Duty Administrative Review; 2020-2022*, 88 Fed. Reg. 76,724 (Dep't Commerce Nov. 7, 2023), and accompanying Issues and Decision Memorandum at 41 (stating it would be inappropriate to include certain costs in the cost database because they relate to non-subject merchandise); *see also Arch Chemicals, Inc. v. United States*, Slip Op. 11-41 (CIT 2011) (discussing whether a disputed credit was earned during the production of subject or non-subject merchandise). These determinations are directly relevant here, because any production by GHC's supplier that was not destined for the United States was production of non-subject merchandise.

By including factors of production and production costs that the record clearly shows were unrelated to the subject merchandise, Commerce arbitrarily inflated GHC's normal value calculation, contrary to the statutory mandate to calculate margins as accurately as possible. *See Koyo Seiko Co. v. United States*, 746 F. Supp. 1108, 1111 (CIT 1990); *see also Anshan Iron & Steel Co. v. United States*, 358 F. Supp. 2d 1236, 1243 (CIT 2004) (stating that "{t}his Court has consistently held that deference is not due an agency determination which relies upon inadequate factual basis or is inconsistent with congressional intent" (citing *Rhone-Poulenc Inc. v. United States*, 927 F. Supp. 451 (CIT 1996))); *Budd Co. Ry. Div. v. United States*, 507 F. Supp. 997 (CIT 1980); *Indus. Fasteners Grp., Am. Imps. Ass'n v. United States*, 525 F. Supp. 885 (CIT 1981). Thus, Commerce's inclusion of these contested inputs in GHC's factors of production was not

supported by substantial evidence and otherwise not in accordance with law, and the Court

should remand to Commerce for reconsideration.

### C.     Commerce's Failure to Correct a Ministerial Error in Jilin Bright's Surrogate Value Calculation was Arbitrary and Otherwise Not in Accordance with Law

Following publication of the *Final Results*, GHC and Jilin Bright submitted ministerial

error comments.  GHC's comments asserted that Commerce had used an incorrect value for

bituminous coal in the margin calculation.  Ministerial Error Memo at 5, P.R. 271.  Commerce

stated that the argument was untimely, but it admitted it had made an inadvertent clerical error

and exercised its discretion to correct the value.  Ministerial Error Memo at 6-7, P.R. 271.

Commerce "declined" to make the same correction for Jilin Bright's margin calculation,

however, even though bituminous coal is a standard input in the production of activated carbon

and was used in both respondents' methodologies.  *See* Carbon Activated's 56.2 Br. at 30-32;

Defendant's Response Br. at 57.

Defendant contends that because no one raised this issue before Commerce, the parties

have failed to exhaust their administrative remedies, and it asserts that there is clear

congressional intent that, absent a strong contrary reason, the court should insist that parties

exhaust administrative remedies before the administrative agencies.  *See* Defendant's Response

Br. at 59.  However, as Defendant acknowledges, there is an exception that allows for a party to

pursue an issue on appeal that a different party had raised before the agency.  *See* Defendant's

Response Br. at 59; *Zhaoqing Tifo New Fibre Co. v. United States*, 60 F. Supp. 3d 1328, 1351

(CIT 2015).  In this case, the issue was raised before Commerce, because GHC alerted

Commerce to the fact that it had used the wrong value for bituminous coal in its margin

calculation methodology.  Carbon Activated's 56.2 Br. at 9-10.  This is a standard input used in

the production of activated carbon and the surrogate value was used in the methodologies for both respondents. Carbon Activated's 56.2 Br. at 9. Thus, Commerce was aware of its inadvertent use of the wrong value for bituminous coal (*i.e.*, "the issue") and simply "declined to correct" the same error in Jilian Bright's calculation. *See* Defendant's Response Br. at 57. This was inconsistent with Commerce's obligation to ensure accurate antidumping duty margins. *See, e.g.*, *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013) (stating "{a}n overriding purpose of Commerce's administration of antidumping laws is to calculate dumping margins as accurately as possible" (citing *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990))).

