# THE UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE JANE A. RESTANI, SENIOR JUDGE

| | |
|---|---|
| NINGXIA GUANGHUA CHERISHMET ACTIVATED CARBON CO., LTD. AND JILIN BRIGHT FUTURE CHEMICALS CO., LTD.,<br><br>         Plaintiffs,<br>   and<br><br>CARBON ACTIVATED TIANJIN CO., LTD. AND CARBON ACTIVATED CORPORATION,<br>         Consolidated Plaintiffs,<br>   and<br><br>BENGBU MODERN ENVIRONMENTAL CO., LTD., ET AL.,<br><br>         Plaintiff-Intervenors,<br>v.<br> UNITED STATES,<br><br>         Defendant,<br>   and<br><br>CALGON CARBON CORPORATION AND NORIT AMERICAS, INC.,<br><br>         Defendant-Intervenors. | Consol. Court No. 24-00262 |

Irene H. Chen
Jake Frischknecht
VCL Law LLP
1945 Old Gallows Road, Suite 260
Vienna, VA 22182
Tel: (301) 760-7393
Email: ichen@vcllegal.com

Mark B. Lehnardt
Davis & Leiman, PLLC
1012 Connecticut Ave., N.W., Ste 1012
Washington, D.C. 20036
(202) 642-4850
Email: mlehnardt@dltrade.com

April 24, 2026

Counsel for Plaintiffs and Plaintiff-Intervenors

**TABLE OF CONTENTS**

I.  Commerce's Refusal to Consider Romania as a Surrogate Country is Not Supported by Substantial Evidence or in Accordance with Law ........................................................................... 5

    A.  Commerce's Requirement that Romania be a Net Exporter to Qualify as a Surrogate Country is Not In Accordance with Law. ......................................................................... 6

II.  Commerce Must Select Romania As the Surrogate Country Because Romania Offers the Best Data Available. ........................................................................................................................ 9

III.  Commerce's Selection of Aberrational Surrogate Values for Coal Tar, Sub-Bituminous Coal, Hydrochloric Acid, Sodium Hydroxide and Potassium Hydroxide is Unsupported by Substantial Evidence and Inconsistent with Its Obligation to Use the Best Available Information 10

    A.  Commerce's Aberrational Analysis of the Malaysian Coal Tar Surrogate Value Was Conclusory and Incomplete ........................................................................................... 12

    B.  Commerce's Aberrational Analysis of the Malaysian Sub-Bituminous Coal Surrogate Value was Incomplete and Inconsistent with Commerce's Practice ........................................ 16

    C.  Commerce's Selection of Malaysia's Hydrochloric Acid Surrogate Value Is Similarly Incomplete ..................................................................................................................... 17

    D.  Commerce's Failed to Compare Malaysia's Sodium Hydroxide and Potassium Hydroxide Surrogate Values to the Values of Economically Comparable Countries ................................. 19

IV.  Commerce Erred in Excluding the Financial Statement of Greenlink, a Malaysian Producer of Charcoal Products, in its Financial Ratio Calculation ............................................. 20

V.  Commerce Should Adopt the Formula Jilin Proposed in Its Section C Questionnaire Response to Correct a Double Multiplication Error in the Per Unit VAT Tax ............................. 22

VI.  CONCLUSION ..................................................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*ATC Tires Priv. Ltd. v. United States*, 324 F. Supp. 3d 1355.................................................... 5,23

*Baoding Mantong Fine Chemistry Co. v. United States*, 222 F. Supp. 3d 1231 (Ct. Int'l Trade 2017) .............................................................................................................................. 14

*Carbon Activated Tianjin Co. v. United States* No. 2023-2413, 2025 U.S. App. LEXIS 11226 (Fed. Cir. May 9, 2025).................................................................................................. 8

*Carbon Activated Tianjin Co., Ltd. and Carbon Activated Corporation, et al. v. United States* Consol. Court No. 20-00007 (CIT April 2, 2021)........................................................ 8

*CS Wind Viet. Co. v. United States*, 832 F.3d 1367 (Fed. Cir. 2016) ........................................ 12

*Dorbest Ltd. v. United States*, 604 F.3d 1363 (Fed. Cir. 2010)................................................ 21

*Goodluck India Ltd. v. United States*, 11 F.4th 1335 (Fed. Cir. 2021)...................................... 23

*Jacobi Carbons AB v. United States*, 365 F. Supp. 3d 1344 (Ct. Int'l Trade 2019) ...................... 7

*Motor Vehicle Mfrs. Ass 'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29,43 (1983)............................................................................................................................ 12

*Nelson v. Adams USA, Inc.*, 529 U.S. 460, 469-70, 120 S.Ct. 1579, 146 L.Ed.2d 530 (2000)..... 24

*Risen Energy Co. v. United States,* 122 F.4th 1348 (Fed. Cir. 2024) ..........................................11

*Shanghai Foreign Trade Enters. Co. v. United States*, 28 CIT 480, 488, 318 F. Supp. 2d 1339 (2004).......................................................................................................................... 12

*Solarworld Ams., Inc. v. United States*, 320 F. Supp. 3d 1341 (Ct. Int'l Trade 2018)........11, 12, 13

*SolarWorld Ams., Inc. v. United States*, 355 F. Supp. 3d 1306(Ct. Int'l Trade 2018) .................. 19

*SolarWorld Ams., Inc. v. United States*, 962 F.3d 1351 (Fed. Cir. 2020)............................. passim

*Timken Co. v. United States*, 894 F.2d 385 (1990) .................................................................. 22

