Slip Op. 26-84

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| NINGXIA GUANGHUA CHERISHMET ACTIVATED CARBON CO., LTD. and JILIN BRIGHT FUTURE CHEMICALS CO., LTD., <br><br> Plaintiffs, <br><br> CARBON ACTIVATED TIANJIN CO., LTD.; CARBON ACTIVATED CORPORATION; CALGON CARBON CORPORATION; and NORIT AMERICAS INC., <br><br> Consolidated Plaintiffs, <br><br> BENGBU MODERN ENVIRONMENTAL CO., LTD., ET AL., <br><br> Plaintiff-Intervenors, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> NORIT AMERICAS, INC. and CALGON CARBON CORPORATION, <br><br> Defendant-Intervenors. | Before: Jane A. Restani, Judge <br><br> Consol. Court No. 24-00262 <br><br> **Public Version** |

## <u>OPINION AND ORDER</u>

Dated: July 29, 2026

[Sustaining in part and remanding in part Commerce's final determination in the antidumping duty review on certain activated carbon from the People's Republic of China.]

<u>Jake Roger Frischknecht</u>, VCL Law LLP, of Vienna, VA, argued for plaintiffs Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd. and Jilin Bright Future Chemicals Co., Ltd., and plaintiff-intervenors Bengbu Modern Environmental Co., Ltd., Datong Hongdi Carbon Co., Ltd., Datong Juqiang Activated Carbon Co., Ltd., Datong Municipal Yunguang Activated Carbon Co., Ltd.,

Ningxia Huahui Environmental Technology Co., Ltd., and Shanxi Industry Technology Trading Co., Ltd.  Also on the brief were Irene Huei-min Chen and Jingwen Xing, VCL Law LLP, of Vienna, VA, and Mark Burton Lehnardt, Davis & Leiman PLLC, of Washington DC.

Stephanie Ellen Hartmann, Wilmer, Cutler, Pickering, Hale & Dorr LLP, of Washington, DC, for consolidated plaintiffs Carbon Activated Tianjin Co., Ltd. and Carbon Activated Corporation. Also on the brief were David J. Ross and Elizabeth Ann Argenti.

Melissa Marie Brewer, Kelley Drye & Warren, LLP, of Washington, DC, argued for consolidated plaintiffs and defendant-intervenors Calgon Carbon Corporation and Norit Americas, Inc.  Also on the brief were John M. Herrmann, II and R. Alan Luberda.

Gregory Stephen Menegaz, The Inter-Global Trade Law Group PLLC, of Washington, DC, for plaintiff-intervenors Ningxia Mineral & Chemical Limited, Shanxi Sincere Industrial Co., Ltd., and Tianjin Channel Filters Co., Ltd.  Also on the brief were Alexandra H. Salzman and Vivien Jinghui Wang.

Tate Nathan Walker, Commercial Litigation Branch – Civil Division, U.S. Department of Justice, of Washington, DC, argued for the defendant.  Also on the brief were Blake William Cowman and Claudia Burke.  Of counsel on the brief were Alexandre Recher and Ruslan N. Klafehn, U.S. Department of Commerce, of Washington, DC.

Restani, Judge:  Before the court are various parties' motions for summary judgment on the agency record pursuant to USCIT Rule 56.2 challenging the U.S. Department of Commerce's ("Commerce") final results of the administrative review of the antidumping duty ("AD") order on certain activated carbon from the People's Republic of China ("China") for period of review ("POR") from April 1, 2022, through March 31, 2023.  See Certain Activated Carbon From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2022-2023, 89 Fed. Reg. 92,893 (Dep't Commerce Nov. 25, 2024) ("Final Results"); see also Certain Activated Carbon from the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review; 2022-2023, 89 Fed. Reg. 104,978 (Dep't Commerce Dec. 26, 2024) ("Amended Final Results"), and accompanying Analysis of Ministerial Error Allegation, P.R. 271 (Dec. 17, 2024) ("Amended IDM").  For the reasons stated below, Commerce's Amended Final Results are sustained in part and remanded in part.

## BACKGROUND

In April 2007, Commerce issued an antidumping ("AD") duty order on certain activated carbon from China. Notice of Antidumping Duty Order: Certain Activated Carbon From the People's Republic of China, 72 Fed. Reg. 20,988 (Dep't Commerce Apr. 27, 2007) ("Order"). On June 12, 2023, following requests for review, Commerce initiated the sixteenth administrative review of the Order for POR from April 1, 2022, through March 31, 2023. Initiation of Antidumping and Countervailing Duty Administrative Reviews, 88 Fed. Reg. 38,021 (Dep't Commerce June 12, 2023); Respondent Selection Memorandum at 4–5, C.R. 35, P.R. 76 (July 27, 2023) ("Respondent Selection Memo."). Commerce selected Jilin Bright Future Chemicals Co., Ltd. ("Jilin Bright") and Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd. ("GHC"),[1] the top two exporters and producers of subject merchandise entered for consumption into the United States during the POR, as mandatory respondents. Respondent Selection Memo. at 4–5; Certain Activated Carbon From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2022-2023, 89 Fed. Reg. 35,797, 35,798 (Dep't Commerce May 2, 2024) ("Preliminary Results").

On November 7, 2023, Commerce placed on the record a list of potential surrogate countries economically comparable to China (the "OP List"), based on per capita gross national income ("GNI") data from the World Bank's 2021 World Development Report, which included Romania, Panama, Costa Rica, Malaysia, Bulgaria, and Türkiye. Request for Economic Development, Surrogate Country, and Surrogate Value Comments and Information, Attach. I at 1–2, P.R. 131 (Nov. 7, 2023). Commerce invited interested parties to comment on the selection

---

[1] The government refers to GHC as "Cherishmet" in its brief. See Def.'s Resp. to Pls.', Consol. Pls.' & Pl.-Intervenors' Mots. For J. on the Agency R. at 2, ECF No. 72 (Feb. 2, 2026) ("Gov't Resp.").

of the primary surrogate country and to provide surrogate information to value the factors of production ("FOPs").  Id. at 1–2.  GHC and Jilin Bright submitted comments arguing that Commerce should select Romania as the primary surrogate country because the Malaysian data were aberrational.  GHC's Pre-Preliminary Comments, C.R. 197, P.R. 207 (Apr. 8, 2024); Jilin Bright's Pre-Preliminary Comments, C.R. 204, P.R. 213 (Apr. 12, 2024); Jilin Bright's First SV Submission, P.R. 144 (Dec. 20, 2023); GHC First SV Submission, P.R. 146–48 (Dec. 20, 2023). The parties provided surrogate value data for Romania, Malaysia, and Türkiye.  Decision Memorandum for the Preliminary Results of the 2022-2023 Administrative Review of the Antidumping Duty Order on Certain Activated Carbon from the People's Republic of China at 7, A-570-904, POR 4/1/2022–3/31/2023 (Dep't Commerce Apr. 26, 2024) ("PDM"); Jilin Bright Final SV Submission, C.R. 144–45, P.R. 194–95 (Mar. 27, 2024); GHC Final SV Submission, P.R. 188 (Mar. 27, 2024).

On May 2, 2024, Commerce published its Preliminary Results.  See Preliminary Results. Commerce found that Malaysia was the only net exporter of activated carbon among the OP List countries and that, accordingly, Malaysia was the only significant producer of comparable merchandise.  PDM at 7–8.  Commerce noted that the record contains financial statements from both Malaysian and Romanian companies, but the financial statements from Romcarbon, the Romanian company on the record, illustrate that the company does not produce the subject merchandise in significant quantities when compared to the Malaysian financial statements on the record.  Id. at 8.  Commerce accordingly preliminarily selected Malaysia as the primary surrogate country and included data from Türkiye for labor surrogate values.[2]  Id. at 9.  Commerce

---

[2] Commerce noted evidence that forced labor was widespread throughout the Malaysian electrical and electronics subsector ("E&E"), and "given the E&E subsector's size in terms of the number of employees relative to the Malaysian manufacturing section, a labor SV based on the Malaysian

Consol. Court No. 24-00262                                                              Page 5

preliminarily calculated weighted-average margins (based on dollars per kilogram) of $2.01 for Jilin Bright, $1.17 for GHC, and $1.43 for the review-specific rate for non-selected companies under review. Preliminary Results at 35,798.

Following the Preliminary Results, GHC and Jilin Bright continued to argue that the Malaysian data were aberrational, and that Commerce should select Romania as the primary surrogate country. GHC Case Brief, C.R. 223, P.R. 231 (June 12, 2024); Jilin Bright Case Brief, C.R. 221, P.R. 229 (June 12, 2024). The petitioners argued that GHC's supplier had improperly calculated the consumption ratios of certain inputs[3] and argued that GHC improperly failed to incorporate all inputs into its consolidated FOP database. Case Brief of Petitioners Concerning GHC, C.R. 225, P.R. 233 (June 12, 2024). Commerce agreed. IDM at 38–39.

On November 25, 2024, Commerce published its Final Results. See Final Results; Final Issues and Decision Memorandum, P.R. 251 (Nov. 5, 2024) ("IDM"). Commerce modified GHC's FOP database to reflect GHC's supplier's consumption of certain inputs[4] in its production of activated carbon and valued this consumption using Malaysian import data for activated carbon. Id. at 37–39; Proprietary Memorandum for Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd., C.R. 230, P.R. 252 (Nov. 5, 2024). Commerce maintained its selection of Malaysia as the primary surrogate country. IDM at 7.

