A-570-904
Court No. 24-00262
Slip Op. 26-84
POR: 04/01/2022 – 03/31/2023
**Public Document**
E&C/OII: AH/KS

***Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd. v. United States***
**Court No. 24-00262 (CIT July 29, 2026)**
**Certain Activated Carbon from China**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I. SUMMARY

The U.S. Department of Commerce (Commerce) has prepared these final results of redetermination pursuant to the opinion and remand order of the U.S. Court of International Trade (the Court) in *Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd. v. United States*, Consol. Court No. 24-00262, Slip Op. 26-84 (CIT July 29, 2026) (*Remand Order*). These final results of redetermination concern the *Final Results* of the 2022-2023 antidumping duty administrative review on certain activated carbon (activated carbon) from the People's Republic of China (China).[1] The Court remanded for Commerce to further explain or reconsider five issues: (1) the selection of Malaysia as the primary surrogate country; (2) the selection of a Malaysian surrogate value used to value hydrochloric acid consumed in the production of subject merchandise; (3) the decision not to select a Malaysian financial statement, Greenlink Biotech Sdn. Bhd.'s (Greenlink), to calculate surrogate financial ratios; (4) the decision not to correct a multiplication error in Jilin Bright Future Chemicals Co., Ltd.'s (Jilin Bright) value added tax (VAT) variable; and (5) the decision not to account for the subtraction of two investment-related

[1] *See Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2022-2023*, 89 FR 92893 (November 25, 2024) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM); *see also Certain Activated Carbon from the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review; 2022-2023*, 89 FR 104978 (December 26, 2024) (*Amended Final Results*), and accompanying Memorandum, "Analysis of Ministerial Error Allegation," dated December 17, 2024 (Ministerial Error Memorandum).

loss items (*i.e.*, fair value loss on equity investments and loss on disposal of equity instruments) from the profit ratio calculation using Century Chemical Works Sendirian Berhad's (Century) financial statements.

Consistent with the *Remand Order*, Commerce has reconsidered or further explained each of these issues. On remand, Commerce: (1) continues to select Malaysia as the primary surrogate country due to Malaysia being the only significant producer of subject merchandise on the record; (2) revised its final results and will now change the surrogate value to no longer value hydrochloric acid from a Malaysian average unit value and instead value hydrochloric acid from a Romanian average unit value; (3) continues to exclude Greenlink's financial statements from the calculation of surrogate financial ratios due to the record indicating that Greenlink does not produce subject merchandise; (4) revised its final results and corrected the VAT calculation for Jilin Bright in order to correct the company's U.S. sales database; and (5) clarifies and further explains that it already subtracted the two investment-related loss items from Century's profit ratio calculation.

As discussed below, pursuant to the Court's *Remand Order*, Commerce has addressed parties' comments regarding Commerce's determination on whether Malaysia's surrogate value for hydrochloric acid is aberrational, whether Romania is a significant producer of subject merchandise, and whether to use Greenlink's financial statements for the calculation of surrogate financial ratios. We received no comments on any other issue addressed in the Draft Remand Redetermination.[2]

After considering the comments received, Commerce finds it appropriate to make no further changes to its analysis and continues to find that the Malaysian surrogate value for

---

[2] *See* Draft Results of Remand Redetermination, *Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd. v. United States* Court No. 24-00262 (CIT July 29, 2026) Slip-Op 26-84, dated September 25, 2026 (Draft Remand Redetermination).

hydrochloric acid is aberrational, Romania is not a significant producer of subject merchandise, and Greenlink's financial statements should continue to be excluded from the surrogate financial ratio calculations. Based on this analysis, Ningxia Guanghua Chersihmet Activated Carbon Co., Ltd.'s (GHC) revised final dumping is 1.00 USD/kg, Jilin Bright Future Chemicals Co., Ltd.'s (Jilin Bright) revised final dumping margin is 1.26 USD/kg, and the revised all-others rate is 1.13 USD/kg percent.

## II. BACKGROUND

Commerce published its *Final Results* on November 25, 2024.[3] Commerce published its *Amended Final Results* on December 26, 2024.[4] GHC and Jilin Bright, joined in part by Carbon Activated Tianjin Co., Ltd.; Carbon Activated Corporation (collectively, the plaintiffs) and Calgon Carbon Corporation; and Norit Americas Inc. (collectively, the petitioners), challenged Commerce's *Amended Final Results* with respect to Commerce's selection of Malaysia as the primary surrogate country; the surrogate value sources used to value coal tar, sub-bituminous coal, hydrochloric acid, sodium hydroxide, and potassium hydroxide; the exclusion of Greenlink's financial statements from the surrogate financial ratio calculation; the inclusion of GHC's unaffiliated supplier's costs in GHC's margin calculation; the correction of a multiplication error in Jilin Bright's VAT variable; and Commerce's treatment of two investment-related loss items in Century Chemical's profit ratio calculation. The Court sustained in part and remanded in part the *Amended Final Results*.

In its *Remand Order*, the Court stated that Commerce's selection of Malaysia as the primary surrogate country is unsupported, and it addressed GHC's and Jilin Bright's arguments that Romania produced a significant volume of activated carbon, that Commerce read an additional requirement into the statute by defining "significant producer" as a "significant net

[3] *See Final Results*.
[4] *See Amended Final Results*.

exporter," and that Commerce unreasonably disqualified Romania from consideration as a surrogate country.[5] The Court also found that Commerce conflated the steps in selecting a primary surrogate country, particularly with respect to its unclear use of financial statements, and could not discern whether Commerce relied on the financial statements to determine whether a country is a significant producer or to assess which country has the best data to value the factors of production.[6] The Court instructed Commerce to clarify its analysis and to consider which countries on the Office of Policy List are significant producers of subject merchandise based on more than the net export standard alone.[7] Additionally, the Court stated that if Romania is a significant producer, then Commerce should explain which country is selected as the primary surrogate country, presumably based on the best available data to value the factors of production.[8]

The Court also held that Commerce reasonably selected some Malaysian surrogate values, including the Malaysian surrogate values to value coal tar, sub-bituminous coal, sodium hydroxide, and potassium hydroxide.[9] However, the Court determined that Commerce's selection of the Malaysian surrogate value to value hydrochloric acid is not adequately supported.[10] The Court instructed Commerce to further justify its choice in selecting the Malaysian surrogate value given its apparent aberrational nature.[11]

The Court also held that Commerce excluded Greenlink's financial statements from the surrogate financial ratio calculations without adequate explanation, agreeing with GHC's and

---

[5] *See Remand Order* at 6-7.
[6] *Id.* at 12.
[7] *Id.*
[8] *Id.*
[9] *Id.* at 14-19 and 21-23.
[10] *Id.* at 19-21.
[11] *Id.*

Jilin Bright's argument that Commerce unreasonably failed to explain its decision to disregard Greenlink's financial statements in its surrogate financial ratio calculations.[12]

Furthermore, the Court held that Commerce's refusal to correct Jilin Bright's proposed VAT correction is not supported.[13] The Court remanded to Commerce to consider whether Jilin Bright's proposed change is appropriate and accurate.[14]

Lastly, the Court found that Commerce did not illustrate that two investment-related loss items were properly deducted from Century's profit ratio calculation.[15] The Court instructed Commerce to either clarify that it deducted these losses from profit or to amend its calculation accordingly.[16]

## III. ANALYSIS

### 1. Commerce's Use of Malaysia as the Primary Surrogate Country

We have re-examined the record pursuant to the *Remand Order* and Commerce continues to select Malaysia as the primary surrogate country for purposes of valuing factors of production in the underlying administrative review.

In the *Preliminary Results*,[17] Commerce found that Malaysia is the only significant producer of comparable merchandise on the Office of Policy Surrogate Country List because Malaysia is the only net exporter and because Malaysia provided evidence of production of comparable merchandise in the form of financial statements from multiple Malaysian companies.[18] Furthermore, in the *Final Results*, Commerce determined that the data submitted

[12] *Id*. at 23.
[13] *Id*. at 28-31.
[14] *Id*. at 31.
[15] *Id.* at 37-39.
[16] *Id*. at 39.
[17] *See Certain Activated Carbon from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2022-2023*, 89 FR 35797 (May 2, 2024) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM), unchanged in the *Final Results* IDM at Comment 2; *see also Amended Final Results*.
[18] *See Preliminary Results* PDM at 7-8.

for Malaysia were more complete than the data submitted for Romania because S.C. Romcarbon S.A. (Romcarbon), the only Romanian company with financial statements on the record, does not produce activated carbon in significant quantities.[19] Moreover, Commerce summarized that "while there is direct evidence on the record that Malaysia is a significant producer of identical merchandise, there is no equivalent information on the record to suggest that Romania is a significant producer of comparable merchandise" and that "the Malaysian financial statements provide stronger evidence of production of the subject merchandise."[20]

The Court held that Commerce had not explained why Romcarbon's financial statements undermine the record data of Romania's exports of activated carbon, and that selecting Malaysia as the primary surrogate country solely because it is the sole net exporter does not inherently prove that Romania is not a significant producer.[21] As the Court explained, "while 'net exporter' may reflect adequate production in most cases, it may not be a suitable test where absolute volumes of production are small or domestic consumption is high. There may be some scenarios where the net exporter standard alone may be reasonable, but the government has not shown that such a scenario is present here."[22] Accordingly, in its *Remand Order*, the Court instructed Commerce to: (1) reconsider which countries on the Office of Policy List are significant producers of subject merchandise on more than the net exporter standard alone; (2) clarify its use of financial statements, specifically, whether they are relevant to determining significant-producer status, to identify the best available data to value the factors of production, or both; and (3) if Romania is found to be a significant producer, explain which country is selected as the primary surrogate country based on the best available data to value the factors of production.[23]

---

[19] *See Final Results* IDM at Comment 2.
[20] *Id*.
[21] *See Remand Order* at 11-12.
[22] *Id*. at 11-12.
[23] *Id.* at 12.

Section 773(C)(4) of the Tariff Act of 1930, as amended (the Act), states that when determining a surrogate country "the administrating authority, in valuing factors of production under paragraph (1), shall utilize, to the extent possible, the prices or costs of factors of production in one or more market economy countries that are: (A) at a level of economic development comparable to that of the non-market economy (NME) country, and (B) significant producers of comparable merchandise." Neither "significant producer" nor "comparable merchandise" is defined by the statute, and Commerce's Policy Bulletin 04.1 recognizes that the meaning of "significant producer" necessarily varies from case to case depending on the characteristics of world production of, and trade in, the comparable merchandise at issue.[24]

The Policy Bulletin 04.1 uses a four-step, general approach to identify countries that are both economically comparable to the NME country, and significant producers of comparable and/or identical merchandise.[25] Under the four-step approach, first, the Office of Policy provides a list of potential surrogate countries that are at a level of comparable economic development to the NME country. Second, Commerce determines which countries on the Office of Policy List produce comparable and/or identical merchandise.[26] Third, Commerce determines whether any of those countries are "significant" producers of that merchandise, the meaning of which "can differ from case to case" but "could mean a country that is a net exporter (particularly in situations where the potential country produces identical merchandise), even though the

---

[24] *See* Enforcement and Compliance's Policy Bulletin No. 04.1, regarding, "Non-Market Economy Surrogate Country Selection Process," (March 1, 2004) (Policy Bulletin 04.1), available on Commerce's website at https://www.trade.gov/enforcement-and-compliance-policy-bulletins-0.