To the extent the Court agrees that administrative remedies were not exhausted in this instance and that an exemption does not apply, Carbon Activated contends that the goal of achieving accurate antidumping margins is a "strong contrary reason" to allow the argument to proceed. *See* Defendant's Response Br. at 59. As Carbon Activated explained in its opening brief, Courts have emphasized that "fair and accurate determinations are fundamental to the proper administration of our dumping laws," and that the "overriding purpose of Commerce's administration of antidumping laws is to calculate dumping margins as accurately as possible." *See* Carbon Activated's 56.2 Br. at 30, citing *Koyo Seiko*, 746 F. Supp. at 1110; *Yangzhou Bestpak Gifts & Crafts*, 716 F.3d at 1379. Indeed, Congress added the ministerial error provision to the statute specifically to further the goal of ensuring accurate determinations. *See* Carbon Activated's 56.2 Br. at 30. Thus, correcting known errors to ensure that dumping margins are being calculated as accurately as possible is entirely consistent with the legislative intent of the statute. Commerce has admitted it inadvertently used the wrong value for bituminous coal in the

margin calculation methodology and the Court should ensure this error is remedied for both respondents.

Further, as Carbon Activated explained in its opening brief, Courts have recognized that affirming final determinations that are known to be based on incorrect data would be *contrary* to legislative intent. *See* Carbon Activated's 56.2 Br. at 30, citing *Koyo Seiko*, 46 F. Supp. at 1111. Indeed, Courts have acknowledged their own "responsibility to 'exercise {their} discretion to prevent knowingly affirming a determination with errors.'" *Hyundai Elecs. Indus. Co. v. United States*, 395 F. Supp. 2d 1231, 1243 (CIT 2005) (quoting *Torrington Co. v. United States*, 21 CIT 1079, 1082 (1997)), *modified on reconsideration*, 30 C.I.T. 63 (2006).

Defendant ignores the intent of the statute and previous caselaw emphasizing the importance of accurate dumping margins and instead essentially claims ignorance, arguing that Commerce was unaware of the issue and therefore cannot be required to address it. *See* Defendant's Response Br. at 59-61. As explained above, however, GHC did alert Commerce to the issue. Commerce agreed it made a mistake by using the wrong value for bituminous coal and determined this was a clerical error that merited correction. *See* Carbon Activated's 56.2 Br. at 30-31. It used this same incorrect value in the margin calculations for both mandatory respondents. *See* Carbon Activated's 56.2 Br. at 9. Despite its obligation to calculate dumping margins as accurately as possible, Commerce only corrected this error with respect to one respondent. Defendant asserts that because the other respondent did not *also* bring the same mistake to Commerce's attention, Commerce had no obligation to correct its mistake with respect to the other respondent. *See* Defendant's Response Br. at 59-61. This rationale defies logic and flies in the face of Commerce's obligation to calculate dumping margins as accurately as possible. Commerce was made aware of the error – which identically impacted both

respondents' dumping margin calculations – but chose to only correct it for one. This was arbitrary and unreasonable.

Finally, Defendant argues that Commerce has discretion not to fix clerical errors when they are untimely raised. Defendant's Response Br. at 59. While it is true that no party raised the erroneous surrogate value for bituminous coal in the case briefs, Commerce admitted that it had made a mistake by inadvertently using the wrong value for bituminous coal and chose to rectify that error in response to GHC's ministerial error allegation. Carbon Activated's 56.2 Br. at 10; Ministerial Error Memo at 6-7, P.R. 271. Commerce thus apparently decided that any timeliness concerns were outweighed by the need to fix the identified error and ensure that GHC's margin calculation was as accurate as possible. The same reasoning should have applied Jilin Bright's margin calculation, which was impacted by the identical error. By failing to correct the same error in both respondents' margin calculations, Commerce's determination was arbitrary and capricious and an abuse of discretion. The Court should remand to Commerce with instructions to correct the erroneous value for bituminous coal in Jilin Bright's margin calculation.