*Torrington Co. v. United States,* 21 CIT 1079 (1997)…………………...……………………23

*Tri Union Frozen Prods. v. United States*, 227 F. Supp. 3d 1387 (Ct. Int'l Trade 2017) ....... passim

*Wind Viet. Co. v. United States*, 832 F.3d 1367 (Fed. Cir. 2016) ............................................ 16

*Zhaoqing Tifo New Fibre Co. v. United States*, 60 F. Supp. 3d 1328(Ct. Int'l Trade 2015)........... 5

**Statutes**

19 U.S.C. § 1677(35) ........................................................................................................ 15

19 U.S.C. § 1677b(c)(1)(B) .............................................................................................6, 11

19 U.S.C. § 1677b(c)(4)...................................................................................................... 5

**Other Authorities**

*Activated Carbon from China*, Inv. No. 731-TA-1103 (Prelim) USITC Pub. 3852 (May 2006) . 22

Christophe A. Casey, Cong. Rsch. Serv., R46296, Trade Remedies: Antidumping 1 (2020)....... 15

*Enforcement and Compliance's Policy Bulletin No. 04.1* ........................................................... 6, 9

*Light-Walled Rectangular Pipe and Tube From the People's Republic of China*, 88 Fed. Reg. 15,671 (Dep't Commerce Mar. 14, 2023) .......................................................................11

*Wire Decking from the People's Republic of China*. 75 Fed. Reg. 1597 (Dep't Commerce January 12, 2010) .................................................................................................................. 8

**Regulations**

19 C.F.R. § 351.408(b)(3) ........................................................................................................ 9

19 C.F.R. § 351.408(c)(2) ....................................................................................................... 10

Plaintiffs Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd. ("GHC") and Jilin Bright Future Chemicals Co., Ltd. ("Jilin Bright") (collectively, "Plaintiffs"), and Plaintiff-Intervenors Bengbu Modern Environmental Co., Ltd., Datong Hongdi Carbon Co., Ltd., Datong Juqiang Activated Carbon Co., Ltd., Datong Municipal Yunguang Activated Carbon Co., Ltd. Ningxia Huahui Environmental Technology Co., Ltd., and Shanxi Industry Technology Trading Co., Ltd. (collectively, "Plaintiff-Intervenors") respectfully submit this reply brief to the briefs in opposition[1] filed by Defendant, the United States ("Defendant" or "Commerce") and Defendant-Intervenors, Calgon Carbon Corporation and Norit Americas, Inc ("Defendant-Intervenors"); and supporting arguments set forth by consolidated plaintiffs, Carbon Activated Tianjin Co., Ltd., and Carbon Activated Corporation[2].

## I. Commerce's Refusal to Consider Romania as a Surrogate Country is Not Supported by Substantial Evidence or in Accordance with Law

Under Commerce's governing statute, a country must meet two conditions to qualify as a surrogate country: First, it must be economically comparable to the relevant nonmarket economy and, second, it must be a significant producer of subject merchandise. 19 U.S.C. § 1677b(c)(4). Commerce has memorialized its process for selecting a surrogate country in a four-step analysis, looking first at economic comparability; second, whether there are producers of comparable

---

[1] Plaintiffs and Plaintiff-Intervenors support Commerce's arguments that it reasonably determined to correct the valuation of bituminous coal consumption for Plaintiff GHC in the *Amended Final Results*. DOC Br. at 57-58.

[2] Commerce tries to impugn arguments raised by consolidated plaintiffs regarding GHC's supplier costs not associated with production of subject merchandise, *see* Consol.Pl.Br. at 25-29, observing that the arguments were raised by GHC before Commerce only. Def.Br. at 49. Commerce concedes, however, that the argument is properly raised before this Court. *See,* Def.Br. at 59 (*quoting Zhaoqing Tifo New Fibre Co. v. United States*, 60 F. Supp. 3d 1328, 1351-52 (Ct. Int'l Trade 2015) ("a party {may} litigate an issue that the party did not exhaust at the administrative level where that issue was raised before the agency by a different party"). Further, this Court has an independent obligation to "exercise its discretion to prevent knowingly affirming a determination with errors." *ATC Tires Priv. Ltd. v. United States*, 324 F. Supp. 3d 1355, 1362 (Ct. Intl Trade 2018) (quotations and citations omitted).

merchandise in the country; third, whether the country as a whole is a "significant producer" of comparable merchandise and fourth, which country provides the best data. *Enforcement and Compliance's Policy Bulletin No. 04.1, regarding, "Non-Market Economy Surrogate Country Selection Process"* (March 1, 2004) (the "Policy Bulletin"); Def. Br. At 21.

This four-step process can be divided into two distinct stages: the qualification stage and the comparison stage. The qualification stage is composed of the first three steps, where Commerce looks at each proposed country individually to determine whether a country qualifies as a potential surrogate country under the statute. Should multiple countries qualify as a potential surrogate, Commerce proceeds to the comparison stage where Commerce is to select "the country with the best factors data." Policy Bulletin.

All parties agree that Commerce's rationale for selecting Malaysia over Romania as a surrogate country in the underlying review rests on a single conclusion: Romania does not qualify as a potential surrogate country because Romania is not a significant producer of activated carbon. *See* PR 251, *Final IDM* at 7; and Def. Br. at 21.[3] Because Commerce relied on a flawed analysis to reach this conclusion, the Court should remand back to Commerce with instructions to consider Romania as a significant producer. Commerce must then engage with the comparative stage of the selection process and determine whether the Malaysia data or the Romania data is best. When Romania is properly considered a significant producer of activated carbon, it offers the "best information available" for valuing the factors of production ("FOPs"). 19 U.S.C. § 1677b(c)(1)(B).