---

manufacturing sector was not the best available information on the record and, therefore, not suitable for use." PDM at 9. Commerce chose to value GHC and Jilin Bright's labor consumption using the reported figures from the International Labour Organization for Türkiye because "Türkiye had a greater quantity of exports of comparable merchandise during the POR than Romania." Id. at 20.

[3] These inputs are [[

                    ]].    See Case Brief of Petitioners Concerning GHC, C.R. 225, P.R. 233 (June 12, 2024).

[4] These inputs are "[[

                    ]]."        Proprietary Memorandum for Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd. at 3–4, C.R. 230, P.R. 252 (Nov. 5, 2024).

Consol. Court No. 24-00262                                                    Page 6

Jilin Bright and GHC submitted comments pursuant to 19 C.F.R. § 351.224(c) arguing the Final Results contained ministerial errors. See Jilin Bright Ministerial Error Allegations, C.R. 242, P.R. 266 (Nov. 20, 2024); GHC Ministerial Error Allegations, P.R. 265 (Nov. 20, 2024). Commerce issued amended final results and corrected inadvertent errors related to the inclusion of two selling, general, and administrative ("SG&A") expenses in the average financial ratios utilized in the review and the incorrect surrogate value applied to a FOP for GHC. Amended Final Results at 104,978. Commerce calculated weighted-average dumping margins of $1.90/kg for Jilin Bright, $1.10/kg for GHC, and $1.35/kg for non-selected companies under review. Id.

JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) and section 516A of the Tariff Act of 1930 (the "Act"), codified as amended, 19 U.S.C. § 1516a. The court will uphold Commerce's determinations in antidumping duty reviews unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]" 19 U.S.C. § 1516a(b)(1)(B)(i); Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1038 (Fed. Cir. 1996).

DISCUSSION

I.    **Commerce's Selection of Malaysia as the Primary Surrogate Country is Unsupported**

GHC and Jilin Bright argue that Commerce unreasonably rejected Romania as the primary surrogate country on the basis that it was not a net exporter of activated carbon and its production was not as high as Malaysia's. Rule 56.2 Mot. for J. on the Agency R. of Pls., Consolidated Pls., & Pl.-Intervenors at 18, ECF No. 60 (Aug. 14, 2025) ("GHC and Jilin Bright Mot."). They argue that Romania produced a significant volume of activated carbon, and that Commerce read an additional requirement into the statute by defining "significant producer" as a "significant net

exporter" and, accordingly, unreasonably disqualified Romania from consideration as a surrogate country at the outset. Id. at 18–19. They contend that because Commerce prematurely dismissed Romania as a potential surrogate country, Commerce failed to adequately examine whether Romania's data constituted the best available information to value certain FOPs.[5] Id. at 21. They also argue that Commerce improperly concluded that Romcarbon, the financial statements for which they argue should be used, is not a significant producer of merchandise. Id. at 19–20. They maintain that the submitted Romanian data met all of Commerce's established criteria for the best available information for valuing FOPs—that the data are, to the extent practicable, publicly available, contemporaneous with the POR, representative of a broad market average, tax- and duty-exclusive, and specific to the inputs being valued—unlike the Malaysian data. Id. at 22.

The government responds that Commerce reasonably selected Malaysia as a surrogate country because the statutory language is broad, and both the legislative history and Commerce's Policy Bulletin 04.1 state that a "significant producer" could mean "a country that is a net exporter, even though the selected surrogate country may not be one of the world's top producers." Def.'s Resp. to Pls.', Consolidated Pls.' & Pl.-Intervenors' Mots. For J. on the Agency R. at 15, ECF No. 72 (Feb. 2, 2026) ("Gov't Resp.") (citing Import Admin., U.S. Dep't of Commerce, Non-Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (2004), https://enforcement.trade.gov/policy/bull04-1.html) ("Policy Bulletin 04.1"); Conference Report

---

[5] GHC and Jilin Bright add that the Malaysian data is also unreliable because Century Chemical Works Sendirian Berhad's ("Century Chemical") financial statement, on which Commerce relies, covers only a one-year period ending December 31, 2022, whereas the POR extends through March 31, 2023. GHC and Jilin Bright Mot. at 26. The government responded at Oral Argument that Commerce often relies on financial statements that do not perfectly cover the POR. Oral Argument at 1:13:10. GHC and Jilin Bright do not point to any authority that a financial statement must be entirely contemporaneous with the POR to be considered the best available information. Further, Century Chemical's financial statement covers a significant portion of the POR.

to the 1988 Omnibus Trade & Competitiveness Act, H.R. Conf. Rep. No. 100-576, 590, reprinted at 1988 U.S.C.C.A.N. 1547, 1623 (1988)) ("Conf. Report").  The government adds that the surrogate value data on the record from Malaysia were publicly available and contemporaneous, represented a broad market average, were tax- and duty-exclusive, and were specific to inputs used by GHC and Jilin Bright to produce activated carbon.  Id. at 16, 26–28.  The government contends that Commerce reasonably rejected Romania as a potential surrogate country because it is not a net exporter of activated carbon and because Romcarbon's financial statements did not indicate any significant production of activated carbon.  Id. at 17–20.  Finally, the government responds that Commerce reasonably declined to evaluate whether the Romanian data are the best available information on the record because Commerce already determined that Romania was not a significant producer of comparable merchandise and because the Malaysian data were available and usable.  Id. at 20–26.

In an antidumping review, Commerce conducts a "fair comparison" of the prices of a good sold in the respondents' home market (the "normal value") with the prices for the same or similar good sold in the United States ("U.S.") market (the "export price") to determine the dumping margin.  19 U.S.C. §§ 1677b(a), 1677a, 1675(a)(2).  A dumping margin is "the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise."  Id. § 1677(35)(A).  When calculating a dumping margin for products from a non-market economy ("NME") country, such as China, see PDM at 5, and Commerce finds that available information does not permit the normal value of the subject merchandise to be determined, Commerce must calculate the normal value by valuing the "factors of production utilized in producing the merchandise" in a comparable "market economy country or countries" (the "surrogate country"), to which it adds an amount to represent general expenses, profit, and other expenses.  Id.

Consol. Court No. 24-00262                                                      Page 9

§ 1677b(c)(1). "By identifying a surrogate country and surrogate values for the factors of production, Commerce approximates what a non-market economy manufacturer might pay in a market economy setting." Risen Energy Co. v. United States, 122 F.4th 1348, 1352 (Fed. Cir. 2024) (citation modified) (citation omitted).

Commerce normally will value all FOPs in a single surrogate country (the "primary surrogate country"). 19 C.F.R. § 351.408(c)(2). The FOPs include, but are not limited to, "hours of labor required," "quantities of raw materials employed," "amounts of energy and other utilities consumed," and "representative capital cost, including depreciation." 19 U.S.C. § 1677b(c)(3). The surrogate data to value the FOPs must "to the extent possible" be from a market economy ("ME") country that is "at a level of economic development comparable to that of the nonmarket economy country" and is a "significant producer[] of a comparable merchandise." Id. § 1677b(c)(4).

The statute does not clarify the meaning of the term "significant producer." See id. Commerce has adopted a four-step approach to select a primary surrogate country. See Policy Bulletin 04.1. First, the Office of Policy ("OP") provides a list of potential surrogate countries that are at a comparable level of economic development to the NME county (the "OP List"). Id. at 2. Second, Commerce determines which countries on the list produce comparable merchandise. Id. at 2–3. Third, Commerce determines whether any of those countries are "significant" producers of that comparable merchandise, the meaning of which "can differ significantly from case to case" but "could mean a country that is a net exporter, even though the selected surrogate country may not be one of the world's top producers." Id. at 3–4. Fourth, if more than one potential surrogate country satisfies the statutory threshold requirements, Commerce selects the country with the best factors data as the primary surrogate country. Id. at 4; PDM at 8. Commerce normally values all

Consol. Court No. 24-00262                                                    Page 10

FOPs in a single surrogate country. 19 C.F.R. § 351.408(c)(2). The rationale seems to be that this avoids distortion.

In this review, Commerce placed Romania, Panama, Bulgaria, Costa Rica, Malaysia, and Türkiye on the record as potential surrogate countries. PDM at 6. Commerce found that each country is at a level of economic development comparable to China, satisfying the first prong of section 773(c)(4) of the Act. IDM at 8. In the PDM, Commerce reasoned that Malaysia is the only significant producer of comparable merchandise on the OP List because Malaysia is the only net exporter and because Malaysia provided evidence of production of comparable merchandise in the form of financial statements from multiple Malaysian companies. PDM at 7–8. Regarding surrogate value ("SV") data availability, Commerce reasoned that the data submitted for Malaysia are more complete than the data submitted for Romania because Romcarbon does not produce activated carbon in significant quantities. Id. at 8–9. In the IDM, Commerce considered Romcarbon's financial statements in concluding that Romania is not a significant producer of comparable merchandise. IDM at 8–9. Finally, Commerce summarized that "while there is direct evidence on the record that Malaysia is a significant producer of identical merchandise, there is no equivalent information on the record to suggest that Romania is a significant producer of comparable merchandise" and that "the Malaysian financial statements provide stronger evidence of production of the subject merchandise." Id. at 11–12. Accordingly, Commerce selected Malaysia as the primary surrogate country. Id. at 12.