[25] *Id*. at 2; *see also Floor-Standing, Metal-Top Ironing Tables and Certain Parts Thereof from the People's Republic of China: Final Results of Antidumping Duty Administrative Review: 2009-2010*, 77 FR 14499 (March 12, 2012), and accompanying IDM at 5; *Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2014-2015*, 81 FR 62088 (September 8, 2016), and accompanying IDM at 20 (citing *Jiaxing Brother Fastener Co. v. United States*, 961 F. Supp. 2d 1323, 1328, 1335 (CIT 2014), *aff'd* 822 F.3d 1289, 1293 (Fed. Cir. 2016)); and *Chlorinated Isocyanurates from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2022-2023*, 90 FR 9710 (February 18, 2025), and accompanying IDM at 6-7.

[26] *See* Policy Bulletin 04.1 at 2-3.

{surrogate country} may not be one of the world's top producers."[27] Policy Bulletin 04.1 instructs that this determination should not be judged against the NME country's own production level or against the comparative production of the other countries of the Office of Policy surrogate country list, but rather against the broader characteristics of world production and trade in the merchandise, to the extent such data is available.[28] Fourth, if more than one potential surrogate country satisfies the statutory threshold requirements, Commerce selects, to the extent possible, the country with the best available data as the primary surrogate country.[29]

Accordingly, only after Commerce compiles the initial surrogate country list will we then consider whether the countries on the list are significant producers of comparable merchandise.[30] The determination of whether a country is a "significant" producer of merchandise cannot solely be made on the basis of whether they are a "net exporter."[31] As noted above, the meaning of "significant producer" "can differ from case to case."[32] In addition, a net exporter may not necessarily be a "significant" net exporter.

**a. Significant-Producer Analysis**

In this case, Commerce has identified six countries whose economic development is comparable to that of China: Romania, Panama, Costa Rica, Malaysia, Bulgaria, and the Republic of Türkiye.[33] Of the countries identified as economically comparable to China on the Surrogate Country List, interested parties advocated and provided data for both Romania and

---

[27] *Id.* at 3-4.
[28] *Id.* at 3.
[29] *Id.* at 4.
[30] *See Clearon Corp. v. United States*, Slip Op. 14-88 (CIT July 24, 2014) at 8.
[31] *See Heze Huayi Chem. Co. v. United States*, Slip Op. 2018-57 (CIT May 22, 2018); *see also Fresh Garlic From the People's Republic of China: Final Results of the 23rd Antidumping Duty Administrative Review; 2016-2017*, 84 FR 35601 (July 24, 2019) (*Fresh Garlic from China*), and accompanying IDM at Comment 2; and *Xanthan Gum from the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 78 FR 2252 (January 10, 2013), and accompanying PDM at 4-7, unchanged in *Xanthan Gum from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 78 FR 33350 (June 4, 2013).
[32] *See* Policy Bulletin 04.1 at 4.
[33] *See* Memorandum, "Request for Economic Development, Surrogate Country, and Surrogate Value Comments and Information," dated November 7, 2023, at Attachment (Surrogate Country List).

Malaysia; accordingly, Commerce limited its significant-producer analysis to these two countries.[34] Consistent with the Court's instruction, Commerce's significant-producer analysis below considers the available record evidence including the relative import and export volumes and scale and composition of each country's activated carbon production, rather than resting solely on the net-exporter status to determine which countries are "significant producers of comparable merchandise."

*Romania*

Upon review of the record, and applying the standard set forth above, Commerce continues to find that Romania is not a significant producer of comparable merchandise for this period of review (POR), based on the totality of the trade and production evidence discussed below.

First, according to COMTRADE data on the record submitted by Calgon Carbon Corporation and Norit Americas Inc. (collectively, the petitioners), Romania was a net importer of activated carbon during the POR,[35] importing 1,243,143 kg, while exporting 35,319 kg, a ratio of 3,500 percent more imports than exports.[36] Furthermore, Romania's 35,319 kg worth of exports amounts to less than two 20-ton containers worth of activated carbon for the entire POR.[37] This combination, substantial imports paired with negligible exports, could in theory reflect either of two scenarios: a country with minimal domestic production that relies on imports to meet demand, or a country with substantial domestic production that is nonetheless entirely absorbed by even greater domestic consumption, leaving little for export. The trade data does not resolve which of these two scenarios describes Romania. Policy Bulletin 04.1 does not

---

[34] *See* GHC's Letter, "Comments on the Department's Selection of a Surrogate Country," dated November 21, 2023; *see also* Jilin Bright's Letter, "Surrogate Country Comments," dated November 21, 2023; and Petitioners' Letter, "Petitioners' Comments on Surrogate Country Selection," dated November 21, 2023 (Petitioners' Surrogate Country Comments).
[35] *See* Petitioners' Surrogate Country Comments at 7.
[36] *Id*.
[37] *Id*.; *see also* Petitioners' Letter, "Petitioners' Rebuttal Brief," dated July 2, 2024 (Petitioners' Rebuttal Brief), at 9.

require that a surrogate country must be a net exporter to be selected as a surrogate country.[38] In this case, the ratio of Romanian exports compared to imports, along with Romania's limited number of exports of activated carbon appear to illustrate that it is not a significant producer vis-à-vis the other potential surrogate country on the record of this segment as explained further below.

Because trade data in this instance cannot by itself distinguish between these two scenarios, Commerce turns to financial statements, information available on the record, to determine which explanation reflects Romania's production of comparable merchandise. Consistent with the significant producer inquiry under step three of Commerce's surrogate country selection methodology and separate from any assessment of data quality for valuing factors of production under step four, Commerce considers Romcarbon's financial statements to discern the level of Romania's domestic production of comparable merchandise. Romcarbon is the only Romanian producer with financial statements on the record, and its financial statements accordingly present the only evidence on the record with regards to the scale of Romania's domestic production of comparable merchandise.

Romcarbon is primarily a producer of plastics, with activated carbon not listed as a main activity of the company.[39] In fact, the financial statements indicate that activated carbon comprises only 3.64 percent of Romcarbon's total revenue when combined with respiratory protective equipment, auto filters, industrial filters, PVC pipes, PVC tubes, and recycled PVC bases for traffic signs.[40] Moreover, Romcarbon's manufacturing of activated carbon is further limited because the company consumes the activated carbon that it produces for use in the

---

[38] *See Fresh Garlic from China* IDM at Comment 2.
[39] *See* Petitioners' Rebuttal Brief at 15 (citing GHC's Letter, "Comments on the Department's Selection of a Surrogate Country," dated June 20, 2023, at Exhibit 6).
[40] *Id*.

manufacturing of gas masks and similar protective devices, rather than sold on the market.[41] This evidence confirms Romania's net import position of limited domestic production, not high demand involving a significant production base.

Considered together, and absent record evidence to the contrary, Romania's substantial net import position and its only known producer's minimal, largely self-consumed output of activated carbon establish that Romania's low level of exports reflects limited domestic production, not domestic demand outstripping a significant production base. Accordingly, Commerce finds that there is no record evidence to support finding that Romania is a significant producer of comparable merchandise for this POR.

*Malaysia*

Upon review of the record, and applying the standard set forth above, Commerce reconsiders whether Malaysia is a significant producer of comparable merchandise for this POR, based on the trade and production evidence discussed below.

First, record data indicates that Malaysia was the only net producer of activated carbon among the countries on the Office of Policy List. Specifically, Malaysia exported 19,795,328 kilograms of activated carbon while importing only 16,803,559 kilograms indicating that not only is it a net exporter, but Malaysia exported 17.62 percent more activated carbon than it imported.[42] This amount equates to 148 20-ton containers worth of merchandise, or more than 12 tons of shipments for each month of the POR. There is no information on the record to support finding that a country can sustain net exports of this scale over the course of a review period without a substantial underlying production base, as exports of this magnitude necessarily exceed what could be supplied by minimal or incidental domestic output. Thus, we conclude

---

[41] *See* Petitioners' Rebuttal Brief at 16.
[42] *Id*. at 9.

that domestic production in Malaysia provided the difference needed to sustain the exports of activated carbon.

Consistent with the significant producer inquiry under step three of Commerce's surrogate country selection methodology, and, separate from any assessment of data quality for valuing factors of production under step four, Commerce also considers producer level financial statements on the record solely for what they reveal about the scale of Malaysia's domestic production of comparable merchandise.[43] At least two Malaysian companies, Century and New Chang Hua Sdn. Bhd. (New Chang Hua), reported activated carbon as their primary business activity, with both companies reporting 100 percent of their revenue from sales of activated carbon.[44] This evidence confirms, at the level of individual producers, that Malaysia's export volume reflects significant production.[45]

Accordingly, we find that record evidence only supports finding Malaysia is a significant producer of comparable merchandise. Romania's status as a substantial net importer, and Romcarbon's financial statements collectively, rather than net-exporter status in isolation, support the conclusion that Romania is not a significant producer of comparable merchandise under section 773(c)(4)(B) of the Act. Whereas Malaysia's substantial net export volume and the existence of Malaysian producers deriving 100 percent of their revenue from activated carbon support the conclusion that Malaysia is a significant producer under section 773(c)(4)(B) of the Act. These determinations rest on each country's own trade and production evidence on the record of this administrative review, and are considered independently, rather than on a comparison basis between the two countries or on net-exporter status alone.

[43] *See Silicon Metal from the People's Republic of China: Preliminary Results and Preliminary Rescission, in Part, of Antidumping Duty Administrative Review*, 74 FR 32885 (July 9, 2009), unchanged in *Silicon Metal from the People's Republic of China: Final Results and Partial Rescission of Antidumping Duty Administrative Review*, 75 FR 1592 (July 12, 2010).
[44] *Id*. at 17; *see also* Jilin Bright's Letter, "Surrogate Value Information," dated March 27, 2024 (Jilin Bright Final SV Comments), at Exhibit 1B.
[45] *Id.*

**b. Commerce's Use of Financial Statements in the Significant-Producer Analysis**

In response to the Court's instruction to clarify Commerce's use of financial statements in the surrogate country selection analysis, specifically, whether financial statements are relevant to determining significant producer status, to identifying the best available data to value factors of production,[46] or both, Commerce addresses that question below. Upon further examination, we continue to find that financial statements are relevant to determining significant producer status and identifying the best available data to value factors of production.

As illustrated by the analyses above, Commerce may also consider financial statements at the significant producer stage because they may provide probative information with respect to the very question step three asks: whether a country's producers are engaged in significant production of comparable merchandise. This, as noted above, is independent of step four where, for example, data quality such as countervailable subsidies may disqualify the financial statement from our surrogate country analysis. As we explained above in our analysis of the Romanian data, the record of this administrative review only includes trade data, which alone cannot distinguish between a country with minimal production and a country with substantial production that, for example, is entirely absorbed by domestic consumption. Romcarbon's financial statements filled the gap by disclosing, at the level of the individual producer, what share of the company's business is devoted to producing activated carbon, and the extent to which that limited output is further consumed internally rather than sold. In this instance, this is the kind of producer level evidence needed to confirm or rebut an inference drawn from country level trade data. It is properly considered at step three, the step in which Commerce determines whether any of the countries found to be at an economically comparable level are "significant producers" of comparable merchandise because it bears directly on the question of production,

---

[46] *See Remand Order* at 12.

not on the separate question of which country's data is the best available source for valuing factors of production.

The Malaysia analysis illustrates the same principle in the inverse. Malaysia's trade data alone was sufficient to support a determination of significant production, as a country generally cannot sustain net exports of the volume Malaysia reported without a significant underlying production base. Century's and New Chuang's financial statements, reflecting that both companies derive 100 percent of their revenue from activated carbon sales, corroborate that inference at the producer level, confirming that Malaysia's export volume reflects actual production rather than an anomaly in the trade data.