## III.    CONCLUSION

For the reasons discussed above, Carbon Activated respectfully requests that the Court reject all arguments made by Defendants and grant Carbon Activated's motion for judgment on the agency record in its entirety.

Respectfully submitted,

/s/ Stephanie E. Hartmann
David J. Ross
Stephanie E. Hartmann
Elizabeth A. Argenti
Wilmer Cutler Pickering Hale and Dorr LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6300
Facsimile: (202) 663-6363
Email: david.ross@wilmerhale.com

*Counsel for Carbon Activated Tianjin Co.,*
*Ltd. and Carbon Activated Corporation*

Dated: April 24, 2026

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this submission complies with the word limitation requirement. The word count for this submission, as computed by Wilmer Cutler Pickering Hale and Dorr LLP's word processing system, is 5,084 words.

<u>/s/ Stephanie E. Hartmann</u>
(Signature of Attorney)

<u>Stephanie E. Hartmann</u>
(Name of Attorney)

<u>Carbon Activated Tianjin Co., Ltd. and Carbon Activated Corporation</u>
(Representative Of)

<u>April 24, 2026</u>
(Date)

# UNITED STATES COURT OF INTERNATIONAL TRADE

*Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd. et al v. United States*,
Ct. No. 24-00262

## **Certificate of Service**

I, Stephanie E. Hartmann, of Wilmer Cutler Pickering Hale and Dorr LLP, as counsel for Consolidated Plaintiffs Carbon Activated Tianjin Co., Ltd. and Carbon Activated Corporation (collectively, "Carbon Activated"), hereby certify that copies of the attached Reply in Support of Carbon Activated's Rule 56.2 Motion for Judgment on the Agency Record were served by secure electronic means on the following interested parties to the relevant administrative proceeding, pursuant to USCIT R. 5(b) on this 24th day of April 2026:

**On Behalf of Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd., et al.**
Irene H Chen, Esq.
VCL Law LLP
1945 Old Gallows Road
Ste 630
Vienna, VA 22182
ichen@vcllegal.com

Jake Roger Frischknecht
Wiley Rein, LLP
2050 M Street, NW.
Washington, DC 20036
jfrischknecht@wiley.law

Mark Burton Lehnardt
Davis & Leiman PLLC
1025 Connecticut Avenue, NW.
Suite 1012
Washington, DC 20036
mlehnardt@dltrade.com

**On Behalf of Calgon Carbon Corporation, et al.**
John M. Herrmann , II
Melissa Marie Brewer
R. Alan Luberda
Kelley Drye & Warren, LLP
670 Maine Avenue, S.W.
Suite 600

Washington, DC 20024
jherrmann@kelleydrye.com
mbrewer@kelleydrye.com
aluberda@kelleydrye.com

**On Behalf of Ningxia Mineral & Chemical Limited, et al.**
Gregory Stephen Menegaz
Alexandra H. Salzman
Vivien Jinghui Wang
The Inter-Global Trade Law Group PLLC
1156 15th Street, NW.
Suite 1101
Washington, DC 20005
gmenegaz@igtlaw.com
asalzman@igtlaw.com
vwang@igtlaw.com

**On Behalf of the United States**
Blake William Cowman
Claudia Burke
Daniel Bartoni
U.S. Department of Justice
Commercial Litigation Branch - Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
blake.w.cowman@usdoj.gov
claudia.burke@usdoj.gov
daniel.bertoni@bbklaw.com

Ruslan N. Klafehn
Of Counsel
U.S. Department of Commerce
1401 Constitution Avenue, NW.
Washington, DC 20230
ruslan.klafehn@trade.gov




/s/ Stephanie E. Hartmann
Stephanie E. Hartmann