### A. Commerce's Requirement that Romania be a Net Exporter to Qualify as a Surrogate Country is Not In Accordance with Law.

---

[3] There is no dispute that both Malaysia and Romania are economically comparable to China for purposes of the underlying review and that both countries have some production of activated carbon.

Commerce determined Romania was not a significant producer of activated carbon because Romania was not a net exporter of the subject merchandise during the POR. *See* PR251, *Final IDM* at 8–10. Commerce cited to the Policy Bulletin as support for this conclusion, but the Department's reasoning relies on a tortured interpretation that the Policy Bulletin cannot support. The net exporter classification in the Policy Bulletin is permissive—net exporters *may* qualify as a significant producer but the net exporter status is, by no means, a dispositive requirement. In fact, the Policy Bulletin explains the exact standard for significant production "will vary from case to case." Yet Commerce treated the Policy Bulletin as establishing a requirement that a country *must* be a net exporter in order to be a "significant producer" and therefore qualify as a surrogate country. PR251, *Final IDM* at 8 ("Malaysia was the only net exporter of activated carbon. . . . Therefore, . . . only Malaysia satisfied the {significant producer} prong for selection as the {surrogate country}"). As this court has found in a prior appeal of the same order, a remand is appropriate where Commerce fails to follow the articulated analysis. *Jacobi Carbons AB v. United States*, 365 F. Supp. 3d 1344, 1350-51 (Ct. Int'l Trade 2019).[4] Commerce's myopic analysis in the *Final Results* violates the Policy Bulletin, which instructs Commerce to make "a judgement . . . consistent with the characteristics of world production of, and trade in, comparable merchandise." Commerce refused to examine relevant information let alone conduct an analysis.

The Government relies on *Carbon Activated Tianjin Co. v. United States* to defend the use of the "net exporter" status as a required condition of the "significant producer" element but

---

[4] In that same opinion, the Court held "Commerce has not supplied the court with a well-reasoned explanation supporting its consideration of total exports as a substitute for production." Commerce has similarly failed here to provide a well-reasoned explanation supporting its determination equating net exporter status to significant production. 365 F. Supp. 3d 1344, 1353 (Ct. Int'l Trade 2019)

the Government's reliance is misplaced.  There, the Federal Circuit opinion confirmed the

Government's ability to select a surrogate country where the country is a net exporter of

comparable merchandise, which is not at issue here.  The question here is whether Commerce

has license to reject a country out of hand where the country is not a net exporter. *Carbon

Activated Tianjin Co. v. United States* No. 2023-2413, 2025 U.S. App. LEXIS 11226, at *8-*10

(Fed. Cir. May 9, 2025).[5]

Romania is a significant producer because it exports a significant volume of activated

carbon. Under Commerce's practice, countries that export are considered significant producers.

*See e.g. Wire Decking from the People's Republic of China*. 75 Fed. Reg. 1597 (Dep't Commerce

January 12, 2010)(notice of preliminary deter. of sales at less than fair value and postponement

of final deter)("The Department examined worldwide export data for comparable merchandise,

using the six-digit level of the HTS numbers listed in the scope language for this investigation").

During the POR, Romania exported approximately 35,000 kg of activated carbon during the

POR. *See* PR 134, *Petitioners' Comments on Surrogate Country Selection.* This volume of

exports was sufficient in a prior review to establish Romania as a significant producer. Final

Results of Redetermination Pursuant to Court Remand in *Carbon Activated Tianjin Co., Ltd. and

Carbon Activated Corporation, et al. v. United States* Consol. Court No. 20-00007 at 8 n.33 (CIT

April 2, 2021)(finding Romania to be a significant producer where export volume was

approximately 34,000 kg and the smallest volume among the OP List countries). There,

Commerce found "the exports from Romania, while relatively small compared to the export

volumes under HS subheading 3902.10 from the other OP List countries, are not negligible; thus,

---

[5] The opinion is also not binding because it is unpublished.  Fed. Cir. R.  32.1(d).

we determine that they are significant." Commerce's decision here flatly contradicts its prior decisions and analysis.

Adding to the inconsistent analysis, another net importer, Türkiye, was identified by Commerce as a significant producer. PR251, *Final IDM* at 15. Thus, Commerce's did not apply its "net exporter" requirement consistently in the *Final Results.*

For the reasons above, Commerce's finding that Romania is not a significant producer is not in accordance with law. By imposing an unlawful requirement and declining to recognize Romania as a significant producer, Commerce failed to follow its own methodology and improperly avoided the required comparison of data quality.

**II.     Commerce Must Select Romania As the Surrogate Country Because Romania Offers the Best Data Available.**

Because Romania is a significant producer of activated carbon, Commerce was required to proceed to the fourth step of the Policy Bulletin and compare the relative quality of the available data. *See* 19 C.F.R. § 351.408(b)(3)("If more than one economically comparable country produces comparable merchandise, the Secretary will consider the totality of the information on the record in selecting a surrogate country.") The Government concedes that if Romania qualifies under the first three steps of the analysis, then Commerce is obligated to conduct a comparative analysis. *See, e.g.* Def. Br. At 21; Policy Bulletin ("if more than one country has survived the selection process to this point, the country with the best factors data is selected as the primary surrogate country.") Commerce's failure to conduct the comparative analysis is contrary to its established practice and renders its surrogate country selection of Malaysia unsupported by substantial evidence and not in accordance with law.[6]

---

[6] Plaintiffs do not argue that Malaysia does not qualify as a potential surrogate country under the qualification stages of the analysis. But where both Malaysia and Romania qualify as surrogate

9

Romania has the best available data for three reasons:

First, Romania allows Commerce to rely on a single surrogate country, consistent with its long-established practice codified in the regulations. 19 C.F.R. § 351.408(c)(2). By contrast, Commerce cannot rely on the Malaysian data for the labor FOP. *See* PR251 *Final IDM* at 20.