Commerce's selection of Malaysia as the primary surrogate country is unsupported by the reasoning and evidence cited. Commerce rejects Romania as a potential primary surrogate country, in part, because Romcarbon's financial statements do not reflect significant production. IDM at 8–9. Yet, the record demonstrates that Romania exports a non-negligible amount of

activated carbon. Jilin Bright Surrogate Country Comments, Ex. 1 at 1–4, P.R. 132 (Nov. 21, 2023) (providing UN Comtrade data for HTS 3802.10 between April 2022 and March 2023 that adds to an export volume of 33,314.27, with the unit unspecified, for Romania), GHC Surrogate Country Comments at 3, P.R. 137 (Nov. 21, 2023) (reporting that, based on UN Comtrade data for HTS 3802.10, Romania exported 52,063 kgs of activated carbon in 2022); Petitioners' Surrogate Country Comments at 7, P.R. 134–36 (Nov. 21, 2023) (reflecting that, based on Trade Data Monitor[6] ("TDM") data, Romania exported 35,319 kgs of activated carbon during the POR). Commerce has not explained why Romcarbon's financial statements undermine the record data of Romania's exports of activated carbon. Malaysia is lacking usable labor data.[7] IDM at 15. Thus, to the extent that Commerce's analysis of Romcarbon's statements was confined to its conclusion that Romanian data were insufficient to value all FOPs, then selecting Malaysia as the primary surrogate country would be based on only Malaysia's status as the sole net exporter. Yet, section 1677b does not suggest that being a net exporter of subject merchandise, by itself, makes a country a significant producer.[8] Commerce's logic likely amounts to a conclusion that not being a "net exporter" disqualifies a country from consideration as a significant producer of subject merchandise. Such a determination would be unreasonable. While "net exporter" may reflect adequate production in most cases, it may not be a suitable test where absolute volumes of production are small or domestic consumption is high. There may be some scenarios where the

---

[6] Trade Data Monitor data excludes price values from NME countries and countries with general export subsidies. Gov't Resp. at 31 (citing IDM at 16–17).

[7] Depending on the results of this remand, other FOPs may not be valued using Malaysian data.

[8] Commerce looked to legislative history and Policy Bulletin 04.1 for guidance, both of which state that a net exporter could be considered a "significant producer of subject merchandise." See IDM at 11; Commerce Policy Bulletin 04.1 at 3 ("[A] 'significant producer' could mean a country that is a net exporter[.]"); Conf. Report at 1623 ("The term 'significant producer' includes any country that is a significant net exporter and, if appropriate, Commerce may use a significant net exporting country in valuing factors.").

net exporter standard alone may be reasonable, but the government has not shown that such a scenario presents itself here.[9]

Further, on this record it appears that Commerce has conflated the steps in selecting a primary surrogate country.  Its use of financial statements is particularly unclear.  Are the financial statements necessary to value some FOPs or are they relevant to consideration of overall country production?  This needs to be explained.  The court remands to Commerce to clarify its analysis and to consider which countries on the OP List are significant producers of subject merchandise based on more than the net exporter standard alone.  If Romania is a significant producer, then Commerce should explain which country is selected as the primary surrogate, presumably based on the best data available to value the FOPs.

It is possible that the following matters will become moot, but the court addresses them now for reasons of judicial economy.

II.       **Commerce Reasonably Selected Some Malaysian Surrogate Values**

Consolidated plaintiffs Carbon Activated Tianjin Co., Ltd. and Carbon Activated Corporation ("Consolidated Plaintiffs"), GHC, and Jilin Bright argue that the surrogate values for Malaysia's imports of coal tar, hydrochloric acid, solid sodium hydroxide, and potassium

---

[9] The Federal Circuit in a particular factual situation has accepted Commerce's reliance on Policy Bulletin 04.1 in its surrogate country selection process.  See Carbon Activated Tianjin Co. v. United States, 2025 WL 1354994, at *3 (Fed. Cir. May 9, 2025).  In Carbon Activated Tianjin Co., however, the Federal Circuit noted that the plaintiff did not challenge the Policy Bulletin.  Id., at *3.  Here, GHC and Jilin Bright challenge Commerce's application of the Policy Bulletin as improperly giving dispositive weight to the consideration that a significant producer includes a net exporter.  See GHC and Jilin Bright Mot. at 16, 21, 26; GHC and Jilin Bright's Reply Br. at 7, ECF No. 84 (Apr. 24, 2026) ("GHC and Jilin Bright Reply").  Further, in Carbon Activated Tianjin Co., the Federal Circuit did not suggest that Commerce may always exclusively rely on the net exporter standard to disqualify other potential surrogate countries.  Rather, the Federal Circuit held that Commerce did not err in relying on the net exporter criterion in Policy Bulletin 04.1 in that case.  Id., at *3.

hydroxide were aberrational because they deviated drastically from world average unit prices ("AUVs") and individual country comparison points.  Rule 56.2 Mot. for J. on the Agency R. of Carbon Activated Tianjin Co., Ltd. & Carbon Activated Corp. at 13–14, 16, ECF No. 59 (Aug. 14, 2025) ("Consol. Pls. Mot.") (citation modified); GHC and Jilin Bright Mot. at 22.  The government responds that plaintiffs' argument that the Malaysian data is aberrational compared to global averages fails because those averages include data from NMEs, countries that are not economically comparable to China, and countries with general export subsidies.  Gov't Resp. at 28–30.

Commerce must use the "best available information" in selecting surrogate data for which to value FOPs.  19 U.S.C. § 1677b(c)(1)(B).  "Commerce has broad discretion to determine what constitutes the best available information, as this term is not defined by statute."  Qingdao Sea-Line Trading Co. v. United States, 766 F.3d 1378, 1386 (Fed. Cir. 2014).  "Commerce's discretion, however, is limited by the statute's objective of obtaining the most accurate dumping margins possible, meaning Commerce's choice of the best available information must evidence a rational and reasonable relationship to the [chosen] factor of production it represents to be supported by substantial evidence."  Calgon Carbon Corp. v. United States, 145 F. Supp. 3d 1312, 1323 (CIT 2016) (citation modified) (citation omitted).  "Commerce has an obligation to review all data and then determine what constitutes the best information available or, alternatively, to explain why a particular data set is not methodologically reliable."  Olympia Indus., Inc. v. United States, 22 CIT 387, 390, 7 F. Supp. 2d 997, 1001 (CIT 1998).  Commerce may disregard price or cost values if Commerce has determined that "broadly available subsidies existed or particular instances of subsidization occurred with respect to those price or cost values."  19 U.S.C. § 1677b(c)(5).

After Commerce determined that Malaysia was the only significant producer of comparable merchandise, see PDM at 7–9; IDM 7–12, Commerce considered the surrogate value

Consol. Court No. 24-00262                                                    Page 14

data on the record, which included data from Malaysia, Türkiye, and Romania, and determined that both the Malaysian and Turkish data generally are publicly available, contemporaneous with the POR, representative of broad market averages, tax- and duty-exclusive, and specific to the inputs being valued.[10] IDM at 14–15. Jilin Bright reported raw materials factor inputs of anthracite coal, bituminous coal, lump coal, coal tar/pitch, salt, and water. Jilin Bright's First SV Submission, Ex. 1. GHC reported several raw materials factor inputs of anthracite coal, bituminous coal, lump coal, coal tar, hydrochloric acid, magnesium oxide, potassium hydroxide, solid sodium hydroxide, sulphur acid, salt, and water. GHC's First SV Submission, Ex. 1. Commerce used data from Malaysia, with the exception of labor value, for which Commerce used Turkish data, to value the FOPs. IDM at 15, 21.

The court addresses the arguments regarding each factor of production in turn.

**a. Commerce's selection of the Malaysian surrogate value for coal tar is adequately supported.**

GHC, Jilin Bright, and Consolidated Plaintiffs argue that, even if Commerce reasonably selected Malaysia as the primary surrogate country, it unreasonably selected the Malaysian SV to value coal tar. GHC and Jilin Bright Mot. at 27; Consol. Pls. Mot. at 22. They contend that Commerce ignored record evidence that the Malaysian AUV of $1.65 did not reflect a broad market average, which Consolidated Plaintiffs reported to be $0.48. GHC and Jilin Bright Mot. at 27; Consol. Pls. Mot. at 13. GHC and Jilin Bright specifically note that Malaysia has historically been a significant net exporter of coal tar and imported a small quantity of coal tar, which suggests that Malaysia's imports may be limited to specialized types of coal tar. GHC and Jilin Bright Mot.

---

[10] Jilin Bright and GHC provided TDM data for Romania and petitioners submitted TDM data for Malaysia and labor FOPs from the International Labor Organization for Türkiye and Malaysia. PDM at 7.

at 27–28. They note that, in contrast, Romania imported a significantly larger quantity of coal tar than it exported, "demonstrating a closer alignment with a broad market average."[11]   Id. at 29 (citing Jilin Bright Final SV Submission, Ex. 6). Further, they argue that the Malaysian AUV rose around 40% between the prior two reviews and the current review, which suggests that the Malaysian value is aberrational. Id. at 31.

The government notes that the Malaysian coal tar AUV encompasses import data from Spain, Australia, and Taiwan, whereas the Romanian coal tar AUV represents import data only from Ukraine. Gov't Resp. at 36. The government reiterates that global market averages are not the appropriate benchmark because they contain prices of imports from NMEs and countries with general export subsidies. Id. The government also argues that the record supports Commerce's determination that the Malaysian import AUV is not aberrational. Id. at 39; see also Resp. Br. of Def.-Intervenors Calgon Carbon Corporation and Norit Americas, Inc. at 2–3, ECF No. 74 (Mar. 4, 2026) ("Petitioners Resp."). The government also argues that the Malaysian AUV is not aberrational when compared to historical import prices because the current AUV is nearly identical to the value used in the 2017-2018 administrative review of the Order, and only 38% higher than the average of the five most recent administrative reviews.[12]  Gov't Resp. at 40; see also Petitioners Resp. at 4.