By contrast, the step four inquiry asks a different question: assuming a country has already been found to be a significant producer, whether that country's data, including its producers' financial statements, is the best available information for valuing factors of production such as surrogate financial ratios. That inquiry depends, in part, on considerations such as completeness, contemporaneity, and comparability of the underlying data, that are distinct from the step three question for whether the country is a significant producer.

**c. Surrogate Country Selection**

As record evidence supports finding that Malaysia is a significant producer of comparable merchandise and that Romania is not, Commerce turns to the fourth step of its surrogate country selection methodology: whether more than one country satisfies the statutory threshold requirements and, if so, which country has the best available data to value factors of production.[47] Because there is no record evidence to support finding that Romania satisfies the significant producer requirement of section 773(c)(4)(B) of the Act, we determine that Romania is ineligible for consideration as the primary surrogate country in this proceeding. As we find

[47] *See* Policy Bulletin 04.1 at 4.

that record evidence does not support finding Romania is a significant producer of comparable merchandise, we do not further assess the completeness and quality of the Romanian surrogate value or financial statement data. The Court's instructions that Commerce explain which country is selected as primary surrogate country, and on what basis,[48] if Romania is found to be a significant producer, is accordingly not triggered, as Commerce continues to find that Romania does not meet that threshold requirement.

Malaysia is the only country on the Office of Policy List that Commerce has found to be both at a level of economic development comparable to China and a significant producer of activated carbon based on record evidence. Accordingly, Malaysia satisfies both statutory threshold requirements of section 773(c)(4) of the Act, and no further comparison among competing significant producer countries is necessary to select the primary surrogate country. For these final results of redetermination, Commerce continues to select Malaysia as the primary surrogate country for purposes of valuing factors of production in the underlying administrative review.

**2. Commerce's Use of a Malaysian Average Unit Value to Value Hydrochloric Acid**

Commerce has reexamined the record and determined that the Malaysian average unit value is aberrational and therefore unreliable to value hydrochloric acid.

In the *Final Results*, Commerce stated that while Malaysia's import value for hydrochloric acid is the highest average price amount among the Office of Policy List countries, the high prices alone do not indicate distortion.[49] Commerce noted that while the Malaysian import value for this review is 130 percent greater than the Malaysian import average unit value

[48] *See Remand Order* at 12.
[49] *See Final Results* IDM at Comment 3 (citing *Trust Chem Co., Ltd. v. United States*, 791 F. Supp. 2d 1264 (CIT 2011)).

in the fifteenth administrative review, it is only 79 percent greater than the Malaysian value in the fourteenth administrative review.[50]

The plaintiffs argue that Commerce unreasonably selected Malaysia's average unit value for hydrochloric acid as the surrogate value because the value sharply diverges from historical Malaysian average unit values and contemporaneous average unit values from other Office of Policy List countries.[51] GHC and Jilin Bright contend that the Malaysian average unit value increased 130 percent from the fifteenth administrative review and 79 percent from the fourteenth administrative review, and that this suggests that the Malaysian average unit value is aberrational.[52] The respondents also argued that the Malaysian average unit value is 500 percent higher than the next highest average unit value from other Office of Policy List countries during the POR, but that Commerce did not analyze this disparity in its results.[53] The respondents add that Commerce has not pointed to any meaningful variation in the composition or grade of hydrochloric acid that could lead to this discrepancy in values and that the Malaysian value differs significantly from the world average unit value, which further highlights that the value is aberrational, but that Commerce failed to consider this point.[54]

The Court held that Commerce's selection of the Malaysian surrogate value for hydrochloric acid is not adequately supported.[55] Specifically, the Court found that Commerce failed to explain why the Malaysian average unit value was not aberrational, noting only that the average unit value rose "only 79 percent" from the fourteenth administrative review without addressing why that increase was insufficient to render the value distortive, and that Commerce failed to compare the Malaysia average unit value for hydrochloric acid to the average unit value

[50] *Id*.
[51] *See Remand Order* at 19.
[52] *Id*.
[53] *Id*. at 19-20.
[54] *Id*. at 20.
[55] *Id*. at 19-21.

of the other Office of Policy List countries.[56] The Court remanded to Commerce for further analysis and explanation of its selection of a surrogate value for hydrochloric acid.[57]

Upon review of the record evidence, Commerce reconsiders its original determination and now finds that the Malaysian average unit value for hydrochloric acid is aberrational. In Commerce's practice, there is no "bright line" determination for what values may qualify as aberrational.[58] Commerce's normal practice is to conduct "a quantitative analysis and measurable analysis," "comparing either data from economically comparable countries or historical data from the country at issue to determine if data is unreliable or an outlier."[59] Under this approach, values have been deemed aberrational when "nearly 30 times higher than other values,"[60] whereas merely sitting at the high or low end of a range does not, on its own, render a data point an outlier.[61] However, because the relevant benchmarks and thresholds Commerce has applied in past proceedings were particular to the facts of those cases, prior findings of aberration (or non-aberration) at a given percentage or numerical differential do not establish a generally applicable rule to be mechanically applied in other proceedings.[62]

Comparing the average unit value for hydrochloric acid in Malaysia to other Office of Policy List countries, record evidence illustrates that the Malaysian average unit value is

---

[56] *Id*.
[57] *Id*.
[58] *See Best Mattresses International Company Limited v. United States*, 622 F. Supp. 3d 1347, 1379 (CIT 2023) (*Best Mattresses*); *see also Hydrofluorocarbon Blends from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 89 FR 16724 (March 8, 2024), and accompanying IDM at Comment 3.
[59] *See Ad Hoc Shrimp Trade Action Committee v. United States*, 234 F. Supp. 3d 1315, 1319 (CIT 2017) (*Ad Hoc Shrimp Trade Action Committee v. United States*); *see also Tri Union Frozen Products, Inc. v. United States*, 254 F. Supp. 3d 1290, 1296 (CIT 2017) (*Tri Union Frozen Products, Inc. v. United States*).
[60] *See Best Mattresses*, 622 F. Supp. 3d at 1379.
[61] *See Multilayered Wood Flooring from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 79 FR 26712 (May 9, 2014), and accompanying IDM at Comment 6.
[62] *See, e.g.*, *Certain Hot-Rolled Carbon Steel Flat Products from Romania: Final Results of Antidumping Duty Administrative Review*, 70 FR 34448 (June 14, 2005), and accompanying IDM at Comment 2 (rejecting the argument that specific percentage-based thresholds applied in prior cases, such as in *Tapered Roller Bearing and Parts Thereof, Finished and Unfinished from the People's Republic of China; Final Results of Antidumping Administrative Review*, 61 FR 65527, 65531 (December 13, 1996), establish a general rule, because "the applications of those benchmarks were particularly to the cases in which they were applied," and finding instead that "there is no single approach that fits all cases" and that whether data are aberrational is determined "on a case-by case basis after considering the totality of the circumstances.").

aberrational. Commerce considers surrogate value data to be aberrational when such data is: "(1) an extreme outlier; (2) distorted or misrepresentative; or (3) is somehow incorrect."[63] Indeed, the Court has found import values to be aberrational where the value is many times higher than the value from other countries.[64]

Malaysia's average unit value for hydrochloric acid during the POR was 3.64 USD/kg, while the average unit values of the other Office of Policy List countries ranged from 0.18 USD/kg to 0.47 USD/kg, and the world average unit value was 0.19 USD/kg.[65] These data show that the average unit value for Malaysian hydrochloric acid is approximately 7.74 times greater than the next highest Office of Policy List countries average unit value at 0.47 USD/kg, and approximately 19 times greater than the world average unit value.[66] This disparity is corroborated by the trend in Malaysia's own historical import data: the Malaysia average unit value for hydrochloric acid increased by 130 percent from the fifteenth administrative review and 79 percent from the fourteenth administrative review.[67] Considered together, the magnitude of Malaysia's average unit value relative to every other country on the Office of Policy List, and the magnitude of its increase relative to its own historical values, demonstrate that the Malaysian average unit value for hydrochloric acid is aberrational and is accordingly not the best available information to value this factor of production.

---

[63] *See Chlorinated Isocyanurates from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2022-2023*, 89 FR 56303 (July 9, 2024), and accompanying PDM at 17, unchanged in *Chlorinated Isocyanurates from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2022-2023*, 90 FR 9710 (February 18, 2025); *see also Tri Union Frozen Prods. v. United States*, 227 F. Supp. 3d 1387, 1394-95 (CIT 2017).
[64] *See Best Mattresses*, 622 F. Supp. 3d at 1379.
[65] *See* GHC's Letter, "Comments on the Department's Selection of a Surrogate Country," dated December 20, 2023, at Exhibit 2B.
[66] *Id*.
[67] *See* Petitioners' Letter, "Petitioners' Rebuttal of Respondents' First Surrogate Value Submission," dated January 10, 2024, at Exhibit SVR-5.

Commerce's preference is to value all factors of production in a single surrogate country.[68] However, Commerce may use a surrogate value from a secondary surrogate country if the sources to value inputs from the primary surrogate country are: (1) unavailable; (2) not sufficiently contemporaneous; (3) of poor quality (*i.e.*, not sufficiently specific to the inputs in question); or (4) otherwise unreliable.[69] As discussed above, Commerce has determined that the Malaysian average unit value is aberrational and therefore unreliable to value hydrochloric acid. Therefore, for these final results of redetermination, we use Romanian Trade Data Monitor import data, as reported by GHC, to value hydrochloric acid, as Romania is the only other Office of Policy List country with full import data available on the record.[70]

**3. Commerce's Exclusion of Greenlink's Financial Statements**

At the *Preliminary Results*, we calculated financial ratios based on the average of the financial statements of two Malaysian companies, Century and New Chang Hua.[71] We found that both financial statements were contemporaneous with the POR, publicly available, and reflected both Jilin Bright's and GHC's experiences because both companies are producers of comparable merchandise.[72] In the *Final Results* and *Amended Final*, Commerce did not change its analysis.[73] GHC and Jilin Bright argue that Commerce unreasonably failed to explain its decision to disregard the financials statements of Greenlink in its financial ratio calculations.[74]

The Court held that Commerce excluded Greenlink's financial statements from its financial ratio calculations without adequate explanation.[75] Accordingly, the Court remanded for

[68] *See* 19 CFR 351.408(c)(2).
[69] *See, e.g.*, *Silicomanganese from the People's Republic of China: Notice of Final Results of Antidumping Duty Administrative Review*, 65 FR 31514 (May 18, 2000), and accompanying IDM at Comment 1.
[70] *See* GHC's Letter, "Comments on the Department's Selection of a Surrogate Country," dated December 20, 2023, at Exhibit 1 and 2.
[71] *See Preliminary Results* PDM at 21.
[72] *Id*. at 21-22.
[73] *See Final Results* IDM at Comment 4; *see also* Ministerial Error Memorandum.
[74] *See Remand Order* at 23.
[75] *Id.* at 23-25.

Commerce to provide a reasoned explanation for its decision to exclude Greenlink's financial statements.[76]

Upon review of the record, Commerce notes that it inadvertently did not specifically address Greenlink's financials in the *Final Results*.[77] Commerce has reconsidered the issue on remand and continues to find that it is appropriate to exclude Greenlink's financial statements, for the reasons discussed below.