Second, the Romania data is more detailed. The Romcarbon financial statement provided by plaintiffs offers complete information to calculate the financial ratios, whereas the Malaysian financial statement fails to break out raw materials, labor, general & administrative and energy costs, and there are issues with freight. *See* PR231/CR223, *GHC Case Br.* at 15.

Third, as discussed below, aberrational data for key FOPs underscores Malaysia's unsuitability as the surrogate country in the underlying administrative. Commerce has a long-standing, codified preference for using a single surrogate country for all FOPs. 19 C.F.R. § 351.408(c)(2). Yet, here, Commerce ignored these aberrational values when selecting Malaysia as the surrogate country.

### III. Commerce's Selection of Aberrational Surrogate Values for Coal Tar, Sub-Bituminous Coal, Hydrochloric Acid, Sodium Hydroxide and Potassium Hydroxide is Unsupported by Substantial Evidence and Inconsistent with Its Obligation to Use the Best Available Information

Commerce relied on these aberrational data points to calculate Plaintiffs' margins. Commerce side-stepped or otherwise ignored its standard practice for determining whether the relevant data was aberrational. To the extent that Commerce is permitted or otherwise continues to insist on using Malaysia as the surrogate country, Commerce should be required to conduct its full aberrational data analysis on the FOPs for Coal Tar, Sub-Bituminous Coal, Hydrochloric Acid, Sodium Hydroxide and Potassium Hydroxide.

---

countries, Commerce was obligated to conduct a comparative analysis to determine which country was "best" for this review. Policy Bulletin.

The statute requires that FOP valuation be based on the "best available information." 19 U.S.C. § 1677b(c)(1)(B). In implementing this statutory requirement, Commerce has developed a more specific practice by selecting values that, among other characteristics, are contemporaneous with the POR, product-specific, and representative of a broad market average. *See e.g. Risen Energy Co. v. United States,* 122 F.4th 1348, 1353 (Fed. Cir. 2024). Furthermore, Commerce does not rely on aberrational or unreliable data because it is not consistent with the "best available information" required by the statute. *Tri Union Frozen Prods. v. United States*, 227 F. Supp. 3d 1387, 1396 (Ct. Int'l Trade 2017)(holding that "Plaintiff's evidence leads to the reasonable inference that the data is aberrational and not reliable and therefore fairly detracts from Commerce's finding that the BBS data is the best information available.").

In order to test reliability and eliminate aberrational data, Commerce's practice is to compare the proposed surrogate value against the same Harmonized Tariff Schedule subheading for the surrogate country over multiple years and POR-specific data for other potential surrogate countries identified as economically comparable to the relevant nonmarket economy. *See e.g. Solarworld Ams., Inc. v. United States*, 320 F. Supp. 3d 1341, 1351 (Ct. Int'l Trade 2018); Issues and Decision Memorandum accompanying *Light-Walled Rectangular Pipe and Tube From the People's Republic of China*, 88 Fed. Reg. 15,671 (Dep't Commerce Mar. 14, 2023)(final results of antidumping duty admin. review; 2020-2021) at 9-10 ("LWR from China IDM");. Where there is "sufficient evidence to demonstrate a particular value is aberrational, and therefore unreliable, {Commerce} will examine all relevant price information on the record, including any appropriate benchmark data, in order to accurately value the input in question." *Tri Union Frozen Prods.,*227 F. Supp. 3d at 1395; PR251 Final IDM at 15-16. "Despite its discretion, Commerce's

determination of what constitutes the best available information must be based in . . .

calculate{ing} accurate dumping margins." *Solarworld Ams,* 320 F. Supp. 3d at 1351.

In the *Final Results,* Commerce engaged in a selective analysis that ignored data on the

record for the five surrogate values and resulted in exaggerated dumping margins. The failure

for each surrogate value merits a remand because the substantial evidence standard requires

Commerce to consider "whatever in the record fairly detracts" from the evidence in support of

Commerce's conclusions. *CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir.

2016); *see also Motor Vehicle Mfrs. Ass 'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463

U.S. 29,43 (1983) (holding that A final agency action must be remanded where the agency "fail

{s} to consider an important aspect of the problem" before it). Rather than engage with its

traditional analysis, Commerce offered conclusory statements, which is also grounds for a

remand. *See, e.g., Shanghai Foreign Trade Enters. Co. v. United States*, 28 CIT 480, 488, 318 F.

Supp. 2d 1339, 1346 (2004).

### A. Commerce's Aberrational Analysis of the Malaysian Coal Tar Surrogate Value Was Conclusory and Incomplete

Commerce's selection of the Malaysian coal tar value is unsupported by substantial

evidence and not in accordance with law. Commerce's traditional aberrational analysis as applied

to the facts demonstrate that the Malaysia data is aberrational in the aggregate. *See Solarworld*

*Ams., Inc.,* 320 F. Supp. 3d at 1351-53. The POR data for Malaysia represents a significant

increase over historical data, a fact that Commerce did not address. And the data shows that

Romania accounts for nearly 90% of coal tar imports by economically comparable countries, and

therefore is a "true representation of market driven prices." *See SolarWorld Ams., Inc. v. United*

*States*, 962 F.3d 1351, 1361 (Fed. Cir. 2020)(citing with approval Commerce's determination that

certain data was not aberrational where it accounted for 77.1%, or "the vast majority of imports").