---

[11] They add that an affidavit from a Malaysian importer of coal tar, submitted with Jilin Bright Final SV Submission, reveals a discrepancy between the unit price of coal tar and the Malaysian import AUV during the POR. Id. at 29. The government responds that Commerce properly disregarded the affidavit because Commerce's practice is to rely on publicly available information, whereas this affidavit was designated as business proprietary information. Gov't Resp. at 38.

[12] The government notes that there was historically high coal consumption during the review period, which could reasonably lead to increased coal prices because coal tar is a by-product of coal. Gov't Resp. at 40 (citing IDM at 18).

Commerce valued coal tar using Malaysian import data for HTS number 2706.00 (1.67 USD/kg).[13]  IDM at 16.  Commerce noted that this value is not aberrational because it is approximately seven percent of the largest coal tar import AUV from the OP List countries and because it does not significantly depart from the value in past reviews.  Id.  Commerce also explained that "in [the] context of the current review, the Malaysian import AUV . . . (1.67 USD/kg) is nearly identical to the Turkish import AUV (1.48 USD/kg), and much lower than the Costa Rican import AUV (21.48 USD/kg)."  Id.  Commerce also noted its preference to value all FOPs in one country unless the data is unusable and unreliable.  Id.

Commerce reasonably selected the Malaysian data to value coal tar.  Commerce reasonably concluded that comparing the Malaysian AUV to world average prices would be improper because the world data includes data for imports from countries not at the same level of economic development as China and from NME countries.  Id. at 16–17; see Zhejiang DunAn Hetian Metal Co. v. United States, 652 F.3d 1333, 1341 (Fed. Cir. 2011) (While Commerce must select the "best available information" on the record to value the FOPs, 19 U.S.C. § 1677b(c)(1)(B), Commerce has "broad discretion" to decide what record evidence meets this criterion.); 19 U.S.C. § 1677b(c)(5) (Commerce may disregard price or cost values if Commerce determines that the values may be distorted.).  While GHC and Jilin Bright argue that Romania's relatively high import volume suggests that its data are more representative of world averages, they have not pointed to any authority or specific reasoning that compels the conclusion that a high import volume means

---

[13] GHC reported the Malaysian unit value of coal tar as $1.65 and a quantity of 173,802 (units unspecified).  GHC Final SV Submission, Ex. 2b at 80.  GHC reported the Romanian unit value as $0.34 and a quantity of 1,261,200 (units unspecified).  Id., Ex. 2b at 84.  It reported a value of $53.54 and a quantity of 2 for Costa Rica (units unspecified).  Id., Ex. 2b at 76.  It did not report any values for Panama.  Id., Ex. 2b at 84.  It reported a value of $1.55 and a quantity of 212,350 for Türkiye (units unspecified).  Id., Ex. 2b at 84.

that a country's data are necessarily the best available.[14]  See GHC and Jilin Bright Mot. at 29;

GHC and Jilin Bright's Reply Br. at 12–16, ECF No. 84 (Apr. 24, 2026) ("GHC and Jilin Bright

Reply").   When compared to the import data of the other countries on the OP List, the Malaysian

data fall squarely within the range of both import volume and import value.  As stated above, the

standard "is not whether the information Commerce used was the best available, but rather whether

a reasonable mind could conclude that Commerce chose the best available information."  Jiaxing

Bro. Fastener Co. v. United States, 822 F.3d 1289, 1301 (Fed. Cir. 2016) (citation omitted).  A

reasonable mind could conclude that the Malaysian AUV for coal tar was not aberrational and that

Commerce chose the best available data.  The court, accordingly, sustains Commerce's use of the

Malaysian AUV for coal tar.

> **b.  Commerce's selection of the Malaysian surrogate value for sub-bituminous**
>
> **coal is adequately supported.**

GHC and Jilin Bright argue that Commerce unreasonably selected Malaysia's AUV for

sub-bituminous coal as the surrogate value because the value sharply diverges from historical

Malaysian AUVs.  GHC and Jilin Bright Mot. at 32.  They contend that Commerce arbitrarily

selected Chile as a benchmark even though Chile is not on the OP List of potential surrogate

---

[14] In their reply brief, GHC and Jilin Bright cite SolarWorld Ams., Inc. v. United States, 962 F.3d 1351, 1361 (Fed. Cir. 2020), for the proposition that the data of a country that imports a high percentage of the total import volume by economically comparable countries are a true representation of market driven prices.  GHC and Jilin Bright Reply at 12–13.  In SolarWorld, the Federal Circuit agreed with the CIT that Commerce did not adequately justify its use of Thai data to value a FOP in the light of distortions by aberrational imports from Hong Kong.  The Federal Circuit reasoned that, specifically, the imports from Hong Kong had a unit value 191 times higher than the AUV for imports into Thailand from other countries, and that the imports from Hong Kong constituted only 1.6% of imports into Thailand, so they could not be considered to be a "true representation of market-driven prices."  SolarWorld Ams., Inc., 962 F.3d at 1361.  The Federal Circuit did not hold that a high import volume necessarily suggests that a country's data are the best available, particularly when the primary surrogate country's AUV is not aberrational.

countries and accordingly risked selecting benchmark data from a market not economically comparable to plaintiffs' home market. Id. They add that Malaysia's sub-bituminous coal AUV rose 129% from the fifteenth review, and 457% from the fourteenth review, and that such a discrepancy required an explanation from Commerce. Id. at 33. They contend that, instead, Commerce should have selected the Romanian AUV because of Commerce's obligation to use the "best available information" per 19 U.S.C. § 1677b(c)(1)(B). Id.

The government responds that Commerce adequately addressed the divergence from historical Malaysian AUVs, which it explained was due to high coal and natural gas consumption. Gov't Resp. at 42. Specifically, the government notes that coal prices surged as high as 440 USD/MT, and that AUVs in both Malaysia and Romania exceeded 300 USD/MT, meaning the Malaysian AUV was not aberrational. Id. The government also argues that Commerce's reference to the Chilean AUV was consistent with Commerce's practice to consider non-listed countries, and that the Chilean data excludes import prices from NME countries and countries with general export subsidies. Id. at 42–43. At oral argument, however, the government argued that Commerce's consideration of the Chilean AUV was harmless error. Oral Argument at 1:03:10.

Commerce used Malaysian import data under HS code 2701.19 to value sub-bituminous coal. IDM at 18. Commerce noted that, while Malaysia's import value of $385.32/MT was the highest of the five OP List countries with import of merchandise under HS code 2701.19, "three [of the five] countries, Malaysia, Romania, and Chile[,] all had import values exceeding $300/MT."[15] IDM at 18. Commerce also reasoned that "Malaysia's market economy imports of HS subheading 2701.19 make up almost all of the . . . imports among the countries on the OP

---

[15] Chile, however, was not one of the OP List countries. See Request for Economic Development, Surrogate Country, and Surrogate Value Comments and Information, Attach. I at 2.

List," from which Commerce inferred "that the Malaysian imports are representative of prices during the POR among the OP List countries." Id.

Commerce has reasonably demonstrated that the Malaysian AUV for sub-bituminous coal is the best information available. While Commerce compared the Malaysian data to Chile's even though Chile is not an OP List country, this mistake was harmless error as it does not materially impact Commerce's analysis. See IDM at 18. Commerce explained that there was historically high coal and natural gas consumption during the POR, which explains the relatively high AUV. Id. Further, the Romanian and Malaysian AUVs are relatively close in value, around $310/MT and $390/MT respectively, Public Letter Submitting Exs. to Pet'rs Rebuttal SV Submission, Ex. SVR-3 at 27, 25, ECF No. 93 (June 26, 2026) ("Exs. to Petitioners' Rebuttal SV Submission"), and Malaysia's import volume is by far the highest of the other OP List countries (4,707,477.53 MTs compared to Romania's 222,683.69 MTs, the country with the next highest import volume). Id., Ex. SVR-3 at 25, 27, 29, 31, 33. Accordingly, Commerce reasonably concluded that the Malaysian data is the best information available.

    **c. Commerce's selection of the Malaysian surrogate value for hydrochloric acid is not adequately supported.**

GHC, Jilin Bright, and Consolidated Plaintiffs argue that Commerce unreasonably selected Malaysia's AUV for hydrochloric acid as the surrogate value because the value sharply diverges from historical Malaysian AUVs and contemporaneous AUVs from other OP List countries. GHC and Jilin Bright Mot. at 34; Consol. Pls. Mot. at 23–24. GHC and Jilin Bright contend that the Malaysian AUV increased 130% from the fifteenth administrative review and 79% from the fourteenth administrative review, and that this suggests that the Malaysian AUV is aberrational. GHC and Jilin Bright Mot. at 35. They also argue that the Malaysian AUV is 500% higher than

the next highest AUV from other OP List countries during the POR, but that Commerce did not analyze this disparity in its results. Id. at 37. They add that Commerce has not pointed to any meaningful variation in composition or grade of hydrochloric acid that could lead to this discrepancy in values. Id. Finally, they argue that the Malaysian value differs significantly from the world AUV, which further highlights that the value is aberrational, but that Commerce failed to consider this point. Id. at 38.