Pursuant to section 773(c) of the Act, we value factors of production using the "best available information" from a market economy country. Commerce's criteria for choosing surrogate financial statements from which we derive the financial ratios are the availability of contemporaneous financial statements, their comparability to the respondent's experience, and whether they are publicly available.[78] Likewise, to value factory overhead, selling, general, and administrative (SG&A)) expenses, and profit, Commerce normally uses non-proprietary information gathered from producers of identical or comparable merchandise in the primary surrogate country, pursuant to 19 CFR 351.408(c)(3).[79] Commerce's practice puts preference on financial statements of producers of identical merchandise, when available, to those of companies that only produce comparable merchandise.[80]

While the statute does not define "comparable merchandise," in selecting surrogate financial statements, it is Commerce's practice to apply a three-prong test to determine whether

---

[76] *Id.*
[77] *See Final Results* IDM at Comment 4.
[78] *See Notice of Final Determination of Sales at Less Than Fair Value: Chlorinated Isocyanurates from the People's Republic of China*, 70 FR 24502 (May 10, 2005), and accompanying IDM at Comment 3.
[79] *See Preliminary Results* PDM at 21 (citing *Final Determination of Sales at Less Than Fair Value and Final Partial Affirmative Determination of Critical Circumstances: Diamond Sawblades and Parts Thereof from the People's Republic of China*, 71 FR 29303, 29307 (May 22, 2006), and accompanying IDM at Comment 1); section 773(c)(4) of the Act; and 19 CFR 351.408(c)(3).
[80] *See, e.g.*, *Certain Oil Country Tubular Goods from the Socialist Republic of Vietnam: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 79 FR 47973 (July 18, 2014), and accompanying IDM at Comment 2.

merchandise is "comparable," considering the: (1) physical characteristics; (2) end uses; and (3) production processes of the product at question.[81]

Greenlink's financial statements are contemporaneous with the POR and publicly available.[82] Notwithstanding that Greenlink's financial statements meet those criteria, Greenlink is not a producer of identical merchandise. Commerce accordingly has a preference for the financial statements of Century Chemical and New Chang Hua, both of which are producers of identical merchandise,[83] over Greenlink's financial statements. This preference alone would be sufficient to exclude Greenlink's financial statements from the surrogate financial ratio calculation. However, because the respondents dispute whether Greenlink is a producer of comparable merchandise, Commerce also addresses that question below.

The record does not contain sufficient information to fully evaluate all three prongs of the comparable merchandise test to determine whether Greenlink's merchandise is comparable. The only information on the record concerning Greenlink is that its principal activity is the manufacturing of charcoal products.[84] Specifically, Greenlink produces pillow-shaped charcoal briquettes, shisha cube charcoal, hexagon charcoal briquettes, mangrove charcoal, biotech fire-starters, and charcoal deodorizers.[85] There is no record evidence regarding the physical characteristics or production process of these products. The petitioners argued in its surrogate value rebuttal comments that these products are "retail ready briquettes for end uses such as smoking pipes, fire-starting and cooking food, *etc.*"[86] Based on that end use information alone, the charcoal products manufactured by Greenlink are not comparable merchandise to activated

[81] *See*, *e.g.*, *Wooden Bedroom Furniture from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and New Shipper Review*, 73 FR 49162 (August 20, 2008), and accompanying IDM at Comment 1.
[82] *See* Jilin Bright Final SV Comments at Exhibits 3A and 3B.
[83] *Id*. at Exhibits 1B and 1C.
[84] *Id.* at Exhibit 3A.
[85] *See* Petitioners' Letter, "Petitioners' Submission of Information to Rebut Respondent's Final Affirmative Surrogate Value Submission," dated April 8, 2024 at Exhibit FSVR-2 (Petitioners' Rebuttal SV Comments).
[86] *See* Petitioners' Rebuttal SV Comments at 6.

carbon. The U.S. International Trade Commission has issued a report indicating that activated carbon is used primarily to separate trace chemical species from liquid and gas steams, such as removing impurities from water, food, beverages, and industrial waste, and for gas-phase uses like air purification and solvent recovery.[87] Given this clear divergence in the end use of the products, the only prong of the test for which there is information on the record, Commerce finds that Greenlink's products are also not comparable to activated carbon.

Accordingly, whether evaluated under Commerce's preference for producers of identical merchandise or under the three-prong comparable merchandise test, notwithstanding the lack of complete information on the record to fully evaluate all three prongs of that test, the record supports excluding Greenlink's financial statements. As such, for these final results of redetermination, Commerce continues to exclude Greenlink's financial statements from the surrogate financial ratio calculations because there is no record information to support finding that Greenlink's products are comparable to activated carbon.

**4. Commerce's Calculation of Jilin Bright's Value Added Tax**

In the *Final Results*, Commerce continued to use a revised per-unit VAT variable, RVATTAXU, for Jilin Bright.[88] In the *Final Results*, Commerce stated that Jilin Bright reported the VAT amount in its Section C questionnaire response[89] and subsequent to that response, Jilin Bright did not update its VAT calculation.[90] Commerce found that Jilin Bright did not alert Commerce that the VAT amount was incorrect until its submission of its case brief, and thus Commerce did not have the opportunity to ensure that the proposed change was appropriate,

[87] *See* Jilin Bright's Letter, "Rebuttal Surrogate Value Comments," dated January 10, 2024 at Exhibit 5-D.
[88] *See Final Results* IDM at Comment 5.
[89] *See* Jilin Bright's Letter, "Section C Response," dated September 21, 2023 at Exhibit C-1 (Jilin Bright's CQR).
[90] *See Final Results* IDM at Comment 5.

correct, or more accurate than the VAT amount originally reported by Jilin Bright.[91] As such, Commerce concluded not to adjust the VAT amount reported.[92]

GHC and Jilin Bright argue that Commerce should have used the formula that Jilin Bright stated in its Section C questionnaire response to calculate the VAT variable "RVATTAXU."[93] The respondents note that a clerical error occurred in Jilin Bright's U.S. sales database,[94] where the VATTAXU for a certain sequence was incorrectly reported due to the use of a formula that improperly multiplied the "QTYU" variable twice.[95] GHC and Jilin Bright state that the Court should require Commerce to apply the "analogous practice to accept minor corrections at verification" here and hold that Commerce improperly failed to correct Jilin Bright's error.[96]

The Court held that Commerce's refusal to correct Jilin Bright's proposed VAT calculation formula was unsupported, because Commerce failed to explain why it lacked the opportunity to assess the correction, which involved only a straightforward mathematical adjustment raised in Jilin Bright's case brief following the *Preliminary Results*.[97] The Court remanded for Commerce to consider whether Jilin Brights's proposed formula is appropriate and accurate.[98]

Upon review of the record evidence, Commerce finds that Jilin Bright originally reported a per-unit VAT calculation for a certain sequence number that contained a clerical error in which the "QTYU" variable was inadvertently multiplied twice, resulting in an inaccurate per-unit VAT figure. Thus, Commerce finds that Jilin Bright's proposed correction to this error is appropriate and accurate. Accordingly, for these final results of redetermination, Commerce is

---

[91] *Id.*
[92] *Id.*
[93] *See Remand Order* at 28.
[94] *See* Jilin Bright's CQR at Exhibit C-1.
[95] *See Remand Order* at 28.
[96] *Id.* at 29.
[97] *Id.* at 28-31.
[98] *Id.*

correcting Jilin Bright's VAT calculation for a certain sequence number and will apply the formula: RVATTAXU = (TOTAMO / 1.13 * 0.13) / QTYU),[99] in place of the formula originally used.[100]

**5. Commerce's Calculation of Century's Profit Ratio**

Following the *Final Results*, Jilin Bright submitted a ministerial error allegation arguing that Commerce improperly added two investment-related loss items, fair value loss on equity investments and loss on disposal of equity instruments to Century's profit ratio when they should have deducted them.[101] Jilin Bright states, "{t}hese items were improperly treated as additions to profit in the recalculated financial ratios. According to standard accounting principles and Commerce practice, losses reported in {SG&A} expenses should be deducted from the profit in the calculation of the surrogate financial ratios."[102] In the *Amended Final*, Commerce disagreed with Jilin Bright's claim that the two expenses were improperly treated as additions to profit in the recalculated financial ratios.[103] However, we agreed with GHC that in order to correctly account for the omission of the two SG&A expenses, a reduction equating to the total value for both expenses needed to be made to the "SG&A and Interest" expense columns in the financial ratios calculations.[104] Accordingly, in the *Amended Final*, we found that "we inadvertently failed to subtract the two charges from the total SG&A in the *Final Results*…{and} revised our calculations to deduct Fair Value Loss on Equity Investments and Loss on Disposal of Equity Instruments from the profit in the calculation of the surrogate financial ratios."[105]

The Court found that Commerce had not demonstrated whether it properly deducted the two investment-related loss items from Century Chemical's profit, after having already removed

[99] *See* Jilin Bright's CQR at C-33.
[100] *See* Jilin Bright's Remand Redetermination Calculation Memorandum.
[101] *See* Jilin Bright's Letter, "Ministerial Error Allegations," dated November 20, 2024, at 2.
[102] *Id.*
[103] *See* Ministerial Error Memorandum at 4-5.
[104] *Id.*
[105] *Id.*

those same items from Century Chemical's SG&A expenses.[106] The Court remanded for Commerce to either clarify that it deducted these losses from profit or to amend its calculation accordingly.[107] In response to the Court's instruction, Commerce clarifies that it deducted the two investment-related loss items from Century Chemical's profit in the *Amended Final Results*, and explains that calculation below.

Century Chemical's original financial statements include the fair value loss on equity investments and loss on disposal of equity instruments as part of administrative expenses on the income statement.[108] Excluding these two investment-related loss items from Century Chemical's financial ratios requires different arithmetic treatment for SG&A and profit, because the losses affect each figure in opposite ways. With respect to SG&A, because the losses were originally included as a component of administrative expenses, excluding them requires subtracting their value from the SG&A total. With respect to profit, because the same losses, embedded in administrative expenses, already reduced profit when administrative expenses were deducted from revenue to calculate net profit, excluding them from profit requires reversing the reduction by adding the loss amounts back to the profit figure. As illustrated in the table below, net profit before tax at line (e) already reflects the reducing effect of the two-investment related items embedded in administrative expenses at line (d); because those losses reduced profit when deducted as part of administrative expenses, lines (f) and (g) reverse that reduction by adding the two loss amounts back, yielding line (h), the profit figure with both items excluded. Although two operations, subtraction for SG&A and addition for profit, appear inconsistent, both achieve the same result: the complete exclusion of the two investment-related loss items from Century Chemical's surrogate financial ratios. This is the same treatment Commerce applied to exclude

[106] *See Remand Order* at 38-39.
[107] *Id.*
[108] *See* Petitioners' Letter, "Petitioners' First Affirmative Surrogate Value Comments," dated December 20, 2023, at Attachment 5.

these two items from Century Chemical's SG&A ratio calculation, consistent with Commerce's determination in the *Amended Final Results* that these losses are unrelated to Century Chemical's operating activities.

| Reference | Item | Value ( in RMB) |
|---|---|---|
| (a) | Revenue | 91,462,602 |
| (b) | Add: Other Income | +4,980,597 |
| (b) | Less: Cost of Goods Sold | (59,646,898) |
| (d) | Less: Administrative Expenses (Includes Investment-Related Losses) | (13,010,676) |
| **(e) = (a) + (b) + (c) + (d)** | **PROFIT BEFORE TAX** | **23,785,625** |
| (f) | Add Back: Fair Value Loss on Equity Investment | +2,460,196 |
| (g) | Add Back: Loss on Disposal of Equity Instruments | +170,450 |
| **(h) = (e) + (f) + (g)** | **REVISED PROFIT EXCLUDING EQUITY LOSSES** | **26,416,271** |

Line (h) is the profit figure Commerce used in the *Amended Final Results* to calculate Century Chemical's surrogate profit ratio.[109] Accordingly, Commerce clarifies that it properly deducted the two investment-related loss items from Century Chemical's profit in the *Amended Final Results*, and for these final results of redetermination Commerce is making no changes to the profit ratio calculated in the *Amended Final*.