In the first prong of Commerce's aberrational surrogate value analysis, Commerce compares the proposed surrogate value against the same HTS subheading for the surrogate country over multiple years. *See Solarworld Ams., Inc.,* 320 F Supp. 3d at 1351. Commerce found, with no explanation and analysis, that "an analysis of the Malaysian import AUV in past reviews demonstrates that the import AUV in this current review is not aberrational." PR251, Final IDM at 16. Commerce made no attempt to grapple with the fact that the surrogate value in this review shows a substantial increase over the two most recent prior administrative reviews. Specifically, the Malaysian AUV rose from 1.22 USD/kg in the 14th Administrative Review (covering 2020-2021) and 1.20 USD/kg in the 15th Administrative Review (covering 2021-2022) to 1.68 USD/kg in the POR at issue in this appeal, representing an increase of approximately 38% and 40%, respectively. *See* PR164, Petr Rebuttal SV Cmts, Exhibit SVR-5. Commerce's offer of a conclusory statement and failure to consider an important aspect of the problem merits a remand.

Commerce's reliance on the second prong of the aberrational analysis, data from other economically similar countries, is also fatally flawed. First, the government points to Costa Rica's absurd value as proof that Malaysia's data is not aberrational. Def. Br. 39; But this argument wholly ignores that this value is based on *half of kilogram* of imports, which accounts for a mere 0.000036% of total imports for economically comparable countries.[7] *See* PR162, *Petitioners' Rebuttal of Respondents' First Surrogate Value Submission* at Exhibit SVR-3

---

[7] The data indicates 1 kg imported from Germany for USD 11 for an AUV of 21.48. Thus the actual quantity appears rounded up from approximately 0.51 kg.

(Petitioners' SV Rebuttal Comments); *see also Baoding Mantong Fine Chemistry Co. v. United States*, 222 F. Supp. 3d 1231, 1248 (Ct. Int'l Trade 2017)(holding values calculated from 0.8 metric tons and 0.6 metric tons were very small and therefore aberrational). In contrast, Romania cannot possibly be considered aberrational where it accounts for nearly 90% of total imports of coal tar for economically comparable countries.[8] As the primary importer of coal tar, the Romanian data is a "true representation of market driven prices." *SolarWorld Ams., Inc. v. United States*, 962 F.3d 1351, 1361 (Fed. Cir. 2020). Commerce's false equivalence of Romania and Costa Rica in support of its justification for the Malaysian coal tar surrogate value cannot stand on the law or the facts.

The aberrational analysis, if done correctly, demonstrates "sufficient evidence to demonstrate a particular value is aberrational, and therefore unreliable" and therefore Commerce is obligated to "examine *all* relevant price information on the record, *Tri Union Frozen Prods. v. United States*, 227 F. Supp. 3d 1387, 1395 (Ct. Int'l Trade 2017)(emphasis added). Commerce did not fulfill this obligation because Commerce did not meaningfully engage with three other pieces of evidence on the record that indicates the Malaysia data is aberrational and unreliable: the prices of Malaysian exports, world prices of activated carbon, and documentation of actual purchases in Malaysia. While this evidence may not be a substitute for a surrogate value, the evidence does shed light on whether the Malaysia data is reliable (it isn't), and whether other data should be used, or an adjustment made to the Malaysian data. Because Commerce failed to engage with this evidence, the Court should remand. *SolarWorld Ams., Inc. v. United States*, 962 F.3d 1351, 1358 (Fed. Cir. 2020)(holding Commerce did not provide sufficient justification for

---

[8] Malaysia imported 73,198 kgs under 270600, Romania imported 1,261,000 kgs, Costa Rica imported .5 kg, and Tukey imported 81,075 kg. Thus, the economically comparable countries imported a total of 1,415,474 kgs during the POR.

its conclusion that certain data was the best available information where contradictory data was on the record.")

First, Malaysian import prices are more than three times higher than the export price for coal tar during the POR. PR229/CR221, Jilin Case Br. at 8-9 (325). The Government concedes that it gave short shrift to the export data simply because export data is not suitable for surrogate values. But the export data certainly falls under "all relevant price information on record" that Commerce must consider. Absent dumping, export prices act as the floor for domestic prices because if export prices were higher than domestic prices, the domestic producers would have an economic incentive to export more. *Cf.* Christophe A. Casey, Cong. Rsch. Serv., R46296, Trade Remedies: Antidumping 1 (2020). Indeed, the entire antidumping statue is designed to address exporters that violate this principle and injury the U.S. domestic industry through the sale of products at prices for less than the prices in the domestic market. *See* e.g. 19 U.S.C. § 1677(35).

Second, Commerce dismissed world average unit prices that demonstrated both the Malaysia coal tar surrogate value was out-of-step with world prices, and the suitability of the Romania values. *See* PR251 Final IDM at 16-17; PR190 GHC Final SV Cmts at Exhibit 2B.[9]

Third, Commerce summarily dismissed evidence of an actual purchase of coal tar in Malaysia. Plaintiffs provided purchase documentation, including sales documents, commercial invoice and other transaction documents. *See* PR195/CR145, *Jilin Bright's Final SV Comments* at Exhibit 4A. Commerce mischaracterized this documentation as a "price quote" in an effort to discredit the information. *See* PR251 Final IDM at 17. Commerce did not examine and consider

---

[9] Commerce, in part, dismissed the data because the data included imports "into countries that are not at the same level of economic development as China." PR251 Final IDM at 16. Yet, Commerce justified its use of the Malaysia surrogate value for sub-bituminous coal based on a comparison with Chile, PR251 Final IDM at 18, but Chile is not "at the same level of economic development as China." This stark inconsistency in rationales merits a remand.

how the evidence reflected on the proposed Malaysian surrogate value.  The failure to consider this evidence constitutes a failure to consider "whatever in the record fairly detracts" from the evidence in support of Commerce's conclusions, *CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016).