The government responds that, "while the Malaysian AUV for this review is 130 percent greater than the Malaysian import AUV in [the fifteenth review], it is only 79 percent greater than the Malaysian value in [the fourteenth review]," which is not a "substantial difference." Gov't Resp. at 43 (citing IDM at 19). It adds that the increases at issue here fall far below the levels that the court has found to be aberrational. Id. at 44 (citing Best Mattresses Int'l Co. v. United States, 622 F. Supp. 3d 1347, 1379 (CIT 2023) (noting that the court has previously affirmed the exclusion of aberrational values that were nearly 30 times higher than other values, and 30 and 79 times higher than the AUV) (citation omitted)).

Commerce has not adequately supported its choice of the Malaysian import value for hydrochloric acid. In the IDM, Commerce does not actually state why the Malaysian import value is the best choice. Rather, Commerce compares the Malaysian value only to the value in prior reviews without any analysis about why an "only 79 percent" difference from the fourteenth administrative review is not aberrational. See IDM at 19. Further, Commerce failed to compare the Malaysian AUV for hydrochloric acid to the AUVs of other countries on the OP List which, by the government's own logic, is the relevant point of comparison here. See Gov't Resp. at 28–30. There is little in Commerce's reasoning, beyond these conclusory observations, to support the choice to use Malaysian import data for this FOP. While Commerce notes in the IDM that its

Consol. Court No. 24-00262                                                                    Page 21

practice is to compare the surrogate country's AUV to historical values or to POR-specific data to determine if the AUV is aberrational, the comparison to historical values here does not reasonably show that the Malaysian value is not aberrational. Commerce's preference for using the data of its primary surrogate country does not support all choices of Malaysian data for surrogate values. Accordingly, the court remands to Commerce for further analysis and explanation of the selection of a surrogate value for hydrochloric acid.

### d. Commerce's selection of the Malaysian surrogate value for sodium hydroxide and potassium hydroxide is adequately supported.

GHC, Jilin Bright, and Consolidated Plaintiffs argue that Commerce unreasonably selected Malaysia's AUV for sodium hydroxide and potassium hydroxide because the values sharply diverge from corresponding world AUVs. GHC and Jilin Bright Mot. at 39. Consolidated Plaintiffs note that Malaysia's import AUV for solid sodium hydroxide was 255% higher than the global average and Malaysia's AUV for potassium hydroxide was 193% higher than the global average. Consol. Pls. Mot. at 24 (citing IDM at 19); see GHC and Jilin Bright Mot. at 40 (citing GHC Final SV Submission, Ex. 2-B). GHC and Jilin Bright add that Romania's values are closer to global averages and are therefore more representative. GHC and Jilin Bright Mot. at 40–41.

The government responds that plaintiffs' calculation of Malaysian AUVs for sodium hydroxide and potassium hydroxide is not reliable because plaintiffs rely on UN Comtrade data, which does not exclude prices of imports from NMEs and countries with general export subsidies. Gov't Resp. at 45. The government notes that the TDM data on the record, by contrast, demonstrates that the Malaysian AUV for sodium hydroxide has been relatively stable over six review periods and that the value is even lower than the Romanian value. Id. at 45–46 (citing Exs. to Petitioners' Rebuttal SV Submission, Exs. SVR-5, SVR-3). The government argues that the

Consol. Court No. 24-00262                                          Page 22

record also demonstrates that the Malaysian AUV for potassium hydroxide is only 54% higher than the five-year average and, accordingly, is not aberrational.  Id. at 46.

Commerce valued solid sodium hydroxide and potassium hydroxide using Malaysian import data.  IDM at 18–19.  Commerce noted that the Malaysian import value for solid sodium hydroxide has been relatively stable over six review periods and, in this review, the value is only 30% higher than all five periods.  Id. at 19.  For potassium hydroxide, Commerce noted that the Malaysian import value for the current review is only 54% higher than the five-year average.  Id. Commerce added that the data GHC provided include countries that are not at the same level of economic development as China and include imports from NME countries.  Id.

Commerce reasonably selected the Malaysian values for sodium hydroxide.  The TDM data on the record demonstrates that Malaysia's AUV for sodium hydroxide is lower than Romania's AUV and falls squarely in the range of the AUVs of the other OP List countries.  Exs. to Petitioners' Rebuttal SV Submission, Ex. SVR-3 at 40–48.  While Commerce's explanation in the IDM is once again limited to a comparison of historical values, Commerce's reasons for selecting the Malaysian AUV are reasonably discernable, see Jacobi Carbons AB v. United States, 313 F. Supp. 3d 1308, 1327 (CIT 2018), because the Malaysian AUV is within a reasonable range of the OP List AUVs.  Regarding potassium hydroxide, while the record is less clear about the respective Romanian and Malaysian AUVs,[16] the parties challenge Commerce's selection of the

---

[16] The TDM data submitted in response to the court's June 24, 2026 order, ECF No. 91, does not contain data for potassium hydroxide.  See generally Exs. to Petitioners' Rebuttal SV Submission, Ex. SVR-3.  The government reports in its response brief that the TDM data for the Malaysian AUV for potassium hydroxide is 1.68 USD/kg.  Gov't Resp. at 46.  Petitioners reported that the TDM data for the Malaysian AUV for potassium hydroxide is 7,907.08 Ringgit/MT.  Petitioners' First Surrogate Value Comments, Summary Worksheet at 1, P.R. 150 (Dec. 20, 2023).  GHC reported that the TDM data for the Romanian AUV for potassium hydroxide is 7,256.23 RON/MT. GHC's First SV Submission, Ex. 1 at 1 (Dec. 20, 2023).  The parties did not provide the values in

Malaysian AUV on the basis that it is aberrational compared to the world AUV or that Malaysia had relatively low import volumes. GHC and Jilin Bright Mot. at 39–41; Consol. Pls. Mot. at 17–21. Commerce, however, adequately addressed these arguments in the IDM.[17] See IDM at 18–21. While Commerce did not consider the Malaysian value for potassium hydroxide compared to other OP List countries' values, the parties did not challenge the Malaysian value on this basis. See GHC and Jilin Bright Mot. at 39–41; Consol. Pls. Mot. at 17–21. Accordingly, the court concludes that Commerce reasonably selected the Malaysian AUV for potassium hydroxide.

**III.    Commerce Excluded Greenlink's Financial Statements Without Adequate Explanation**

GHC and Jilin Bright argue that Commerce unreasonably failed to explain its decision to disregard the financial statements of Greenlink Biotech Sdn. Bhd. ("Greenlink") in its financial ratio calculations.[18] GHC and Jilin Bright Mot. at 42. The government responds that Commerce considered the record evidence and explained in the Preliminary Results that only the financial statements of Century Chemical Works Sdn. Bhd. ("Century Chemical") and New Chang Hua

---

USD/MT or the TDM AUVs for the other OP List countries on the record. See generally id.; Petitioners' First Surrogate Value Comments; Jilin Bright's First SV Submission.

[17] Commerce noted that it "continue[d] to find that the argument concerning world average unit price has no merit" and that Commerce does not compare the import quantity of the primary surrogate country to the import quantities of the other OP List countries to determine whether a SV is aberrational. IDM at 19–20.

[18] The record contains information for five Malaysian producers: Century Chemical, New Chang Hua, Greenlink, Nikom Carbon Technology Sdn. Bhd. ("Nikom"), and Mesjaya Abadi Sdn. Bhd. ("Mesjaya"). See IDM at 21, 24; Jilin Bright Final SV Submission at 2; GHC Final SV Submission at 1; Petitioners' Final Affirmative Surrogate Value Comments at 4, P.R. 192 (Mar. 27, 2024). In their motion, GHC and Jilin Bright argue that Commerce unreasonably excluded the financial statements of three Malaysian producers of identical merchandise, but only specifically mention Greenlink and Nikom. GHC and Jilin Bright Mot. at 41–42. At Oral Argument, however, they noted that they were no longer pursuing the issue with respect to Nikom. Oral Argument at 00:40:00. The court therefore considers only whether Commerce reasonably excluded Greenlink's financial statements.

Consol. Court No. 24-00262                                                Page 24

Sdn. Bhd. ("New Chang Hua") were contemporaneous with the period of review, publicly available, and reflected producers of comparable merchandise. Gov't Resp. at 47 (citing PDM at 21–22). The government argues that the record demonstrates that Greenlink's principal activity is manufacturing charcoal products, which are not comparable merchandise to activated carbon, and that Commerce adequately explained its reasoning. Id. at 47–48 (citing Jilin Bright Final SV Submission, Ex. 3A).

To calculate the normal value of the subject merchandise from a NME country, Commerce calculates the value of the FOPs and adds an amount for general expenses and profit plus the cost of containers, coverings, and other expenses. 19 U.S.C. § 1677b(c)(1)(B). For these expenses, Commerce will normally use non-proprietary information gathered from producers of identical or comparable merchandise in the surrogate country. 19 C.F.R. § 351.408(c)(3). Generally, if more than one producer's financial statements are available, Commerce averages the financial ratios derived from all the available financial statements. Ad Hoc Shrimp Trade Action Comm. v. United States, 618 F.3d 1316, 1320 (Fed. Cir. 2010) (citation omitted). Commerce must provide an explanation adequate to enable the court to determine whether its choices are reasonable. CP Kelco US, Inc. v. United States, 949 F.3d 1348, 1356 (Fed. Cir. 2020).

Commerce calculated financial ratios based on the average of the financial statements of Century Chemical and New Chang Hua. PDM at 21. In the IDM, Commerce declined to consider all the financial statements on the record because "several of the financial statements are inadequate, or not appropriate as described in the preliminary analysis." IDM at 22 (citing PDM at 8–9). Commerce did not explain why it excluded Greenlink's financial statements specifically. See id. at 22–25.