Based on the changes made pursuant to these final results of redetermination, Commerce has made a change to the estimated weighted-average dumping margin established at the *Amended Final Results* for both GHC and Jilin Bright which is now 1.00 USD/kg and 1.26 USD/kg, respectively.[110] The margin rate for non-selected companies in this review is 1.13 USD/kg percent.[111]

[109] *See* Memorandum, "Amended Final Analysis Memorandum for Jilin Bright Future Chemicals Co., Ltd." dated December 17, 2024, at 2 and Attachment II.
[110] *See* Jilin Bright Remand Redetermination Calculation Memorandum; *see also* GHC Remand Redetermination Calculation Memorandum.
[111] *See* Non-Selected Companies Redetermination Calculation Memorandum.

## IV. INTERESTED PARTY COMMENTS

On September 25, 2026, Commerce issued its Draft Remand Redetermination and provided interested parties with the opportunity to comment.[112] Commerce received comments from the petitioners and plaintiffs.[113] We address those comments below.

**Comment 1: Whether the Malaysian Surrogate Value for Hydrochloric Acid is Aberrational**

*Petitioners' Comment:*

The following is a verbatim summary of arguments submitted by the petitioners.[114] For further details, *see* Petitioners' Draft Remand Comments at pages 3-7.

> With respect to the surrogate value for hydrochloric acid in the Draft Remand {Redetermination}, although the data points {Commerce} identifies are accurate, they do not demonstrate that the Malaysian import value is aberrational. The magnitude of the increase in the Malaysian value over the past several review periods is not so great as to demonstrate aberrancy, based on {Commerce's} threshold for finding aberrancy in prior segments. Nor is the extent to which the Malaysian value is greater than other values on the record indicative of aberrancy.
>
> For these reasons, {Commerce} should modify the surrogate value for hydrochloric acid used in the Draft Remand {Redetermination} and instead rely on the Malaysian source used in the *Final Results*.

**Commerce's Position:** We disagree with the petitioner. For the reasons discussed below, Commerce continues to find that the Malaysia average unit value is aberrational and therefore unreliable to value hydrochloric acid. As determined in the Draft Remand Redetermination, Commerce will continue to use the Romanian Trade Data Monitor import data to value hydrochloric acid.

Pursuant to section 773(c)(1)(B) of the Act, Commerce will select the best available information regarding the value of a respondent's factor of production in a market economy

---

[112] *See* Draft Remand Redetermination.
[113] *See* Petitioners' Letter, "Petitioners' Comments on the Draft Remand Results," dated October 2, 2026 (Petitioners' Draft Remand Comments); *see also* Plaintiffs' Letter, "Comments on Draft Results of Redetermination Pursuant to Court Remand," dated October 2, 2026 (Plaintiffs' Draft Remand Comments).
[114] *See* Petitioners' Draft Remand Comments at 2.

country or countries as a surrogate with which to value each factor of production. Commerce has broad discretion in deciding what constitutes the best available information for valuing factors of production in nonmarket economy proceedings.[115] In assessing data and data sources, it is Commerce's stated practice to use "review period-wide price averages, prices specific to the input in question, prices that are net of taxes and import duties, prices that are contemporaneous with the period of review, and publicly available data."[116] Further, as explained in *SolarWorld Americas I*, it is Commerce's practice not to use as surrogate values data that is found to be aberrational.[117] When presented with sufficient evidence to demonstrate that a particular surrogate value is aberrational, and therefore unreliable, it is Commerce's practice to examine relevant price information on the record, including any appropriate benchmark data in order to accurately value the input in question.[118]

In the Draft Remand Redetermination, Commerce determined that the Malaysian average unit value for hydrochloric acid was aberrational on two independent bases: first, the Malaysian average unit is abnormally high, at 7.74 times greater than the next-highest Office of Policy List country's average unit value and more than 19 times greater than the world average unit value; and second, there is a historical pattern to this disparity, as is corroborated by the magnitude of the Malaysian average unit value's historical increase relative to the fourteenth and fifteenth administrative reviews (79 percent and 130 percent increase, respectively).[119]

The petitioners argue that Commerce should determine that the Malaysian average unit value for hydrochloric acid is not aberrational, and thus should rely on it as Commerce did in the

[115] *See QVD Food Co. v. United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011) (noting the absence of a definition for 'best available information' in the statute).
[116] *See* Policy Bulletin 04.1 at 4.
[117] *See SolarWorld Ams., Inc. v. United States*, 273 F. Supp. 3d 1262 (CIT 2017) (*SolarWorld Americas I*).
[118] *See e.g. Certain Activated Carbon from the People's Republic of China: Final Results of the Antidumping Duty Administrative Review*, 82 FR 51607 (November 7, 2017), and accompanying IDM at Comment 6; *see also Certain Steel Threaded Rod from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2013-2014*, 80 FR 69938 (November 12, 2015), and accompanying IDM at Comment 6.
[119] *See* Draft Results Redetermination at 15-19.

*Final Results*, for the following reasons: (1) although the data Commerce cite are accurate, the Draft Redetermination does not cite precedent to support the conclusion that Malaysian import data are aberrational given the comparative values on the record and Commerce previously found values aberrational only when disparity was far greater (*e.g.*, differences up to 10,000 percent in *Solar Cells from China*, and nearly 30 times other record values in *Best Mattresses*);[120] (2) Commerce's comparison of the Malaysian average unit value to the world average and to Romania data is unreliable because those SVs include imports from non-market economies and countries receiving export subsidies, were not adjusted from free-on-board basis to cost, insurance and freight terms; and (3) Malaysia is the only country that satisfies the two statutory criteria of the surrogate country analysis (*i.e.*, is economically comparable to China and is a significant producer of comparable merchandise), and Commerce has a preference for using surrogate values from the primary surrogate country.[121] We address each argument in turn.

First, Commerce does not apply a fixed numerical or percentage threshold to find a value aberrational, as the determination is made on a case-by-case basis considering the totality of the circumstances on the record. The absence of a disparity as extreme as those in *Solar Cells from China* and *Best Mattresses* does not establish that the Malaysian average unit value here is not aberrational.[122] For example, Commerce found a 13.67 times disparity sufficient to support an aberration finding in *Corrosion Inhibitors from China*.[123] While there is no bright-line standard

[120] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, and Affirmative Final Determination of Critical Circumstances, in Part*, 77 FR 63791 (October 17, 2012) (*Solar Cells from China*), and accompanying IDM at Comment 9; *see also* Draft Results of Remand Redetermination, Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd. v. United States Court No. 24-00262 (CIT July 29, 2026) Slip-Op 26-84, dated September 25, 2026 (Draft Remand Redetermination); and *Best Mattresses*, 622 F. Supp. 3d at 1379.
[121] *See* Petitioners' Draft Remand Comments at 3-7.
[122] *See Solar Cells from China* IDM at Comment 9; *see also Best Mattresses*, 622 F. Supp. 3d at 1380.
[123] *See Certain Corrosion Inhibitors from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 2023-2024*, 90 FR 24097 (June 6, 2025) (*Corrosion Inhibitors from China*), and accompanying IDM at Comment 2.

for determining whether a value is aberrational,[124] Commerce's normal practice is to conduct "a quantitative and measurable analysis," "comparing either data from economically comparable countries or historical data from the country at issue to determine if data is unreliable or an outlier" as seen in *Ad Hoc Shrimp Trade Action Comm* and *Tri Union Frozen Prods*, and we employed both steps of that analysis here by relying on the Office of Policy country list and the historical Malaysian average unit values.[125] Under this approach, values have been deemed aberrational when "nearly 30 times higher than other values,"[126] whereas merely sitting at the high or low end of a range does not, on its own, render a data point an outlier.[127] However, because the relevant benchmarks and thresholds Commerce has applied in past proceedings were particular to the facts of those cases, prior findings of aberration (or non-aberration) at a given percentage or numerical differential do not establish a generally applicable rule to be mechanically applied in other proceedings.[128]

Second, the Office of Policy List average unit comparison is drawn from countries already determined to be at a comparable level of economic development to China, and the disparity between the Malaysian average unit value is not only apparent when compared among the AUVs of the other countries on the list, but also when considered with respect to and the next highest Office of Policy List country's average unit value. These average unit values are

---

[124] *See Best Mattresses*, 622 F. Supp. 3d at 1379; *see also Hydrofluorocarbon Blends from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 89 FR 16724 (March 8, 2024), and accompanying IDM at Comment 3.

[125] *See Ad Hoc Shrimp Trade Action Committee v. United States*, 234 F. Supp. 3d at 1319; *see also Tri Union Frozen Products, Inc. v. United States*, 254 F. Supp. 3d at 1296.

[126] *See Best Mattresses*, 622 F. Supp. 3d at 1379.

[127] *See Multilayered Wood Flooring from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 79 FR 26712 (May 9, 2014), and accompanying IDM at Comment 6.

[128] *See, e.g.*, *Certain Hot-Rolled Carbon Steel Flat Products from Romania: Final Results of Antidumping Duty Administrative Review*, 70 FR 34448 (June 14, 2005), and accompanying IDM at Comment 2 (rejecting the argument that specific percentage-based thresholds applied in prior cases, such as in *Tapered Roller Bearing and Parts Thereof, Finished and Unfinished from the People's Republic of China; Final Results of Antidumping Administrative Review*, 61 FR 65527, 65531 (December 13, 1996), establish a general rule, because "the applications of those benchmarks were particularly to the cases in which they were applied," and finding instead that "there is no single approach that fits all cases" and that whether data are aberrational is determined "on a case-by-case basis after considering the totality of the circumstances.").

reported on a cost, freight and insurance basis and exclude imports from non-market economies and countries with broadly available export subsidies. The U.S. Court of Appeals for the Federal Circuit (Federal Circuit) has observed that "{a}s early as 2004, Commerce has followed a four-step process to select a surrogate country": (1) the Office of Policy assembles a list of potential surrogate countries that are at a comparable level of economic development to the {NME} country; (2) Commerce identifies countries from the list with producers of comparable merchandise; (3) Commerce determines whether any of the countries which produce comparable merchandise are significant producers of that comparable merchandise; and (4) if more than one country satisfies steps (1)-(3), Commerce will select the country with the best factors data.[129]

Malaysia's average unit value of $3.64/kg is 7.74 times greater than the average unit value of Costa Rica and Panama, the next-highest Office of Policy List countries, each at $0.47/kg, and compares to average unit values of $0.25/kg for Bulgaria, $0.20/kg for Türkiye, and $0.18/kg for Romania. Absent any additional information regarding Malaysia's AUV, we consider this value to be an outlier among the otherwise consistent range of values of the other countries for which we have data. In the Draft Redetermination we stated that the world average unit value was $0.19/kg.[130] However, as the petitioners argue, that average unit value included countries that had data in free-on-board basis and NME and subsidized countries. Removing that data from our calculation, Malaysia's average unit value is approximately 22.75 times greater than the revised world average unit value of $0.16/kg.[131] This correction does not change our underlying aberrational finding; if anything, the corrected world average unit value demonstrates an even greater disparity than the figure cited in the Draft Redetermination, where Malaysia's

[129] *See Jiaxing Bro. Fastener Co. v. United States*, 822 F.3d 1289, 1293 (Fed. Cir. 2016) (citing *Vinh Hoan Corp. v. United States*, 49 F. Supp. 3d 1285, 1292, (CIT 2015)).