**B. Commerce's Aberrational Analysis of the Malaysian Sub-Bituminous Coal Surrogate Value was Incomplete and Inconsistent with Commerce's Practice**

In its analysis of whether the Malaysian sub-bituminous coal surrogate value was aberrational, Commerce completely skipped the first prong, despite Plaintiff's explicit argument. Commerce also relied on data from Chile, which is not economically comparable with China, in violation of the Department's practice and inconsistent with its analysis for other FOPs.

In the first prong of Commerce's aberrational surrogate value analysis, Commerce compares the proposed surrogate value against the same HTS subheading for the surrogate country over multiple years.  Imports of HTS 2701.19 sub-bituminous coal into Malaysia at $0.39/kg represented a 138% increases in price from the previous POR. *See* PR231/CR223 *GHC Case Brief* at 18. The difference is even more drastic when compared to prior years when the same product was being imported for $0.07/ kg in 2020. *See* PR157 *Jilin Bright Rebuttal Surrogate Value Comments* at Exhibit 3A.  Moreover, the Malaysian price per kilogram of sub-bituminous coal exhibited drastic month-to-month fluctuations during the POR, with average prices not exceeding $1 some months and other months exceeding $22 per kilogram due to disproportionately high-price imports from Germany, Japan, South Africa and the United States. *Id.* These drastic fluctuations contrast with prices in countries in the SC list, such as Romania, where the price per kilogram for sub-bituminous coal remains relatively stable for all months of the POR.  This significant data demonstrating the aberrational quality of the Malaysian surrogate value was not discussed at all in Commerce's analysis. PR251 Final IDM at 18.  Commerce's

reliance on "high coal and natural gas consumption" does not resolve the issue because the statement is conclusory and does not explain why Malaysia was uniquely affected. While higher consumption in Malaysia could explain the aberrational data, but does not negate the aberrational quality of the data.

Commerce's comparison of the Malaysian surrogate value against other economically comparable countries was also incomplete and flawed. Commerce's analysis primarily relied on Chile, which the Government concedes is not economically comparable to China. *Compare* PR 251 *Final IDM* at 18 *with* Def. Br. at 42-43. At the same time, Commerce ignored Turkey and Romania. This use and justification of Chilean data is especially problematic in two respects. First, because Chile is not economically comparable to China, the data has no bearing on the second prong of the aberrational analysis, which focuses on other economically comparable countries. Without the Chilean data, the fact that the Malaysia data is significantly higher than all other economically comparable countries is not obscured. Second, the Government's *post-hoc* rationalization that the use of the Chilean data for sub-bituminous coal serves Commerce's obligation to examine all relevant price data is inconsistent with Commerce's refusal to examine other country data for other surrogate values (*e.g.* coal tar) because the other countries are not economical comparable.

### C. Commerce's Selection of Malaysia's Hydrochloric Acid Surrogate Value Is Similarly Incomplete

Commerce failed to analyze the Malaysian hydrocholoric acid surrogate value under its standard analysis, but again made familiar and egregious lapses in its analysis. With relation to the first prong of historical data, hydrocholoric acid for the POR was valued at 3.13 USD/kg, which far exceeds any prior period. Historical Malaysian values from AR7 through AR15 ranged from 0.31 to 1.75 USD/kg. *See* PR164 *Petr. Rebuttal* SV Cmts, Exhibit SVR-5. The POR

17

value therefore exceeded the entire historical range, was 145 percent above AR15, 79 percent above AR14. *Id.*

The Government does not seriously contest the magnitude of the deviation but seeks to minimize it at "only 79%," PR251 IDM at 19, which "fall{s} far short" of a 30x increase from another case. Def. Br. at 40. This argument is a distraction for two reasons. First, it fails to take into account the significance of the increase over additional periods, including the immediately preceding period. Second, it renders the analysis meaningless because it would allow Commerce to find increases that are less than a multiple of 30 to be not significant enough to qualify as "aberrational." Indeed, the Government argues before this court that a factor of 16, (or 1600%) is insufficient to establish the data is aberrational, because, "16 . . . is far below 30". Def. Br. at 44 n.17.

The *Final Results* and the Defendant's brief before this court fail entirely to engage with the second prong, a comparison of the surrogate value with data from other economically similar countries. Yet the data starkly contradicts the Department's finding that the Malaysian data is not aberrational. The Malaysian surrogate value is more than 500 percent above the next highest OP List country value, which was Panama at 0.51 USD/KG. PR162 Petr Rebuttal SV Cmts, Exhibit SVR-3. The aberrational nature of Commerce's preferred surrogate value is underscored by the fact that Malaysia's imports of hydrochloric acid represented only 1.56% of the total imports. PR188 *GHC's Final SV Submission* at Exhibit 2b. In contrast, 96.35% of total imports of Hydrochloric acid into the economically comparable countries ranged from $0.18 USD/kg to $0.25 USD/kg. PR188 *GHC's Final SV Submission* at Exhibit 2b. This "vast majority" of imports into the other countries, is a "true representation of market driven prices."