Consol. Court No. 24-00262                                                                Page 25

While the government makes several arguments about the insufficiency of Greenlink's financial statements, Gov't Resp. at 46–48, Commerce did not provide any such reasoning in its determination. Commerce fails to even discuss Greenlink specifically. Without a reasoned explanation of its decision to exclude Greenlink's financial statements, the court cannot determine whether Commerce acted reasonably. See Borusan Mannesmann Boru Sanayi ve Ticaret A.Ş. v. United States, 222 F. Supp. 3d 1255, 1267 (CIT 2017) ("An agency's determination thus cannot be sustained on the basis of a rationale supplied after the fact—whether by the agency's litigation counsel, by another party, or by the court."). The court remands to Commerce for further analysis.

IV.     **Commerce Reasonably Included GHC's Unaffiliated Supplier's Costs in GHC's Margin Calculation**

Consolidated Plaintiffs (the non-mandatory respondents) argue that Commerce unreasonably included a supplier's costs that was not associated with the production of subject merchandise in GHC's margin calculation, and that Commerce cited no record evidence to support its decision to include the supplier's purchased materials as an input in GHC's cost database.[19] Consol. Pls. Mot. at 25–27. Consolidated Plaintiffs note that the supplier, under duress, provided unit consumption ratios for these materials,[20] and stated that the data would not result in accurate FOPs because they were not used in production of GHC's activated carbon for export to the U.S. market. Id. at 26 (citing Second Supplemental Section A, C, and D Questionnaire Response at 27, C.R. 152, 154, 162, P.R. 202 (Apr. 5, 2024) ("GHC Second Supp. Questionnaire Resp.")). Consolidated Plaintiffs conclude that Commerce's decision to include valuations for these

---

[19] Petitioners prevailed on this issue in the administrative proceeding. IDM at 38–39. GHC and Jilin Bright do not pursue this issue. See GHC and Jilin Bright Mot.

[20] These materials are [[                                                    ]].     Consol. Pls. Mot. at 26.

materials in GHC's FOP database was unreasonable and inflated GHC's normal value calculation. Consol. Pls. Mot. at 27. Consolidated Plaintiffs add that Commerce routinely excludes costs and expenses from its dumping calculations when those costs and expenses are unrelated to the production of subject merchandise. Id. at 27–28 (citing Nagase & Co. v. United States, 628 F. Supp. 3d 1326, 1332 (CIT 2023); NSK Ltd. v. United States, 29 C.I.T. 1, 17, 358 F. Supp. 2d 1276, 1291 (2005)).

The government responds that whether Commerce cited record evidence on this issue is irrelevant because it was GHC's burden to build an adequate record to demonstrate that its supplier did not use these materials. Gov't Resp. at 50. Rather, GHC provided only its own certifications that it had agreed with its supplier that the products that GHC purchased would be self-produced but failed to actually submit the agreement in the record. Id. Further, the government notes that, while GHC provided a purchase order that it claimed referred to the agreement, GHC failed to provide a translated version as is its burden. Id. (citing GHC Second Supp. Questionnaire Resp., Ex. 2SD-B-4). The government notes that the record demonstrates that the supplier purchased these materials to produce the activated carbon that it sold to GHC, which GHC then sold as a finished product to the U.S. market, and GHC identified no basis on which to show that those costs are related to non-subject merchandise. Id. at 51.

As part of its calculation of normal value, Commerce values the FOPs utilized in producing the subject merchandise, which includes "quantities of raw materials employed." 19 U.S.C. § 1677b(c)(3)(B). Commerce uses a surrogate country producer's information for this calculation. See 19 C.F.R. § 351.408(c)(3). The interested parties, not Commerce, bear the burden of creating an adequate record. QVD Food Co. v. United States, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (citation omitted).

Consol. Court No. 24-00262                                                        Page 27

In response to Commerce's Section D questionnaire, which requested information about the FOPs of merchandise sold in or to the United States, GHC submitted cost of production information for itself, "an unaffiliated producer from which GHC purchased for export to the United States during the POR," and "an unaffiliated company GHC used to further process subject merchandise that GHC exported to the United States during the POR." Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd. Section D Questionnaire Response at 1, C.R. 64, P.R. 123 (Sep. 28, 2023) ("GHC Sec. D Resp."). Petitioners filed a request for Commerce to issue a supplemental questionnaire requesting, among other things, more information about GHC's supplier's production process. Request to Issue Supplemental Questionnaire Addressing Unresolved Critical Deficiencies in GHC's DQR at 4–5, C.R. 142, P.R. 184 (Mar. 22, 2024). Commerce issued a supplemental questionnaire to that effect. Second Supplemental Section A, C, and D Questionnaire, Attach. I at 0, C.R. 143, P.R. 185 (Mar. 25, 2024). GHC submitted its response and explained that the activated material sold by its supplier for the purpose of exporting to the United States was self-produced. GHC Supp. Questionnaire Resp. at 20. To be responsive to Commerce, however, the supplier provided unit consumption ratios the materials. Id. at 27; id., Ex. 2SD-B-4.

Commerce found that GHC failed to incorporate the unit consumption ratios for GHC, its supplier, and its toller. Proprietary Memorandum for Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd. at 3, C.R. 230, P.R. 252 (Nov. 5, 2024). Commerce also found that GHC failed to establish whether its supplier used the material in the production of subject merchandise that was not self-produced. Id. Commerce noted that GHC claims that its agreement with its supplier illustrates that the products exported to the United States must be only self-produced materials of the supplier, but GHC failed to supply a copy of the agreement on the record. Id. For the Final

Results, Commerce corrected the consolidated FOP database provided by GHC to accurately reflect its supplier's inputs. Id. at 4. Commerce valued GHC's revised consumption using HTS code 3802.10. Id.

Commerce reasonably included the supplier's inputs in GHC's FOP database. Consolidated Plaintiffs have not demonstrated what record evidence, beyond GHC's questionnaire response and an untranslated document, suggests that GHC's supplier's materials were self-produced. As the government notes, GHC did not provide the purported agreement between GHC and its supplier that the supplier's materials would be self-produced. It is the interested parties' responsibility, not Commerce's, to build the record, QVD Food Co., 658 F.3d at 1324, and Commerce reasonably found that the record did not include sufficient information to support GHC's attestation that its supplier used only self-produced materials.

V. **Commerce's Refusal to Correct Jilin Bright's Proposed Value Added Tax Correction is Not Supported**

GHC and Jilin Bright argue that Commerce should have used the formula that Jilin Bright stated in its Section C questionnaire response to calculate the value added tax ("VAT") variable "RVATTAXU." GHC and Jilin Bright Mot. at 44. They note that a clerical error occurred in Jilin Bright's U.S. sales database submitted on September 21, 2023, where the VATTAXU for the SEQU[21] was incorrectly reported, due to the use of a formula that improperly multiplied the "QTYU" variable twice.[22] Id. at 44–45. They argue that, although there was no verification in

---

[21] Specifically, SEQU [[ ]].    GHC and Jilin Bright Mot. at 44.

[22]  GHC  and  Jilin  Bright  note  that  the  improper  formula  used  was VATTAXU=**QTYU**\*GRSUPRU\*QTYU/1.13\*0.13, and the correct formula to derive the per-unit VAT tax variable is RVATTAXU=(TOTAMO/1.13\*0.13)/QTYU. GHC and Jilin Bright Mot. at 44–45; see Resp. to the Ct.'s Req./Order to File R. Docs. at C-33, ECF No. 100-1 (July 2, 2026). GRSUPRU stands for "gross unit price." Jilin Bright Section C Response at C-16.

this case, the court should require Commerce to apply the "analogous practice to accept minor corrections at verification" here and hold that Commerce improperly failed to correct Jilin Bright's error. GHC and Jilin Bright Reply at 23.

The government responds that Commerce reasonably declined to adopt Jilin Bright's proposed VAT calculation formula.[23] Gov't Resp. at 52. The government adds that Jilin Bright submitted an incorrect amount for VAT in its section C response but did not correct this mistake in its supplemental section C questionnaire response. Id. at 52–53. The government reasons that Jilin Bright failed to alert Commerce to reporting errors until after Commerce had already issued the Preliminary Results and that, therefore, Commerce did not have the opportunity to ensure that the proposed change is appropriate, correct, or more accurate than the VAT amount originally reported. Id. at 53 (citing IDM at 27). The government concludes that Commerce therefore reasonably chose not to adjust the VAT amount reported. Id. at 53.

Commerce has discretion to accept or reject corrective information on a case-by-case basis. Goodluck India Ltd. v. United States, 11 F.4th 1335, 1342 (Fed. Cir. 2021) (citation omitted). This discretion is grounded in 19 U.S.C. § 1673d(e), which states that "[t]he administering authority shall establish procedures for the correction of ministerial errors in final determinations within a reasonable time after the determinations are issued." Commerce can abuse this discretion by refusing to accept updated data when there is plenty of time for Commerce to verify or consider it. Goodluck India, 11 F.4th at 1342 (citation omitted). At the preliminary results stage, "Commerce abuses its discretion where it refuses to let a respondent establish an accurate dumping

---

[23] The government argues that the plaintiffs fail to address whether Commerce's decision is unsupported by substantial evidence and merely repeat the same arguments made in plaintiffs' administrative brief. Gov't Resp. at 52. GHC and Jilin Bright respond that they adequately raised the argument in their opening brief before the court. GHC and Jilin Bright Reply at 23–24. GHC and Jilin Bright's motion sufficiently presents the issue to the court.

margin by correcting mistakes in its response. Finality concerns only begin to counterbalance accuracy concerns when the administrative review reaches the final results stage." Fischer S.A. Comercio, Inustria & Agricultura v. United States, 34 C.I.T. 334, 346, 700 F. Supp. 2d 1364, 1375 (2010) (discussing NTN Bearing Corp. v. United States, 74 F.3d 1204 (Fed. Cir. 2014); Timken U.S. Corp. v. United States, 434 F.3d 1345 (Fed. Cir. 2006)).