[130] *See* Draft Redetermination at 18.

[131] *See* Memorandum, "Hydrochloric Acid Average Unit Value Calculation," dated concurrently with this memorandum.

average unit value was found to be approximately 19 times greater than the world average unit value.

Third, Commerce's preference for valuing factors of production using data from the primary surrogate country does not override the requirement that the surrogate value itself be reliable. Commerce may use a secondary surrogate country if financial data are "inadequate or unavailable" from the primary surrogate country.[132] Having found the Malaysian average unit value for hydrochloric acid aberrational, Commerce may consider a secondary surrogate country's data to value this input. This is consistent with *Corrosion Inhibitors from China*, where Commerce found a Malaysian average unit value aberrational and continued to value that single input using a secondary surrogate country while Malaysia remained the primary surrogate country for all other factors of production.[133] And, although Romania is not a significant producer of subject merchandise, 19 CFR 351.408(d)(4) expressly permits Commerce to value a factor using data from a non-significant producer where no other reasonable value exists from a significant-producer country.

Therefore, for this final remand redetermination we find that our Draft Remand Redetermination complied with the *Remand Order* and have made no changes.

**Comment 2: Whether Romania is a Significant Producer of Subject Merchandise**

*Plaintiffs' Comment*:

The following is a verbatim summary of arguments submitted by the plaintiffs.[134] For further details, *see* Plaintiffs' Draft Remand Comments at pages 4-12.

> Commerce's determination that Romania is not a significant producer does not comply with the Court's remand order, is not supported by substantial evidence, and is not in accordance with law. The Court rejected Commerce's analysis in the contested *Final Results* that Romania is not a significant producer because it is not a net exporter. However, Commerce continues to rely on this rejected reasoning in

---

[132] *See* Policy Bulletin 04.1; *see also Jiaxing Brother Fastener Co. v. United States*, 38 CIT 1404, 1412, 11 F. Supp. 3d 1326, 1332-33, Slip Op. 2014-115 (2014) (citations omitted), and aff'd in, *Jiaxing II*, 822 F.3d 1289.
[133] *See Corrosion Inhibitors from China* at Comment 2.
[134] *See* Plaintiffs' Remand Redetermination Comments at 2.

> the {Draft Remand Redetermination}. Under Commerce's Policy Bulletin {04.1}, for the "significant producer" analysis, each country must be examined individually and not in comparison to production in other countries. Under Commerce's practice, countries that export are significant producers. Commerce previously found that Romania was a significant producer based on levels of activated carbon similar to exports in this review. Commerce's analysis of Romcarbon's financial statement compared with Malaysian producers' financial statements improperly discounts Romcarbon's significant activated carbon production activities because the company has other production activities. Commerce's analysis also erroneously relies on Romcarbon's financial statement to discount Romanian trade data. Rather, Romcarbon's financial statement is substantial evidence that there is significant production in Romania.

**Commerce's Position:** We disagree with the plaintiffs. For the reasons discussed below, Commerce continues to find that Romania is not a significant producer of activated carbon.

In the Draft Remand Redetermination, Commerce re-evaluated the record and continued to determine that Romania is not a significant producer of activated carbon.[135] Consistent with the *Remand Order*, we looked beyond the net-exporter standard alone, considered the totality of the trade and production evidence on the record, and continue to find that Romania is not a significant producer of activated carbon.[136]

For Romania, we found that the trade data alone was unambiguous: Romania's substantial net-importer position (1,243,143 kg imported versus only 35,319 kg exported during the POR, a ratio of roughly 3,500 percent and less than two 20-ton containers worth of exports) could reflect either minimal domestic production reliant on imports, or substantial domestic production entirely absorbed by even greater domestic consumption.[137] Because the trade data could not distinguish between these two scenarios, we turned to the only other available information on the record: Romanian financial statements from Romcarbon, which shows that activated carbon production comprises only 3.65 percent of Romcarbon's revenue and that

[135] *See* Draft Remand Redetermination at 5-15.
[136] *Id.*
[137] *Id.* at 9-11.

Romcarbon further consumes much of its own production internally.[138] We find that this information supports a finding that Romania is not a significant producer of comparable merchandise.

For Malaysia, we relied on both its net-export position and the financial statements on the record from two Malaysian producers that derive 100 percent of their revenue from activated carbon sales.[139] We also clarified, in response to the Court's *Remand Order*, the financial statements are relevant both to the significant-producer inquiry to select a surrogate country and, independently, to the data-quality inquiry to value factors of production.[140]

In their comments on Commerce's Draft Redetermination, the plaintiffs argue that Commerce should find that Romania is a significant producer, for the following reasons: (1) Commerce continues to rely on the fact that Romania is not a net exporter and that under Commerce's Policy Bulletin 04.1, for the significant producer analysis, each country must be examined individually and not in comparison to production in other countries; (2) Commerce has previously found smaller or comparable export volumes to be sufficient to establish significant-producer status, including Romania's "non-negligible" exports of 34,000 kg in a prior review and Bulgaria's "non-negligible" exports of 16,356 kg; (3) Commerce's practice of using financial statements to discount or override trade data is inconsistent with prior Court guidance that financial statements should be used as evidence of production, not as a basis to negate export data; (4) Commerce's reliance on the relative product mix of Romania vs Malaysia producers is not probative, because absolute sales volumes show that Romcarbon's activated carbon-related sales ($1.16 million) are comparable to a Malaysian producer, New Chang Hua ($1.78 million); and (5) Commerce is disregarding Romcarbon's production because it is partly consumed

---

[138] *Id.*
[139] *Id.* at 11-13
[140] *Id.* at 13-14.

internally rather than sold to third parties and this argument has no basis in the statue or the Policy Bulletin 04.1. Each argument is addressed in turn below.

The Policy Bulletin lays out a four step analysis to select an appropriate surrogate country.[141] Under the four-step approach, first, the Office of Policy provides a list of potential surrogate countries that are at a level of comparable economic development to the NME country. Second, Commerce determines which countries on the Office of Policy List produce comparable and/or identical merchandise.[142] Third, Commerce determines whether any of those countries are "significant" producers of that merchandise, the meaning of which "can differ from case to case" but "could mean a country that is a net exporter (particularly in situations where the potential country produces identical merchandise), even though the {surrogate country} may not be one of the world's top producers."[143] Policy Bulletin 04.1 instructs that this determination should not be judged against the NME country's own production level or against the comparative production of the other countries of the Office of Policy surrogate country list, but rather against the broader characteristics of world production and trade in the merchandise, to the extent such data is available.[144] Fourth, if more than one potential surrogate country satisfies the statutory threshold requirements, Commerce selects, to the extent possible, the country with the best available data as the primary surrogate country.[145]

The plaintiffs argue that Commerce's analysis of significant production continues to heavily rest on the "net exporter" status, in opposition to the Court's instruction.[146] Commerce disagrees. The Court found that "Commerce's logic likely amounted to a conclusion that not being a 'net exporter' disqualifies a country from consideration as a significant producer of

---

[141] *See* Policy Bulletin 04.1 at 2-3.
[142] *Id.*
[143] *Id.* at 3-4.
[144] *Id.* at 3.
[145] *Id.* at 4.
[146] *See* Plaintiffs' Draft Remand Redetermination Comments at 6.

subject merchandise. Such a determination would be unreasonable. While 'net exporter' may reflect adequate production in most cases, it may not be a suitable test where absolute volumes of production are small or domestic consumption is high. There may be some scenarios where the net exporter standard alone may be reasonable, but the government has not shown that such a scenario presents itself here."[147]

In the Draft Remand Redetermination, Commerce applied the four-step surrogate country analysis finding that the Romanian COMTRADE data describes one of two scenarios: (1) Romania is a country with minimal domestic production that relies on imports to meet demand or (2) Romania has substantial domestic production that is nonetheless entirely absorbed by even greater domestic consumption, leaving little left for export.[148] The COMTRADE data on the record does not resolve which of these scenarios is accurate and, as such, Commerce turned to the financial statements on the record to determine which explanation reflects Romania's production of comparable merchandise.[149] Therefore for this remand redetermination, in accordance with the approach set out in Policy Bulletin 04.1, Commerce's findings rest on two independent bases corroborated by the available trade data on the record: (1) Romania's substantial net-import position and (2) Romania's only producer of activated carbon, Romcarbon, financial statements which support a finding of lack of significant production. We note that our reference to Romania's position relative to Malaysia reflect that these were the only two countries with data on this record. Thus, the record evidence considered for each country independently supports a finding of significant production for Malaysia and not Romania.

The plaintiffs argue that Romania is a significant producer of subject merchandise because it exports a significant volume of activated carbon, and under Commerce's practice,

---

[147] *See Remand Order* at 11-12.
[148] *See* Draft Remand Redetermination at 9.
[149] *Id*. at 10.

"countries that export are considered significant producers" citing to *Wire Decking from China*.[150] However, in *Wire Decking from China*, Commerce found that all six countries were significant producers of subject merchandise based on the large volumes of exports reported in either kilograms or pieces, with Colombia exporting 355,679 kilograms, and 11,080,755 pieces; Indonesia exporting 37,994,423 kilograms, the Philippines exporting 35,385,873 kilograms, Thailand exporting 89,367,977 kilograms, Peru exporting 1,065,699 kilograms and 618,727 pieces, and India exporting 53,185,837 kilograms.[151] All six countries in that case, exported significantly more subject merchandise than Romania's exports of activated carbon in our case during the POR indicating that the comparison is not at scale. In *Wire Decking from China*, all countries on the Office of Policy List were indeed found by Commerce to be significant producers, as they produced millions of pieces/kilograms of wire decking. Moreover, in the document plaintiffs cite, Commerce did not state that the mere evidence of exports of comparable merchandise supports finding that a country is a significant producer of such merchandise.[152]

The plaintiffs also argue that in prior reviews of this *Order*, Commerce has found Romania to be a significant producer where Romania exported approximately 34,000 kilograms of activated carbon and had the smallest number of exports of any of the countries on the OP List.[153] However, the plaintiffs misconstrue the facts of the prior reviews pertaining this *Order*. In *Activated Carbon from China AR 2017-2018*, cited by the plaintiffs,[154] Commerce determined that none of the six OP list countries were net exporters of subject merchandise during the POR,

[150] *See* Plaintiffs' Draft Remand Redetermination Comments at 5 (citing *Wire Decking from the People's Republic of China: Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 75 FR 1597 (January 12, 2010) (*Wire Decking from China*), unchanged in *Wire Decking from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 75 FR 32905 (June 10, 2010)).
[151] *Id.*
[152] *Id.*
[153] *Id.*
[154] *See* Plaintiffs' Draft Remand Redetermination Comments at 5.