However, the low-volume, high-value imports into Malaysia closely mirror an

*SolarWorld Ams., Inc. v. United States*. 962 F.3d 1351, 1361 (Fed. Cir. 2020). There, Commerce

relied on import data where 1.6% of imports had a significantly higher AUV that drastically

changed the ultimate surrogate value. *Id*. The Federal Circuit affirmed this Court's

determination that Commerce did not "adequately justify" the use of the data. *Id.* Indeed,

Commerce could not justify it, because, on remand, Commerce relied on a different data set,

which this Court found to comply with the remand order. *SolarWorld Ams., Inc. v. United States*,

355 F. Supp. 3d 1306, 1315 (Ct. Int'l Trade 2018).

These drastic differences between the Malaysia data and both prior period Malaysia data

and POR data from other economically comparable countries qualifies as "sufficient evidence to

demonstrate a particular value is aberrational, and therefore unreliable" *Tri Union Frozen Prods.*

*v. United States*, 227 F. Supp. 3d 1387, 1395 (Ct. Int'l Trade 2017). Thus, Commerce is obligated

to "examine *all* relevant price information on the record, including any appropriate benchmark

data, in order to accurately value the input in question." *Id.* Record evidence shows that

Malaysia's $3.64 per kilogram average unit price for hydrochloric acid is 2275% higher than the

world average of $0.16 per kilogram. PR188 *GHC's Final SV Submission* at Exhibit 2b.

Commerce made no attempt to explain this drastic difference.

**D. Commerce's Failed to Compare Malaysia's Sodium Hydroxide and Potassium Hydroxide Surrogate Values to the Values of Economically Comparable Countries**

For both sodium hydroxide and potassium hydroxide, Commerce failed to engage with

the second prong of its aberrational analysis. PR251 *Final IDM at* 19. Plaintiffs demonstrated

that Malaysia's imports of solid sodium hydroxide price of $2.60 per kilogram was much greater

than Türkiye, Bulgaria, Costa Rica, and Romania (prices of $0.68, $1.00, $1.16, and $1.19 per

kilogram respectively). PR188 *GHC's Final SV Submission* at Exhibit 2b. Moreover the

19

Malaysia imports represented less than one percent of imports into economically comparable countries, where as the imports into the other countries represented 98.79% of total imports. PR188 *GHC's Final SV Submission* at Exhibit 2b. Like coal tar and hydrochloric acid, the higher-volume, lower-value imports are a "true representation of market driven prices." *SolarWorld Ams., Inc. v. United States,* 962 F.3d 1351, 1361 (Fed. Cir. 2020). Yet Commerce relied on and defends its decision to rely on a surrogate value based on a minute volume of imports that are more than double the value. Such data is aberrational.

Commerce's treatment of potassium hydroxide is similar. Malaysia's imports of potassium hydroxide represented 4.43% of the total imports and had an average unit price of $2.31 per kilogram which was greater than Romania and Türkiye (prices of $1.47 and $1.53 per kilogram while representing a combined 88.39% of total imports). PR188 *GHC's Final SV Submission* at Exhibit 2b.

This disparity is sufficient evidence that should trigger Commerce's obligation to consider all relevant price information. *Tri Union Frozen Prods. v. United States*, 227 F. Supp. 3d 1387, 1395 (Ct. Int'l Trade 2017); *see also* PR251 Final IDM at 15-16. Yet, like the other FOPs, Commerce utterly refused to examine the world data and consider how that world data relates to the significantly higher Malaysian values. PR251 Final IDM at 19. Commerce again treated Plaintiffs' benchmark evidence as either fully admissible or wholly irrelevant, where the law and the record required a more measured inquiry.

## IV. Commerce Erred in Excluding the Financial Statement of Greenlink, a Malaysian Producer of Charcoal Products, in its Financial Ratio Calculation

Commerce erred in excluding the financial statement of Greenlink in its financial ratio calculation. Record evidence demonstrated that Greenlink is a Malaysian producer of charcoal products. Commerce did not address in the *Final Results* why it rejected Greenlink's financial

statement. Instead, Commerce now offers for this first time in this appeal that it rejected Greenlink's financial statement because charcoal products are not comparable to activated carbon. This is impermissible *post-hoc* rationalization and the Court should not consider it. Instead, the Court should remand the case to Commerce to accept Greenlink's financial statement because it produces charcoal products, which are comparable to activated carbon.

Commerce's long-standing practice is to use as many usable financial statements as possible to account for outliers and obtain the most representative data. *See, e.g.*, *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1368 (Fed. Cir. 2010); *see also* PR251 *Final IDM* at 22–23 (citing to *Amended Final Results of Antidumping Duty Administrative Review and New Shipper Reviews: Wooden Bedroom Furniture from the People's Republic of China*, 72 Fed. Reg. 46957, Dep't of Commerce Aug. 22, 2007, and accompanying IDM at Comment 17). With this practice, Commerce must provide a reasoned explanation why it excluded certain financial statements from the financial ratio calculation.

In the Final IDM, Commerce broadly stated that it would not use all financial statements on the record" because "several of the financial statements are inadequate, or not appropriate as described in our preliminary analysis" but did not explain why it rejected Greenlink. PR 251 Final IDM at 22. Instead, for the first time in this appeal, Commerce surmises that it rejected Greenlink because its principal activity is "manufacturing of charcoal products." Def. Br. at 47 (citing PR 195 Jilin Bright Final SV Submission at Exh. 3A). Without any citation to the record, Commerce claims that charcoal is not comparable to activated carbon. *Id.*

This rationale appears nowhere in Final IDM and should be disregarded entirely by the Court. *Post hoc* rationalization by counsel in judicial proceedings is impermissible justification. *Timken Co. v. United States*, 894 F.2d 385, 389 (1990) ("The first mention of these

justifications appears in Commerce's appeal brief before the CIT. '{A}gency action cannot be sustained on *post hoc* rationalizations supplied during judicial review.'"). Because Commerce's decision may not be sustained on the basis of *post hoc* rationalization, this Court should ignore the *post hoc* rationalization.