Commerce's practice in calculating export price or constructed export price in NME cases is to subtract from the gross U.S. sales price the amount of any un-refunded VAT. PDM at 17. Commerce created a per-unit VAT variable for Jilin Bright, "RVATTAXU." Prelim. Calculation Memorandum for Jilin Bright Future Chemicals Co., Ltd. at 2–3, C.R. 207, P.R. 218 (Apr. 26, 2024). Jilin Bright reported the VAT amount as 13% for inputs that it consumed to produce the subject merchandise in its section C questionnaire response. Jilin Bright Section C Response at C-32, C.R. 51, P.R. 114 (Sep. 21, 2023). Commerce found that there was no difference between the standard VAT rate of 13% and the VAT refund rate of 13% during the POR and, accordingly, made no adjustments to Jilin Bright's or GHC's export prices for irrecoverable VAT. PDM at 18. Jilin Bright alerted Commerce to Jilin Bright's mistake in its case brief and argued that Commerce should adopt Jilin Bright's proposed formula of "RVATTAXU = (TOTAMO/1.13*0.13)/QTYU." Case Brief of Jilin Bright Future Chemicals Co., Ltd. at 17, C.R. 221, P.R. 229 (June 12, 2024). Commerce declined to amend this calculation, reasoning that Jilin Bright's supplemental section C questionnaire response failed to note that its reported VAT amount was incorrect or update the amount, and that Commerce did not have the opportunity to ensure that the proposed change was appropriate and accurate and, accordingly, declined to amend the VAT amount. IDM at 27.

Commerce has not supported its refusal to consider the alternative formula that Jilin Bright noted in its case brief following the Preliminary Results. Commerce stated in the IDM that it did

not have an opportunity to ensure that the proposed change is appropriate, but it is unclear why. See id.  The Federal Circuit has held that a refusal to consider corrective information offered in response to the preliminary results on the basis of untimeliness constituted an abuse of discretion where the correction of the errors involved only a "straightforward mathematical adjustment" that "would neither have required beginning anew nor have delayed making the final determination." NTN Bearing Corp., 74 F.3d at 1208; Timken U.S. Corp., 434 F. Supp. at 1353 ("[W]e hold that Commerce is free to correct any type of importer error—clerical, methodology, substantive, or one in judgment—in the context of making an antidumping duty determination, provided that the importer seeks correction before Commerce issues its final results and adequately proves the need for the requested corrections.").  The government has not demonstrated that the balance between accuracy and finality weighs in favor of declining to even consider Jilin Bright's proposed correction.  The court remands to Commerce to consider whether Jilin Bright's proposed change is appropriate and accurate.

## VI.    Ministerial Errors Allegations

### a. Commerce reasonably amended GHC's coal consumption and declined to amend Jilin Bright's coal consumption value.

Petitioners argue that Commerce impermissibly modified the agency's valuation of bituminous coal consumption pursuant to GHC's claim that the valuation in the Final Results was a ministerial error rather than a methodological decision.  Consolidated Pls.' Rule 56.2 Mem. of Law in Supp. of Mot. for J. on the Agency R. at 6, ECF No. 55-1 (Aug. 14, 2025) ("Petitioners Mot."); Reply Brief of Consolidated Pls. Calgon Carbon Corporation and Norit Americas, Inc. at 2–5, ECF No. 79 (Apr. 24, 2026) ("Petitioners Reply").  They argue that the implementation of programming language to value bituminous coal consumption reflects a methodological decision

by Commerce, and that nothing in the record indicates that the programming language includes a clerical error. Petitioners Mot. at 10. They also argue that in both the Preliminary Results and Final Results, Commerce used identical programming language to value GHC's consumption of bituminous coal, but that GHC failed to raise the issue in its case brief, meaning GHC failed to exhaust its administrative remedies and timely raise the issue. Id. at 9–12; Petitioners Reply at 6–8.

Consolidated Plaintiffs argue that Commerce properly corrected the error in GHC's calculation, but that Commerce similarly used the wrong value for bituminous coal in Jilin Bright's margin calculation and unreasonably failed to correct the error. Consol. Pls. Mot. at 29. They acknowledge that Jilin Bright did not raise this error in its ministerial error allegations, but that Commerce has a responsibility to produce accurate dumping margins and may correct ministerial errors in final determinations with or without a party's request.[24] Id. at 31 (citing Hyundai Elecs. Indus. Co. v. U.S., 395 F. Supp. 2d 1231, 1243 (CIT 2025)). They add that it should have been apparent to Commerce that the error in GHC's margin calculation also existed in Jilin Bright's margin calculation. Id. Finally, they argue in reply that this issue was raised before Commerce by GHC, and that Consolidated Plaintiffs may pursue the issue because of the exception allowing for a party to pursue an issue on appeal that a different party raised before the agency. Carbon Activated Tianjin Co., Ltd. & Carbon Activated Corporation's Reply in Supp. of its Rule 56.2 Mot. for J. Upon the Agency R. at 13, ECF No. 82 (Apr. 24, 2026) ("Consol. Pls. Reply") (citing

---

[24] Consolidated Plaintiffs add that correcting known errors to ensure that dumping margins are being calculated as accurately as possible is consistent with the legislative intent of the statute. Carbon Activated Tianjin Co., Ltd. & Carbon Activated Corporation's Reply in Supp. of its Rule 56.2 Mot. for J. Upon the Agency R. at 14, ECF No. 82 (Apr. 24, 2026) ("Consolidated Plaintiffs Reply").

Gov't Resp. at 59; Zhaoqing Tifo New Fibre Co. v. United States, 60 F. Supp. 1328, 1351 (CIT 2015)).

The government responds that Commerce's errors as to both the GHC and Jilin Bright margin calculations were clerical within the meaning of 19 U.S.C. § 1675(h) and 19 C.F.R. § 351.224(f), and that Commerce has discretion either to correct or reject an untimely raised ministerial error. Gov't Resp. at 56–58. The government argues that the error in GHC's calculation had nothing to do with the substance of the surrogate value selection; rather, Commerce merely mistakenly used a different surrogate value in its programming. Id. at 57. The government also argues that Commerce reasonably declined to correct the valuation of bituminous coal consumption for Jilin Bright in the Amended Final Results because Jilin Bright failed to exhaust its administrative remedies and because Commerce "has authority not to fix clerical errors" where they are untimely raised. Id. at 58–59. The government notes that no party raised the issue of Jilin Bright's bituminous coal consumption value in administrative briefing, and that Jilin Bright even failed to raise the issue in its own brief to the court. Id. at 59–60. The government adds that case law does not support the proposition that Commerce must correct a ministerial error that is not raised in the administrative proceedings. Id. at 60–61 (citing Dorbest, 604 F.3d at 1376–77; Nagase & Co. v. United States, 719 F. Supp. 3d 1343, 1355 (CIT 2024)).

19 U.S.C. § 1675(h) requires Commerce to "establish procedures for the correction of ministerial errors in final determinations within a reasonable time after the determinations are issued under this section." Pursuant to Commerce's regulation, a party to a proceeding before Commerce to whom the Secretary has disclosed calculations performed in connection with a final determination or the final results of a review may submit comments "concerning any ministerial error in such calculations." 19 C.F.R. § 351.224(c)(1). A ministerial error is "an error in addition,

subtraction, or other arithmetic function, clerical error resulting from inaccurate copying, duplication, or the like, and any other similar type of unintentional error which the Secretary considers ministerial." Id. § 351.224(f). Commerce has broad discretion to determine what constitutes a ministerial error. Fabrique de Fer de Charleroi, SA v. United States, 25 C.I.T. 567, 166 F. Supp. 2d 593, 607 (2001). Commerce's regulation states that a party to the proceeding must file comments concerning ministerial errors within five days after Commerce discloses its calculations to the party. 19 C.F.R. § 351.224(c)(2). A party's case brief "must present all arguments that continue in the submitter's view to be relevant to the Secretary's final determination or final results." Id. § 351.309(c)(2). Commerce is not required to correct errors in the calculations underlying its determination unless the respondent exhausts its administrative remedies "[by] applying to Commerce to correct the error within five days of the release of the final calculations or, if an extension is granted, within five days after the publication of the final determination." Dorbest, 604 F.3d at 1376 (citing Alloy Piping Prods. v. Kanzen Tetsu, 334 F.3d 1284, 1293 (Fed. Cir. 2003)). The court shall, where appropriate, require the exhaustion of administrative remedies. 19 U.S.C. § 2637(d).

Following the issuance of the Final Results, GHC argued that Commerce improperly used the surrogate value for lump coal in place of the surrogate value for bituminous coal and that, accordingly, the Final Results contained a ministerial error. Ningxia Guanghua Cherishmet Ministerial Error Allegation at 2–3, P.R. 265 (Nov. 20, 2024). The parties do not dispute that Commerce used the same programming language in the Preliminary Results, but that GHC failed to raise the issue until after Commerce published the Final Results. Petitioners Mot. at 12; see Consol. Pls. Mot. at 29–32; Gov't Resp. at 58. Petitioners filed responsive comments arguing that GHC's argument was methodological, not ministerial, and therefore should not be subject to a

post-final results correction.  Petitioners' Response to GHC's Ministerial Error Allegation at 2–6, C.R. 243, P.R. 268 (Nov. 25, 2024).  Commerce found that the error was ministerial and modified the valuation of GHC's bituminous coal consumption accordingly.  Amended IDM at 6–7. Commerce noted that, although GHC failed to raise this argument in its case brief following the Preliminary Results, Commerce exercised its discretionary authority to correct the ministerial error.  Amended IDM at 7.