and subsequently used the export volumes of comparable merchandise using the primary harmonized schedule (HS) heading (HS subheading 3802.10) from the six Office of Policy List countries as a proxy for production data.[155] In this instant case, we have no need to turn to comparable merchandise as a proxy given that both Malaysia and Romania, the only potential surrogate countries with sufficient data on the record, produce identical merchandise.[156] Moreover, Commerce's practice gives preference to producers of identical merchandise, when available, compared to companies that only produce comparable merchandise.[157] Therefore, the fact pattern demonstrated in *Activated Carbon from China AR 2017-2018* is not similar to this review. The plaintiffs also point to *Activated Carbon from China AR 2018-2019*, where Commerce found Bulgaria to be a significant producer of activated carbon when Bulgaria exported 16,356 kilograms of comparable merchandise and argued that Romania exported 35,319 kilograms in this review indicating that Commerce has found countries exporting smaller amounts of activated carbon as significant producers in previous administrative reviews.[158] However, the Federal Circuit has previously affirmed in *Qingdao Sea-Line Trading* that each administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record.[159] Moreover, as explained above, we have determined that evidence of exports from Romania is insufficient here. Commerce notes that while in previous reviews, we have found that exports can vary widely and still be considered

[155] *See Carbon Activated Tianjin Co., Ltd. v. United States*, 547 F.Supp.3d 1310 (CIT 2021) (upholding Commerce's remand redetermination in *Activated Carbon from China AR 2017-2018*).
[156] *See* Draft Remand Redetermination at 12.
[157] *See* Policy Bulletin 04.1.
[158] *See* Petitioners' Draft Remand Redetermination Comments at 5, (citing *Certain Activated Carbon from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Intent to Rescind the Review, in Part, and Preliminary Determination of No Shipments; 2018-2019*, 85 FR 23947 (April 30, 2020), and accompanying PDM at 14, unchanged in *Certain Activated Carbon from the People's Republic of China: Final Results of the Antidumping Duty Administrative Review, Final Determination of No Shipments, and Final Rescission of Administrative Review, in Part; 2018-2019*, 86 FR 10539 (February 22, 2020) (*Activated Carbon from China AR 2018-2019*)).
[159] *See Qingdao Sea-Line Trading Co., Ltd. v. United States*, 766 F.3d 1378, 1387 (Fed. Cir. 2014) (*Qingdao Sea-Line Trading*).

significant producers, the record evidence in this administrative review is indicative of the fact Romania is not a significant producer.[160] Unlike the prior reviews cited by the plaintiffs, we have Romcarbon's financial statement in this review that clarifies the trade data and supports a finding that Romania is a non-significant producer of activated carbon. Accordingly, the export volumes considered in those prior reviews do not establish that Romania is a significant producer here.

The plaintiffs also argue that Romcarbon's financial statements contradict, rather than support, Commerce's conclusion that Romania lacks a "significant production base."[161] They go on to state that Commerce attempts to disqualify Romania as a significant producer by comparing Romcarbon's financial statements on the record to the Malaysian financial statements on the record.[162] We disagree. In the Draft Remand Redetermination, Commerce did not base its determination on a comparison of Romcarbon's financial statements to the Malaysian financial statements on the record. Commerce conducted an analysis in accordance with Policy Bulletin 04.1, assessing both Malaysia's and Romania's production levels on their own merits.[163]

As explained above, in the Draft Remand we found that Romania's substantial net import position and its largely self-consumed output of activated carbon illustrated by the countries only activated carbon producer, Romcarbon, indicates limited domestic production, not domestic demand outstripping a significant production base.[164] Conversely, we found that Malaysia's substantial net export volume and the existence of Malaysian producers deriving 100 percent of their revenue from activated carbon. [165] This analysis supports our determination that Malaysia is a significant producer of subject merchandise. Still, the plaintiffs also argue that Commerce

[160] *See* Draft Remand Redetermination at 8-13.
[161] *See* Plaintiffs' Draft Remand Redetermination Comments at 7.
[162] *Id.*
[163] *See* Draft Remand Redetermination at 9-13.
[164] *Id.*
[165] *Id.*

erred in finding that Romcarbon cannot be a significant producer of activated carbon because activated carbon production is not listed as a "main activity in the company's financial statements." [166] The plaintiffs then go on to argue that there are numerous mentions of Romcarbon's activated carbon production throughout its financial statement, indicating that the company has significant activated carbon activities.[167]

In the Draft Remand Redetermination, we also stated that Romcarbon is "primarily a producer of plastics, with activated carbon not listed as a main activity of the company…activated carbon comprises only 3.64 percent of Romcarbon's total revenue when combined with respiratory protective equipment, auto filters, industrial filters, PVC pipes, PVC tubes, and recycled PVC bases for traffic signs."[168] Romcarbon has seven profit centers listed in its financial statements, only one of which relates to activated carbon.[169] Furthermore, the one profit center focused on producing activated carbon is further split into two separate workshops, one focused on producing activated carbon and one focused on producing protective equipment.[170] Both the limited share of revenue derived from the production of activated carbon and the fact that only a fraction of one of the seven profit centers identified by Romcarbon in their financial statements supports Commerce's finding in the Draft Remand Redetermination that Romcarbon, while a producer of activated carbon, is not a significant producer of activated carbon.

Moreover, the plaintiffs argue that in order for Commerce to determine significant production by looking at the financial statements on the record, Commerce should compare reported sales volumes for the relevant profit center for Romcarbon to those of Malaysian

---

[166] *See* Plaintiffs' Draft Remand Redetermination Comments at 7-8.
[167] *Id*. at 8.
[168] *See* Draft Remand Redetermination at 10.
[169] *See* Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd.'s (GHC) Letter, "Comments on the Department's Selection of a Surrogate Country," dated December 20, 2023, at Exhibit 6.
[170] *Id*.

producer New Chang Hua Sdn. Bhd. (New Chang Hua).[171] In particular, the plaintiffs argue that Commerce found that New Chang Hua is a significant producer after determining that it made 1,776,616.87 USD worth of sales in 2022, while Romcarbon made 1,158,437.58 USD worth of sales in 2022.[172] Based on the similarity of the total sales figures made by both companies, the plaintiffs argue that Commerce should find Romcarbon to be significant producer.[173] We disagree. Comparing the absolute dollar values of Romcarbon's and New Chang Hua's sales does not establish that Romania is a significant producer of activated carbon. Although Romcarbon's sales in "Profit Center 2 – Protective Equipment and Active Carbon" total approximately 1.16 million USD compared to New Chang Hua's approximately 1.78 million USD, this comparison is insufficient to find that that Romcarbon is a significant producer. Romcarbon's Profit Center 2 – Protective Equipment and Active Carbon includes down-stream products, which are not segregated from profits related to activate carbon; thus, we are unable to ascertain the total amount of profits relating to activated carbon. The plaintiffs then go on to argue that, "the comparison to other surrogate countries explicitly violates {Commerce's} Policy Bulletin, which prohibits determining 'the extent to which a country is a significant producer by…judging against…the comparative production of the {other countries}."[174] Having identified this prohibition, the plaintiffs cannot now ask Commerce to find Romania is a significant producer by comparing financial statements, which, in this instance, offers no additional information to support a finding of significant producer. Accordingly, Commerce continues to base its significant producer analysis on an assessment of each country's record evidence independently, without comparing Romcarbon's sales volumes to the sale volumes of the Malaysian financial statements on the record.

---

[171] *Id.*
[172] *Id.*
[173] *Id.*
[174] *Id.* at 6-7.

Lastly, the plaintiffs also argue that Commerce improperly disregards Romcarbon's activated carbon production merely because a portion of it is consumed internally rather than sold to the third parties, and that this approach has no basis in the statute or Policy Bulletin 04.1.[175] We disagree. Romcarbon's internal consumption of its own activated carbon production is relevant to confirming the limited scale of its market-facing production, not to impose an unstated sales requirement; it corroborates, rather than substitutes for, the trade and revenue-share evidence discussed above. The absence of an express "sales requirement" in the statue or the Policy Bulletin 04.1 does not preclude Commerce from considering internal consumption as part of its analysis. Policy Bulletin 04.1 directs that significant-producer status be assessed consistent with "the characteristics of world production of, and, *trade in*, comparable merchandise," and production that never reaches the market does not reflect participation in trade in the way the Policy Bulletin 04.1 contemplates.[176]

Accordingly, based on the totality of the record evidence and our analysis as explained above, for this final remand redetermination, Commerce continues to find that Romania is not a significant producer of subject merchandise during the POR, and continues to utilize Malaysia as the primary surrogate country.

**Comment 3: Whether to Use Greenlink's Financial Statements**

*Plaintiffs' Comment*:

The following is a verbatim summary of arguments submitted by the plaintiffs.[177] For further details, *see* Plaintiffs' Draft Remand Comments at pages 12-14.

> Commerce erroneously rejects the Greenlink financial statement in its {Draft Remand Redetermination}. Commerce claims a preference for producers of identical merchandise over comparable merchandise, but as the {Court} has pointed out, that is not supported by the statute, {Commerce} regulations, or {Commerce} determinations. Commerce's regulations require the use of "financial statements and other non-proprietary information from producers of identical or

[175] *See* Plaintiffs' Draft Remand Redetermination Comments at 9-10.
[176] *See* Policy Bulletin 04.1 at 3-4.
[177] *See* Plaintiffs' Draft Remand Redetermination Comments at 3.

> comparable merchandise in the surrogate country" when calculating surrogate financial ratios. {Commerce's} rejection of Greenlink on the basis that its products are not comparable to activated carbon is also unsupported by substantial evidence. The evidence establishes that charcoal is a comparable product to activated carbon. Malaysian producer, New Chang Hua, whose financial statements {Commerce} accepted describes its principal activities as "trading of charcoal and related product and manufacturing of basic organic chemicals such as process charcoal and activated carbon." Commerce also fails to address the {U.S. International Trade Commission (ITC)} report explaining that most activated carbon is made from coal or coal-based carbons. This citation directly detracts from {Commerce's} conclusion that Greenlink's charcoal products are not comparable to activated carbon. {Commerce's} position is also inconsistent with its own treatment of Greenlink in the subsequent 2024-2025 administrative review of the same antidumping duty order, where it included Greenlink in the financial ratios.

**Commerce's Position:** We disagree with the plaintiffs. For the reasons discussed below, Commerce continues to exclude Greenlink's financial statements from the calculation of the surrogate financial ratios.

In the Draft Remand Redetermination, Commerce found that Greenlink's financial statements were properly excluded because adequate, reliable financial statements from producers of identical merchandise are already on this record, and because, although the record does not contain sufficient information to fully evaluate all three prongs of the comparable merchandise test, the limited record evidence available is independently sufficient to establish that Greenlink's products are not comparable merchandise.[178]

The plaintiffs argue that Commerce should include Greenlink's financial statements, for the following reasons: (1) Commerce's stated preference of producers of identical over comparable merchandise is unsupported by the statute, the regulations, and is inconsistent with 19 CFR 351.408(c)(3), which directs Commerce to use statements from producers of identical or comparable merchandise without establishing a hierarchy between the two; (2) Commerce's finding that Greenlink's charcoal products are not comparable merchandise is unsupported by substantial evidence, because New Chang Hua, a Malaysian producer whose statements

---

[178] *See* Draft Remand Redetermination at 19-22; *see also Remand Order* at 23-25.