Commerce's conclusory statements also show a lack of knowledge about the activated carbon product. Activated carbon is certainly a charcoal product. *See, e.g., Activated Carbon from* China, Inv. No. 731-TA-1103 (Prelim) USITC Pub. 3852 at 9 (May 2006).

The Court should remand the case for Commerce to accept Greenlink's financial statement and recalculate the financial ratio.

V.     **Commerce Should Adopt the Formula Jilin Proposed in Its Section C Questionnaire Response to Correct a Double Multiplication Error in the Per Unit VAT Tax**

Commerce improperly declined to correct an obvious clerical error raised by Jilin. Pl.Br. at 44-45. The error is plain: a single cell for a single sale incorrectly included the term QTYU in a formula twice when it should have been included only once. Id. Jilin pointed Commerce to the precise location in the database where the error could be found, and Commerce declined to correct the obvious error. Id. In its response brief, Commerce does not dispute that an error exists, but relies on *Goodluck India Ltd. v. United States*, 11 F.4th 1335 (Fed. Cir. 2021), to defend is decision not to correct the obvious error by claiming the error was raised too late: "'Commerce did not have the opportunity to ensure that the proposed change is appropriate, correct, or more accurate than the VAT amount originally reported.'" Def.Br. at 53 (*citing* PR251, *Final IDM* at 27).

Commerce's reliance on *Goodluck India* supports Jilin's argument. In that case, a month after the preliminary results and four months before the final results, Goodluck India submitted

on the first day of the cost verification "a systemic change to the entire reported database {where the} revisions were not singular, such as a missing word or an error in arithmetic."  Id. at 1339-40, 1343.  The timing here is nearly identical.  Although there was no verification in this case, Jilin submitted its case brief on June 12, 2024, PR229/CR221, about a month after the May 2, 2024 *preliminary results*, PR223, but a full six months before the final results published in the *Federal Register*.  PR267.  In contrast with the "systemic change to the entire reported database" in *Goodluck India*, Jilin's obvious clerical error was a single duplicate term in a formula applied to a single sale.  See Pl.Br. at 44-45.  Thus, Commerce's analogous practice to accept minor corrections at verification, which "strikes an appropriate balance between finality and accuracy," *Goodluck India*, 11 F.4th at 1343, should be required here.

Although Commerce quibbles about the presentation of the argument in the opening brief, Def.Br. at 52, Jilin adequately raised the argument here.  Jilin identified (1) the error, (2) the precise location in the record submitted to this Court where the error is, and (3) stated that it was an error.  Pl.Br. at 44-45 (*citing* CR207/PR218 and CR51/PR114).  The argument plainly argues Commerce's failure to correct an obvious clerical error and sets forth the standard of review earlier in the brief.  See Pl.Br. at 14-16.  Because Jilin "fairly put on notice as to the substance of the issue," *Nelson v. Adams USA, Inc.*, 529 U.S. 460, 469-70, 120 S.Ct. 1579, 146 L.Ed.2d 530 (2000)), this Court should ignore Commerce's quibbles and remand for Commerce to correct the obvious clerical error. Further, this Court has an independent obligation to "exercise its discretion to prevent knowingly affirming a determination with errors." *ATC Tires Priv. Ltd. v. United States*, 324 F. Supp. 3d 1355, 1362 (Ct. Intl Trade 2018); *accord Torrington Co. v. United States*, 21 CIT 1079, 1082 (1997) (remanding decision to Commerce to correct

23

computer programming errors, noting "the Court is loathe to affirm a determination that might be based on a questionable record").

**VI. CONCLUSION**

Commerce's actions as described above, including its refusal to treat Romania as a qualifying surrogate country, its selection of Malaysia over Romania as the primary surrogate country, its reliance on aberrational Malaysian surrogate values for key FOPs, its exclusion of usable financial statements from producers of identical or comparable merchandise, and its failure to correct the challenged VAT Tax calculation issues, were unsupported by substantial evidence and not in accordance with law. Accordingly, this Court should remand this case with instructions for Commerce to select Romania as the primary surrogate country, to utilize Romanian surrogate values for all inputs, to include Greenlink's financial statement in its financial ratio calculation, to correct Jilin's VAT tax issue, and to re-calculate the margins for both GHC and Jinlin.

Respectfully submitted,


/s/Irene H. Chen
Irene H. Chen
Jake R. Frischknecht
VCL Law LLP
1945 Old Gallows Road, Suite 260
Vienna, VA 22182
Tel: (301) 760-7393
Fax: (301) 263-7700
Email: ichen@vcllegal.com

/s/Mark B. Lehnardt
Mark B. Lehnardt
Davis & Leiman
1012 Connecticut Ave., N.W., Ste. 1012
Washington, DC 20036

Tel: (202) 642-4850
Email: mlehnardt@dltrade.com


Date: April 24, 2026

*Counsel to Plaintiffs and Plaintiff-Intervenors*

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the guidelines set forth in the Standard Chambers Procedures. The brief contains 6591 words on numbered pages (that is, excluding only the Cover Page, the Table of Contents, and the Table of Authorities, the signature block, and the present certificate).

2. This brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 12-point font.

Dated: April 24, 2026

/s/ Irene H. Chen
Irene H. Chen

Counsel for Plaintiffs and Plaintiff-Intervenors