Petitioners' argument that Commerce's use of the surrogate value for lump coal was a methodological choice fails. Commerce has broad discretion to determine what constitutes a ministerial error.  Fabrique de Fer de Charleroi, SA, 166 F. Supp. 2d at 607.  Further, Commerce made no indication in the PDM or IDM that the appropriate value should be bituminous coal rather than lump coal.  See generally PDM; IDM.  Rather, Commerce's mistake was a clerical error that GHC properly raised.

Once Commerce determined that the error in GHC's calculation was ministerial, Commerce also reasonably corrected that error in the Final Results.  While the doctrine of administrative exhaustion requires a party to raise issues at the time appropriate under an agency's practice, see Ancientree Cabinet Co. v. United States, 736 F. Supp. 3d. 1334, 1340 (CIT 2024) (citation omitted), section 1675(h) requires that Commerce's procedures for the correction of ministerial errors in final determinations "ensure opportunity for interested parties to present their views regarding any such errors."  19 U.S.C. § 1675(h).  Petitioners' reading of Commerce's regulations would require an interested party to alert Commerce to ministerial errors present in the Preliminary Results in its case brief or forfeit the argument and would also prohibit Commerce

from correcting those ministerial errors in the final results.[25]  Section 1675(h), however, contains no such restrictions.  Id.  Even if, as Petitioners argue, GHC and Jilin Bright forfeited this ministerial error allegation, the statute provides discretion for Commerce to waive this forfeiture.[26]

Commerce's discretion extends to its decision to decline to correct a ministerial error that was not raised in the administrative proceedings.  See QVD Food Co., 658 F.3d at 1328 ("Even if the error alleged by QVD were ministerial in nature, Commerce's failure to correct it would not constitute an abuse of discretion because QVD did not raise the issue in a timely fashion."); see Dorbest, 604 F.3d at 1376 ("Commerce was not required to correct these errors unless 'the respondent . . . exhaust[s] its administrative remedies . . . [by] applying to Commerce to correct the error within five days of the release of the final calculations or, if an extension is granted, within five days after the publication of the final determination.") (citing Alloy Piping Prods. v. Kanzen Tetsu, 334 F.3d 1284, 1293 (Fed. Cir. 2003)).  While Commerce may correct errors without a party's request, Commerce is not required to do so.  See 19 U.S.C. § 1675(h).  No party timely raised the error in Jilin Bright's calculation to Commerce during any stage of the

---

[25] Petitioners cite QVD Food Co., 658 F.3d at 1328 to argue that Commerce improperly corrected the ministerial error here.  Petitioners Mot. at 13.  In QVD Food Co., however, the court sustained Commerce's determination to decline to correct an error that was present in the preliminary results but not raised until after publication of the final results.  QVD Food Co., 658 F.3d at 1328.  The court's holding, however, cannot be stretched into a per se rule that Commerce abuses its discretion when it corrects an otherwise untimely ministerial error allegation.

[26] The court has held that Commerce unreasonably declined to consider ministerial errors that were discoverable in the preliminary results but not included in the party's case brief before Commerce because Commerce did not ensure that the respondent had the opportunity to present its views regarding an alleged ministerial error in the final determination as required in section 1675(h).  Catfish Farmers of Am. v. United States, 815 F. Supp. 3d 1339, 1350 (CIT 2025).  No party, however, raises the issue of whether Commerce's regulations conflict with section 1675(h).  See Gov't Resp. at 57–58; Petitioners Mot. at 29–32; Consol. Pls. Mot. at 29–32.  Accordingly, the court does not reach this question.

administrative proceedings and, accordingly, Commerce reasonably declined to correct the error in Jilin Bright's calculation.

### b. Commerce inadequately explained its calculation of Century Chemical's profit.

GHC and Jilin Bright argue that Commerce erred in denying Jilin Bright's ministerial error allegations and subtracting "fair value loss on equity investments" and "loss on disposal of equity instruments" from SG&A expenses but not from the total profit.  GHC and Jilin Bright Mot. at 43.  They argue that these values constitute losses for Century Chemical under standard accounting principles, and therefore the loss in value should have been deducted from the profit, resulting in a decrease in the overall adjusted profit.  Id. at 43–44.

The government responds that Commerce reasonably removed the "fair value loss on equity investments" and "loss on disposal of equity investments" expenditures from the SG&A column in calculating financial ratios because these expenditures were unrelated to operating activities.  Id. at 55–56.  The government argues that the expenditures here were unrelated to operating activities because they did not reflect the company's underlying administrative costs, and GHC and Jilin Bright do not contest this finding by Commerce.  Gov't Resp. at 55–56 (citing IDM at 2–5).  It contends that GHC and Jilin Bright's argument suggests that removal of losses would decrease a company's profitability, which is illogical.  Id. at 56.  Rather, as Commerce found, the SG&A value was overstated and the profit value was understated.  Id. (citing IDM at 25).  The government concludes that, accordingly, Commerce correctly removed these expenditures from the SG&A calculation and adjusted profit to account for the same.  Id.

Following Commerce's publication of the Preliminary Results, Jilin Bright submitted a case brief arguing, in part, that Commerce should remove two specific investment-related losses

from SG&A expenses in the financial ratio calculations for Century Chemical. Case Brief of Jilin Bright at 19–20, C.R. 221, P.R. 229 (June 12, 2024). Jilin Bright argued that these losses represent specific investment activities, not the company's administrative costs, and therefore should be excluded from SG&A. Id. Commerce agreed. IDM at 25. Commerce, however, found that the losses contributed to the profitability of Century Chemical during the fiscal year and, accordingly, Commerce included the expenditures as profit adjustments, which increased the profit ratio. Id. Jilin Bright filed a ministerial error allegation, in which it argued that Commerce improperly added the losses to profit in the recalculated financial ratios, whereas Commerce should have deducted them from profit. Jilin Bright Ministerial Error Allegations at 2, C.R. 242, P.R. 266 (Nov. 20, 2024). Jilin Bright argued that this incorrect calculation led to an inflated profit figure in the surrogate financial ratios, and that correcting this mistake would bring Jilin Bright's dumping margin from $1.95 to $1.83. Id. GHC also filed a ministerial error allegation, arguing that Commerce had failed to exclude the expenses from Century Chemical's SG&A, meaning that the losses were double counted in Commerce's calculation of surrogate financial ratios. Ningxia Guanghua Cherishmet Ministerial Error Allegations at 4, P.R. 265 (Nov. 20, 2024). In the Amended IDM, Commerce found that it added the value of the losses to the total profit but inadvertently failed to subtract the two charges from the total SG&A. Amended IDM at 4. Commerce found that it had not improperly treated the expenses as additions to profit but found that it should deduct the expenses from the SG&A expense column. Id. at 5. Commerce amended the calculation accordingly. See id.

        Commerce properly deducted the expenses from the SG&A expense column as these expenses were unrelated to operating activities, but Commerce has not demonstrated that it also deducted these expenses from Century Chemical's profit. Neither the IDM, Amended IDM, nor

the government's response brief makes clear how Commerce factored these losses into its calculation. See IDM at 25; Amended IDM at 4–5; Gov't Resp. at 55–56. The calculation sheets submitted by the government also do not clarify the calculation. See Def.'s Notice of Filing Surrogate Value Worksheet, GHC SV Worksheet at 58–59, ECF No. 99-1 (July 2, 2026); Def.'s Notice of Filing Surrogate Value Worksheet, Jilin Bright SV Workeet at 36–37, ECF No. 99-2 (July 2, 2026) (collectively, the "Calculation Sheets"). The Calculation Sheets contain line items for fair value loss on equity investments and loss on disposal of equity instruments but does not appear to subtract these values from the profit. See Calculation Sheets. Rather, the calculation of Century Chemical's profit subtracts the sum of the expenditures, which does not include the line items for fair value loss on equity investments and loss on disposal of equity instruments, and subtracts that from Century Chemical's profit, which consists of sales revenue and rental income. See id. It is therefore not clear how, if at all, Commerce subtracted these values from the profit. The court therefore remands to Commerce either to clarify that it deducted these losses from profit or to amend its calculation accordingly.

## CONCLUSION

The court sustains Commerce's determinations regarding the surrogate values for coal tar, sub-bituminous coal, sodium hydroxide, and potassium hydroxide; the inclusion of GHC's supplier's costs in GHC's margin calculation; the amendment of GHC's coal consumption value; and the amendment of Jilin Bright's coal consumption value. For the foregoing reasons, the court remands to Commerce for reconsideration of the primary surrogate country and the surrogate value for hydrochloric acid; of whether to exclude Greenlink's financial statements; of the alleged double multiplication error in Jilin Bright's VAT variable; and of the subtraction of fair value losses on investments and loss on disposal of equity instruments from Century Chemical's profit. The

Consol. Court No. 24-00262                                                    Page 40

remand shall be issued within 90 days hereof.  Comments may be filed 30 days thereafter and any

responses 15 days thereafter.

        /s/ Jane A. Restani
        Jane A. Restani, Judge

Dated: July 29, 2026
      New York, New York