Commerce did use, describes its own principal activities as including both charcoal and activated carbon production; (3) the ITC report Commerce cited for the proposition that charcoal and activated carbon are different products actually states that most activated carbon is made from coal or coal-based carbons and the steam-activation creates activated carbon's pore structure by applying steam to charcoal, undercutting rather than supporting Commerce's conclusion; and (4) Commerce's position is inconsistent with the *2024-2025 Admin Review*[179] in which it used Greenlink's financial statements.[180]

First, the plaintiffs argue that Commerce's stated preference of producers of identical over comparable merchandise is unsupported by the statute and is inconsistent with 19 CFR 351.408 (c)(4) which directs Commerce to use statements from producers of identical or comparable merchandise without establishing a hierarchy between the two.[181] Commerce agrees that the statute and regulations do not establish a rigid hierarchy mandating the exclusion of comparable merchandise producers whenever identical data producers exist;[182] however, the Federal Circuit has supported Commerce's preference for relying on surrogate financial ratios derived from a company that produces identical merchandise as opposed to comparable merchandise.[183] Moreover, here the identical merchandise data on the record are not only adequate and reliable, but also the best available information, such that there is no need to resort to Greenlink's comparable merchandise financial statement. Furthermore, the plaintiffs' reliance

---

[179] *See Certain Activated Carbon from the People's Republic of China: Preliminary Results and Rescission, in part, of Antidumping Duty Administrative Review*; 2024-2025, 91 FR 42919 (July 13, 2026) (*2024-2025 Admin Review*), and accompanying PDM.
[180] *See 2024-2025 Admin Review* PDM at 21.
[181] *See* Plaintiffs' Draft Remand Redetermination Comments at 12.
[182] *See Steel Wire Garment Hangers From the People's Republic of China: Preliminary Results and Preliminary Rescission, in Part, of the First Antidumping Duty Administrative Review*, 75 FR 68758 (November 9, 2010), unchanged in *First Administrative Review of Steel Wire Garment Hangers From the People's Republic of China: Final Results and Final Partial Rescission of Antidumping Duty Administrative Review*, 76 FR 27994 (May 13, 2011), and accompanying IDM at Comment 2.
[183] *See Seah Steel Vina Corp. v. United States*, 950 F.3d 833, 841 (Fed. Cir. 2020) (stating "Commerce acted in keeping with its 'practice . . . to use, whenever possible, the financial statement of a producer of identical merchandise.'").

on *Jiaxing Brother Fastener Co. v. United States* is misplaced.[184] That case addressed whether Commerce was required to prefer a subsidy-tainted identical-merchandise financial statement over an otherwise reliable comparable-merchandise statement.[185] The Court held it was not, and that Commerce's practice of treating identical and comparable merchandise as equally acceptable substitutes in that circumstance was a reasonable exercise of its broad discretion to determine the best available information.[186] The plaintiffs reliance on *Heze Huayi Chemical Co. v. United States* for the same proposition fares no better.[187] There, the Court reaffirmed the holding in *Jiaxing Brother Fastener Co. v. United States* that there is no categorical preference for identical-merchandise financial statements over comparable-merchandise financial statements, yet nonetheless sustained Commerce's selection of comparable-merchandise financial statements because the identical-merchandise financial statements were unreliable.[188] *Heze Huayi Chemical Co. v. United States* thus confirms that Commerce's financial-statement selection turns on the adequacy and reliability of the data actually on the record. The question, then, is not whether identical merchandise is preferred in the abstract, but whether the identical-merchandise financial statements already on this record, Century Chemical and New Chang Hua, are adequate and reliable without the need to resort to Greenlink's comparable merchandise financial statements. Century Chemical's financial statements confirm that the company's principal activity is the manufacture and sale of activated carbon products, and New Chang Hua identifies activated carbon as among its principal manufacturing activities.[189] Both statements are contemporaneous with the POR, publicly available, and derived from producers of identical

---

[184] *See* Plaintiffs' Draft Remand Redetermination Comments at 12 (citing *Jiaxing Brother Fastener Co v. United States*, 751 F. Supp. 2d 1345, 1353 (CIT 2010) (*Jiaxing Brother Fastener Co. v. United States*)).
[185] *See Jiaxing Brother Fastener Co. v. United States*, 751 F. Supp.2d at 1353.
[186] *Id.*
[187] *See* Plaintiffs' Draft Remand Redetermination Comments at 13 (citing *Heze Huayi Chemical Co. v. United States*, 532 F. Supp. 3d 1301, 1320 (CIT 2020) (*Heze Huayi Chemical Co. v. United States*)).
[188] *See Heze Huayi Chemical Co. v. United States*, 532 F. Supp. 3d at 1320.
[189] *Id.*

merchandise, with no record indication of unreliability. Because the record already contains adequate, reliable financial statements from identical-merchandise producers, Commerce has no need to resort to Greenlink's financial statements. Indeed, as discussed further below, it is not established on this record that Greenlink produces merchandise comparable to activated carbon in the first place, which makes resorting to its financial statements doubly unwarranted.

The plaintiffs also argue that Commerce's finding that Greenlink's products are not comparable to activated carbon is unsupported by record evidence.[190] They state that Greenlink's principal activity is manufacturing "charcoal products," and that activated carbon is a charcoal product. We continue to find that Greenlink's manufactured products are not comparable merchandise to activated carbon. As described in the Draft Remand Redetermination, Greenlink produces pillow shaped charcoal briquettes, shisha cube charcoal, hexagonal charcoal briquettes, mangrove charcoal, biotech fire-starters, and charcoal deodorizers.[191] Commerce notes that in the Draft Remand Redetermination, as explained above, we applied the three-pronged comparable merchandise test, and determined that charcoal products, like those produced by Greenlink, have different end uses from activated carbon.[192] Greenlink's charcoal products are used for smoking, fire-starting, cooking, and fuel, while activated carbon products are used primarily to separate trace chemical species from liquid and gas steams, such as removing impurities from water, food, beverages, and industrial waste and for gas-phase uses like air purification and solvent recovery.[193] This clear divergence in the end use of the products is independently sufficient to establish that Greenlink's products are not comparable to activated carbon, regardless of the limited record evidence available on the

[190] *See* Plaintiffs' Draft Remand Redetermination Comments at 13.
[191] *See* Draft Remand Redetermination at 21-22 (citing Petitioners' Letter, "Petitioners' Submission of Information to Rebut Respondent's Final Affirmative Surrogate Value Submission," dated April 8, 2024, at Exhibit FSVR-2).
[192] *Id.*
[193] *See* Jilin Bright's Letter, "Rebuttal Surrogate Value Comments," dated January 10, 2024, at Exhibit 5-D.

remaining two prongs of the test. The plaintiffs continue their argument stating that New Chang Hua describes its own principal production activities as including both charcoal and activated carbon, illustrating that both charcoal and activated carbon are comparable products.[194] The plaintiffs' argument is misguided. New Chang Hua's reference of "trading charcoal" describes a trading activity, not a manufacturing one, and Commerce's comparable merchandise analysis concerns what a company produces, not what it trades. New Chang Hua produces only three products, wood activated carbon, coconut activated carbon, and palm shell activated carbon, all of which are forms of identical merchandise.[195] Comparatively, Greenlink only produces charcoal-based products. Accordingly, we continue to find that Greenlink does not produce merchandise comparable to activated carbon.

The plaintiffs also argue that the ITC report that Commerce cited in the Draft Remand Redetermination, discusses the relationship between charcoal and activated carbon with the report stating most activated carbon is made from coal or coal-based carbons and that, in the steam-activation process, the characteristic pore structure is created when steam is applied to charcoal at high temperatures, and, thus, directly detracts from Commerce's argument that Greenlink's charcoal products are not comparable to activated carbon.[196] We disagree. The ITC report explicitly describes activated carbon as charcoal that has gone through a steam-activation process at high temperatures.[197] There is no evidence on the record that indicates that any of the charcoal-based products produced by Greenlink have undergone such an activation process. The plaintiffs also fail to demonstrate that the ITC Report stands for this premise. In fact, this general industry evidence regarding the activation process does not, by itself, establish that

---

[194] *See* Plaintiffs' Draft Remand Redetermination Comments at 14.
[195] *See* Jilin Bright's SV Comments at Exhibit 1A.
[196] *See* Plaintiffs' Draft Remand Redetermination Comments at 14 (citing Jilin Bright's Letter, "Rebuttal Surrogate Value Comments," dated January 10, 2024, at Exhibit 5-D).
[197] *Id*.

Greenlink's specific products underwent that process, and the absence of any such company-specific evidence on this record leaves the end-use divergence discussed above as an independently sufficient and unrebutted basis for finding Greenlink's products not comparable to activated carbon.

Lastly, the plaintiffs argue that Commerce's position in the *2024-2025 Admin Review* regarding the inclusion of Greenlink's financials runs counter to the exclusion of Greenlink's financials in this review.[198] Commerce notes that while we did preliminarily find that Greenlink was a producer of comparable merchandise in the *2024-2025 Admin Review*, that decision has only been made in the preliminary results stage of the administrative review, and is subject to change for the final results.[199] Additionally, the information on the record of the *2024-2025 Admin Review* contains more detailed information regarding Greenlink's products produced that is not present on the record in this current administrative review. Moreover, it is Commerce's longstanding practice to find that decisions made in one administrative review do not necessarily compel the same results in a subsequent administrative review.[200]

Accordingly, based on the reasons stated above, for this final remand redetermination, Commerce continues to find that Greenlink does not produce comparable merchandise to activated carbon and continues to exclude Greenlink's financials from the surrogate financial ratios in this review.

---

[198] *See* Plaintiffs' Draft Remand Redetermination Comments at 13.

[199] *See Certain Activated Carbon from the People's Republic of China: Preliminary Results and Rescission, in Part, of Antidumping Duty Administrative Review*; 2024-2025, 91 FR 42919 (July 13, 2026), and accompanying PDM at 21.

[200] *See Jiaxing Brother Fastener Co. v. United States* 822 F.3d 1289, 1299 (Fed. Cir. 2016) (where the Court found that "Each administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record.").

## V. FINAL RESULTS OF REDETERMINATION

Consistent with the *Remand Order*, Commerce has reviewed and reconsidered the following issues: (1) the selection of Malaysia as the primary surrogate country; (2) the selection of a Malaysian surrogate value used to value hydrochloric acid consumed in the production of subject merchandise; (3) the decision not to select a Malaysian financial statement, Greenlink, to calculate surrogate financial ratios; (4) the decision not to correct a multiplication error in Jilin Bright's VAT variable; and (5) the decision not to account for the subtraction of two investment-related loss items (*i.e.*, fair value loss on equity investments and loss on disposal of equity instruments) from the profit ratio calculation using Century financial statements.

In these final results of remand redetermination, Commerce: (1) continues to select Malaysia as the primary surrogate country due to Malaysia being the only significant producer of subject merchandise on the record; (2) revised its final results and will now change the surrogate value to value hydrochloric acid from the Malaysian average unit value to a Romanian average unit value; (3) continues to exclude Greenlink's financial statements from the calculation of surrogate financial ratios due to the record indicating that Greenlink does not produce subject merchandise; (4) revised its final results and corrected the VAT calculation for Jilin Bright in order to correct the company's U.S. sales database; and (5) clarifies and further explains that it already subtracted the two investment-related loss items from Century's profit ratio calculation.

Consequently, for these final results of remand redetermination, Commerce has made a change to the estimated weighted-average dumping margin established at the *Amended Final Results* for both GHC and Jilin Bright which is now 1.00 USD/kg and 1.26 USD/kg,

respectively.[201] The margin rate for non-selected companies in this review is 1.13 USD/kg percent.[202]

10/27/2026

X

Signed by: SCOT FULLERTON

Scot Fullerton
Acting Deputy Assistant Secretary
for Antidumping and Countervailing Duty Operations

---

[201] *See* Jilin Bright Remand Redetermination Calculation Memorandum; *see also* GHC Remand Redetermination Calculation Memorandum.

[202] *See* Non-Selected Companies Redetermination Calculation Memorandum.